# PREFERRED STOCK PURCHASE AGREEMENT

## BETWEEN

## LAB123, INC.

## AND

## BARRON PARTNERS LP

DATED

_____, 2006

Exhibit 25

# PREFERRED STOCK PURCHASE AGREEMENT

This PREFERRED STOCK PURCHASE AGREEMENT (the "**Agreement**") is made and entered into as of the __th day of _____, 2006 between **LAB123, Inc.**, a corporation organized and existing under the laws of the State of Delaware ("Lab123" or the "Company") and **BARRON PARTNERS LP**, a Delaware limited partnership ("**Investor**").

## PRELIMINARY STATEMENT:

WHEREAS, the Investor wishes to purchase from the Company, upon the terms and subject to the conditions of this Agreement, Three Million Seven Hundred Seventy Four Thousand (3,774,000) shares of preferred stock of the Company, with such preferred stock being as described in the Certificate of Designations, Rights and Preferences (the "**Certificate of Designations**") in substantially the form attached hereto as **Exhibit A** (the "**Preferred Stock**") for the Purchase Price set forth in Section 1.3.23 hereof. Subject to the limitations set forth herein and in the Certificate of Designation, the Preferred Stock shall be initially convertible into shares of common stock of the Company at any time at a conversion price of Fifty Three Cents ($0.53) per share (the "**Conversion Value**"). In addition, the Company will issue to the Investor two Common Stock Purchase Warrants (the "**Warrants**") to purchase up to an additional Three Million Seven Hundred Seventy Four Thousand (3,774,000) shares of common stock of the Company at exercise prices as stated in the Warrants; and

WHEREAS, the parties intend to memorialize the purchase and sale of such Preferred Stock and the Warrants.

NOW, THEREFORE, in consideration of the mutual covenants and premises contained herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby conclusively acknowledged, the parties hereto, intending to be legally bound, agree as follows:

## ARTICLE I

## INCORPORATION BY REFERENCE, SUPERSEDER AND DEFINITIONS

1.1   **Incorporation by Reference.** The foregoing recitals and the Exhibits and Schedules attached hereto and referred to herein, are hereby acknowledged to be true and accurate, and are incorporated herein by this reference.

1.2     **Superseder**. This Agreement, to the extent that it is inconsistent with any other instrument or understanding among the parties governing the affairs of the Company, shall supersede such instrument or understanding to the fullest extent permitted by law. A copy of this Agreement shall be filed at the Company's principal office.

1.3     **Certain Definitions**. For purposes of this Agreement, the following capitalized terms shall have the following meanings (all capitalized terms used in this Agreement that are not defined in this Article 1 shall have the meanings set forth elsewhere in this Agreement):

    1.3.1    "**1933 Act**" means the Securities Act of 1933, as amended.

    1.3.2    "**1934 Act**" means the Securities Exchange Act of 1934, as amended.

    1.3.3    "**Affiliate**" means a Person or Persons directly or indirectly, through one or more intermediaries, controlling, controlled by or under common control with the Person(s) in question. The term "control," as used in the immediately preceding sentence, means, with respect to a Person that is a corporation, the right to the exercise, directly or indirectly, of more than 50 percent of the voting rights attributable to the shares of such controlled corporation and, with respect to a Person that is not a corporation, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such controlled Person.

    1.3.4    "**Articles**" means the Certificate of Incorporation of the Company, as the same may be amended from time to time.

    1.3.5    "**Closing**" shall mean the Closing of the transactions contemplated by this Agreement on the Closing Date.

    1.3.6    "**Closing Date**" means the date on which the payment of the Purchase Price (as defined herein) by the Investor to the company is completed pursuant to this Agreement to purchase the Preferred Stock and Warrants, which shall occur on or before _____, 2006.

    1.3.7    "**Common Stock**" means shares of common stock of the Company, par value $0.001 per share.

    1.3.8    "**Escrow Agreement**" shall mean the Escrow Agreement among the Company, the Investor and LawFirm LLP, as Escrow Agent, attached hereto as **Exhibit E**.

    1.3.9    "**Exempt Issuance**" means the issuance of (a) shares of Common Stock or options to employees, officers, or directors of the Company pursuant to any stock or option plan duly adopted by a majority of the non-employee members of the Board of Directors of the Company or a majority of the members of a committee of non-employee directors established for such purpose, (b) securities upon the exercise of or conversion of any securities issued hereunder, and (c) securities issued pursuant to acquisitions or strategic transactions, provided any such issuance shall only be to a Person which is, itself or through its subsidiaries, an operating company in a business synergistic with the business of the Company and in which the

Company receives benefits in addition to the investment of funds, but shall not include a transaction in which the Company is issuing securities primarily for the purpose of raising capital or to an entity whose primary business is investing in securities.

1.3.10 "**Material Adverse Effect**" shall mean any adverse effect on the business, operations, properties or financial condition of the Company that is material and adverse to the Company and its subsidiaries and affiliates, taken as a whole and/or any condition, circumstance, or situation that would prohibit or otherwise materially interfere with the ability of the Company to perform any of its material obligations under this Agreement or the Registration Rights Agreement or to perform its obligations under any other material agreement.

1.3.11 "**Delaware Act**" means the Delaware General Corporation Law, as amended.

1.3.12 "**Person**" means an individual, partnership, firm, limited liability company, trust, joint venture, association, corporation, or any other legal entity.

1.3.13 "**Purchase Price**" means the Two Million ($2,000,000.00) dollars paid by the Investor to the Company for the Preferred Stock and the Warrants.

