## Todd Kremin

| | |
|---|---|
| **From:** | Robert Trumpy |
| **Sent:** | Monday, August 14, 2006 10:31 AM |
| **To:** | 'Matt Samuel' |
| **Subject:** | due diligence request |
| **Attachments:** | Form MDR - Part II (2)v2.doc; Form MDR - Part I (2)v2.doc |

This version should be more helpful.

Rob Trumpy, CPA
SVP and CFO
BioSafe Medical Technologies, Inc.
100 Field Drive, Suite 240
Lake Forest, IL 60045
Work:847-234-8111
Fax:847-234-8222
rtrumpy@ebiosafe.com

Exhibit 29

4/28/2008

## Form MDR – Part I

**Instructions:** For both the Company and each Acquisition target, please provide the following materials in electronic format. Please provide all worksheets and financials in Excel format. Items should be submitted by email to MDR@BARRONPARTNERS.COM. To accelerate the process, we strongly recommended you send items immediately as they become available.

Section A – Description of Offering and Use of Proceeds.  *[Formatted: Font color: Red]*

1. Briefly describe your Company, its management and business plan.
   Lab123 has the exclusive rights to market and sell selected Biosafe customer health diagnostic tests in the retail, internet and disease management sales channels. The company will also market other (yet identified) customer health diagnostic tests in the retail, internet and disease management sales channels as long as these products do not compete with Biosafe.

   Lab123 is able manufacture/process lab tests or outsource manufacturing and/or the lab processing to Biosafe at cost plus up to 20%. Thus, Lab123 can control virtually all aspects of the business cycles for the products it licenses from Biosafe.

   Currently, Biosafe products are in approximately 15,000 retail locations. There are approximately 25 disease management and health screening companies currently using Biosafe products on a regular basis. All of these and the Biosafe internet site will "seed" this company with mature account relationships.

   The management structure is identified in the employee tab of the financial projections, however, the key members will be a:
   - President – Henry Warner ( interim until a permanent president is hired – interviewing progressing with retail pharmacy sales oriented executives.
   - VP of Sales – John Kramer, current lead sales executive at Biosafe for the above sales channels will immediately join Lab123 to head the sales effort.
   - Controller – on an interim basis Rob Trumpy, Biosafe's CFO will fill this role. The new president will select a permanent Controller that fits the president's concept of this position.

2. Explain the attractiveness of your company to investors.
   As noted in #1 above, Biosafe is seeding this company with sales relationships and exclusives to allow Lab123's retail oriented executive and sales staff significantly grow this sales channel far beyond the capabilities of Biosafe. Biosafe core expertise is in R&D and its Big Pharma sales ability. Plus, as a separate company Lab123 will have much better access to other diagnostic products that it can represent in these sales sectors.

   The key advantage that the Lab123's retail and internet sales have over other sales channel is that the sales are very profitable with a gross margin that could approach 70-80%. When the sale is made the lab test is prepaid by the customer, however, less the 70% of the kits sold actually result in a lab test. Lab123 pays only for the lab tests actually performed. Thus, the "breakage" is pure profit to Lab123.

3. How have your historical results compared to expectations and past guidance?
   Retail and disease management have really developed over the past two years and especially retail has exceeded our expectations of placement of product into retail stores. Biosafe has not been internet oriented and, accordingly, the internet sales channel has under performed our expectations. The president that is being recruited will be an "expert" in at least one of these sale channels if not both.

4. Describe your company's current and future capital requirements including anticipated amounts and funding timeline covering the next 24 months.  *[Formatted: Bullets and Numbering]*
   As the projections indicate, the capital is primarily to support working capital during the year of operations. CapEx is nominal given that in the early phase of Lab123, the company will not be doing any manufacturing or warehousing.

5. How long has your company been seeking the current round of financing? Barron was the first private equity firm we considered for this relationship.
6. For the current round, provide a schedule detailing the use of proceeds of this financing, being certain to include commission payable to brokers, finders fees, and legal expenses.

| | |
|---|---|
| Raised : | $2,000,000 |
| Uses: | |
| License fee to Biosafe | $1,000,000 |
| Legal | $40,000 |
| Barron fee | $85,000 |
| Biosafe expenses | $10,000 |
| Accountants | $20,000 |
| Other | $15,000 |
| Working capital to Lab123 | $830,000 |

