As filed with the Securities and Exchange Commission on September 22, 2006

File No. 333-

# U.S. SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

## FORM SB-2

### REGISTRATION STATEMENT
### UNDER
### THE SECURITIES ACT OF 1933

## LAB123, INC.
(Name of small business issuer in its charter)

| Delaware | 2835 | 45-0542515 |
|---|---|---|
| (State or jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (IRS Employer Identification No.) |

**233 Narragansett Avenue**
**Lawrence, New York 11559**
**(516) 837-9876**
(Address and telephone number of principal executive offices and principal place of business)

**Michael Sosnowik**
**President and Chief Executive Officer**
**Lab123, Inc.**
**233 Narragansett Avenue**
**Lawrence, New York 11559**
**(516) 837-9876**
(Name, address, and telephone number, of agent for service)

*Copy to:*
**Darren Ofsink, Esq.**
**Guzov Ofsink, LLC**
**600 Madison Avenue**
**New York, New York 10022**
**(212) 371-8008**

**Approximate date of commencement** of proposed sale to the public: as soon as practical after the registration statement becomes effective.

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

**Exhibit 37**

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If delivery of the prospectus is expected to be made pursuant to Rule 434, check the following box. ☐

## CALCULATION OF REGISTRATION FEE

| Title of each class of securities to be registered | Amount to be registered (1)(2) | Proposed maximum offering price per share (3) | Proposed maximum aggregate offering price | Amount of registration fee |
|---|---|---|---|---|
| Common Stock $0.001 par value per share | 14,323,000 | $ 1.90 | $ 27,213,700 | $ 2,911.87 |

(1) Pursuant to Rule 416 under the Securities Act, this Registration Statement also covers such additional number of shares of common stock as may be issuable upon a stock split, stock dividend or similar transaction.

(2) This registration statement relates to the resale by the selling stockholders identified herein of up to 14,323,000 shares of our common stock issued in private placement transactions, including an aggregate of 7,548,000 shares of common stock that may be issued to certain of the selling stockholders upon the conversion of outstanding convertible preferred stock and exercise of outstanding warrants.

(3) Estimated solely for the purpose of calculating the registration fee pursuant to Rule 457. As of the date hereof, there is no established public market for the common stock being registered. The proposed maximum offering price is based on the estimated high end of the range at which the common stock will initially be sold.

THE REGISTRANT HEREBY AMENDS THIS REGISTRATION STATEMENT ON SUCH DATE OR DATES AS MAY BE NECESSARY TO DELAY ITS EFFECTIVE DATE UNTIL THE REGISTRANT SHALL FILE A FURTHER AMENDMENT WHICH SPECIFICALLY STATES THAT THIS REGISTRATION STATEMENT SHALL THEREAFTER BECOME EFFECTIVE IN ACCORDANCE WITH SECTION 8(a) OF THE SECURITIES ACT OF 1933 OR UNTIL THE REGISTRATION STATEMENT SHALL BECOME EFFECTIVE ON SUCH DATE AS THE COMMISSION, ACTING PURSUANT TO SAID SECTION 8(a), MAY DETERMINE.

The information in this prospectus is not complete and may be changed. These securities may not be sold until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.

## PART I — INFORMATION REQUIRED IN PROSPECTUS

SUBJECT TO COMPLETION

PRELIMINARY PROSPECTUS DATED SEPTEMBER 22 , 2006

LAB123, INC.
233 Narragansett Avenue
Lawrence, New York 11559
(516) 837-9876

14,323,000 Shares of Common Stock

The selling stockholders named in this prospectus are offering all of the shares of common stock offered through this prospectus. We will not receive any proceeds from the sale of the common stock being sold by the selling stockholders. The shares being offered include an aggregate of 7,548,000 shares reserved for issuance upon exercise of warrants and conversion of convertible preferred stock that we have issued to one of the selling stockholders. We will receive the exercise price of such warrants if and when the warrants are exercised. We will pay the cost of the preparation of this prospectus, which is estimated at $50,000.

The selling stockholders have not engaged any underwriter in connection with the sale of their shares of common stock. Because there is no trading market in our common stock as of the date of this prospectus, the selling stockholders will sell shares at prices ranging from $1.15 to $1.90 per share until a public market develops for the common stock. Once a public market develops for the common stock, the selling stockholders may sell their shares of common stock in the public market based on the market price at the time of sale or at negotiated prices. The selling stockholders may also sell their shares in transactions that are not in the public market in the manner set forth under "Plan of Distribution."

