stockholders listed in this prospectus. Because there is no trading market in our common stock as of the date of this prospectus, the selling stockholders will sell shares at prices ranging from $1.15 to $1.90 per share until a public market develops for the common stock. Once a public market develops for the common stock, the selling stockholders may sell their shares of common stock in the public market based on the market price at the time of sale or at negotiated prices.

## SELLING STOCKHOLDERS

The following table sets forth the names and addresses of the selling stockholders, the number of shares of common stock owned beneficially by the selling stockholders as of September 19, 2006 and the number of shares of our common stock that may be offered by the selling stockholders pursuant to this prospectus. No selling stockholder, other than Michael Sosnowik, who will own 900,000 of restricted stock after completion of the offering, will own any shares of our outstanding common stock upon completion of the offering. The table and the other information contained under the captions "Selling Stockholders" and "Plan of Distribution" has been prepared based upon information furnished to us by or on behalf of the selling stockholders.

10

On September 6, 2006 we entered into agreements with Barron, a New York based private limited partnership which is an accredited investor, regarding a $2 million private placement equity financing of the Company. The financing consisted of the sale to Barron of 3,774,000 shares of our Series A Convertible Preferred Stock. Each share of preferred stock is convertible initially into one share of the Company's common stock. In addition, we issued warrants to Barron to acquire up to an additional 3,774,000 shares of our common stock, of which 1,887,000 are exercisable at $0.80 per share and 1,877,000 are exercisable at $1.10 per share. The warrants are exercisable for five years from the date of issuance, which was September 6, 2006.

We also entered into a registration rights agreement with Barron whereby, among other things, we agreed to file a registration statement, of which this prospectus is a part, with the SEC, to register the resale of the shares of common stock that we will issue upon conversion of the convertible preferred stock and exercise of warrants issued to Barron. We agreed to keep the registration statement effective until the date when all of the shares registered hereunder are sold or the date on which the shares registered hereunder can be sold without registration and without restriction as to the number of shares that may be sold.

We have also granted to each of the other selling stockholders, "piggyback" registration rights to include shares of common stock they own in the registration statement and this prospectus.

The shares being offered hereby are being registered to permit public secondary trading, and the selling stockholders are under no obligation to sell all or any portion of their shares.

| Name and Address of Beneficial Owner | Shares Beneficially Owned Prior to Offering | Shares Offered (1) |
|---|---|---|
| Barron Partners, LP (2)<br>c/o Barron Capital Advisors, LLC<br>730 Fifth Avenue, 25th Floor<br>New York, NY 10019 | 7,548,000 | 7,548,000 |
| BioSafe Laboratories, Inc.<br>8600 West Catalpa<br>Chicago, Illinois 60656 | 6,050,000 | 6,050,000 |
| Michael Sosnowik<br>233 Narragansett Avenue<br>Lawrence, New York 11559 | 300,000(3) | 600,000 |
| Leonardo and Kathleen Zangani<br>18 Flintrock Road<br>Flemington, New Jersey 08822 | 125,000 | 125,000 |

(1) Assumes that all shares are sold pursuant to this offering and that no other shares of common stock are acquired or disposed of by the selling stockholders prior to the termination of this offering. Because the selling stockholders may sell all, some or none of their shares or may acquire or dispose of other shares of common stock, we cannot estimate the aggregate number of shares which will be sold in this offering or the number or percentage of shares of common stock that each selling security holder will own upon completion of this offering.

(2) Mr. Andrew B. Worden, president of the general partner of Barron, has sole voting and dispositive power over the

shares beneficially owned by Barron.

(3) Under his employment agreement with the Company, dated as of August 30, 2006, Mr. Sosnowik was issued 1,500,000 shares of the Company's common stock, of which 300,000 shares were fully vested on issuance and 300,000 shares shall become vested on the each of the first through fourth anniversaries of August 30, 2006 provided that Mr. Sosnowik is then employed by the Company under the agreement. Therefore, the 1,200,000 shares of common stock of the Company which were issued to Mr. Sosnowik on August 30, 2006, but which are not yet vested on the date of this prospectus are not reported in the table as beneficially owned by Mr. Sosnowik.