1.3.14 "**Registration Rights Agreement**" shall mean the registration rights agreement between the Investor and the Company attached hereto as Exhibit B.

1.3.15 "**Registration Statement**" shall mean the registration statement under the 1933 Act to be filed with the Securities and Exchange Commission for the registration of the Shares pursuant to the Registration Rights Agreement attached hereto as Exhibit B.

1.3.16 "**SEC**" means the Securities and Exchange Commission.

1.3.17 "**SEC Documents**" shall mean the Company's latest Form 10-K or 10-KSB as of the time in question, all Forms 10-Q or 10-QSB and 8-K filed thereafter, and the Proxy Statement for its latest fiscal year as of the time in question until such time as the Company no longer has an obligation to maintain the effectiveness of a Registration Statement as set forth in the Registration Rights Agreement.

1.3.18 "**Shares**" shall mean, collectively, the shares of Common Stock of the Company issued upon conversion of the Preferred Stock subscribed for hereunder and those shares of Common Stock issuable to the Investor upon exercise of the Warrants.

1.3.19 "**Subsequent Financing**" shall mean any offer and sale of shares of Preferred Stock or debt that is initially convertible into shares of Common Stock or otherwise senior or superior to the Preferred Stock.

1.3.20 "**Transaction Documents**" shall mean this Agreement, all Schedules and Exhibits attached hereto and all other documents and instruments to be executed and delivered by the

parties in order to consummate the transactions contemplated hereby, including, but not limited to the documents listed in Sections 3.2 and 3.3 hereof.

1.3.21 "**Warrants**" shall mean the Common Stock Purchase Warrants in the form attached hereto Exhibit D.

## ARTICLE II

## SALE AND PURCHASE OF XYZ PREFERRED STOCK AND WARRANTS PURCHASE PRICE

2.1   **Sale of Preferred Stock and Issuance of Warrants.**

(a)   Upon the terms and subject to the conditions set forth herein, and in accordance with applicable law, the Company agrees to sell to the Investor, and the Investor agrees to purchase from the Company, on the Closing Date _____ shares of Preferred Stock and the Warrants for the (the "**Purchase Price**") of Two Million Dollars ($2,000,000.00). The Purchase Price shall be paid by the Investor to the Company on the Closing Date by a wire transfer or check of the Purchase Price into escrow to be held by the escrow agent pursuant to the terms of the Escrow Agreement. The Company shall cause the Preferred Stock and the Warrants to be issued to the Investor upon the release of the Purchase Price to the Company by the escrow agent pursuant to the terms of the Escrow Agreement. The Company shall register the shares of Common Stock into which the Preferred Stock is convertible pursuant to the terms and conditions of a Registration Rights Agreement attached hereto as **Exhibit B**.

(b)   Each share of Preferred stock shall initially be convertible by the Investor into One (1) share of Common Stock; provided, however, that the Investor shall not be entitled to convert the Preferred Stock into shares of Common Stock that would result in beneficial ownership by the Investor and its affiliates of more than 4.9% of the then outstanding number of shares of Common Stock on such date. For the purposes of the immediately preceding sentence, beneficial ownership shall be determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended, and Regulation 13d-3 thereunder.

(c)   Upon execution and delivery of this Agreement and the Company's receipt of the Purchase Price from the Escrow Agent pursuant to the terms of the Escrow Agreement, the Company shall issue to the Investor the Warrant to purchase an aggregate of Three Million Seven Hundred Seventy Four Thousand shares of Common Stock at exercise prices as stated in the Warrants, all pursuant to the terms and conditions of the form of Warrants attached hereto as **Exhibit C**; provided, however, that the Investor shall not be entitled to exercise the Warrants and receive shares of Common Stock that would result in beneficial ownership by the Investor and its affiliates of more than 4.9% of the then outstanding number of shares of Common Stock on such date. For the purposes of the immediately preceding sentence, beneficial ownership shall be

determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended, and Regulation 13d-3 thereunder.

2.2  **Purchase Price.**  The Purchase Price shall be delivered by the Investor in the form of a check or wire transfer made payable to the Company in United States Dollars from the Investor to the escrow agent pursuant to the Escrow Agreement on the Closing Date.

# ARTICLE III

# CLOSING DATE AND DELIVERIES AT CLOSING

3.1  **Closing Date.**  The closing of the transactions contemplated by this Agreement (the "**Closing**"), unless expressly determined herein, shall be held at the offices of the Company, at 5:00 P.M. local time, on the Closing Date or on such other date and at such other place as may be mutually agreed by the parties, including closing by facsimile with originals to follow.

3.2  **Deliveries by the Company.**  In addition to and without limiting any other provision of this Agreement, the Company agrees to deliver, or cause to be delivered, to the escrow agent under the Escrow Agreement, the following:

(a) At or prior to Closing, an executed Agreement with all exhibits and schedules attached hereto;
(b) At or prior to Closing, an executed Warrant in the name of the Investor in the form attached hereto as Exhibit C;
(c) The executed Registration Rights Agreement;
(d) Certifications in form and substance acceptable to the Company and the Investor from any and all brokers or agents involved in the transactions contemplated hereby as to the amount of commission or compensation payable to such broker or agent as a result of the consummation of the transactions contemplated hereby and from the Company or Investor, as appropriate, to the effect that reasonable reserves for any other commissions or compensation that may be claimed by any broker or agent have been set aside;
(e) Management letter from the accountants and MDNA;
(f) Evidence of approval of the Board of Directors and Shareholders of the Company of the Transaction Documents and the transactions contemplated hereby;
(g) Certificate of the President and the Secretary of the Company that the Certificate of Designation has been adopted and filed;
(h) [Certificate of Amendment to the Certificate of Incorporation of the Company adopting the provision described in Section 6.18]
(i) Certificates of Existence or Authority to Transact Business of the Company issued by each of the Secretaries of State for Delaware and _____;

- (j) An opinion from the Company's counsel concerning the Transaction Documents and the transactions contemplated hereby in form and substance reasonably acceptable to Investor;
- (k) Stock Certificate in the name of Investor evidencing the Preferred Stock;
- (l) The executed Escrow Agreement; and
- (m) Copies of all executive employment agreements, all past and present financing documentation or other documentation where stock could potentially be issued or issued as payment, all past and present litigation documents and historical financials.
- (n) Such other documents or certificates as shall be reasonably requested by Investor or its counsel.