Section B – Financials. **SEE FINANCIAL PROJECTIONS**

1. Monthly GAAP income statements for the Company and Acquisition Target(s) for the past six months. The format should give the greatest detail possible, but at a minimum must break out revenue and cost of sales by major products/divisions, SG&A, depreciation and amortization, interest expense and taxes accrued.
2. Quarterly and Annual GAAP financial statements for the Company and Acquisition Target(s) for the past two years in the same format as above. Audited financial statements (when available) must also be submitted but are not a substitute for the detailed statements.
3. The most recent GAAP balance sheet available.
4. Detailed Schedule of Current Assets with Aged Accounts Receivable summary.
5. Detailed Schedule of Current Liabilities with Aged Accounts Payable summary and summaries of accrued expenses and accrued compensation.
6. Detailed Schedule of Long Term Liabilities outlining basic terms of each outstanding debt or preferred stock series.
7. Pro Forma historical and projected financials for the Company and each Acquisition Target (breaking each division out separately).
8. Pro Forma projected working capital and monthly cash flow projections for six months.
9. Pro Forma projected capital expenditures for 12 months.
10. Pro Forma schedule of largest customers as a percentage of total revenue.

Section C – Past Financings and Legal. **NA**

1. Detail all past financings being careful to disclose the split-adjusted price and quantity of shares/securities issued and any special rights: piggyback, ratchet/reset/toxic, conversion, warrant shares, options, MFN, first refusal, etc.
2. Detail all past, present, pending or threatened litigation or investigations at all levels, related to or involving the company, its officers or directors.
3. Provide copies of all business broker or finder's agreements executed within the past three years. Where only verbal agreements exist please provide a summary of the basic terms.
4. Provide a list of the company and acquisition target(s) officers and directors (full names) including addresses and contact info.
5. Provide a list of the company and acquisition target(s) legal business names, state of incorporation, DBAs, and physical and legal addresses of the various offices or states in which the companies do business.
6. Provide details of ownership structure, capital structure, including major shareholders, debtholders, and each class of stock outstanding.

## Form MDR – Part II

**Instructions:** For both the Company and each Acquisition target, please provide the following materials in electronic format. Please provide all worksheets and financials in Excel format. Items should be submitted by email to MDR@BARRONPARTNERS.COM. To accelerate the process, we strongly recommended you send items immediately as they become available.

### Section D – Contact Info.

1. Please provide complete contact info for all key executives, officers and directors, auditors and accountants, bankers (all areas), and lawyers.
   Rob Trumpy, Biosafe CFO, 847-234-8111
   Hank Warner, Biosafe CEO 847-234-8111
   John Kramer VP Sales, 847-234-8111
   Note: Mr. Trumpy and Mr. Warner are interim management to be replace with permanent Lab123 officers.

### Section E – Business Opportunity  see LOI and financial projections

1. Provide copies of any business plans, strategic plans, business valuations, investor presentations and one page summaries made within the past two years.
   Lab123 was a concept created by Barron and Biosafe to move existing business and sales channels into a public company that will incorporate the retail/internet experienced executives to much better prosecute these markets.
2. Provide copies of press clippings, articles (including 3rd party articles), and conference call transcripts originating within the past 3 years. To be provided under separate cover.

### Section F – Backlog and Pipeline  Lab123 is a new entity.

1. Provide a summary and breakdown of the current backlog by product or service line of unfilled orders. These orders are filled within days or week at most. Only upon the fulfilling of the initial stocking of a retail chain is ther any significant backlog (1-2 months depending) There are not any new chains pending at this time.
2. Is this backlog normal, high, low, increasing or declining? normal
3. What was the backlog one year ago? Higher as we were filling the initial stocking of Albertson's.
4. Over what period of time will the backlog be fulfilled? See1#
5. What are the policies governing when an order is considered firm and can be recorded into the backlog? A PO or a contract qualifies as backlog
6. Provide evidence (contracts or PO's) supporting the backlog. See#1
7. Provide a summary of potential pipeline sales that in addition to those provided in the backlog. Financial projections have the sales forecast detail.