The selling stockholders will pay any underwriting discounts and commissions. Biosafe, one of the selling stockholders, owns 6,050,000 shares of our outstanding common stock and Barron Partners, L.P. beneficially owns (as a result of its ability to immediately convert shares of our convertible preferred stock and to exercise warrants to purchase our common stock) an aggregate of 7,548,000 shares of our common stock. BioSafe Laboratories, Inc., Barron Partners, L.P. and the brokers through whom sales of the securities are made, will be "underwriters" within the meaning of Section 2(11) of the Securities Act of 1933, as amended, referred to herein as the "Securities Act".

**Investing in our common stock involves a high degree of risk.
See "Risk Factors" beginning on page 5.**

*Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the adequacy or accuracy of this prospectus. Any representation to the contrary is a criminal offense.*

You should rely only on the information contained in this prospectus. We have not authorized anyone to provide you with different information from that contained in this prospectus. The selling security holder is offering to sell and seeking offers to buy shares of our common stock and share warrants only in jurisdictions where offers and sales are permitted. The

Page 5 of 79
Case 1:07-cv-11135-JSR    Document 14-46    Filed 04/30/2008    Page 5 of 20

information contained in this prospectus is accurate only as of the date of this prospectus, regardless of the time of delivery of this prospectus or of any sale of our common stock or share warrants.

The date of this prospectus is _____.

Case 1:07-cv-11135-JSR    Document 14-46    Filed 04/30/2008    Page 5 of 20

# TABLE OF CONTENTS

| | Page |
|---|---|
| PROSPECTUS SUMMARY | 3 |
| RISK FACTORS | 5 |
| USE OF PROCEEDS | 10 |
| DETERMINATION OF OFFERING PRICE | 10 |
| SELLING STOCKHOLDERS | 10 |
| PLAN OF DISTRIBUTION | 12 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OR PLAN OF OPERATION | 14 |
| DESCRIPTION OF BUSINESS | 16 |
| DIRECTORS, EXECUTIVE OFFICERS, PROMOTERS AND CONTROL PERSONS | 25 |
| EXECUTIVE COMPENSATION | 26 |
| SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 27 |
| DESCRIPTION OF SECURITIES | 28 |
| CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS | 29 |
| MARKET FOR COMMON EQUITY AND RELATED STOCKHOLDER MATTERS | 29 |
| LEGAL PROCEEDINGS | 30 |
| EXPERTS | 30 |
| LEGAL MATTERS | 30 |
| INDEX TO FINANCIAL STATEMENTS | 30 |
| FINANCIAL STATEMENTS | F-1 |

## PROSPECTUS SUMMARY

*The following summary is qualified in its entirety by the more detailed information and financial statements and the notes thereto appearing elsewhere in this prospectus. All dollar amounts herein are presented in U.S. dollars. Prospective investors should carefully consider the information set forth under "Risk Factors." References to the terms "we," "our," or "us," refer to Lab123, Inc.*

### The Company

Lab123, Inc. ("Lab123" or the "Company") is engaged in the manufacture and marketing of clinical diagnostic products for use in disease detection and prevention. Under an exclusive license agreement with Biosafe Laboratories, Inc. ("Biosafe") we intend to sell 5 such diagnostic products (the "Diagnostic Products") to retail drug stores, retail drug mass merchandisers, and the distributors, marketers, brokers and group buyers who supply medical products to retail drug stores, retail drug mass merchandisers in the United States and to internet-based retail drug companies (the "Market").

The products we currently license from Biosafe and market are:

- BIOSAFE Cholesterol Panel including Total Cholesterol, HDL, LDL and Triglycerides;

- BIOSAFE Anemia Meter, a rapid result quantitative hemoglobin-measuring device;

- BIOSAFE Prostate Specific Antigen (PSA) test;

- BIOSAFE Thyroid Stimulating Hormone (TSH) test; and

- BIOSAFE Hemoglobin A1c (Diabetes) test

### Issuance of Securities to the Selling Stockholders

The selling stockholders acquired their shares in private placements in August and September 2006.

On August 30, 2006, we issued 1,500,000 shares of common stock to Michael Sosnowik, our Chief Executive Officer and Chairman of the Board, under an employment agreement with Mr. Sosnowik. 1,200,000 of such shares are restricted shares which vest over a 4 year period commencing August 30, 2007.