11

The securities purchase agreement with Barron, the Certificate of Designations relating to the Series A Stock and the warrants all provide that the Series A Stock cannot be converted and the warrants cannot be exercised to the extent that the number of shares of common stock held by Barron and its affiliates after such conversion or exercise would exceed 4.9% of our outstanding common stock. Beneficial ownership is determined in the manner provided in Section 13(d) of the Securities Exchange Act of 1934 and Regulation 13d-3 of the SEC thereunder. This provision, which cannot be modified, limits the ability of Barron to convert its shares of Series A Stock and exercise its warrants. Based on our outstanding common stock on September 12, 2006, of 7,675,000 shares, Barron would not be able to convert Series A Stock or exercise warrants for more than 395,452 shares of common stock. As the number of shares of common stock increases, whether upon conversion of Series A Stock, exercise of warrants or for any other reason, the number of shares which could be issued under this limitation will increase. In the event that any holder of the Series A Stock or the warrants originally issued to Barron transfers its, her or his shares of Series A Stock or warrants, the transferee, if it is not an affiliate of the transferor, would be subject to a separate 4.9% limitation.

**September 2006 Private Placement to Barron Partners, L.P.**

In September 2006, we issued to Barron for a purchase price of $2 million, an aggregate of 3,774,000 shares of Series A Stock, and warrants to purchase an aggregate of 3,774,000 shares of common stock. Pursuant to the preferred stock purchase agreement with Barron relating to the issuance of the Series A Stock and warrants:

- o We agreed that the audit and compensation committees of our Board of Directors would be composed solely of independent would have a majority of independent directors. Our failure to meet these requirements would result in the payment of liquidated damages.

- o We and Barron entered into a registration rights agreement pursuant to which we agreed to file after the closing, the registration statement of which this prospectus is a part and have the registration statement declared effective by January 4, 2007. We will be required to issue 2,491 shares of Series A Stock for each day of the delay in effectiveness of the registration statement after January 4, 2007. We will also be required to issue 2,491 shares of Series A Stock for each day that we fail to keep this registration statement current and effective, with certain limited exceptions.

- o The investors have the right to participate in any future financing until September 6, 2008.

- o If prior to September 6, 2010 and so long as Barron holds at least 5% of the outstanding Series A Stock, we issue stock at a purchase price or warrants or convertible securities at an exercise or conversion price which is less than the conversion price of the Series A Stock or the exercise price of the warrants, the conversion price and exercise price will be reduced to such lower price. The initial conversion price of the Series A Stock is $.53 per share and the initial conversion ratio is one share of common stock for each share of Series A Stock. Any change in the conversion price will automatically result in an adjustment in the conversion ratio of the Series A Stock.

- o If our earnings before interest, taxes, depreciation and amortization ("EBITDA") for the three months ending December 31, 2006 are less than $.0306 per share, there would be a reduction in the conversion price of the Series A Stock and the exercise price of the warrants of up to 40%. If our earnings before interest, taxes, depreciation and amortization ("EBITDA") for the fiscal year ending December 31, 2007 are less than $.19 per share, there would be a further reduction in the conversion price of the Series A Stock and the exercise price of the warrants of up to 25%.

## PLAN OF DISTRIBUTION

The selling stockholders and any of their pledgees, donees, assignees and successors-in-interest may, from time to

time, sell any or all of their shares of common stock on any stock exchange, market or trading facility on which the shares are traded or in private transactions or by gift. These sales may be made at fixed or negotiated prices. The selling stockholders cannot predict the extent to which a market will develop or, if a market develops, what the price of our common stock will be. Because there is no trading market in our common stock as of the date of this prospectus, the selling stockholders will sell shares at prices ranging from $1.15 to $1.90 per share until a public market develops for the common stock. Once a public market develops for the common stock, the selling stockholders may sell their shares of common stock in the public market based on the market price at the time of sale or at negotiated prices. Subject to the foregoing, the selling stockholders may use any one or more of the following methods when selling or otherwise transferring shares:

o   ordinary brokerage transactions and transactions in which the broker-dealer solicits purchasers;

o   block trades in which a broker-dealer will attempt to sell the shares as agent but may position and resell a portion of the block as principal to facilitate the transaction;

http://www.sec.gov/Archives/edgar/data/1375772/000114420406039504/v053300_sb2.htm   4/28/2008

- sales to a broker-dealer as principal and the resale by the broker-dealer of the shares for its account;

- an exchange distribution in accordance with the rules of the applicable exchange;

- privately negotiated transactions, including gifts;

- covering short sales made after the date of this prospectus.