3.3 **Deliveries by Investor.** In addition to and without limiting any other provision of this Agreement, the Investor agrees to deliver, or cause to be delivered, to the escrow agent under the Escrow Agreement, the following:

- (a) A deposit in the amount of the Investor Funds;
- (b) The executed Agreement with all Exhibits and Schedules attached hereto;
- (c) The executed Registration Rights Agreement;
- (d) The executed Escrow Agreement; and
- (e) Such other documents or certificates as shall be reasonably requested by the Company or its counsel.

In the event any document provided to the other party in Paragraphs 3.2 and 3.3 herein are provided by facsimile, the party shall forward an original document to the other party within seven (7) business days.

3.4 **Further Assurances.** The Company and the Investor shall, upon request, on or after the Closing Date, cooperate with each other (specifically, the Company shall cooperate with the Investor, and the Investor shall cooperate with the Company) by furnishing any additional information, executing and delivering any additional documents and/or other instruments and doing any and all such things as may be reasonably required by the parties or their counsel to consummate or otherwise implement the transactions contemplated by this Agreement.

3.5 **Waiver.** The Investor may waive any of the requirements of Section 3.2 of this Agreement, and the Company at its discretion may waive any of the provisions of Section 3.3 of this Agreement. The Investor may also waive any of the requirements of the Company under the Escrow Agreement.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF

## LAB123, INC.

The Company represents and warrants to the Investor as of the date hereof and as of Closing (which warranties and representations shall survive the Closing regardless of what examinations, inspections, audits and other investigations the Investor has heretofore made or may hereinafter make with respect to such warranties and representations) as follows:

4.1 **Organization and Qualification**. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, and has the requisite corporate power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted and is duly qualified to do business in any other jurisdiction by virtue of the nature of the businesses conducted by it or the ownership or leasing of its properties, except where the failure to be so qualified will not, when taken together with all other such failures, have a Material Adverse Effect on the business, operations, properties, assets, financial condition or results of operation of the Company and its subsidiaries taken as a whole.

4.2 **Articles of Incorporation and By-Laws**. The complete and correct copies of the Company's Articles and By-Laws, as amended or restated to date which have been filed with the Securities and Exchange Commission are a complete and correct copy of such document as in effect on the date hereof and as of the Closing Date.

4.3 **Capitalization.**

    4.3.1 The authorized and outstanding capital stock of the Company is set forth in The Company's Annual Report on Form 10-K, filed on March 31, 2004 with the Securities and Exchange Commission and updated on all subsequent SEC Documents. All shares of capital stock have been duly authorized and are validly issued, and are fully paid and no assessable, and free of preemptive rights.

    4.3.2 As of the date of this Agreement, the authorized capital stock of the Company consists of _____ shares of common Stock ($.001 par value) and _____ shares of preferred stock ($.001 par value), of which approximately _____ share of common Stock are issued and outstanding. As of Closing, following the issuance by the Company of the Preferred Stock to the Investor, the authorized capital stock of the Company will consist of _____ shares of Common Stock ($.001 par value) and _____ shares of preferred stock ($.001 par value), of which approximately _____ share of Common Stock and _____ shares of preferred stock shall be issued and outstanding. As of Closing, the Stock Option Holders will hold options to purchase an aggregate of _____ shares of Common Stock. All outstanding shares of capital stock have been duly authorized and are validly issued, and are fully paid and nonassessable and free of preemptive rights. All shares of capital stock described above to be issued have been duly authorized and when issued, will be validly issued, fully paid and nonassessable and free of preemptive rights. Schedule 4.3.2 hereby contains all shares and derivatives currently and potentially outstanding. The company hereby represents that any and all shares and current potentially dilutive events have been included in Schedule 4.3.2, including

employment agreements, acquisition, consulting agreements, debts, payments, financing or business relationships that could be paid in equity, derivatives or resulting in additional equity issuances that could potentially occur.

4.3.3  Except pursuant to this Agreement and as set forth in Schedule 4.3 hereto, and as set forth in the Company's SEC Documents, filed with the SEC, as of the date hereof and as of the Closing Date, there are not now outstanding options, warrants, rights to subscribe for, calls or commitments of any character whatsoever relating to, or securities or rights convertible into or exchangeable for, shares of any class of capital stock of the Company, or agreements, understandings or arrangements to which the Company is a party, or by which the Company is or may be bound, to issue additional shares of its capital stock or options, warrants, scrip or rights to subscribe for, calls or commitment of any character whatsoever relating to, or securities or rights convertible into or exchangeable for, any shares of any class of its capital stock. The Company agrees to inform the Investors in writing of any additional warrants granted prior to the Closing Date.