### Section G - Customer Concentration, Risk and Sales Outlook  see projections

1. Provide a worksheet showing sales by customer for the last twelve months covering at least 80% of total revenues. Provided under separate cover
2. Projected sales by customer (including new customers) for the next 12 months covering at least 80% of total projected revenues. Indicate the percentage likelihood of achieving the projected sales level for each customer. See fin. projections
3. For both worksheets, please indicate for each customer the percentage of total revenues. Historical has been provided under separate cover
4. For each customer, indicate whether it is dependent on maintaining the relationship with any other customer. No linkage between customers
5. For each customer, indicate whether there is or has been any real or perceived conflicts of interest or related party transactions. none
6. Provide explanation of any significantly increased sales projection. The financial projections provide the detail. However, in general:

   a. Management that understands and is experienced in retail channels
   b. Better experience in advertising inside retail chains (Sunday circulars) and independent of the chains
   c. Better experience with internet marketing and advertising
   d. Better access to other products to represent thru purchase or just joint agreements.
   e. Better access to any capital that may be needed to accomplish potentially more aggressive strategies/tactics

7. Provide copies of any significant agreements, e.g. royalty or license agreements, long term sales contracts or distribution agreements. License agreement with Biosafe is the primary agreement and a draft copy has been provided under separate cover.

## Section H - Customer References ( to be provided for any customer Biosafe and Barron agree can be contacted. Customer list has been provided under separate cover)

**Instructions:** In order for us to verify current and projected sales volumes and to gauge customer satisfaction, we need to conduct a brief customer survey. Our questions will be provided for your review and approval prior to conducting the survey. In the meantime, please prepare and submit a schedule of contacts for all customers provided in **Section G** above. Just prior to our survey, please notify the contacts that a representative of our firm will be calling and inform the contact of the nature of our call.

## Section I - Customer Support most customer support provided by Biosafe. Nominal costs. The primary support is for patients/retail purchasers calling for status or questions as to the results of a test. Under the license agreement this will be provided at approximately cost plus a markup of up to 20%. This will probably be charged on a per call basis.

1. Detail and provide representative copies of all agreements with customers to provide any service, support, warranty or maintenance.
2. Estimate the cost to the Company of providing such services.
3. When are these costs collected from the customers?

## Section J - Collections No discreet balance sheet for these sales channel

1. Provide quarterly DSO figures for the past two years.
2. What is the company's charge-off policy?
3. How are collections handled?
4. Explain any negative trends.

## Section K - Suppliers and Outsourcing Agreements This is virtually 100% covered by the license agreement between BMT and Lab123

1. List and provide copies of all significant agreements with vendors, manufacturers, retailers, brokers and suppliers.
2. Provide contact information for the five largest suppliers as well as any key component or service suppliers.
3. Indicated whether or not there are plans for back-up suppliers and identify the critical supply risks the company faces.
4. What is the timing and cost of replacing critical suppliers?
5. List and provide copies of all agreements pursuant to which products or services are or will be manufactured or provided by third parties.

## Section L – Past Financings and Appraisals na

1. Provide copies of all term sheets, PPM's and closing documents for all previous financings.
2. Provide copies of all agreements to pay finders fees or brokers fees for all previous financings as well as the proposed financing(s).
3. Break down the use of proceeds from any previous rounds of financing within the past two years.
4. Provide copies of any appraisals within the last 5 years as to the value of the Company.

Section M – Partnerships and Earn-outs na

1. Explain and provide copies of any partnership agreements, joint ventures, or co-marketing agreements currently being contemplated or in effect at any point during the past five years.
2. Explain and provide copies of any revenue sharing, earnings sharing or earn-out agreements currently being contemplated or in effect at any point during the past five years.

Section N – Properties na    *Deleted: -*

1. List and describe any real estate presently or formerly owned, leased, subleased or used, detailing size, use, cost basis, market value, lease payments and lessor's contact information.
2. Provide copies of all lease agreements, loans and subleases related to all properties.
3. Describe significant equipment, machinery, or computers including a schedule of acquisition dates, costs, useful life, depreciation and present book value.
4. Provide copies of any audits conducted on or relating to equipment or systems material to the business.

Section O - Capital Expenditures and R&D see projections for future capital expenditures – there will not be any assets transfer to Lab123 at the close.

1. Provide a breakdown of all capital equipment purchases in the past five years and as projected for the next five years including price paid, current market value, replacement cost, useful life, disposition plans, and ongoing service and maintenance costs.
2. Please provide a list of Research and Development costs for the past five years and as projected for the next five years.
3. Please provide copies of any contracts or commitments relating to Capital Equipment Lease or Purchase or R&D expense contracts.