Pursuant to a Distributor and License Agreement entered into on September 7, 2006 we issued 6,050,000 shares of common stock to Biosafe, as partial consideration of a grant to us of an exclusive license to sell the Diagnostic Products in the Market.

On September 6, 2006, we issued to Barron Partners, L.P. ("Barron") for a total purchase price of $2 million, 3,774,000 shares of our Series A Preferred Stock ("Series A Stock") and warrants to purchase an aggregate of $3,774,000 shares of our common stock. The Series A Stock is convertible into 3,774,000 shares of common stock.

On September 6, 2006 we issued to Leonardo and Kathleen Zangani an aggregate of 125,000 shares of our common stock for services in connection with the formation of our company.

We are registering all 6,050,000 outstanding shares of common stock held by Biosafe, 600,000 of the 1,500,000 shares of our common stock held by Michael Sosnowik, all 125,000 shares of our common stock held by the Zanganis, 3,774,000 shares of our common stock which are issuable upon conversion of the Series A Stock, and 3,774,000 shares of our

common stock issuable upon exercise of warrants.

3

## The Offering

| | |
|---|---|
| Securities being offered | Up to 14,323,000 shares of common stock. |
| Common Stock outstanding after offering | Approximately 15,223,000 shares of common stock, assuming 7,548,000 shares of stock are issued upon the conversion of Series A Stock and the exercise of warrants held by one of the selling stockholders. The 900,000 share difference between the number of shares of common stock being offered and the number of shares outstanding is the amount of restricted shares of our common stock issued to our CEO that are not being registered. |
| Limitation on Issuance of Common Stock | The holder of the Series A stock and the holders of the warrants cannot convert its shares of Series A Stock or exercise its warrants to the extent that such conversion and exercise would result in the holder and its affiliates owning more than 4.9% of our outstanding common stock. |
| Use of proceeds | We will not receive any proceeds from the sale of the shares of common stock by the selling stockholders, However, we will receive the exercise price of warrants held by one of our selling stockholders, if and when such warrants are exercised |

## Summary Financial Information

Since as of the Balance Sheet date of August 31, 2006, we had not commenced operations nor achieved our initial capital formation, there is no significant summary financial data to disclose.

## RISK FACTORS

An investment in Lab123 entails certain risks that should be carefully considered. In addition, these risk factors could cause actual results to differ materially from those expected include the following:

*We have only recently been organized and have very little operating history.*

The Company is a start-up, having been formed in August, 2006. Accordingly, we have practically no operating history nor any revenues on which you may evaluate our performance. The Company is subject to all of the risks encountered by a new company.

*Rapid screening and diagnostic at-home testing devices may not be accepted in the consumer marketplace.*

We are currently licensed to sell our five clinical diagnostic products for use in disease detection and prevention through internet-based companies and through retail drug outlets located in the United States. We are not licensed to sell our products in the professional market. Because of the lack of sales history, there can be no assurance that our products will be accepted in the consumer market or in any market. While we believe that the market for our products and other rapid testing products is very large, the actual size of the markets is unknown. Therefore, even if our products are accepted in our targeted markets, our actual sales may be much less than our estimate of our products' market potential.

*We have been the subject of a going concern opinion by our independent auditors who have raised substantial doubt as to our ability to continue as a going concern.*

Our Independent Registered Public Accountants have added an explanatory paragraph to their audit opinion issued in connection with our financial statements which states that our financial statements raise substantial doubt as to our ability to continue as a going concern. We have not generated revenues since inception, have accumulated losses of $132,247 from inception through August 31, 2006 and may not have sufficient working capital to sustain its operations for the next fiscal year. These factors raise substantial doubt regarding our ability to continue as a going concern. The continuation of the Company as a going concern is dependent upon the continued financial support from our shareholders, our ability to obtain necessary equity financing to continue operations and/or the attainment of profitable operations. Management has plans in place to address these concerns and expects that the Company will be able to obtain additional funds by equity financing and/or related party advances, if necessary; however, if we do need additional financing, there is no assurance that additional funding will be available to the extent required.