- pursuant to an arrangement or agreement with a broker-dealer to sell a specified number of such shares at a stipulated price per share;

- a combination of any such methods of sale; and

- any other method of sale permitted pursuant to applicable law.

See "Selling Stockholders" for information concerning the restriction on the right of the holder of the Series A Stock and the warrants to convert the shares of Series A Stock and to exercise warrants if such conversion or exercise would result in the holder and its affiliates beneficially owning more than 4.9% of our common stock. Because of the limitation whereby Barron cannot hold more than 4.9% of our stock, there is a limit on the number of shares that it may sell at any time.

Broker-dealers engaged by the selling stockholders may arrange for other brokers dealers to participate in sales. Broker-dealers may receive commissions or discounts from the selling stockholders (or, if any broker-dealer acts as agent for the purchaser of shares, from the purchaser) in amounts to be negotiated. The selling stockholders do not expect these commissions and discounts to exceed what is customary in the types of transactions involved.

A selling stockholder may from time to time pledge or grant a security interest in some or all of the shares or common stock or warrant owned by such selling stockholder and, if the selling stockholder defaults in the performance of the secured obligations, the pledgees or secured parties may offer and sell the shares of common stock from time to time under this prospectus, or under an amendment to this prospectus under Rule 424(b)(3) or other applicable provision of the Securities Act of 1933 amending the list of selling stockholders to include the pledgees, transferees or other successors in interest as selling stockholders under this prospectus.

In connection with the sale of our common stock or interests therein, the selling stockholders may enter into hedging transactions with broker-dealers or other financial institutions which may in turn engage in short sales of our common stock in the course of hedging the positions they assume. The selling stockholders may, after the date of this prospectus, also sell shares of our common stock short and deliver these securities to close out their short positions, or loan or pledge their common stock to broker-dealers that in turn may sell these securities. The selling stockholders may also enter into option or other transactions with broker-dealers or other financial institutions or the creation of one or more derivative securities which require the delivery to such broker-dealer or other financial institution of shares offered by this prospectus, which shares such broker-dealer or other financial institution may resell pursuant to this prospectus (as supplemented or amended to reflect such transaction).

The selling stockholders also may transfer the shares of common stock in other circumstances, in which case the transferees, pledgees or other successors in interest will be the selling beneficial owners for purposes of this prospectus. In the event of a transfer by a selling stockholder of the Series A Stock, warrants or the common stock issuable upon conversion or transfer of the Series A Stock or warrants other than a transfer pursuant to this prospectus, we may be required to amend or supplement this prospectus in order to name the transferee as a selling stockholder.

Biosafe and Barron, two of the selling stockholders, and any broker-dealers or agents that are involved in selling the shares may be deemed to be "underwriters" within the meaning of the Securities Act in connection with such sales. In such

event, any commissions received by such broker-dealers or agents and any profit on the resale of the shares purchased by them may be deemed to be underwriting commissions or discounts under the Securities Act. The selling stockholders have informed us that they do not have any agreement or understanding, directly or indirectly, with any person to distribute the common stock.

Because Biosafe and Barron Partners, L.P may be deemed to be "underwriters" within the meaning of the Securities Act, they will be subject to the prospectus delivery requirements of the Securities Act. Federal securities laws, including Regulation M, may restrict the timing of purchases and sales of our common stock by the selling stockholders and any other persons who are involved in the distribution of the shares of common stock pursuant to this prospectus.

We are required to pay all fees and expenses incident to the registration of the shares. We have agreed to indemnify the selling stockholders against certain losses, claims, damages and liabilities, including liabilities under the Securities Act.

# MANAGEMENT'S DISCUSSION AND ANALYSIS OR PLAN OF OPERATION

The following discussion should be read in conjunction with the financial statements and accompanying notes included elsewhere herein.

**Plan of Operation**

As of September 21, 2006, the Company's net cash available was approximately $860,000. The Company does not have any plans for capital expenditure or research and development projects that would cumulatively exceed $100,000 within the twelve months following the date of this prospectus. The Company also does not have, nor does it plan to have, any significant debt or off balance commitments that could consume material amounts of cash during the next twelve months.