4.3.4  The Company on the Closing Date (i) will have full right, power, and authority to sell, assign, transfer, and deliver, by reason of record and beneficial ownership, to the Investor, the Company Shares hereunder, free and clear of all liens, charges, claims, options, pledges, restrictions, and encumbrances whatsoever; and (ii) upon conversion of the Preferred Stock or exercise of the Warrants, the Investor will acquire good and marketable title to such Shares, free and clear of all liens, charges, claims, options, pledges, restrictions, and encumbrances whatsoever, except as otherwise provided in this Agreement as to the limitation on the voting rights of such Shares in certain circumstances.

4.4  **Authority**. The Company has all requisite corporate power and authority to execute and deliver this Agreement, the Preferred Stock, and the Warrants, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement by the Company and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate action and no other corporate proceedings on the part of the Company is necessary to authorize this Agreement or to consummate the transactions contemplated hereby except as disclosed in this Agreement. This Agreement has been duly executed and delivered by the Company and constitutes the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms.

4.5  **No Conflict; Required Filings and Consents**. The execution and delivery of this Agreement by the Company does not, and the performance by the Company of their respective obligations hereunder will not:  (i) conflict with or violate the Articles or By-Laws of the Company; (ii) conflict with, breach or violate any federal, state, foreign or local law, statute, ordinance, rule, regulation, order, judgment or decree (collectively, "**Laws**") in effect as of the date of this Agreement and applicable to the Company; or (iii) result in any breach of, constitute a default (or an event that with notice or lapse of time or both would become a default) under, give to any other entity any right of termination, amendment, acceleration or cancellation of,

require payment under, or result in the creation of a lien or encumbrance on any of the properties or assets of the Company pursuant to, any note, bond, mortgage, indenture, contract, agreement, lease, license, permit, franchise or other instrument or obligation to which the Company is a party or by the Company or any of its properties or assets is bound. Excluding from the foregoing are such violations, conflicts, breaches, defaults, terminations, accelerations, creations of liens, or incumbency that would not, in the aggregate, have a Material Adverse Effect.

4.6     **Report and Financial Statements**. The Company's Annual Report on Form 10-K, filed on _____, 200__ with the SEC contains the audited financial statements of the Company. The Company has previously provided to the Investor the audited financial statements of the Company as of _____ and for the six months ended _____ (collectively, the "**Financial Statements**"). Each of the balance sheets contained in or incorporated by reference into any such Financial Statements (including the related notes and schedules thereto) fairly presented the financial position of the Company, as of its date, and each of the statements of income and changes in stockholders' equity and cash flows or equivalent statements in such Financial Statements (including any related notes and schedules thereto) fairly presents, changes in stockholders' equity and changes in cash flows, as the case may be, of the Company, for the periods to which they relate, in each case in accordance with United States generally accepted accounting principles ("**U.S. GAAP**") consistently applied during the periods involved, except in each case as may be noted therein, subject to normal year-end audit adjustments in the case of unaudited statements. The books and records of the Company have been, and are being, maintained in all material respects in accordance with U.S. GAAP and any other applicable legal and accounting requirements and reflect only actual transaction.

4.7     **Compliance with Applicable Laws**. The Company is not in violation of, or, to the knowledge of the Company is under investigation with respect to or has been given notice or has been charged with the violation of any Law of a governmental agency, except for violations which individually or in the aggregate do not have a Material Adverse Effect.

4.8     **Brokers**. Except as set forth on Schedule 4.8, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or Commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Company.

4.9     **SEC Documents**. The Company acknowledges that the Company is a publicly held company and has made available to the Investor after demand true and complete copies of any requested SEC Documents. The Company has registered its Common Stock pursuant to Section 12(d) [15(d)] of the 1934 Act, and the Common Stock is quoted and traded on the OTC Bulletin Board of the National Association of Securities Dealers, Inc. The Company has received no notice, either oral or written, with respect to the continued quotation or trading of the Common Stock on the OTC Bulletin Board. The Company has not provided to the Investor any information that, according to applicable law, rule or regulation, should have been disclosed publicly prior to the date hereof by the Company, but which has not been so disclosed. As of

their respective dates, the SEC Documents complied in all material respects with the requirements of the 1934 Act, and rules and regulations of the SEC promulgated thereunder and the SEC Documents did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

4.10  **Litigation**. To the knowledge of the Company, no litigation, claim, or other proceeding before any court or governmental agency is pending or to the knowledge of the Company, threatened against the Company, the prosecution or outcome of which may have a Material Adverse Effect.

4.11  **Exemption from Registration.** Subject to the accuracy of the Investor's representations in Article V, except as required pursuant to the Registration Rights Agreement, the sale of the Common Stock and Warrants by the Company to the Investor will not require registration under the 1933 Act, but may require registration under New York state securities law if applicable to the Investor. When validly converted in accordance with the terms of the Preferred Stock, and upon exercise of the Warrants in accordance with their terms, the Shares underlying the Preferred Stock and the Warrants will be duly and validly issued, fully paid, and non-assessable. The Company is issuing the Preferred Stock and the Warrants in accordance with and in reliance upon the exemption from securities registration afforded, inter alia, by Rule 506 under Regulation D as promulgated by the SEC under the 1933 Act, and/or Section 4(2) of the 1933 Act; provided, however, that certain filings and registrations may be required under state securities "blue sky" laws depending upon the residency of the Investor.