Section P – Legal and Accounting NA

1. Provide copies of all legal action, administrative proceedings, or investigations involving the Company, its acquisition targets, divisions, property, assets, directors, officers, employees or agents.
2. Provide a listing and copies of all liens and collateral agreements against equipment, inventories or other property.
3. Provide copies of all management letters from the Company's accountants for each of the last three fiscal years.

Section Q – Regulatory The FDA clearances for the products were provided under separate cover.

1. Explain the applicable regulatory requirements for the industry including, where applicable, compliance with environmental laws.
2. List and provide copies of all franchises, permits, governmental certifications, concessions or similar authorizations necessary to the conduct of business.
3. Provide copies of all material regulatory filings with federal, state and local agencies.

Section R – Risk and Insurance normal D&O, product liability, etc. will be placed.

1. Provide a list of all current insurance coverage including risk covered, aggregate and per event limits, annual premium, carrier and expiration date.
2. List any termination by an insurance carrier in the last 2 years.
3. List any significant claims in the past 5 years.
4. Provide a list of former divisions that were sold, abandoned or otherwise disposed of since the formation of the company.

Section S – Other Liabilities NA

1. Provide copies and descriptions of all guarantees of obligations of third parties and any similar agreements.
2. Provide a description of any contingent liabilities.

**Section T – Personnel and Management NA**

1. Provide an organizational chart detailing structure, positions, titles and names. See employee detail tab of the financial projections
2. Provide CV's for all senior management. Provided under separate cover
3. Detail the number of employees, FT vs. PT, and employees to manager ratio. Only 5-8 FTEs anticipated
4. Are any of the operations subject to unions/unionization? no
5. Provide employment agreements for all key executives and any and all compensation of any kind to management. No contracts
6. List non-cash compensation and perks of management (automobile expenses, etc.) none
7. Describe the bonus/incentive plans for management and all employees. Are they tied to performance or are they subjective? How are amounts determined? Are there written policies covering the process? If so, please furnish copies. The sales vp earns a 1.5% commission. The president's bonus is likely to be a sliding scale of 4-10% of ebit above $1.5 million.
8. Provide copies of senior management performance reviews (most recent years). na
9. Provide complete documentation relating to the employment of foreign nationals by the Company. na

**Section U - Conflicts of Interest NA**

1. Describe any and all real or potential conflicts of interest between key executives, management and directors.
2. Describe any and all real or potential conflicts of interest between the Company and its acquisition targets.
3. Provide copies of any inter-related party leaseholds, transactions, loans or arrangements.
4. Provide a summary of business and personal relationships and affiliations among directors, officers, shareholders, creditors, customers, suppliers and other business affiliates.
5. How are Directors nominated? How are Directors compensated?
6. Explain the company's plans to achieve an independent Board of Directors.

**Section V - Sales and Marketing**
1. How is the sales force compensated (both the in-house sales force or reps and distributors)? Salary plus commission of 1.%-2%
2. How much can a sales person earn? 100,000-200,000
3. What are average earnings, and how does that compare to the industry norms? Last year John Kramer earned salary and bonus of $115,000
4. What has been the turnover rate in sales personnel for the last two years? na
5. How are sales personnel evaluated? na
6. Provide copies of all sales and marketing materials and a short description of each product or service offered. Provided under separate cover
7. Provide copies of all marketing studies and customer surveys conducted. none
8. Provide copies of all competitive analyses conducted. none

**Section W – Technology, Intellectual and Intangible Property Provided under separate cover.**

1. Provide copies of all agreements relating to technology or intellectual property that are material to the business, including agreements, understandings and proposed transactions with employees (past and present), consultants, stockholders and other third parties regarding ownership and/or use of intellectual property, and confidentiality, nondisclosure or assignment of inventions or intellectual property rights.
2. Provide a list of all patents owned or applied for, with descriptive titles, numbers, jurisdiction and copies of all correspondence to or from examining authorities or other parties regarding such patents and patent applications.
3. Provide a list of copyrights claimed and copies of filings and documentation with descriptive titles, numbers and jurisdiction.

4. Provide a list of all trademarks owned or used in the business, whether registered or unregistered, and copies of federal or state registrations.
5. Provide a list of all trademarks, trade names, patents, copyrights, trade secrets and other proprietary rights licensed to or from third parties.
6. Provide copies of license and sublicense agreements and any other agreements pursuant to which any technology or intellectual property rights have been assigned to or from third parties.
7. Provide a list of any other intangible holdings, including but not limited to, trade secrets, inventions and technical information.