*We may continue to incur losses and are likely to require additional financing.*

We have incurred operating losses and negative cash flow from operations since our recent inception. Losses incurred since our inception have aggregated $132,247 as of August 31, 2006. There can be no assurance that we will be able to generate positive cash flows to fund our operations in the future or to pursue our strategic objectives. Assuming no significant changes from our plan, we believe that we will have sufficient cash to satisfy our needs for at least the next twelve months. If we are not able to operate profitably and generate positive cash flows, we will undoubtedly need to raise additional capital, most likely via the sale of equity securities, to fund our operations. If we do in fact need additional financing to meet our requirements, there can be no assurance that we will be able to obtain such financing on terms satisfactory to us, if at all. Alternatively, any additional equity financing may be dilutive to existing stockholders, and debt financing, if available, may include restrictive covenants. If adequate funds are not available, we might be required to limit or completely curtail our research and development activities or our selling, marketing and administrative activities, and such curtailment could have a material adverse effect on the future of our business as a going concern.

*We depend upon third parties for product development and commercialization; there can be no assurance of successful or timely development of additional products.*

Our business strategy includes the development of additional diagnostic products for the diagnostic business. We plan to rely on third parties for the development of products and technologies. There can be no assurance that we will be able to negotiate new product acquisitions on acceptable terms, if at all, or that our current business or future acquisitions, if made, will be successful. To the extent that we are not able to acquire ownership of or license new products, we could be forced to undertake such product development at our own expense. In such event, our success in developing new products will depend on our ability to achieve scientific and technological advances and to translate these advances into commercially competitive products on a timely basis. Development of new products requires significant research, development and testing efforts. We have limited resources to devote to the development of products and, consequently, a delay in the development of one product or the use of resources for product development efforts that prove unsuccessful may delay or jeopardize the development of other products. Any delay in the development, introduction and marketing of future products could result in such products being marketed at a time when their cost and performance characteristics would not enable them to compete effectively in their respective markets. If we are unable, for technological or other reasons, to complete the development and introduction of any new product or if any new product is not approved or cleared for marketing or does not achieve a significant level of market acceptance, our ability to remain competitive in our product niches would be impaired.

*We depend upon third parties for product manufacturing and clinical laboratory service.*

We plan to rely on others for the production of products and technologies. There can be no assurance that we will be able to negotiate new product manufacturing on acceptable terms, if at all, or that current or future manufacturing arrangements will be successful. To the extent that we are not able to outsource product manufacturing or laboratory services, we could be forced to undertake such activities at our own expense. The amount and timing of resources that any of these manufacturers devote to our product manufacturing activities may be outside of our control. With respect to any products manufactured by third parties, there can be no assurance that any third-party manufacturer will perform acceptably or that failures by third parties will not delay or impair our ability to deliver products on a timely basis.

*Competition in the human medical diagnostics industry is, and is expected to remain, significant.*

Our competitors range from development stage diagnostics companies to major domestic and international pharmaceutical and biotechnology companies. Many of these companies have financial, technical, marketing, sales, manufacturing, distribution and other resources significantly greater than ours. In addition, many of these companies have name recognition, established positions in the market and long standing relationships with customers and distributors. Moreover, the diagnostics industry continues to show a significant amount of consolidation whereby large domestic and international pharmaceutical companies are acquiring mid-sized diagnostics companies, further increasing the concentration of resources. There can be no assurance that technologies will not be introduced that could be directly competitive with or superior to our technologies.

*Rapid technological change may make our products obsolete or uncompetitive.*

The markets in which our rapid testing devices will compete are characterized by technological change, frequent new products and changes in consumer demand. The introduction of a new product embodying new technology can render existing products obsolete and unmarketable. Even if our products are successfully marketed, a newer product may be introduced that renders one or all of our products obsolete.

*Our products and activities are subject to regulation by various governments and government agencies.*

The testing, manufacture and sale of our products is subject to regulation by numerous governmental authorities, principally the United States Food and Drug Administration (the "FDA") and certain foreign regulatory agencies. Pursuant to the Federal Food, Drug, and Cosmetic Act, and the regulations promulgated thereunder, the FDA regulates the preclinical and clinical testing, manufacture, labeling, distribution and promotion of medical devices. We are limited in our ability to commence marketing or commercial sales in the United States of new products under development until we receive clearance from the FDA. The testing for, preparation of and subsequent FDA regulatory review of required filings can be a lengthy, expensive and uncertain process. Noncompliance with applicable requirements can result in, among other consequences, fines, injunctions, civil penalties, recall or seizure of products, repair, replacement or refund of the cost of products, total or partial suspension of production, failure of the government to grant pre-market clearance or pre-market approval for devices, withdrawal of marketing clearances or approvals and criminal prosecution.