During the next twelve months the Company plans to hire at least three new employees, including a Chief Financial Officer, a sales executive and an administrative assistant, and depending on future strategies, sales successes and any other employee intensive strategies, it is possible that the Company may need to hire or retain additional employees or consultants.

One of the Company's current strategies is to concentrate on developing relationships with customers that offer the best combination of profitability and payment terms. Management believes that with this strategy and its relatively conservative plan for future general cash commitments, cash resources and cash flows for the first year of operation should be sufficient to adequately sustain operations.

While acquisitions may be considered during the first year, the primary focus of the Company as to new products, will be to concentrate on products that can be sold via a sales representative or contractual joint venture. A purchase of an additional product in the first year is possible, but not likely.

**Management's Discussion and Analysis of Financial Condition and Results of Operations**

The Company was formed on August 25, 2006, and, accordingly, its only operations through the date of this prospectus have been related to the creation and formation of the Company. The Company's net loss from inception through August 31, 2006 was $132,247 and was exclusively the result of the legal and accounting fees associated with the formation of the Company and the compensation expense recorded in connection the CEO's stock grant. The formation expenses as well as expenses incurred through the date of this prospectus and the remainder expected to be incurred should not aggregate more than approximately $140,000.

Except as noted above, as of the date of this prospectus:

- There are not any known trends, events or uncertainties that have or are reasonably likely to have a material impact on the Company's short-term or long-term liquidity, its net sales, revenues or income from continuing operations.
- The Company has not incurred any material commitments for capital expenditures.
- Other than the Company's formation, registration and compensation expenses, the Company has not experienced any significant elements of income or loss that do not arise from its continuing operations.
- While management believes its plans for operations should allow the cash flows and cash resources to adequately sustain operations, there is no certainty that this plan will succeed, thus, requiring additional working capital via the issuance of stock or debt. Also, there is no assurance that, given the operational status of the Company should such issuances be necessary, the issuance of debt or additional stock would be possible.

As of August 31, 2006, we have not generated any revenues since inception, have an accumulated loss of $132,247 since inception and have a negative working capital of $24,247 which is insufficient to sustain its operations for the next fiscal year. These factors raise substantial doubt regarding the Company's ability to continue as a going concern. The continuation of the Company as a going concern is dependent upon the continued financial support from its shareholders, the ability of the

Company to obtain necessary equity financing to continue operations and the attainment of profitable operations. Management has plans in place to address this concern and expects that the Company will be able to obtain additional funds by equity financing and/or related party advances; however, there is no assurance that additional funding will be available to the extent required to address this concern.

**Off Balance Sheet Arrangements**

The Company is not party to nor has it any plans to become a party to any off balance sheet arrangement.

**Recent Financing**

On September 6, 2006 we entered into agreements with Barron Partners, L.P., a New York based private partnership ("Barron"), which is an accredited investor, regarding a $2 million private placement equity financing of the Company. The financing consisted of the sale to Barron of 3,774,000 shares of our Series A Convertible Preferred Stock. Each share of preferred stock is convertible initially into one share of the Company's common stock. In addition, we issued warrants to Barron to acquire up to an additional 3,774,000 shares of our common stock, of which 1,887,000 are exercisable at $0.80 per share and 1,877,000 are exercisable at $1.10 per share. The warrants are exercisable for five years from the date of issuance, which was September 6, 2006.

The exercise prices of the warrants, and the conversion rate, are subject to adjustment upon the occurrence of certain specified events, including issuance of additional shares of common stock or subdivision or combining of shares of common stock.

The conversion right as contained in the preferred stock certificate of designations and the exercise rights contained in the warrants provide that a holder will not convert an amount of preferred stock or exercise warrants to the extent that the number of shares held by the holder, when added to the number of shares of common stock beneficially owned by such holder or issuable if the holder exercised one or more of its warrants immediately prior to conversion, would exceed 4.9% of the Company's issued and outstanding common stock.

The transaction with Barron also included a Registration Rights Agreement in which the Company has agreed to file a registration statement on Form SB-2 covering the shares of common stock issuable upon the exercise of the warrants or the conversion of the preferred stock. If the registration statement is not declared effective or is otherwise ineffective or incomplete on the time schedule cited in the Registration Rights Agreement, the Company shall pay the holders of the preferred stock or warrants liquidated damages in the amount of 2,491 shares of preferred stock per day.