4.12  **No General Solicitation or Advertising in Regard to this Transaction**. Neither the Company nor any of its Affiliates nor, to the knowledge of the Company, any Person acting on its or their behalf (i) has conducted or will conduct any general solicitation (as that term is used in Rule 502(c) of Regulation D as promulgated by the SEC under the 1933 Act) or general advertising with respect to the sale of the Preferred Stock or Warrants, or (ii) made any offers or sales of any security or solicited any offers to buy any security under any circumstances that would require registration of the Preferred Stock or Warrants, under the 1933 Act, except as required herein.

4.13  **No Material Adverse Effect**. Except as set forth in Schedule 4.13 attached hereto, since _____, 2006, no event or circumstance resulting in a Material Adverse Effect has occurred or exists with respect to the Company. No material supplier or customer has given notice, oral or written, that it intends to cease or reduce the volume of its business with the Company from historical levels. Since June 30, 2004, no event or circumstance has occurred or exists with respect to the Company or its businesses, properties, prospects, operations or financial condition, that, under any applicable law, rule or regulation, requires public disclosure or announcement prior to the date hereof by the Company but which has not been so publicly announced or disclosed in writing to the Investor.

4.14    **Material Non-Public Information**. The Company has not disclosed to the Investors any material non-public information that (i) if disclosed, would reasonably be expected to have a material effect on the price of the Common Stock or (ii) according to applicable law, rule or regulation, should have been disclosed publicly by the Company prior to the date hereof but which has not been so disclosed.

4.15    **Internal Controls And Procedures**. The Company maintains books and records and internal accounting controls which provide reasonable assurance that (i) all transactions to which the Company or any subsidiary is a party or by which its properties are bound are executed with management's authorization; (ii) the recorded accounting of the Company's consolidated assets is compared with existing assets at regular intervals; (iii) access to the Company's consolidated assets is permitted only in accordance with management's authorization; and (iv) all transactions to which the Company or any subsidiary is a party or by which its properties are bound are recorded as necessary to permit preparation of the financial statements of the Company in accordance with U.S. generally accepted accounting principles.

4.16    **Full Disclosure**. No representation or warranty made by the Company in this Agreement and no certificate or document furnished or to be furnished to the Investor pursuant to this Agreement contains or will contain any untrue statement of a material fact, or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading.

4.17    **Independent Board**. As of the date of this Agreement, the Board of Directors of the Company consists of a minimum of five directors with a majority being independent as defined by the NASD. At the Closing, the Board of Directors of the Company shall consist of five directors, three of whom shall be independent. As of the date of this Agreement, the Audit and Compensation Committees of the Board of Directors of the Company are comprised, and at the Closing will be comprised, of independent directors.

# ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF THE INVESTORS

The Investor represents and warrants to the Company that:

5.1    **Organization and Standing of the Investor**. The Investor is a limited partnership duly formed, validly existing and in good standing under the laws of the State of Delaware. The state in which any offer to purchase shares hereunder was made or accepted by such Investor is the state shown as such Investor's address. The Investor was not formed for the purpose of investing solely in the Preferred Stock, the Warrants or the shares of Common Stock which are the subject of this Agreement.

5.2    **Authorization and Power**. The Investor has the requisite power and authority to enter into and perform this Agreement and to purchase the securities being sold to it hereunder. The execution, delivery and performance of this Agreement by the Investor and the consummation by the Investor of the transactions contemplated hereby have been duly authorized by all necessary partnership action where appropriate. This Agreement and the Registration Rights Agreement have been duly executed and delivered by the Investor and at the Closing shall constitute valid and binding obligations of the Investor enforceable against the Investor in accordance with their terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, liquidation, conservatorship, receivership or similar laws relating to, or affecting generally the enforcement of, creditors' rights and remedies or by other equitable principles of general application.

5.3    **No Conflicts**. The execution, delivery and performance of this Agreement and the consummation by the Investor of the transactions contemplated hereby or relating hereto do not and will not (i) result in a violation of such Investor's charter documents or bylaws where appropriate or (ii) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of any agreement, indenture or instrument to which the Investor is a party, or result in a violation of any law, rule, or regulation, or any order, judgment or decree of any court or governmental agency applicable to the Investor or its properties (except for such conflicts, defaults and violations as would not, individually or in the aggregate, have a Material Adverse Effect on such Investor). The Investor is not required to obtain any consent, authorization or order of, or make any filing or registration with, any court or governmental agency in order for it to execute, deliver or perform any of such Investor's obligations under this Agreement or to purchase the securities from the Company in accordance with the terms hereof, provided that for purposes of the representation made in this sentence, the Investor is assuming and relying upon the accuracy of the relevant representations and agreements of the Company herein.

5.4    **Financial Risks**. The Investor acknowledges that such Investor is able to bear the financial risks associated with an investment in the securities being purchased by the Investor from the Company and that it has been given full access to such records of the Company and the subsidiaries and to the officers of the Company and the subsidiaries as it has deemed necessary or appropriate to conduct its due diligence investigation. The Investor is capable of evaluating the risks and merits of an investment in the securities being purchased by the Investor from the Company by virtue of its experience as an investor and its knowledge, experience, and sophistication in financial and business matters and the Investor is capable of bearing the entire loss of its investment in the securities being purchased by the Investor from the Company.

5.5    **Accredited Investor**. The Investor is (i) an "accredited investor" as that term is defined in Rule 501 of Regulation D promulgated under the 1933 Act by reason of Rule 501(a)(3) and (6), (ii) experienced in making investments of the kind described in this Agreement and the related documents, (iii) able, by reason of the business and financial experience of its officers (if an entity) and professional advisors (who are not affiliated with or compensated in any way by

the Company or any of its affiliates or selling agents), to protect its own interests in connection with the transactions described in this Agreement, and the related documents, and (iv) able to afford the entire loss of its investment in the securities being purchased by the Investor from the Company.