There can be no assurance that we will be able to obtain necessary regulatory approvals or clearances for our products on a timely basis, if at all, and delays in receipt of or failure to receive such approvals or clearances, the loss of previously received approvals or clearances, limitations on intended use imposed as a condition of such approvals or clearances or failure to comply with existing or future regulatory requirements could negatively impact our sales and thus have a material adverse effect on our business.

We currently do not manufacture the medical devices we intend to distribute. However, under our license agreement with Biosafe for the products we intend to distribute, we have the right to source such products from another manufacturer and may do so in the future. As a manufacturer of medical devices for marketing in the United States we would be required to adhere to applicable regulations setting forth detailed good manufacturing practice requirements, which include testing, control and documentation requirements. We would also be required to comply with Medical Device Report (MDR) requirements, which require that a manufacturer reports to the FDA any incident in which its product may have caused or contributed to a death or serious injury, or in which its product malfunctioned and, if the malfunction were to recur, it would be likely to cause or contribute to a death or serious injury. Manufacturers are also subject to routine inspection by the FDA for compliance with Quality System Regulations (QSR) requirements, MDR requirements and other applicable regulations. Labeling and promotional activities are subject to scrutiny by the FDA and, in certain circumstances, by the Federal Trade Commission. We may incur significant costs to comply with laws and regulations in the future, which would decrease our net income or increase our net loss and thus have a potentially material adverse effect upon our business, financial conditions and results of operations.

Distribution of diagnostic products outside the United States is subject to extensive foreign government regulation. These regulations, including the requirements for approvals or clearance to market, the time required for regulatory review and the sanctions imposed for violations, vary from country to country. We may be required to incur significant costs in obtaining or maintaining foreign regulatory approvals. In addition, the export of certain of our products that have not yet been cleared for domestic commercial distribution may be subject to FDA export restrictions. Failure to obtain necessary regulatory approval or the failure to comply with regulatory requirements could reduce our product sales and thus have a potentially material adverse effect on our business, financial condition and results of operations.

*Our success depends, in part, on our ability, or the ability of our partners, to obtain patents and license patent rights, to maintain trade secret protection and to operate without infringing on the proprietary rights of others.*

There can be no assurance that our owned or licensed patents will afford meaningful protection against a competitor, or that patents issued or licensed to us will not be infringed upon or designed around by others, or that others will not obtain patents that we would need to license or design around. We could incur substantial costs in defending the Company in litigation brought by others. The potential for reduced sales and increased legal expenses would have a negative impact on our cash flow and thus our overall business could be adversely affected. Currently, we do not own any patents.

6

*We may not be able to successfully implement our plans to acquire other companies or technologies.*

Our growth strategy may include the acquisition of complementary companies, products or technologies. There is no assurance that we will be able to identify appropriate companies or technologies to be acquired, to negotiate satisfactory terms for such an acquisition, or to obtain sufficient capital to make such acquisitions. Moreover, because of limited cash resources, we will be unable to acquire any significant companies or technologies for cash and our ability to effect acquisitions in exchange for our capital stock may depend upon the market prices for our common stock, which could result in significant dilution to its existing stockholders. If we do complete one or more acquisitions, a number of risks arise, such as disruption of our existing business, short-term negative effects on our reported operating results, diversion of management's attention, unanticipated problems or legal liabilities, and difficulties in the integration of potentially dissimilar operations. Any of these factors could materially harm our business or our operating results.

*We depend on suppliers for our products' components.*

The components of our products include chemical, biological and packaging supplies that are generally available from several suppliers. We mitigate the risk of a loss of supply by maintaining a sufficient supply of finished goods to ensure an uninterrupted supply for at least three months. We have also qualified second vendors for all critical raw materials and believe that we can substitute a new supplier with respect to any of these components in a timely manner. If, for some reason, we lose our main supplier for a given material, there can be no assurances that we will be able to substitute a new supplier in a timely manner and failure to do so could impair the manufacturing of certain of our products and thus have a material adverse effect on our business, financial condition and results of operations.