The Company plans to use the net proceeds, after transaction fees and expenses, for key strategic initiatives, working capital and other general corporate purposes.

The Company granted to Barron the right for a two year period ending September 6, 2008 to participate in any subsequent equity financings by the Company on a pro rata basis on the same terms and conditions as offered by the Company to other investors.

The agreements with Barron state that if the Company's earnings before interest, taxes, depreciation and amortization ("EBITDA") for the three months ending December 31, 2006 and the fiscal year ending December 31, 2007 are less than certain targeted amounts, then the conversion rate of the preferred stock and the exercise price of the warrants issued to Barron shall be reduced in accordance with certain formulas.

The Company has agreed to ensure that a majority of the compensation and audit committees of the Board of Directors of the Company are qualified independent directors within 30 days after September 6, 2006. If the Board fails to meet either of such majority committee requirements, then the Company is obligated to pay to Barron liquidated damages at the rate of $36,667 per month for each month during which this requirement has not been met.

The foregoing is a summary of the terms of the Company's various agreements with Barron and instruments issued to Barron. Such summary does not purport to be complete and is qualified in its entirety by reference to the full text of each such agreement and instrument, copies of which are have been filed as exhibits to the Company's Registration Statement on Form SB-2 of which this prospectus comprises a part.

**Recently Issued Accounting Pronouncements**

In July 2006, the Financial Accounting Standards Board (the "FASB") issued FASB Interpretation No. 48, "Accounting for Uncertainty in Income Taxes - an interpretation of FASB Statement No. 109" ("FIN48"), which clarifies the accounting for uncertainty in tax positions. This interpretation requires that the Company recognize in its financial statements, the impact of a tax position, if that position is more likely than not of being sustained on audit, based on the technical merits of the position. The provisions of FIN 48 are effective as of the beginning of the Company's 2007 fiscal year, with the cumulative effect of the change in accounting principle recorded as an adjustment to opening retained earnings. The Company is currently evaluating the impact of adopting FIN 48 on its financial statements.

In February 2006, the Financial Accounting Standards Board issued SFAS No. 155, "Accounting for Certain Hybrid Financial Instruments, which amends SFAS No. 133, Accounting for Derivative Instruments and Hedging Activities" ("SFAS No. 155"), and SFAS No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities" . SFAS No. 155 simplifies the accounting for certain derivatives embedded in other financial instruments by allowing them to be accounted for as a whole if the holder elects to account for the whole instrument on a fair value basis. SFAS No. 155 also clarifies and amends certain other provisions of SFAS No. 133 and SFAS No. 140. SFAS No. 155 is effective for all financial instruments acquired, issued or subject to a remeasurement event occurring in fiscal years beginning after September 15, 2006. Earlier adoption is permitted, provided we have not yet issued financial statements, including for interim periods, for that fiscal year. The Company does not expect that the adoption of SFAS 155 will have a material impact on its financial position and results of operations.

**Critical Accounting Policies**

*Income Taxes*

Deferred income taxes are provided for the differences between the bases of assets and liabilities for financial reporting and income tax purposes. A valuation allowance is established when necessary to reduce deferred tax assets to the amount expected to be realized.

The Company recorded a deferred income tax asset for the tax effect of net operating loss carryforwards, aggregating approximately $49,500. A full valuation allowance has been established to reduce deferred tax assets to the amount estimated to be realized.

The effective tax rate differs from the statutory rate of 34% due to the affects of state income taxes and the increase in the valuation allowance.

*Loss Per Share*

Loss per share is computed by dividing net loss by the weighted-average number of shares of Common Stock outstanding during the period.

15

*Use of Estimates*

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of expenses during the reporting period. Actual results could differ from those estimates.

## DESCRIPTION OF BUSINESS

We were incorporated in Delaware on August 25, 2006 and are engaged in the manufacture and marketing of clinical diagnostic products for use in disease detection and prevention. Under an exclusive license agreement with Biosafe ("Biosafe") we intend to sell 5 such diagnostic products (the "Diagnostic Products") to retail drug stores, retail drug mass merchandisers, and the distributors, marketers, brokers and group buyers who supply medical products to retail drug stores, retail drug mass merchandisers in the United States and to internet-based retail drug companies (the "Market").