5.6  **Brokers**. Except as set forth in Schedule 4.8, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or Commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Investor.

5.7  **Knowledge of Company**. The Investor and such Investor's advisors, if any, have been, upon request, furnished with all materials relating to the business, finances and operations of the Company and materials relating to the offer and sale of the securities being purchased by the Investor from the Company. The Investor and such Investor's advisors, if any, have been afforded the opportunity to ask questions of the Company and have received complete and satisfactory answers to any such inquiries.

5.8  **Risk Factors**. The Investor understands that such Investor's investment in the securities being purchased by the Investor from the Company involves a high degree of risk. The Investor understands that no United States federal or state agency or any other government or governmental agency has passed on or made any recommendation or endorsement of the securities being purchased by the Investor from the Company. The Investor warrants that such Investor is able to bear the complete loss of such Investor's investment in the securities being purchased by the Investor from the Company.

5.9  **Full Disclosure**. No representation or warranty made by the Investor in this Agreement and no certificate or document furnished or to be furnished to the Company pursuant to this Agreement contains or will contain any untrue statement of a material fact, or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading. Except as set forth or referred to in this Agreement, Investor does not have any agreement or understanding with any person relating to acquiring, holding, voting or disposing of any equity securities of the Company.

5.10  **Payment of Due Diligence Expenses**. At Closing the Escrow Agent shall disperse to the Investor Fifty Thousand Dollars ($50,000.00) for due diligence expenses.

## ARTICLE VI

## COVENANTS OF THE COMPANY

6.1  **Registration Rights**. The Company shall cause the Registration Rights Agreement to remain in full force and effect according to the provisions of the Registration Rights Agreement and the Company shall comply in all material respects with the terms thereof.

6.2     **Reservation of Common Stock**. As of the date hereof, the Company has reserved and the Company shall continue to reserve and keep available at all times, free of preemptive rights, shares of Common Stock for the purpose of enabling the Company to issue the shares of Common Stock underlying the Preferred Stock and Warrants.

6.3     **Compliance with Laws**. The Company hereby agrees to comply in all respects with the Company's reporting, filing and other obligations under the Laws.

6.4     **Exchange Act Registration**. The Company (a) will continue its obligation to report to the SEC under Section E 12(d) of the 1934 Act [or (b) shall register under Section 12(b) or (g) under the 1934 Act and thereafter shall continue to be registered thereunder] and [ in either case] will use its best efforts to comply in all respects with its reporting and filing obligations under the 1934 Act, and will not take any action or file any document (whether or not permitted by the 1934 Act or the rules thereunder) to terminate or suspend any such registration or to terminate or suspend its reporting and filing obligations under the 1934 until the Investors have disposed of all of their Shares.

6.5     **Corporate Existence; Conflicting Agreements**. The Company will take all steps necessary to preserve and continue the corporate existence of the Company. The Company shall not enter into any agreement, the terms of which agreement would restrict or impair the right or ability of the Company to perform any of its obligations under this Agreement or any of the other agreements attached as exhibits hereto.

6.6     **Listing, Securities Exchange Act of 1934 and Rule 144 Requirements**. The Company is required to maintain their current or a listing on a higher exchange and maintain their status as a Company regulated by Securities Exchange Act of 1934 and if the Company is current currently listed on the Pink Sheets the Company must be fully reporting per Rule 144 until such time as they are regulated by the Securities Exchange Act of 1934. If for any time post Closing the Company is no longer regulated by the Securities Exchange Act of 1934 and is not a fully reporting Company, then the Company shall pay to the Investors as liquidated damages and not as a penalty, Five Percent (5%) a month in Cash or PIK at the option of the Investor. Such damages shall cease at the time the Company begins complying with the standards as mentioned above in Section 6.6.

6.7     **Preferred Stock**. On or prior to the Closing Date, the Company will cause to be cancelled all preferred stock in the Company with the exceptions of Preferred Stock issued to the Investor. For a period of five years from the closing the Company will not issue any preferred stock of the Company with the exception of Preferred Stock issued to the Investor.

6.8     **Convertible Debt**. On or prior to the Closing Date, the Company will cause to be cancelled all convertible debt in the Company. For a period of five years from the closing the Company will not issue any convertible debt.

6.9     **Debt Limitation.** The Company agrees for five years after Closing not to enter into any new borrowings of more than twice as much as the sum of the EBITDA from recurring operations over the past four quarters.

6.10    **Reset Equity Deals.** On or prior to the Closing Date, the Company will cause to be cancelled any and all reset features related to any shares outstanding that could result in additional shares being issued. For a period of five years from the closing the Company will not enter into any transactions that have any reset features that could result in additional shares being issued.

6.11    **Independent Directors.** The Company shall have caused the appointment of the majority of the board of directors to be qualified independent directors, as defined by the NASD, before Closing. If at any time after Closing the board shall not be composed in the majority of qualified independent directors, the Company shall pay to the Investors, pro rata, as liquidated damages and not as a penalty, an amount equal to twenty eight percent (28%) of the Purchase Price per annum, payable monthly in cash or Preferred Stock at the option of the Investor. The parties agree that the only damages payable for a violation of the terms of this Agreement with respect to which liquidated damages are expressly provided shall be such liquidated damages. Nothing shall preclude the Investor from pursuing or obtaining specific performance or other equitable relief with respect to this Agreement. The parties hereto agree that the liquidated damages provided for in this Section 6.10 constitute a reasonable estimate of the damages that may be incurred by the Investor by reason of the failure of the Company to appoint at least two independent directors in accordance with the provision hereof.