*We have only limited manufacturing experience with certain products.*

Although our manufacturers are experienced in the manufacturing and packaging of our current products, certain of our diagnostic products which we may consider for future development, incorporate technologies with which we have little manufacturing experience. Assuming successful development and receipt of required regulatory approvals, significant work may be required to scale up production for each new product prior to such product's commercialization. There can be no assurance that such work can be completed in a timely manner and that such new products can be manufactured cost-effectively, to regulatory standards or in sufficient volume.

*Due to the specialized nature of our business, our success will be highly dependent upon our ability to attract and retain qualified scientific and executive personnel.*

We believe our success will depend to a significant extent on the efforts and abilities of Michael Sosnowik, our Chairman of the Board and Chief Executive Officer. We believe that Mr. Sosnowik would be difficult to replace. There can be no assurance that we will be successful in attracting and retaining skilled personnel, who are generally in high demand by other companies. The loss of, inability to attract, or poor performance by key scientific and executive personnel may have a material adverse effect on our business, financial condition and results of operations.

*The testing, manufacturing and marketing of medical diagnostic devices entails an inherent risk of product liability claims.*

To date, we have experienced no product liability claims, but any such claims arising in the future could have a material adverse effect on our business, financial condition and results of operations. Potential product liability claims may exceed the amount of our insurance coverage or may be excluded from coverage under the terms of our policy or limited by other claims under our umbrella insurance policy. Additionally, there can be no assurance that our existing insurance can be renewed by us at a cost and level of coverage comparable to that presently in effect, if at all. In the event that we are held liable for a claim against which we are not insured or for damages exceeding the limits of our insurance coverage, such claim could have a material adverse effect on our cash flow and thus potentially a materially adverse effect on our business, financial condition and results of operations.

*We do not have a CFO or Controller, the lack of which our auditors have advised us is a significant deficiency in our internal controls.*

During September 2006 our independent auditors, Marcum & Kliegman, LLP, advised us that they had identified a significant deficiency in our internal controls because we have only one employee (our Chief Executive Officer) in our accounting department and such person has not been trained as a Chief Financial Officer or a Controller. Therefore, our accounting department presently may not have the sophistication to design and implement a system of internal controls or to critically evaluate and implement new accounting pronouncements. Additionally, since our accounting staff consists of only one person, there is a lack of segregation of duties of our personnel, which also constitutes a significant deficiency in financial reporting. We have mitigated the above deficiencies by retaining a temporary outside consultant to assist with the proper accounting functions. We plan to hire a full time Chief Financial Officer within the next 12 months.

*There has, to date, been no active public market for our Common Stock, and there can be no assurance that an active public market will develop or be sustained.*

We were only recently incorporated and as of the date of this prospectus had only four stockholders and there has never been a trading market in our common stock. and we cannot give any assurance that there will ever be a market for our common stock. We do not anticipate that a market for our common stock will develop, if at all, until after the registration statement of which this prospectus is a part has been declared effective by the SEC. If a market for our common stock develops, there is a significant risk that our stock price may fluctuate dramatically in the future in response to any of the following factors, some of which are beyond our control:

- o   variations in our quarterly operating results;

- o   announcements that our revenue or income are below analysts' expectations;

- o   general economic slowdowns;

- o   changes in market valuations of similar companies;

- o   sales of large blocks of our common stock;

- o   announcements by us or our competitors of significant contracts, acquisitions, strategic partnerships, joint ventures or capital commitments;

- o   fluctuations in stock market prices and volumes;

- o   concern by potential investors that the large number of shares of common stock which may be sold pursuant to this prospectus may have a downward effect upon the market price of the stock.

- o   the effect of sales pursuant to this prospectus on the trading volume of our common stock.

In addition, the Company's securities are subject to the "penny" stock regulation of Rule 15g-9 of the Securities Exchange Act of 1934 (the "Exchange Act"). Rule 15g-9 of the Exchange Act is commonly referred to as the "penny stock" rule and imposes special sales practice requirements upon broker-dealers who sell such securities to persons other than established customers or accredited investors. A penny stock is any equity security with a market price less than $5.00 per share, subject to certain exceptions. Rule 3a51-1 of the Exchange Act provides that any equity security is considered a penny stock unless that security is: registered and traded on a national securities exchange and meets specified criteria set forth by the Securities and Exchange Commission (the "SEC"); authorized for quotation in the National Association of Securities Dealers' Automated Quotation System; issued by a registered investment company; issued with a price of five dollars or more; or issued by an issuer with net tangible assets in excess of $2,000,000. This rule may affect the ability of broker-dealers to sell the Company's securities.