The products we currently license from Biosafe and market are:

- BIOSAFE Cholesterol Panel including Total Cholesterol, HDL, LDL and Triglycerides;

- BIOSAFE Anemia Meter, a rapid result quantitative hemoglobin-measuring device;

- BIOSAFE Prostate Specific Antigen (PSA) test;

- BIOSAFE Thyroid Stimulating Hormone (TSH) test; and

- BIOSAFE Hemoglobin A1c (Diabetes) test

**Our Diagnostics Products Business**

In vitro diagnostic testing is the process of analyzing the components of a wide variety of body fluids outside of the body to identify the presence of markers for diseases or other human health conditions. The human health in vitro diagnostic testing market consists of reference laboratory and hospital laboratory testing, testing in physician offices and the emerging over-the-counter market, in which testing is done at home by the consumer. Traditional laboratory testing for conditions in human subjects requires an individual to visit a lab, clinic, hospital or a doctor's office where a vial of blood is drawn from a vein. This is often inconvenient (involving a significant time commitment) and is often accompanied by severe nervous apprehension, since more people are "afraid" of needles than care to admit it. Consequently, individuals who need testing often avoid it because of the "hassle" and fear factors. Our products, as easy-to-use self-collected at-home tests, provide a readily accepted, easy to use and convenient alternative to this traditional testing method.

Our licensor, Biosafe, has been developing and marketing new clinical diagnostic products for more than 10 years. Biosafe's products, including those that we license the right to market, consist of a blood collection kit that contains everything needed for the consumer to self-collect his or her own blood sample (several drops from a single finger-nick, in contrast to a vial at the laboratory). The specimen is then mailed to BioSafe's laboratory for analysis. The results are mailed back to the consumer in a clear and easy-to- read, consumer-friendly laboratory report. The major obstacles of time and inconvenience (and possibly the fear of a venipuncture blood draw) have been removed. Free of location constraints, this consumer-friendly testing method brings with it a new and convenient way to better manage one's own health. The convenience and ease of use of Biosafe's testing method has attracted thousands of new consumers who had previously been reluctant to test even though they exhibited a clear need.

16

Case 1:07-cv-11135-JSR   Document 14-47   Filed 04/30/2008   Page 13 of 20

| | Comparison of Testing Methods | |
|---|---|---|
| | **Traditional Laboratory Testing** | **Our "at home" Alternative** |
| **Convenience** | One or more visits to lab or physician. Scheduled visits often required | Self-collected in the comfort of the home "at will" |
| **Costs** | High | Low (Sometimes as low as 1/3 the cost of traditional test methods) |
| **Compliance** | Tests often delayed or not performed. High cost to "healthcare system" | Higher Compliance |
| **Quality** | Equal to BioSafe test results | Equal to traditional lab test results |

While Biosafe's technology is applicable to many diseases and conditions, the tests we have licensed focus on those disease states that affect the largest populations:

| **TARGETED DISEASE STATES** | **TESTS** | **ESTIMATED SIZE OF U.S. PATIENT GROUPS** |
|---|---|---|
| Prostate Disease | Prostate Screen | 2 + million men with prostate |
| Diabetes | Hemoglobin A1c | 18.2 million diabetics[2] |
| Heart Disease | Cholesterol Panel | 13 million men and women[3] |
| Thyroid Disease | Thyroid Test | 13 million women and men[4] |
| Anemia | Anemia Test | 3.4 million [5] |

Biosafe owns and operates its own laboratory, which is certified under the Clinical Laboratory Information Act of 1988 ("CLIA") and accredited by the College of American Pathologists ("CAP"). CAP accreditation is the highest accreditation available to a clinical laboratory. In addition, there are levels of CAP accreditation. Biosafe has received the highest level of CAP accreditation-Accreditation with Distinction. Biosafe has the capability to process samples from almost anywhere in the world and is centrally located in Chicago, Illinois.

**Strategy**

Our primary objective is to commercialize at home diagnostic testing products for use by consumers. Our strategies for achieving this objective include the following:

- To utilize master distributors where ever possible;
- To market large retail drug chains;
- To market to mass merchandiser with retail drug divisions; and
- To license other products for all sources available appropriate to our customers and our markets.

---

[1] Dr. Leslie Michelson, President & CEO of Prostate Cancer Foundation

[2] Estimated 13 million diagnosed, remainder undiagnosed. 2002 fact sheet from www.diabetes.org

[3] Estimated with heart disease.