6.12    **Independent Directors Become Majority of Audit and Compensation Committees.** The Company will cause the appointment of a majority of outside directors to the audit and compensation committees of the board of directors before Closing. If at any time after Closing such independent directors do not compose the majority of the audit and compensation committees, the Company shall pay to the Investors, pro rata, as liquidated damages and not as a penalty, an amount equal to twenty eight percent (28%) of the Purchase Price per annum, payable monthly in cash or Preferred Stock at the option of the Investor. The parties agree that the only damages payable for a violation of the terms of this Agreement with respect to which liquidated damages are expressly provided shall be such liquidated damages. Nothing shall preclude the Investor from pursuing other remedies or obtaining specific performance or other equitable relief with respect to this Agreement.

6.13    **Use of Proceeds.** The Company will use the proceeds from the sale of the Preferred Stock and the Warrants (excluding amounts paid by the Company for legal and administrative fees in connection with the sale of such securities) for product rights, working capital and acquisitions.

6.14    **Right of First Refusal.** Each Investor shall have the right to participate in any subsequent funding by the Company on a pro rata basis at eighty percent (80%) of the offering price.

6.15 **Price Adjustment.** From the date hereof until such time as no Purchaser holds any of the Securities, the Company closes on the sale of a note or notes, shares of Common Stock, or shares of any class of Preferred Stock at a price per share of Common Stock, or with a conversion right to acquire Common Stock at a price per share of Common Stock, that is less than the Conversion Price (as adjusted to the capitalization per share as of the Closing Date, following any stock splits, stock dividends, or the like) (collectively, the "Subsequent Conversion Price"), the Company shall make a post-Closing adjustment in the Conversion Price so that the effective price per share paid by the Investor is reduced to being equivalent to such lower conversion price after taking into account any prior conversions of the Preferred Stock and/or exercises of the Warrant.

6.16 **Price Adjustment Based on Earnings Per Share.** In the event the Company earns between $\_\_\_\_ and $\_\_\_\_ (50% Decline) per share (where such earnings in this paragraph shall always be defined as earnings on a pre tax fully diluted basis as reported for the audited fiscal year ended December 31, 2006 from continuing operations before any non-recurring items the then current Conversion Price to the Investor at the time the audited numbers are reported to the SEC shall be decrease proportionately by 0% if the earnings are $\_\_\_\_ per share or greater and by 50% if the earnings are $\_\_\_ per share (50% decrease). For example if the earnings are $\_\_\_ per share or less (20% Decline) then the then current Conversion Price to the investor shall be reduced by 20%. Such adjustment shall be made within five business days of the audited numbers being reported to the SEC.

6.17 **Insider Selling.** The earliest any "Insiders" can start selling their shares shall be four years from Closing. Insiders shall include all officers and directors of the Company. Andrew Barron Worden and the Investor shall not be considered "Insiders".

6.18 **Employment and Consulting Contracts.** For five years after the Closing Company must have a unanimous opinion from the Compensation Committee of the Board of Directors that any awards other than salary are usual, appropriate and reasonable for any officer, director, employee or consultant holding a similar position in other fully reporting public companies with independent majority boards with similar market capitalizations in the same industry with securities listed on the OTCBB, ASE, NYSE or NASDAQ.

6.19 **Subsequent Equity Sales.** From the date hereof until such time as no Purchaser holds any of the Securities, the Company shall be prohibited from effecting or entering into an agreement to effect any Subsequent Financing involving a "Variable Rate Transaction" or an "MFN Transaction" (each as defined below). The term "Variable Rate Transaction" shall mean a transaction in which the Company issues or sells (i) any debt or equity securities that are convertible into, exchangeable or exercisable for, or include the right to receive additional shares of Common Stock either (A) at a conversion, exercise or exchange rate or other price that is based upon and/or varies with the trading prices of or quotations for the shares of Common Stock at any time after the initial issuance of such debt or equity securities, or (B) with a conversion, exercise or exchange price that is subject to being reset at some future date after the initial issuance of such debt or equity security or upon the occurrence of specified or contingent events

directly or indirectly related to the business of the Company or the market for the Common Stock. The term "MFN Transaction" shall mean a transaction in which the Company issues or sells any securities in a capital raising transaction or series of related transactions which grants to an investor the right to receive additional shares based upon future transactions of the Company on terms more favorable than those granted to such investor in such offering. Any Purchaser shall be entitled to obtain injunctive relief against the Company to preclude any such issuance, which remedy shall be in addition to any right to collect damages. Notwithstanding the foregoing, this Section 6.18 shall not apply in respect of an Exempt Issuance, except that no Variable Rate Transaction or MFN Transaction shall be an Exempt Issuance.

6.20   **Reverse Split**. Following the Closing, the Company shall effect a reverse split of the Common Stock at a ratio of no less than one to xxx. If at any time after 60 days from the Closing, the Company shall not effect a reverse split of the Common Stock at a ratio of no less than one to 25, the Company shall pay to the Investors, pro rata, as liquidated damages and not as a penalty, an amount equal to twenty eight percent (28%) per annum of the Purchase Price for the Shares still held by the Investor on such date, payable monthly in cash. The parties agree that the only damages payable for a violation of the terms of this Agreement with respect to which liquidated damages are expressly provided shall be such liquidated damages Closing Date. The parties hereto agree that the liquidated damages provided for in this Section 6.19 constitute a reasonable estimate of the damages that may be incurred by the Investor. Nothing shall preclude the Investor from pursuing or obtaining specific performance or other equitable relief with respect to this Agreement.