For transactions covered by Rule 15g-9, a broker-dealer must furnish to all investors in penny stocks a risk disclosure document, make a special suitability determination of the purchaser, and receive the purchaser's written agreement to the transaction prior to the sale. In order to approve a person's account for transactions in penny stocks, the broker-dealer must (i) obtain information concerning the person's financial situation, investment experience, and investment objectives; (ii) reasonably determine, based on that information that transactions in penny stocks are suitable for the person and that the person has sufficient knowledge and experience in financial matters to reasonably be expected to evaluate the transactions in penny stocks; and (iii) deliver to the person a written statement setting forth the basis on which the broker-dealer made the

determination of suitability stating that it is unlawful to effect a transaction in a designated security subject to the provisions of Rule 15g-9(a)(2) unless the broker-dealer has received a written agreement from the person prior to the transaction. Such written statement from the broker-dealer must also set forth, in highlighted format immediately preceding the customer signature line, that the broker-dealer is required to provide the person with the written statement and the person should sign and return the written statement to the broker-dealer only if it accurately reflects the person's financial situation, investment experience and investment objectives.

8

*The rights of the holders of common stock may be impaired by the potential issuance of preferred stock.*

Our certificate of incorporation gives our board of directors the right to create new series of preferred stock. As a result, the board of directors has and in the future may, without stockholder approval, issue preferred stock with voting, dividend, conversion, liquidation or other rights which could adversely affect the voting power and equity interest of the holders of common stock. Preferred stock, which could be issued with the right to more than one vote per share, could be utilized as a method of discouraging, delaying or preventing a change of control. The possible impact on takeover attempts could adversely affect the price of our common stock. Although we have no present intention to issue any additional shares of preferred stock or to create any new series of preferred stock and the Certificate of Designations relating to the Series A Stock restricts our ability to issue additional series of preferred stock, we may issue such shares in the future.

*Because we are not subject to compliance with rules requiring the adoption of certain corporate governance measures, our stockholders have limited protections against interested director transactions, conflicts of interest and similar matters.*

The Sarbanes-Oxley Act of 2002, as well as rule changes proposed and enacted by the SEC, the New York and American Stock Exchanges and the Nasdaq Stock Market as a result of Sarbanes-Oxley require the implementation of various measures relating to corporate governance. These measures are designed to enhance the integrity of corporate management and the securities markets and apply to securities which are listed on those exchanges or the Nasdaq Stock Market. Because we are not presently required to comply with many of the corporate governance provisions and because we chose to avoid incurring the substantial additional costs associated with such compliance any sooner than necessary, we have not yet adopted all of these measures. We also are not in compliance with requirements relating to the distribution of annual and interim reports, the holding of stockholders meetings and solicitation of proxies for such meeting and requirements for stockholder approval for certain corporate actions. Until we comply with such corporate governance measures, regardless of whether such compliance is required, the absence of such standards of corporate governance may leave our stockholders without protections against interested director transactions, conflicts of interest and similar matters and investors may be reluctant to provide us with funds necessary to expand our operations.

*Failure to achieve and maintain effective internal controls in accordance with Section 404 of the Sarbanes-Oxley Act could have a material adverse effect on our business and operating results and stockholders could lose confidence in our financial reporting.*

Effective internal controls are necessary for us to provide reliable financial reports and effectively prevent fraud. If we cannot provide reliable financial reports or prevent fraud, our operating results could be harmed. We may be required to document and test our internal control procedures in order to satisfy the requirements of Section 404 of the Sarbanes-Oxley Act, which requires increased control over financial reporting requirements, including annual management assessments of the effectiveness of such internal controls and a report by our independent certified public accounting firm addressing these assessments. Failure to achieve and maintain an effective internal control environment, regardless of whether we are required to maintain such controls, could also cause investors to lose confidence in our reported financial information, which could have a material adverse effect on our stock price.

*The registration and potential sale by our stockholders of a significant number of shares could encourage short sales by third parties.*

Because there is no public market for our stock, there may be significant downward pressure on our stock price caused by the sale or potential sale of a significant number of shares pursuant to this prospectus, which could allow short sellers of our stock an opportunity to take advantage of any decrease in the value of our stock. The presence of short sellers in our common stock may further depress the price of our common stock. If the selling stockholders sell a significant number of shares of common stock, the market price of our common stock may decline. Furthermore, the sale or potential sale the offered shares and the depressive effect of such sales or potential sales could make it difficult for us to raise funds from other sources.