[4] www.thyroid.org

[5] National Center for Health Statistics

17

**Our Products**

Our products specialize in the use of micro-sample blood transportation devices and unique, scientific procedures for the clinical testing of these micro-blood samples. These products are based on tried and true platforms for micro-blood sample technologies that provide accurate and convenient clinical laboratory tests. These platforms allow an individual to safely and conveniently collect, in a non-clinical setting, such as in one's home or office, a small blood sample (a couple of drops from a finger nick) and send it to a laboratory where tests can be performed under exacting clinical standards. The blood transportation devices (a patented telfa-card and patented plastic collection device) and technologies for the collection, transportation, stabilization and processing of micro-blood samples make it possible to gather and manage bio-medical data on large populations without the impediment of a venous blood draw and a visit to the lab, clinic or physician's office. There is no difference between the results obtained from our product's micro-sample analysis and those obtained from a traditional venous blood draw. In fact, the FDA has found our micro-sample analysis to be substantially equivalent to that obtained from a traditional venous blood draw.

As the trend toward health consciousness increases and time constraints grow, it seems that people either do not have time for (or make excuses not to take) routine screening or diagnostic tests. In addition, some tests involve embarrassment or discomfort, so people avoid them. This, coupled with the growing trend toward self-administered at-home tests has resulted in expanding markets for our products.

Our products have been developed as a unique set of blood sample collection kits. Each kit is a complete blood collection "system" designed for a specific test that offers easy and convenient access to accurate and quantitative diagnostic testing for consumer markets. Everything needed to collect the micro-sample specimen is included in each kit. The collection process is quick and virtually painless. Using the included finger lancet, a couple of drops of blood are taken from a nick of the finger, placed in a small, proprietary micro-sample blood collection device and sent postage paid to Biosafe for analysis. A laboratory report is then mailed to the customer, physician and/or the disease management company in an easy-to-understand format. This report provides a numerical (quantitative) test value, not just a simple "yes" or "no" answer, which merely indicates the presence of a condition, not the severity (as the quantitative result does). Since all our tests provide quantitative results, the report can be used to identify and track shifts in the condition over time. This is very significant since comparing the results of an initial test to the results of subsequent tests can determine the degree of effectiveness of treatment or the onset of side effects from drug usage.

Our current products consist of the following:

- **Cholesterol Panel** (a lipid profile consisting of total cholesterol, high density cholesterol ("HDL"), low density cholesterol ("LDL") and triglycerides). This Cholesterol Panel is the first self-collected lipid profile for dried blood sample analysis that satisfies the National Cholesterol Education Program's rigorous performance standards. It is used in the management and determination of coronary heart disease.
- **Hemoglobin A1c** (a test that meets the certification standards of the National Glycohemoglobin Standardization Program). This test is critical for proper blood sugar monitoring and regulation by persons affected with diabetes.
- **Prostate Screen** (a test to determine blood levels of prostate specific antigen "PSA")). This test is used to help determine abnormal prostate conditions, such as prostate cancer.
- **Thyroid Test** (a test to determine blood levels of thyroid stimulating hormone ("TSH")). This test is used to help determine thyroid dysfunction and to successfully manage treatment regimens.
- **Anemia Test** (a rapid response test - like a home pregnancy test, the results are available to the user immediately - for low hemoglobin levels). This test is used to monitor and identify the onset or change in hemoglobin levels which is a common side effect for many disease states including HIV, chronic kidney disease and cancer.

We believe that that our tests provide the following benefits to consumers:

- Easy and convenient to use

- low cost
- administered in private
- takes only seconds

- Ease of use leads to the test being taken, as opposed to being avoided.
- Test results are *quantitative*, as opposed to *qualitative*. The significance is that instead of merely indicating the existence of a condition (qualitative result), the quantitative result indicates the severity of the condition.
- Use leads to early detection of abnormal conditions.
- Early detection leads to early treatment, which increases the odds for a cure.
- Changes in the condition and the effectiveness of treatment can be identified and tracked over time by comparing the quantitative test results.

18

**Technology Platforms**

The technology for our products was developed by Biosafe which has been engaged since 1994 in developing technologies and products meeting the needs of, originally, their pharmaceutical customer base, and, increasingly, retail market opportunities.