6.21   **Amendment to Certificate of Incorporation.** At or before the next annual meeting of the stockholders of the Company, the Board of Directors shall propose and submit to the holders of the Common Stock for approval, an amendment to the Certificate of Incorporation that provides substantially as follows:

> "The terms and conditions of any rights, options and warrants approved by the Board of Directors may provide that any or all of such terms and conditions may be waived or amended only with the consent of the holders of a designated percentage of a designated class or classes of capital stock of the Corporation (or a designated group or groups of holders within such class or classes, including but not limited to disinterested holders), and the applicable terms and conditions of any such rights, options or warrants so conditioned may not be waived or amended absent such consent.".

6.22   **Stock Splits**. All forward and reverse stock splits shall effect all equity and derivative holders proportionately.

6.23   **Retention of Investor Relations / Public Relations**. The Company must retain $250,000 with the Escrow Agent to be utilized in approximately equal quarterly installments for public relations and investor relations firms. The Company must retain an investor relations and public relations firm within 30 days post Closing Date. If at any time after 30 days from the Closing, the

Company shall not have retained an investor relations and public relations firm, the Company shall pay to the Investors, pro rata, as liquidated damages and not as a penalty, an amount equal to twenty eight percent (28%) per annum of the Purchase Price for the Shares still held by the Investor on such date, payable monthly in cash. The parties agree that the only damages payable for a violation of the terms of this Agreement with respect to which liquidated damages are expressly provided shall be such liquidated damages Closing Date. The parties hereto agree that the liquidated damages provided for in this Section 6.23 constitute a reasonable estimate of the damages that may be incurred by the Investor. Nothing shall preclude the Investor from pursuing or obtaining specific performance or other equitable relief with respect to this Agreement.

## ARTICLE VII

## COVENANTS OF THE INVESTOR

7.1  **Compliance with Law**. The Investor's trading activities with respect to shares of the Company's Common Stock will be in compliance with all applicable state and federal securities laws, rules and regulations and rules and regulations of any public market on which the Company's Common Stock is listed.

7.2  **Transfer Restrictions**. The Investor's acknowledge that (1) the Preferred Stock, Warrants and shares underlying the Preferred Stock and Warrants have not been registered under the provisions of the 1933 Act, and may not be transferred unless (A) subsequently registered thereunder or (B) the Investor shall have delivered to the Company an opinion of counsel, reasonably satisfactory in form, scope and substance to the Company, to the effect that the Preferred Stock, Warrants and shares underlying the Notes and Warrants to be sold or transferred may be sold or transferred pursuant to an exemption from such registration; and (2) any sale of the Preferred Stock, Warrants and shares underlying the Preferred Stock and Warrants made in reliance on Rule 144 promulgated under the 1933 Act may be made only in accordance with the terms of said Rule and further, if said Rule is not applicable, any resale of such securities under circumstances in which the seller, or the person through whom the sale is made, may be deemed to be an underwriter, as that term is used in the 1933 Act, may require compliance with some other exemption under the 1933 Act or the rules and regulations of the SEC thereunder.

7.3  **Restrictive Legend**. The Investor acknowledges and agrees that the Preferred Stock, the Warrants and the Shares underlying the Preferred Stock and Warrants, and, until such time as the Shares underlying the Preferred Stock and Warrants have been registered under the 1933 Act and sold in accordance with an effective Registration Statement, certificates and other instruments representing any of the Shares, shall bear a restrictive legend in substantially the following form (and a stop-transfer order may be placed against transfer of any such securities):

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS AND NEITHER SUCH SHARES NOR ANY INTEREST THEREIN MAY BE OFFERED, SOLD,

PLEDGED, ASSIGNED OR OTHERWISE TRANSFERRED UNLESS (1) A REGISTRATION STATEMENT WITH RESPECT THERETO IS EFFECTIVE UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS, OR (2) IN ACCORDANCE WITH THE PROVISIONS OF REGULATION S, OR (3) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT."

7.4   **Amendment to Certificate of Incorporation.** Investor hereby agrees to vote any shares of capital stock that it may own directly or beneficially, for the amendment to the Certificate of Incorporation referenced in Section 6.20. Pending adoption of such amendment, Investor hereby agrees for itself and its successors and assigns that neither this Section 7.4 or Section 6.20 above, or any restriction on exercise of the Warrant shall be amended, modified or waived without the consent of the holders of a majority of the shares of Common Stock held by Persons who are not Affiliates of the Company, or the Investor or Affiliates of the Investor.

## ARTICLE VIII

### CONDITIONS PRECEDENT TO THE COMPANY'S OBLIGATIONS

The obligation of the Company to consummate the transactions contemplated hereby shall be subject to the fulfillment, on or prior to Closing Date, of the following conditions:

8.1   **No Termination.** This Agreement shall not have been terminated pursuant to Article X hereof.

8.2   **Representations True and Correct.** The representations and warranties of the Investor contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as if made on as of the Closing Date.

8.3   **Compliance with Covenants.** The Investor shall have performed and complied in all material respects with all covenants, agreements, and conditions required by this Agreement to be performed or complied by it prior to or at the Closing Date.

8.4   **No Adverse Proceedings.** On the Closing Date, no action or proceeding shall be pending by any public authority or individual or entity before any court or administrative body to restrain, enjoin, or otherwise prevent the consummation of this Agreement or the transactions contemplated hereby or to recover any damages or obtain other relief as a result of the transactions proposed hereby.

## ARTICLE IX