*Because the purchaser of our Series A Stock has a right of first refusal for future offering of our stock, we may have difficulty in raising additional funds if required for our business.*

Barron, which purchased its securities in a September 2006 private placement, has the right until September 2008 to participate in any future funding. These provisions may prevent us from raising additional funds during the next two years.

*Because the holder of our warrants has cashless exercise rights, we may not receive proceeds from the exercise of the outstanding warrants if the underlying shares are not registered.*

The holder of our warrants has cashless exercise rights, which provide it with the ability to receive common stock with a value equal to the appreciation in the stock price over the exercise price of the warrants being exercised. This right is not exercisable during the first six months that the warrants are outstanding and thereafter if the underlying shares are subject to an effective registration statement. To the extent that the holder of the warrants exercises this right, we will not receive proceeds from such exercise.

*The issuance and sale of the registered common stock could result in a change of control.*

If we issue all of the 7,548,000 shares issuable upon conversion of the Series A Stock and exercise of the warrants, the 7,548,000 shares of common stock offered by Barron, one of the selling stockholders, would constitute approximately 49.6% of our then outstanding common stock. The percentage would increase to the extent that we are required to issue any additional shares of common stock become upon conversion of the Series A Stock pursuant to the anti-dilution and adjustment provisions pertaining to such stock. Any sale of all or a significant percentage of those shares to a person or group could result in a change of control.

Forward-Looking Statements

Statements in this prospectus may be "forward-looking statements." Forward-looking statements include, but are not limited to, statements that express our intentions, beliefs, expectations, strategies, predictions or any other statements relating to our future activities or other future events or conditions. These statements are based on current expectations, estimates and projections about our business based, in part, on assumptions made by management. These statements are not guarantees of future performance and involve risks, uncertainties and assumptions that are difficult to predict. Therefore, actual outcomes and results may, and are likely to, differ materially from what is expressed or forecasted in the forward-looking statements due to numerous factors, including those described above and those risks discussed from time to time in this prospectus, including the risks described under "Risk Factors," in this prospectus and in other documents which we file with the SEC. In addition, such statements could be affected by risks and uncertainties related to product demand, our ability to develop, obtain rights to or acquire new products and successfully market the products, market and customer acceptance, our ability to raise any financing which we may require for our operations, competition, government regulations and requirements, pricing and development difficulties, our ability to make acquisitions and successfully integrate those acquisitions with our business, as well as general industry and market conditions and growth rates, and general economic conditions. Any forward-looking statements speak only as of the date on which they are made, and we do not undertake any obligation to update any forward-looking statement to reflect events or circumstances after the date of this prospectus.

## USE OF PROCEEDS

We will not receive any proceeds from the sale of common stock offered by this prospectus from the selling stockholders. If one of the selling stockholders exercise any warrants held by it, we will receive the amount of the exercise price. The maximum total exercise price is $3,584,300, which we would receive only if all of the warrants were exercised at their present exercise prices, which are $.80 per share as to warrants to purchase 1,887,000 shares of common stock and $1.10 per share as to warrants to purchase an additional 1,887,000 shares of common stock. Any proceeds which we receive from the exercise of the warrants would be used for working capital and general corporate purposes. In the event that the exercise price of the warrants is reduced as a result of our failure to meet the required level of earnings before interest, taxes, depreciation and amortization ("EBITDA") per share, the total proceeds from the exercise of the warrants could be reduced by up to 55%, with the result that the total proceeds would be reduced by up to $1,971,365. We cannot assure you that any of the warrants will be exercised.

The holder of our warrants has cashless exercise rights, which provide it with the ability to receive common stock with a value equal to the appreciation in the stock price over the exercise price of the warrants being exercised. This right is not exercisable during the first six months that the warrants are outstanding and thereafter if the underlying shares are subject to an effective registration statement. The six month period will end on February 6, 2007. To the extent that the holder of the warrants exercises this
right, we will not receive proceeds from such exercise.

## DETERMINATION OF OFFERING PRICE

We are not selling any of the common stock that we are registering. The common stock will be sold by the selling