Traditional blood tests have involved a venous blood draw of a vial of the patient's blood, performed in a physician's office (often by a nurse or phlebotomist); a hospital setting; or at the drawing station of a traditional laboratory. Often unpleasant and often inconvenient, this process effectively reduces testing compliance when a doctor instructs a patient to make a separate visit to a lab for a test.

Our tests have been proven to produce equivalent results (via double blind trials and other FDA and CLIA required testing with much smaller blood samples, allowing for, as appropriate, self collection in the home or in a professional setting. The testing with microsamples is possible because of the collection procedure on the one end, the sample transportation and the specialized analysis of the smaller sized samples in the laboratory.

Using proprietary systems, patients provide blood samples consisting of a few drops of blood (from a lancet nick on the finger) on a specially treated paper card. Variations of this system are used for the cholesterol test, the hemoglobin A1c, and the PSA test.

The patented Enhanced Blood Collection Card used in the cholesterol panel includes a filter card with a Telfa® overlay which evenly distributes a capillary blood drop for accurate total cholesterol, HDL and triglyceride measurement. Dried blood samples have stability of 14 -28 days depending on the storage and the card treatment for a given test.

The cholesterol panel is the first and only self-collected lipid profile for dried blood sample analysis that satisfies the National Cholesterol Education Program ("NCEP") rigorous performance standards. Proprietary methods to stabilize dried samples to serve as reference materials and standardized calibrators has attracted a positive interest from the Centers for Disease Control, which oversees the NCEP, Cholesterol Reference Method Laboratory Network, and the administration of public health testing initiatives for the World Health Organization (WHO).



*BioSafe Enhanced Blood Collection Card*

The patented Blood Transport System ("BTS") is a device for collecting a specific amount of whole blood and combining it with the correct diluent for a given test, again in specific amounts. The diluent stabilizes the critical analyte (PSA or TSH, for example) for transportation, and the diluted whole blood sample is used for analysis in the lab. The BTS has the unique ability to keep blood from clotting during collection and delivery; there is a patent pending on the diluent stabilizing solution for hormones.

The primary significances of the BTS are threefold:

- **Necessity and Versatility of Liquid Blood Transportation Modes** - Certain analytes cannot be transported in a dried blood spot form or any other form other than liquid
- **Ease of Use** - The easy to use BTS plastic device accurately measures 80 uL of blood (about three drops, again from a finger prick) and the view port changes color to indicate when the correct amount of blood has been drawn.
- **Maintaining Clinical Stability** - The BTS preserves a stable specimen as it transported, without any special considerations, other than the leak proof foil pouch noted below, through the standard USPS mail service and between virtually any climate extremes (Alaska to Arizona to the Delta region of the South). Additionally, samples have stability of 21 days.

19



*Blood Transport System*

      The unique blood collection methods developed by Biosafe are complemented by the packaging in which samples are transported to the Biosafe lab in Chicago, Illinois. The patented solution ensuring sample integrity is the Biological Sample Storage Package - a desiccated foil bag that maintains the quality and stability of the blood sample during delivery to the laboratory and also extends the shelf life of the product when it is maintained in inventory. The kits also include a postage paid first class mailing envelope.



*BioSafe Foil Bag*

      Blood collection and transportation expertise eliminates the need for a phlebotomist and courier and, as such, gives it a unique competitive advantage to all traditional laboratories. A patient/customer no longer has to endure the inconvenient and unpleasant venous blood draw required to obtain an accurate diagnostic result.

      The U.S. Post Office and Canada Post have also approved the packaging for blood transport through the mail (leak proof, waterproof, safe from heat and cold, crush proof and unaffected by irradiation).

      Biosafe's laboratory has received the highest certification available from the CAP, as well as a series of other commendations and state certifications (necessary because the sample mail-in process attracts patients from all over the country and certain states require state licensing in order to serve patients from that state).

      The scientists at Biosafe have demonstrated their research and development capabilities and ingenuity in modifying standard laboratory assays to work with the small blood samples collected; the results of these modifications have been tested and approved as equally effective in delivering accurate results. The methodology is proprietary in that a Biosafe sample sent to another CLIA or CAP lab whose staff has not been trained with Biosafe's standard operating procedures will be unable to process the microsample and achieve accurate results.