UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

BARRON PARTNERS, LP,

                     Plaintiff,

             -against-

LAB123, INC., HENRY A. WARNER, FRED
FITZSIMMONS, KENT B. CONNALLY, KURT
KATZ, ROBERT TRUMPY, JEREMY J. WARNER,
DAVID FLEISNER, BIOSAFE LABORATORIES,
INC. and BIOSAFE MEDICAL TECHNOLOGIES,
INC.,

                    Defendants.

-----------------------------------------------------------------X

Docket No.: 07-CV-11135 (JSR)

# DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT

Kaufman Dolowich & Voluck LLP
Attorneys for Defendants,
Lab123, Inc., Biosafe Laboratories, Inc.
Biosafe Medical Technologies, Inc.,
Henry A. Warner, Kent B. Connally,
Robert Trumpy and Jeremy J. Warner
135 Crossways Park Drive, Suite 201
Woodbury, New York 11797
(516) 681-1100

On the brief:
      Janene M. Marasciullo, Esq.
      Todd D. Kremin, Esq.

## TABLE OF CONTENTS

PAGE NO.

TABLE OF AUTHORITIES .............................. iii - vi

I.    INTRODUCTION .................................. 1

II.   STATEMENT OF FACTS ........................... 2

      A.    Preliminary Discussions and the Letter of Intent ..... 2

      B.    Barron Partners Due Diligence Investigation and
            Negotiation of the License Agreement and
            Stock Purchase Agreement ..................... 4

      C.    The Closing and the Final Agreements ........... 8

      D.    Lab123's Compliance with All Provisions of the
            Stock Purchase Agreement .................... 9

I.    ARGUMENT .................................... 11

      A.    The Claims Against Jeremy Warner and Kent
            Connally Should be Dismissed for Lack of
            Personal Jurisdiction ......................... 11

            1.    Plaintiff Has Not Alleged Facts Sufficient to
                  Support Jurisdiction Over Jeremy Warner and
                  Kent Connally Pursuant to CPLR § 301 ..... 12

            2.    Plaintiff Has Not Alleged Facts Sufficient to
                  Support Jurisdiction Over Jeremy Warner
                  And Kent Connally Pursuant to CPLR § 302. . 13

      B.    The Court Should Dismiss the Complaint for Failure
            To State a Claim Upon Which Relief Can Be
            Granted ................................... 15

            1.    The Court Should Dismiss the Statutory and
                  Common Law Fraud Claims Set forth in
                  Counts I, II, III, IV, and X for Failure to
                  State a Claim ........................ 16

                  a.    Barron Cannot Demonstrate
                        Reasonable Reliance ............. 18

i

PAGE NO.

    b.    Plaintiff Has Failed To Adequately
        Plead Loss Causation . . . . . . . . . . . .     22

2.    The Court Should Dismiss Count II, which
    Alleges Control Person Liability Against
    the Individual Defendants, for Failure to
    State a Claim . . . . . . . . . . . . . . . . . . . . . . .     24

3.    The Court Should Dismiss Counts V and VI,
    Which Allege Breaches of the Stock
    Purchase Agreement and the License
    Agreement . . . . . . . . . . . . . . . . . . . . . . . . .     26

    a.    Barron Cannot Establish A Breach
        of the Stock Purchase Agreement. . .     27

    b.    Barron Cannot Establish that it was
        a Third Party Beneficiary of the
        License Agreement . . . . . . . . . . . . . .     30

4.    The Court Should Dismiss Count VII for
    Failure to State a Claim . . . . . . . . . . . . . . . .     32

5.    The Court Should Dismiss Count VII for
    Failure to State a Claim . . . . . . . . . . . . . . . .     33

6.    The Court Should Dismiss Count IX for
    Failure to State a Claim . . . . . . . . . . . . . . . .     34

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     35

## TABLE OF AUTHORITIES

CASES

PAGE NO.

A.J. Maggio Co. v. Willis
738 N.E.2d 592, 316 Ill.App.3d 1043 (Ill.App.Ct. 2000)........................    31, 32

American Roller Co. v. Foster-Adams Leasing
472 F.Supp. 2d 1019 (N.D. Ill 2007).............................................    34, 35

Am. Nat. Bank & Trust Co. of Chicago ex rel.
Emerald Invs. LP v. AXA Client Solutions, LLC
2001 WL 743399 (N.D.Ill. June 29, 2001).......................................    31

ATSI Communications, Inc. v. Shaar Fund, Ltd.
493 F.3d 87 (2d Cir.2007)..........................................................    20, 23, 24, 25

Bank Brussels Lambert v. Fiddler Gonzales & Rodriguez
305 F. 3d 120 (2d Cir. 2002)........................................................    12

Beatie & Osborn LLP v. Patriot Scientific Corp.
431 F.Supp.2d 367 (S.D.N.Y. 2006)...............................................    13

Bellepoint, Inc. v. Kohl's Dep't Stores, Inc.
975 F. Supp. 562 (S.D.N.Y. 1997).................................................    12

Bensusan Restaurant Corp. v. King
126 F. 3d 25 (2d Cir. 1997)..........................................................    12

Big Apple Pyrotehnics v. Sparktacular, Inc.
2007 WL 747807 (S.D.N.Y. March 9, 2007)......................................    12

Black v. USA Travel Auth. Inc.
2001 WL 761070 (S.D.N.Y. July 6, 2001).........................................    13

Bradley v. Staubach
2004 WL 830066 (S.D.N.Y. April 13, 2004) .....................................    12

Brass v. Am. Film Techs, Inc.
987 F.2d 142 (2d Cir. 1993)..........................................................    16

Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.
70 N.Y.2d 382, 521 N.Y.S.2d 653 (1987).........................................    32

CutCo Indus. v. Naughton
806 F. 2d 361 (2d Cir. 1986).........................................................    14

Delagi v. Volkswagenwerk A.G. of Wolfsburg, Germany
29 N.Y.2d 426, 328 N.Y.S.2d 653, (1972)……………………………………..    13

DeJohn v. The .TV Corp.
245 Supp.2d 913 (N.D. Ill. 2003)………………………………………………    17, 34

Dura Pharm. v. Broudo
544 U.S. 336 (2005)……………………………………………………………..    17, 18, 22

Emergent Capital Inv. Mgmt. LLC v. Stonepath Group Inc.
165 F.Supp.2d at 615 (S.D.N.Y. 2001) aff'd at 343 F.3d 189
(2d Cir. 2003)…………………………………………………………………….    17, 19, 20, 21,
   22, 23, 24

Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co.
375 F.3d 168 (2d Cir. 2004)……………………………………………………    27, 28

Giannacopoulos v. Credit Suisse
37 F.Supp.2d 626 (S.D.N.Y. 1999)……………………………………………    22

Goldman v. Metro. Life Ins. Co.
5 N.Y.3d 561, 807 N.Y.S.2d 583 (2005)………………………………………..    32

Granat v. Bochner
268 A.D. 2d 365, 702 N.Y.S.2 262(1st Dept. 2000))………………………    14

Grumman Allied Indus., Inc. v. Rohr Indus., Inc.
748 F.2d 729 (2d Cir.1984))…………………………………………………..    22

Hearst Corp. v. Goldberger
1997 WL 97097 (S.D.N.Y. Feb. 26, 1997)……………………………………    15

Heinold Commodities Inc. v. McCarty
513 F.Supp. 311 (N.D. Ill. 1979)……………………………………………    35

Hirsch v. du Pont
553 F.2d 750 (2d Cir. 1977)……………………………………………………..    18

Hishon v. King & Spalding
467 U.S. 69 (1984)…………………………………………………………...    16

India.com, Inc. v. Dalal
412 F.3d 315 (2d Cir. 2005)……………………………………………….......    28

Ingraham v. Carroll
90 N.Y.2d 592 (1997)…………………………………………………………    15

Jazini v. Nissan Motor Co.
148 F. 3d 181 (2d Cir. 1998) ………………………………............... 11

JSMS Rural LP v. GMG Capital Partners III, LP
2006 WL 1867482 (S.D.N.Y. July 6, 2006) aff'd on reconsideration
2006 WL 2239681 (S.D.N.Y. August 4, 2006). ……………………………… 22, 23

Kalin v. Xanboo, Inc.
2007 WL 273546 (S.D.N.Y. Jan. 31, 2007)…………………………………… 25.

Kernan v. Kurz-Hastings, Inc.
175 F. 3d 236 (2d Cir. 1999)………………………………………….……… 11

Knudsen v. Quebecor Printing (U.S.A.) Inc.
792 F.Supp. 234 (S.D.N.Y. 1992)…………………………………………….. 32

Lake County Grading Co. v. Adv. Medical Contractors
275 Ill. App.3d 452, 654 N.E. 2d. 1109, (Ill. App. 1995)………………….. 34

Laufer v. Ostrow
55 N.Y.2d 305 (1982))…………………………………………………… 12

Lazard Freres & Co. v. Protective Life Ins. Co.
108 F.3d 1531 (2d Cir. 1997)………………………………………….……… 17, 18, 19, 21

Lentell v. Merrill Lynch & Co.
396 F.3d 161 (2d Cir. 2005)…………………………………………………... 17

Lucente v. IBM
310 F.3d 243 (2d Cir. 2002). ……………………………………….……… 27

Matusovsky v. Merrill Lynch
186 F.Supp.2d 397 (S.D.N.Y. 2002) …………………………………………. 16

Metropolitan Life Ins. Co. v. Robertson-CECO Corp.
84F.3d 560 (2d Cir. 1996)………...................................................................... 11

Nat'l Tel. Dir. Consultants, Inc. v. Bellsouth Adver. & Pub. Corp.
25 F.Supp.2d 192 (S.D.N.Y. 1998)…………………………….............................. 14

New Freedom Mortgage Corp. v. C&R Mortgage Corp.
2004 WL 783206 (Jan. 15, 2004 N.D. Ill.)…………………………………… 35

Nikitovich v. O'Neal
40 A.D.3d 300, 836 N.Y.S.2d 34 (1st Dep't 2007)………………….……… 32

Oliveira v. Amoco Oil Co.
726 N.E.2d 51, 311 Ill.App.3d 886 (Ill.App.Ct. 2000)............................ 35

PennComm v. Merrill Lynch, 372 F. 3d 488 (2d Cir.2004) ..................... 33

Phillips v. Bally Total Fitness Holding Corp.
865 N.E.2d 310, 372 Ill.App.3d 53 (Ill. App. Ct. 2007)......................... 35

Rapoport v. Asia Elecs. Holding Co., Inc.
88 F.Supp.2d 179 (S.D.N.Y. 2000)................................................. 16

Rolls-Royce Motor Cars, Inc. v. Schudroff
929 F.Supp. 117 (S.D.N.Y. 1996)................................................. 33, 34

Ronnen v. Ajax Elec. Motor Corp.
88 N.Y.2d 582, 648 N.Y.S.2d 422 (1996)........................................ 28, 29

Roth v. Jennings
489 F.3d 499 (2d Cir. 2007)........................................................ 16

Scientific Holding Co. v. Plessey Inc.
510 F.2D 15 (2d Cir. 1974)......................................................... 17, 34

SEC v. First Jersey Secs., Inc.
101 F.3d 1450 (2d Cir. 1996)...................................................... 24, 25

Sunward Electronics, Inc. v. McDonald
362 F.3d 17 (2d Cir. 2004)........................................................ 14

Thomas v. City of N.Y.
143 F.3d 31 (2d Cir. 1998)......................................................... 16

Tirapelli v. Advanced Equities, Inc.
813 N.E.2d 1138, 351 Ill.App.3d 450 (Ill.App.Ct. 2004)....................... 17

Traver v. Officine Meccniche Toschi SpA
233 F.Supp.2d 404 (N.D.N.Y. 2002)............................................. 14

Van Der Molen v. Washington Mutual Finance, Inc.
835 N.E.2d 61, 359 Ill.App.3d 813 (Ill. App. Ct. 2005)........................ 27

Zirp-Burnham, LLC v. E. Terrell Associates, Inc.
826 N.E.2d 430, 356 Ill.App.3d 590 (Ill.App.Ct. 2005)........................ 27

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT

### I.    Introduction

Pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, defendants Jeremy J.

Warner and Kent Connally respectfully move to dismiss the complaint against them for lack of

personal jurisdiction.  In addition, pursuant to Rule 12(b)(6), defendants Lab123, Inc.

("Lab123"), Biosafe Laboratories, Inc. ("Biosafe Labs"), Biosafe Medical Technologies, Inc.

("BMT"), Henry A. Warner, Kent B. Connally, Robert Trumpy, and Jeremy J. Warner move to

dismiss the complaint for failure to state a claim on which relief can be granted.   In support of

this motion, defendants rely upon this Memorandum of Law and the exhibits thereto, as well as

Barron Partners, LP's ("Barron") First Amended Complaint ("Compl.").

There is good cause for defendants' motions to dismiss. As explained more fully below,

defendants Jeremy J. Warner and Kent Connally are not subject to the jurisdiction of this Court

and the claims against them must be dismissed for lack of personal jurisdiction.

Furthermore, the Court should dismiss all of the claims set forth in plaintiff's complaint

for failure to state claims upon which relief can be granted. As explained more fully below,

Barron is a self-proclaimed sophisticated investment fund, and an "accredited investor" within

the meaning of Rule 501 of Regulation D of the Securities Act of 1933, and thus, it cannot

establish, as a matter of law, that it reasonably relied upon any statements that defendants made

during the pre-investment negotiations, and thus cannot prove transaction causation.  Likewise,

Barron has not made allegations sufficient to meet its burden of pleading "loss causation."  These

fundamental failures are fatal to the statutory and common law fraud claims set forth in counts I,

II, III, IV, X, and XI of the complaint.

The causes of action set forth in counts V – IX are similarly flawed. Counts V and VI, which allege breaches of the Stock Purchase Agreement between Lab123 and Barron and the License Agreement between Lab123 and Biosafe, ignore the plain language of the agreements. When Barron's allegations are measured against the actual contractual language it is clear that Lab123 did not breach the Stock Purchase Agreement and that Barron is not a third party beneficiary to the License Agreement, which has not been breached in any event. Moreover, the existence of these written agreements precludes Barron from stating a cause of action for "unjust enrichment," as alleged in count VII and "conversion," as alleged in count VIII. Finally, Barron cannot recover under the Illinois Consumer Fraud and Deceptive Business Practices Act because it is not a consumer, it did not purchase merchandise, and is not a resident of Illinois. Thus, count IX fails to state a claim. Accordingly, the Court should dismiss the complaint in its entirety.

## II.    Statement Of Facts

### A.    Preliminary Discussions and the Letter of Intent

According to Barron's website, it "is a private investment fund specializing in micro-cap companies" and has "approximately $200 million in assets." Ex. 1 at 1. Barron claims that it assists micro-cap companies in going public "by introducing them to proven professionals including lawyers and accountants" who specialize in this work. Id. Barron also claims that as a result of its experience, it can perform due diligence in a shortened time frame. Ex. 1 at 2; Ex. 3. Barron does not advertise, however, that its Chairman and CEO, Andrew Worden, has been convicted of wire fraud in connection with the purchase of securities. Exs. 4; 5 at 9. Instead, Barron claims that Mr. Worden has "over 20 years of experience founding, managing, planning, analyzing and investing with public and private companies." Ex. 1 at 1.

2

In May 2006, Leonardo Zangani introduced Mr. Worden to Henry Warner, the Chairman of Biosafe Labs, which is owned by BMT. Both Biosafe Labs and BMT (collectively "Biosafe") are privately owned companies that manufacture and sell a variety of medical testing products, including home blood-collection and testing kits. Compl. ¶ 52. At the time that Worden and Warner met, Biosafe had minimal sales to the retail market. Id. Instead, Biosafe's principal customers were large pharmaceutical companies and medical clinics. Id.

During the discussions that followed, Barron expressed interest in expanding Biosafe's presence in the retail market. Compl. ¶ 51. Specifically, Barron proposed the creation of a new, publicly traded company, which would be responsible for marketing Biosafe's home medical testing kits to the public through retail distribution chains, such as CVS and Walgreens. Barron actively courted Biosafe, and indeed, Mr. Worden sent Mr. Warner an e-mail forwarding the names of its references and a link to Barron's website. Ex. 6. By e-mail dated May 23, 2006, Mr. Warner expressed interest in this idea, and proposed to facilitate the deal by transferring the license for the home testing kits and existing contracts to a newly created entity. Ex. 7.

Shortly thereafter, by e-mail dated June 2, 2006, Barron's junior analyst, Matthew Samuel, indicated that Barron "look[ed] forward to becoming your financial partner." Ex. 10. Samuel's e-mail also forwarded a Letter of Intent ("LOI"), which broadly outlined the proposed terms of the deal. Ex. 11, Compl. ¶ 69. Pursuant to Barron's LOI, it proposed to pay $2 million for 3.774 million shares of the not yet created company. Ex. 11. Barron also assumed that the company to be formed would have "$1.85 million in run-rate seasonal adjusted annualized EBITDA." Id. The LOI gave Barron an "exclusive due diligence period until July 30, 2006," during which Barron would "be given reasonable access to the Company's facilities, management personnel, customers and its financial and legal records." Id. It further stated that

3

the parties agreed that "Barron would be the exclusive investor" and that the parties would use "Barron's Intrinsic Value formula." Id. The LOI further stated that the consumption of the investment was conditioned upon the "satisfactory completion of due diligence by Barron." Id. Ironically, Barron's LOI did not mention a license for any of the products that would be sold.

By e-mail dated June 5, 2006, Mr. Warner questioned the assumptions underlying Barron's EBIDTA calculations. Ex. 12. Mr. Samuel responded by two e-mails the same day. In the first e-mail, Mr. Samuel forwarded "Barron's Intrinsic Value calculation." Ex. 13. Mr. Samuel followed up with a second e-mail which advised Mr. Warner that Mr. Worden "is very firm on the price." Ex. 14. By e-mail dated June 8, 2005, Biosafe's CFO, Robert Trumpy, sent Barron a revised LOI, which did not make any material changes to Barron's original LOI, other than to reference the need for a licensing agreement between Biosafe and the as yet unformed company. Ex. 15.

Shortly thereafter, on June 12, 2006, Trumpy sent Barron another LOI, which described the intended use of Barron's proposed $2 million investment. Ex.16, Compl. ¶ 70. The June 12, 2006 LOI indicated that the newly formed company would pay $1 million for the licenses to 5 Biosafe home testing products, would use $760,000 for the first year's working capital, and that the remaining $230,000 would be used to cover the cost of Barron's due diligence and the cost of taking the company public.[1] Ex. 16; Compl. ¶ 71. There were no other changes to the LOI. The parties executed the LOI on June 13, 2006. Ex. 17.

**B.    Barron Partners Due Diligence Investigation and Negotiation of the License Agreement and Stock Purchase Agreement**

After the execution of the LOI, Barron began its due diligence efforts and the parties began to negotiate the terms of Barron's investment. On June 13, 2006, Barron sent its standard

---

[1]    The LOI referred to Lab123, which was still only a conceptual entity, as "NEWCO."

due diligence package ("Form MDR") to Trumpy for completion and requested financial information on the products that were planned to be spun into Lab123. Ex. 18; Compl. ¶ 53. Shortly thereafter, Trumpy sent Barron a revised retail pro forma, significantly decreasing its projections, noting in his email that the revisions to the pro forma projections contained the best assumptions. Ex. 19. Trumpy sent the initial response to Barron's due diligence package by e-mail dated June 20, 2006. Compl. ¶ 73; Exs. 20, 21. Trumpy noted that most of the questions posed by Barron's standard due diligence package were "N/A" and stated that the most important part of the response was the first document, which summarized Biosafe's year to date sales. Ex. 20.[2]

On the same day, Trumpy sent Barron a draft License Agreement by e-mail. Compl. ¶ 78; Ex. 22. The draft License Agreement provided that Biosafe would grant Lab123 an exclusive license to sell certain "Products" "solely to, and in support of, the Market." Ex. 22, ¶ 3.1.2. The draft License Agreement defined the term "Product" to include only those tests identified in Exhibit 1 to the Agreement.[3] Ex. 22, ¶ 2.33. In addition, the draft License Agreement defined the term "Market" as follows:

> **"Market"** means manufacturers, distributors, marketers, brokers, and consumers of products sold in the United States through retail drug stores, retail drug mass merchandisers, and shall also include health screening and disease management companies with annual sales of less than $25 million. "Market" specifically excludes any Pharmaceutical Company and/or disease management company with annual sales greater than $25 million.

Ex. 22, ¶ 2.26. The agreement thus expressly preserved Biosafe's right to sell the licensed products to markets other than the retail market. Ex. 22, ¶ 3.1.4. The License Agreement also

---

[2]    Significantly, the "Sales by Customer" spreadsheet, which summarized Biosafe's sales, indicated that the terms for Walgreen's sales was "pay on scan."   Ex. 21.

[3]    The five (5) Biosafe products, as listed in Exhibit 1 to the License Agreement are: (1) Biosafe Cholesterol Panel; (2) Biosafe Anemia Meter; (3) Biosafe prostate specific antigen test (PSA); (4) Biosafe thyroid Stimulating Hormone test (TSH); Biosafe Hemoglobin A1c. Exh. 22.

expressly stated that it was solely for the benefit of the parties and that no third parties were beneficiaries or had the right to enforce the agreement. Ex. 22, ¶ 12.3.

As soon as Barron began its due diligence, it also began to work on the terms of the Stock Purchase Agreement. As indicated above, Biosafe's CEO, Henry Warner, had not previously been involved in running a public company. Ex. 1. Accordingly, in late-June 2006, Mr. Worden introduced Warner to Darren Ofsink of the law firm of Guzov Ofsink, Ex. 1 at ¶ 4, for the purported purpose of assisting Warner with the incorporation of Lab123, negotiating the Stock Purchase Agreement, and filing the necessary registration statements with the Securities and Exchange Commission ("SEC"). Ex. 23.

Shortly thereafter, by e-mail dated July 6, 2006, Samuel sent Trumpy and Warner a draft Stock Purchase Agreement, which he described as the "basic drafts of our deal documents for the funding of Lab123." Exs. 24, 25; Compl. ¶ 69. Significantly, Article V of Barron's draft agreement contained several provisions touting Barron's financial expertise, its ability to evaluate the investment, and its ability to withstand a total loss of its investment. Indeed, paragraph 5.4 expressly stated that Barron was "capable of evaluating the risks and merits of an investment . . . by virtue of its experience as an investor, and its knowledge, experience, and sophistication in financial and business matters." Ex. 25, ¶ 5.4. The draft agreement also acknowledged that Barron was "an accredited investor" as defined by Rule 501 of Regulation D of the Securities Act of 1933 and was "able, by reason of [its] business and financial experience, . . . protect its own interests in connection with the transactions." Id. at ¶ 5.5. Barron's draft agreement also repeatedly stated that Barron was able to suffer the entire loss of its investment. Id. at ¶¶ 5.4, 5.5, 5.8. Furthermore, Barron's draft agreement also indicated that Baron

6

understood that the "investment in the securities being purchased . . . involves a high degree of risk." Id. at ¶ 5.8.

Pursuant to the draft agreement, Barron agreed to purchase 3,774,000 shares of preferred stock for the purchase price of $0.53 per share or a total purchase price of $2 million. In the event that Barron wished to sell its stock, the draft agreement gave Barron the right to convert its preferred stock to common stock. Ex. 25, Prelim. Stmt. Finally, the draft Stock Purchase Agreement also protected Barron in the event that Lab123 did not meet its projected earnings. Indeed, paragraph 6.16 contained "price adjustments," pursuant to which Barron could convert its preferred stock to common stock for less than $.53 per share in the event that Lab123 earned below a certain, yet unspecified, level of earnings. Ex. 25, ¶ 6.16.

Several weeks after Samuel sent Trumpy and Warner the draft agreement for review, he followed up on his original request for information regarding Biosafe's sales. By e-mail dated July 27, 2006, which was only 3 days before the expiration of the "exclusive due diligence period," Samuel stated that he "need[ed] more proof of revenue" to "close on the Lab123 deal." Compl. ¶ 79, Ex. 26. Samuels noted that although Barron had Biosafe's "schedule of customers," Barron could not verify their accuracy because "the numbers are unaudited." Id. He therefore requested "invoices and proof of payments for your customers." Id. Mr. Trumpy replied by e-mail, Compl. ¶ 79, which forwarded an invoice level spreadsheet, and offered Mr. Samuel a random sampling of the invoices to facilitate any accuracy review. Ex. 27. Mr. Samuel did not respond to this e-mail.

On July 27, 2006, Mr. Trumpy also sent a revised retail pro forma to Barron, which reduced the projected 2006 EBIDTA by $156,965. Compl. ¶ 80; Ex. 28. This was the final set of financial projections that Trumpy sent to Barron. Shortly thereafter, on August 14, 2006,

Trumpy sent revised responses to plaintiff's Form MDR. Compl. ¶ 54; Ex. 29. Samuel visited

Biosafe's offices in Lake Forrest, Illinois on August 17, 2006, to perform Plaintiff's due

diligence investigation, where he was given access to all of the invoices and payment detail

which formed the basis of the pro forma projections. Exs. 30, 31; Ex. A, ¶ 27. Samuel never

expressed any concern regarding his access to information and made no further requests for

information after that visit. Ex. A, ¶ 27.

        In furtherance of Barron's due diligence efforts, both Samuel and Worden met with

Michael Sosnowik, a candidate that Warner had identified to serve as Lab123's first CEO, on

August 22, 2006. Ex. 32. After meeting with Sosnowik, Samuel advised Warner by e-mail

that Worden approved of Sosnowik and that they would be ready to close once Sosnowik was

comfortable with the budget and projections for Lab123. Ex. 32.

        ## C.    The Closing and the Final Agreements

        The parties executed the Stock Purchase Agreement on September 6, 2006. Compl. ¶

102; Ex. 33. The material provisions of the Stock Purchase Agreement were similar to the draft

that Barron sent by e-mail on July 6, 2006. Exs. 25, 33. The Stock Purchase Agreement

indicated that Barron had had an opportunity to conduct due diligence, Ex. 33, ¶¶ 5.4, 5.7, that it

was an accredited investor, Ex. 33, ¶ 5.5, and had sufficient experience and sophistication to

evaluate the merits and risks of the investments. Ex. 33, ¶¶ 5.4, 5.5, 5.8.

        Likewise, the price did not change. Indeed, pursuant to the Stock Purchase Agreement,

Barron paid $2 million to purchase 3,774,000 shares of Lab123 preferred stock, and two

Warrants for the right to purchase an aggregate of 3,774,000 shares of Lab123 common stock.

Compl. ¶ 102, Ex. 33. In recognition of the fact that the parties were creating an entirely new

entity with a new mission, the Stock Purchase Agreement did not contain any representations

regarding Lab123's EBIDTA or its current financial health. Instead, the Stock Purchase

Agreement stated that the Lab123 would provide Barron with audited financial statements "for

the period from the inception of the Company until August 31, 2006," which "fairly presented

the financial position of the Company." Ex. 33, ¶ 4.6. [4]    Although the executed Stock Purchase

Agreement did not, and indeed, could not, make any representations about Lab123's financial

position, since the company did not yet exist, the agreement nonetheless provided some

protection to Barron's investment. Indeed, the Stock Purchase Agreement allowed Barron to

convert its preferred stock to common stock at a lower price if Lab123 failed to meet its

projected earnings. Ex. 33, ¶ 6.16. Thus, if Lab123's earning were below the specified Stock

Purchase Agreement level for either 2006 or 2007, when Plaintiff converts its preferred stock to

common stock, it would receive more shares of common stock, thereby giving it a larger

percentage of ownership of Lab123. Id. Plaintiff still owns its preferred stock and warrants.

Finally, the Stock Purchase Agreement expressly acknowledged that Barron's investment

in Lab123's securities "involve[d] a high degree of risk," Ex. 33, ¶ 5.8, and stated that Barron

was able to suffer the entire loss of its investment. Ex. 33, ¶¶ 5.4, 5.5, 5.8.

There were no material changes to the Licensing Agreement between Lab123 and

Biosafe. See Ex. 45. On September 21, 2006, the funds were released from escrow and the

agreements closed. See Ex. 34.

### D.    Lab123's Compliance with All Provisions of the Stock Purchase Agreement

Lab123 has complied with all provisions of the Stock Purchase Agreement. Indeed, by

September 29, 2006, Lab123 had appointed Kent Connally, Fred Fitzsimmons and Kurt Katz to

---

[4]    This was a material change from the original draft Stock Purchase which indicated that
Lab 123 had included audited an audited financial statement is annual 10-K report. Given the
fact that Lab 123 did not exist prior to this transaction with Barron, it could not make such a
representation or provide an audited financial report.

its board of directors, Ex. 35, Compl. ¶ 105, and thus, had an independent board of directors. Ironically, Barron itself acknowledged the appointment of the three independent members of Lab123's Board. Ex. 36.

Furthermore, Lab123 filed a Registration Statement on Form SB-2 with the Securities and Exchange Commission ("SEC") on September 22, 2006, Compl. ¶ 106, Ex. 37, the drafts of which Plaintiff had the opportunity to review and approve before it was filed. Significantly, the SB-2 contained a laundry list of risks associated with investing in Lab123, stating that it was a start-up with "no operating history nor any revenue," and no assurance of "positive cash flows." Ex. 37 at p. 10.

In response to the Lab123's SB-2 the SEC sent a comment letter directing Lab123 to identify Barron as an underwriter. Ex. 38, ¶ 38. Contrary to Barron's allegations, Compl. ¶ 106, the SEC did not challenge Lab123's revenue recognition, but rather asked Lab123 to explain its revenue recognition policy. Id. at ¶ 51. Lab123 filed an amendment to its SB-2 on Form SB-2/A on November 22, 2006, which explained its revenue recognition policy as follows: "Revenue is recognized upon shipment of products. Sales discounts and allowances are recorded at the time the product sales are recognized and are offset against sales revenue." Compl. ¶ 106, Ex. 39. Ironically, despite its flouted financial sophistication, Barron never posed any questions regarding Lab123's revenue recognition policy during the due diligence period.

Finally, contrary to Barron's assertions, Biosafe never revoked the License Agreement with Lab123. Indeed, Lab123's most recent SEC filings indicate that the License Agreement is still in effect. Ex. 41.

However, Lab123 experienced several problems which are not uncommon for start up companies. It was forced to terminate the employment of its first CEO, Sosnowick, and its second CEO, Mary Rodino, resigned without explanation shortly after starting.

Mr. Worden was not satisfied with the bargain that Barron had proposed and struck. Thus, by e-mail dated January 26, 2007, Mr. Worden recommended a reverse merger whereby Biosafe would be merged into Lab123 and become a public company, and Barron would have a stake in the resulting public company. Ex. 42. However, the parties could not come to an agreement on this proposal, and this lawsuit followed.

## I.   ARGUMENT

### A.   The Claims Against Jeremy Warner and Kent Connally Should be Dismissed for Lack of Personal Jurisdiction

Plaintiff "bears the burden of demonstrating that the court has jurisdiction over the defendants." Metropolitan Life Ins. Co. v. Robertson-CECO Corp., 84 F.3d 560, 566 (2d Cir. 1996); Kernan v. Kurz-Hastings, Inc., 175 F.3d 236, 240 (2d Cir. 1999). Prior to discovery, a plaintiff can discharge this burden by pleading "legally sufficient allegations of jurisdiction, i.e., by making a prima facie showing of jurisdiction." Jazini v. Nissan Motor Co., 148 F.3d 181, 184 (2d Cir. 1998) (citations omitted). However, to discharge this burden, the "plaintiff must plead facts which, if true, are sufficient in themselves to establish jurisdiction." Bellepoint, Inc. v. Kohl's Dep't Stores, Inc., 975 F.Supp. 562, 564 (S.D.N.Y. 1997). Thus, this Court may exercise personal jurisdiction over these defendants only if Barron has alleged facts that demonstrate that they have contacts with New York that satisfy both the New York long arm statute and the due process clause of the Fourteenth Amendment. Bensusan Restaurant Corp. v. King, 126 F.3d 25, 27 (2d Cir. 1997); accord Bank Brussels Lambert v. Fiddler Gonzales & Rodriguez, 305 F.3d 120, 124 (2d Cir. 2002).

11

The allegations of the complaint are insufficient to meet this burden with respect to defendants Jeremy Warner and Kent Connally. Plaintiff alleges that the Court has jurisdiction over both Jeremy Warner and Kent Connally pursuant to both CPLR § 301, which provides for traditional general jurisdiction over parties, and CPLR § 302, which is the New York long arm statute. Big Apple Pyrotehnics v. Sparktacular, Inc., 2007 WL 747807 at * 2 (S.D.N.Y. March 9, 2007). Plaintiff has not, however, pled any facts to support this allegation and indeed, no such facts exist.

### 1. Plaintiff Has Not Alleged Facts Sufficient to Support Jurisdiction Over Jeremy Warner and Kent Connally Pursuant to CPLR § 301

The complaint asserts that the Court has jurisdiction over Jeremy Warner and Kent Connally pursuant to CPLR § 301, which provides for traditional general jurisdiction over parties. Big Apple Pyrotehnics, 2007 WL 747807 at * 2. However, section 301 does not support the exercise of jurisdiction over an individual "unless he is doing business in [New York] individually." Bradley v. Staubach, 2004 WL 830066 at* 4 (S.D.N.Y. April 13, 2004) (quoting Laufer v. Ostrow, 55 N.Y.2d 305, 313 (1982)). Furthermore, "it is well-settled that an officer of a corporation does not subject himself individually to section 301 jurisdiction *unless he is doing business in New York personally.*" Bradley, 2004 WL 830066 at *4 (emphasis added) (quoting Black v. USA Travel Auth. Inc., 2001 WL 761070 at *4 (S.D.N.Y. July 6, 2001).

The complaint provides absolutely no basis for asserting general jurisdiction over Jeremy Warner and Kent Connally pursuant to CPLR § 301. Neither resides in New York. Rather, Jeremy Warner resides in Illinois, Compl. ¶ 48, and Kent Connally resides in Colorado. Ex. 43. Furthermore, the complaint does not allege that either Jeremy Warner or Kent Connally transacted any individual business in New York. Section 301 does not vest this Court with jurisdiction over Jeremy Warner and Kent Connally because they have not "engaged in a

systematic and regular course of business in New York [.]" <u>Delagi v. Volkswagenwerk A.G. of</u>

<u>Wolfsburg, Germany</u>, 29 N.Y.2d 426, 430, 328 N.Y.S.2d 653, 655 (1972).

### 2. Plaintiff Has Not Alleged Facts Sufficient to Support Jurisdiction Over Jeremy Warner and Kent Connally Pursuant to CPLR § 302

The complaint also asserts that the Court has jurisdiction over defendants Jeremy Warner

and Kent Connally pursuant subsections (a)(1) and (a)(3) of New York's long arm statute, CPLR

§ 302, which provides for personal jurisdiction over non-residents who regularly transact

business in the state, CPLR § 302(a)(1); or who commit a tort outside the state, which causes

harm within the state, if the defendant regularly does business in the state or should reasonably

expect the tortuous act to "have consequences in the state and derives substantial revenue from

interstate or international commerce." CPLR § 302(a)(3). Again, the complaint does not allege

sufficient facts to establish jurisdiction over either Jeremy Warner or Kent Connally pursuant to

these subsections of CPLR § 302.

To establish jurisdiction over Jeremy Warner and Kent Connally under CPLR §

302(a)(1), Baron must plead facts that establish that these individuals "transacted business in

New York; and . . . the cause of action arises out of the subject matter of the transaction." <u>Beatie</u>

<u>& Osborn LLP v. Patriot Scientific Corp.</u>, 431 F.Supp.2d 367, 387 (S.D.N.Y. 2006)(quoting

<u>CutCo Indus. v. Naughton</u>, 806 F.2d 361, 365 (2d Cir. 1986)); <u>accord</u> <u>Sunward Electronics, Inc.</u>

<u>v. McDonald</u>, 362 F.3d 17, 22 (2d Cir. 2004). To meet the "transacting business" element, a

plaintiff must show that the defendant "purposefully avail[ed] [itself] of the privilege of

conducting activities within [New York], thus invoking, the benefits and protections of its laws."

<u>Cutco Industries</u>, 806 F.2d at 365. Plaintiff has pleaded no such facts.

Indeed, the complaint does not allege that Jeremy Warner and Kent Connally transacted

any business in New York beyond sending e-mail messages. However, "sending faxes and

13

making phone calls to [New York] are not, without more, activities tantamount to transacting business within the meaning of CPLR §302(a)(1)." Big Apple Pyrotechnics, supra at *6 (quoting Granat v. Bochner, 268 A.D.2d 365, 703 N.Y.S.2d 262 (1ˢᵗ Dep't 2000); accord see Nat'l Tel. Dir. Consultants, Inc. v. Bellsouth Adver. & Pub. Corp., 25 F.Supp.2d 192 (S.D.N.Y. 1998) (merely telephoning and mailing plaintiff in forum state is not sufficient for purposeful availment). Thus, negotiation of contract terms by telephone, e-mail, or facsimile is not sufficient to establish jurisdiction under section 302(a)(1). Traver v. Officine Meccniche Toschi SpA, 233 F.Supp.2d 404, 410 (N.D.N.Y. 2002). Accordingly, section 302(a)(1) does not supply this Court with jurisdiction over Jeremy Warner and Kent Connally.

To establish personal jurisdiction over Jeremy Warner and Kent Connally pursuant to CPLR §302(a)(3), plaintiff must establish that they committed a tort that caused injury within New York *and* that they either regularly do business in New York, CPLR § 302(a)(3)(i), or should reasonably expect their actions to have consequences in New York and derive substantial revenue from either interstate commerce or international commerce. CPLR § 302(a)(3)(ii). Plaintiff has not alleged sufficient facts to establish that the Court has personal jurisdiction over these individuals pursuant to section 302(a)(3).

As a threshold matter, although the complaint alleges that certain defendants committed torts, the complaint does not allege any facts that suggest that either Jeremy Warner or Kent Connally committed any tort. The purportedly tortious behavior alleged in the complaint involves supposed misrepresentations that were made during the due diligence period that preceded the execution of the Stock Purchase Agreement on September 6, 2006. Significantly, however, the complaint does not contain any specific allegations that suggest that either Jeremy Warner or Kent Connally themselves made any such misrepresentations.

14

Likewise, even if the complaint were construed as alleging that Jeremy Warner or Kent Connally committed some tort, the complaint does not allege that either Jeremy Warner or Kent Connally transacted business in New York or that they derived substantial revenue from either interstate or international commerce as required by CPLR §§ 301(a)(3)(i) or 301(a)(3)(ii). To establish jurisdiction pursuant to CPLR § 301(a)(3)(i), Baron must allege facts showing that Kent Connally and Jeremy Warner had "ongoing activity within New York State," Ingraham v. Carroll, 90 N.Y.2d 592, 597 (1997), that was regular, persistent or ongoing. Hearst Corp. v. Goldberger, 1997 WL 97097, *14 (S.D.N.Y. Feb. 26, 1997). The Complaint is utterly devoid of such allegations. Likewise, the complaint does not allege that either Jeremy Warner or Kent Connally derived substantial revenue from either interstate or international commerce. Thus, plaintiff has failed to establish jurisdiction pursuant to CPLR §302(a)(3).

Because the complaint fails to allege facts sufficient to assert jurisdiction over defendants Kent Connally and Jeremy Warner, the Court should dismiss the complaint against them.

## B.   The Court Should Dismiss the Complaint for Failure to State A Claim Upon Which Relief Can be Granted

When reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations of the complaint as true, and may grant the motion only "if it appears beyond doubt that the non-moving party could prove no set of facts that would entitle it to relief." See Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); see also Thomas v. City of N.Y., 143 F.3d 31, 36 (2d Cir. 1998). When deciding a 12(b)(6) motion, a court may consider documents attached to the complaint as exhibits or incorporated by reference. Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007); Brass v. Am. Film Techs. Inc., 987 F.2d 142, 150 (2d Cir. 1993). Likewise, a court may consider any document upon which the complaint relies or which is a public record. Roth, 489 F.3d at 509(2d Cir. 2007). This is particularly true in fraud cases, and

where there are allegations of misrepresentations, courts should examine the documents which allegedly contain the misrepresentations. Id. Moreover, "[i]f a plaintiff's allegations are contradicted by such a document, those allegations are insufficient to defeat a motion to dismiss." Matusovsky v. Merrill Lynch, 186 F.Supp.2d 397, 399-400 (S.D.N.Y. 2002) (citations omitted); see also Rapoport v. Asia Elecs. Holding Co., Inc., 88 F.Supp.2d 179, 184 (S.D.N.Y. 2000).

When the allegations of the complaint and the actual documents referenced in the complaint are viewed in accordance with this standard, it is clear that the complaint should be dismissed for failure to state a claim.

### 1. The Court Should Dismiss the Statutory and Common Law Fraud Claims Set forth in Counts I, II, III, IV, and X for Failure to State a Claim

In count I of the complaint, Barron alleges that defendants violated section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5. To recover on this claim, Barron must allege that defendants: (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiff relied; (5) economic loss; and (5) that plaintiff's reliance was the proximate cause of their injury. Dura Pharm. v. Broudo, 544 U.S. 336, 341-42 (2005); Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005). "It is long settled that a securities-fraud plaintiff must prove both transaction causation and loss causation." Lentell, 396 F.3d at 172; accord Dura Pharm., 544 U.S. at 341-42. "Transaction causation is akin to reliance," and "loss causation 'is the causal link between the alleged misconduct and economic harm'" plaintiff allegedly suffered. Lentell, 396 F.3d at 172 (quoting Emergent Capital Inv. Mgmt. LLC v. Stonepath Group Inc., 343 F.3d 189, 197 (2d Cir. 2003)).

To satisfy its burden to plead transaction causation and loss causation, plaintiff must do more than simply allege that it relied upon the purported misstatements or that the value of its investment decreased. Rather, to demonstrate transaction causation, plaintiff must allege and demonstrate that its reliance was reasonable in light of "the complexity of the transaction, the sophistication of the parties, and the contents of any agreements between them." Emergent Capital, 343 F.3d at 197. To demonstrate loss causation, plaintiff must allege and demonstrate that the particular misrepresentation "when disclosed, negatively affected the value of the security." Lentell, 396 F.3d at 173. Furthermore, plaintiff must allege and prove these facts to sustain a common law fraud action under New York state law, Emergent Capital, 343 F.3d at197, Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1541 (2d Cir. 1997) or a statutory cause of action under Illinois law. Tirapelli v. Advanced Equities, Inc., 813 N.E.2d 1138, 1142, 351 Ill.App.3d 450, 455 (Ill.App.Ct. 2004)(reasonable reliance).[5]

Barron has not, and indeed, cannot, plead or prove any set of facts that will demonstrate either reasonable reliance or loss causation.[6] Indeed, Barron is a self-proclaimed sophisticated, accredited investor, which had ample opportunity to conduct due diligence and negotiate the terms of its investment. Barron thus will not be able to prove that it *reasonably relied* upon any pre-transaction statements by Lab123 or its agents. Likewise, Barron acknowledged, in writing, that its investment involved a high degree of risk and that it might lose the entire value of its investment. Accordingly, Barron cannot prove loss causation. Each issue is addressed in turn.

---

[5] Given the fact that the Stock Purchase Agreement is governed by New York law, Ex. 33, ¶ 11.9, it is not clear that Barron can state a cause of action under the Illinois securities law. See DeJohn v. The .TV Corp., 245 Supp.2d 913, 922 (N.D. Ill. 2003) citing Scientific Holding Co. v. Plessey Inc., 510 F.2D 15, 22, (2d Cir. 1974).

[6] Contrary to Barron's allegations, defendants did not make any misrepresentations in regarding their pro forma retail data or the License Agreement. However, given the fact that Barron cannot demonstrate reasonable reliance or loss causation as a matter of law, it is not necessary to address Barron's misrepresentation allegations.

### a.    Barron Cannot Demonstrate Reasonable Reliance

It is well settled that the Federal securities laws were not enacted "to provide investors with broad insurance against market losses," Dura Pharm., 544 U.S. at 345, or "to protect sophisticated businessmen from their own errors of judgment." Hirsch v. du Pont, 553 F.2d 750, 763 (2d Cir. 1977). Thus, courts require an aggrieved investor to plead and prove reasonable reliance on the alleged misrepresentation. Dura Pharm., 544 U.S. at 345; accord Emergent Capital, 343 F.3d at 197. As stated above, "[i]n assessing the reasonableness of a plaintiff's alleged reliance, [the court will] consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." Emergent Capital, 343 F.3d at 195.

Thus, "when a party has been put on notice of the existence of material facts which have not been documented and he nevertheless proceeds with a transaction without securing the available documentation or *inserting the proper language in the agreement for his protection,* he may truly be said to have willingly assumed the risk of that the facts may not be as represented." Emergent Capital, 343 F.3d at 195; (emphasis in the original, citations omitted) accord Lazard, 108 F.3d at 1543. In such situations, claims of reasonable reliance "fail as a matter of law." Emergent Capital, 343 F.3d at 196 citing Lazard, 108 F.3d at 1543. Thus, courts will not entertain fraud claims when the plaintiff's "evident lack of due care . . . is responsible for his predicament." Emergent Capital, 343 F.3d at 196 (citing Lazard, 108 F.3d at 1543).

There is no dispute that Barron is a sophisticated investor, who had both ample opportunity to conduct all necessary due diligence and to dictate the terms of the Stock Purchase Agreement. Indeed, Barron cannot contend otherwise. Barron touts its financial sophistication and acumen on its website. Ex. 1. Likewise, the Stock Purchase Agreement, which Barron

18

drafted, acknowledged that Barron is "an accredited investor," Ex. 33, ¶ 5.5, repeatedly noted

Barron's financial sophistication, Ex. 33, ¶¶ 5.4, 5.5, and its ability to "evaluat[e] the risks and

merits of the transaction," Ex. 33, ¶ 5.4, and "to protect its own interests." Ex. 33, ¶ 5.5.  There

is thus no question that Barron is a sophisticated investor, and therefore, is held to a higher

standard of care.  See Hirsch, 553 F.2d at 763 ("The securities laws were not enacted to protect

sophisticated businessmen from their own errors of judgment.  Such investors must, if they wish

to recover under federal law, investigate the information available to them with the care and

prudence expected from people blessed with full access to information."); accord Emergent

Capital, 343 F.3d at 195-96; Lazard, 108 F.3d at 1543.

　　　　Likewise, the plain language of the Stock Purchase Agreement is fatal to Barron's

contention that it reasonably relied upon any of defendants' purported representations.  The

Stock Purchase Agreement expressly stated that Barron "has been given full access to such

records of the Company  . . . as it deemed necessary or appropriate to conduct its due diligence

investigation." Ex. 33, ¶ 5.4.  Furthermore, the Stock Purchase Agreement represented that

Barron had "been given the opportunity to ask questions of the Company and have received

complete and satisfactory answer to any such inquiries."  Ex. 33, ¶ 5.7.  Finally, the Stock

Purchase Agreement contained an integration clause which expressly stated that it "constitute[s]

the entire agreement of the parties and supersede[s] all prior agreements and undertakings, both

written and oral, between the parties, or any of them with respect to the subject matter hereof."

Ex. 33, ¶ 11.4.

　　　　Despite these clear statements, Barron now claims that defendants induced it to enter into

the Stock Purchase Agreement by misrepresenting exclusivity of the License Agreement

between Biosafe and Lab123 and the extent of Lab123's retail sales revenue.  Compl. ¶ 102.

Significantly, however, the Stock Purchase Agreement does not mention either the License Agreement nor reference any representations that Lab123 made regarding its sales revenue. The agreement's silence, coupled with Barron's self-proclaimed financial sophistication and its documented opportunity to conduct due diligence, precludes Barron, as a matter of law, from alleging that it reasonably relied upon these purported representations.[7]

Indeed, it is well settled that where there is an integrated stock purchase agreement, and the agreement does not include the alleged misrepresentations at issue, plaintiff cannot establish that it reasonably relied on purported extra-contractual representations. ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 105 (2d Cir. 2007); Emergent Capital, 343 F.3d at 196. In ATSI Communications, the Second Circuit definitively held that when "the plaintiff is a sophisticated investor and an integrated agreement between the parties does not include the misrepresentation at issue, the plaintiff cannot establish reasonable reliance on that misrepresentation." ATSI Communications, 493 F.3d at 105; accord Emergent Capital, 343 F.3d at 196. Thus, "to the extent [Plaintiff's] causes of action are based on alleged misrepresentations made during negotiations preceding the defendants' investment, those claims are barred by the merger clauses." ATSI Communications, 493 F.3d at 105. Indeed, the Second Circuit has repeatedly rejected claims of reasonable reliance by financially sophisticated business people who fail to include purportedly material representations in written contracts. See Emergent Capital, 343 F.3d at 196 (holding that plaintiff's failure to insist that certain representations be included in the contract "precludes as a matter of law a finding of reasonable reliance upon

---

[7]    It is hard to imagine how the Stock Purchase Agreement could reference Lab 123's sales revenue, since Lab 123 was an entirely new entity, Compl. ¶ 52, and did not have any historic sales revenue on which Barron could rely. Indeed, Barron, not Lab 123, developed the projected earnings which were discussed in the price adjustment section in the Stock Purchase Agreement. Exh. 33, ¶ 6.16.

defendant's misrepresentations," due to plaintiff's "sophistication and the size of the

transaction."); accord Lazard, 108 F.3d at 1543 (holding that "the failure to insert [appropriate]

language – by itself – renders reliance on the misrepresentations unreasonable as a matter of

law.").

The language of the Stock Purchase Agreement, although fatal to Barron's ability to

claim that it reasonably relied upon Lab123's representations, is not the only obstacle to Barron's

reasonable reliance claim.   To the contrary, the record clearly establishes that Barron had ample

opportunity to conduct due diligence regarding Lab123's representations regarding Biosafe's

retail sales.  Ex. 33, ¶¶ 5.4, 5.7.  Indeed, Lab123 responded to multiple inquiries regarding its

revenue and provided Barron with both spreadsheets, Exs. 21, 27, and access to the underlying

invoices.  Ex. 27.  The record further reflects Barron's apparent satisfaction with the data it

received.   Barron not only consummated the transaction, it also represented that it had ample

opportunity to conduct due diligence.  Ex. 33  ¶¶ 5.4, 5.7.  These irrefutable facts are fatal to its

claim of reasonable reliance.

"It is well established that '[w]here sophisticated businessmen engaged in major

transactions enjoy access to critical information but fail to take advantage of that access, New

York courts are particularly disinclined to entertain claims of justifiable reliance.'" Lazard, 108

F.3d at 1541 (quoting Grumman Allied Indus., Inc. v. Rohr Indus., Inc., 748 F.2d 729, 737 (2d

Cir.1984)).  Indeed, this Court has held that "[p]arties cannot demand judicial protection when

they could have protected themselves with a reasonable inquiry into any misrepresented facts."

Giannacopoulos v. Credit Suisse, 37 F.Supp.2d 626, 633 (S.D.N.Y. 1999).  "Put another way, if

the plaintiff has the means of knowing, by the exercise of ordinary intelligence, the truth, or the

real quality of the subject of the representation, he must make use of those means, or he will not

21

be heard to complain that he was induced to enter into the transaction by misrepresentations."
Emergent Capital, 165 F.Supp.2d 615, 623 (S.D.N.Y. 2001) (internal quotations and citations
omitted).

In sum, Barron is a sophisticated accredited investor, who had ample opportunity to
conduct due diligence and negotiate the terms on which it invested its money.   In light of these
facts, Barron is precluded, as a matter of law, from claiming that it reasonably relied upon
representations which it had an opportunity to investigate and which were not included as
material representations in the Stock Purchase Agreement.  Accordingly, counts I, II, III, IV, and
X, fail as a matter of law, and should be dismissed.

### b.      Plaintiff Has Failed To Adequately Plead Loss Causation

In addition to the fact that Barron cannot demonstrate reasonably reliance, the complaint
does not contain sufficient allegations of loss causation. Thus, Barron cannot state a fraud claim
under Rule 10b-5 or New York common law. Dura Pharm., 544 U.S. at 341-42, Emergent
Capital, 343 F.3d at197.

To meet its burden of pleading loss causation, Barron must do more than allege that the
price of the security was inflated on the day of purchase or that the price declined. Dura Pharm.,
544 U.S. at 342-43.  Likewise, it is not sufficient for Barron to allege that the securities it
purchased are worthless.  See JSMS Rural LP v. GMG Capital Partners III, LP, 2006 WL
1867482, *3 (S.D.N.Y. July 6, 2006) aff'd on reconsideration 2006 WL 2239681 (S.D.N.Y.
August 4, 2006).  Finally, it is not enough for Barron to allege that Lab123's representations
caused Barron to assign an incorrect valuation to the securities because such an allegation is
"nothing more than a paraphrased allegation of transaction causation." Emergent Capital, 343
F.3d at 198.  Instead, plaintiff must allege facts that demonstrate that there is a "proximate causal

link between the alleged misconduct and the plaintiff's economic harm." ATSI

Communications., 493 F.3d at 106. Thus, plaintiff must allege that the representation or

omission "concealed something from the market, that when disclosed, negatively affected the

value of the security." Lentell, 396 at 173. Barron has not alleged, and indeed, cannot allege,

sufficient facts to make this showing.

In its complaint, Barron does not allege any *facts* which demonstrate that Lab123

concealed facts, which when disclosed, negatively impacted the price of the security. Indeed, it

is difficult to identify any allegation which contains factual assertions that could be characterized

as alleging loss causation. On several occasions, however, Barron simply asserts that the stock

it purchased is "worthless." Compl, ¶¶ 2, 3, 113. This is plainly insufficient. JSMS Rural, 2006

WL 1867482 at *3.

Moreover, a careful review of Barron's complaint indicates that the allegations of

purported loss do not demonstrate loss causation, but instead, represent only transaction

causation. For example, paragraph 2 alleges that "Defendants' fraudulent scheme rendered

worthless Plaintiff's $2,000,000 investment in Lab123, because Plaintiff, in deciding to so

invest, relied on Defendants' representations." Compl. ¶ 2. Likewise paragraph 3 alleges that

"Plaintiff's investment in Lab123 [is] practically worthless as Lab123's entire business model

was based on the above-mentioned licensing agreement and on the Defendants' fraudulent

financials." Compl., ¶ 3. However, these allegations are actually allegations of transaction

causation, not loss causation. Emergent Capital, 343 F.3d at 198. Likewise, the allegations set

forth in paragraph 113, which alleges that "[a]s a result of the false statements and/or omissions

of Defendants, "Lab123 stock price was artificially inflated when Plaintiff invested in Lab123,"

is not sufficient to allege loss causation. Indeed, in Emergent Capital, the Second Circuit

squarely held that allegations concerning "the investment quality" of a security are "nothing more than a paraphrased allegation of transaction causation." Emergent Capital, 343 F.3d at 198.

Moreover, given the specific circumstances of this transaction, Barron cannot allege facts which would establish loss causation. Although Barron alleges that it would be "easy and conservative" to predict the future revenue of Lab123, Compl. ¶ 52, the Stock Purchase Agreement stated that the purchase of Lab123 securities "involved a high degree of risk." Ex. 33, ¶ 5.8. Furthermore, Barron twice acknowledged that it could "bear the complete loss of [its] investment in the securities being purchased." Id. at ¶¶ 5.4, 5.8. These provisions reflected the fact that Barron was investing a new entity and that, like any new entity, Lab123 might not be as profitable as anticipated or profitable at all. Under the circumstances, it would be virtually impossible for Barron to prove that Lab123's representations were the proximate cause of any economic harm to Barron. Accordingly, Counts I, III, and IV should be dismissed for failure to state a claim.

## 2. The Court Should Dismiss Count II, which alleges Control Person Liability Against the Individual Defendants, for Failure to State a Claim

"To establish a prima facie case of control person liability under § 20(a), a plaintiff must show (1) a primary violation of the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI Communications, 493 F.3d at 108; SEC v. First Jersey Secs., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996). "Control over a primary violator may be established by showing that the defendant possessed the 'the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." First Jersey, 101 F.3d at 1472-73. The plaintiff is also required to plead " 'culpable participation' to state a section 20(a) claim, and that such participation must be plead

with particularity.  Thus, to withstand a motion to dismiss, a section 20(a) claim must allege, at a minimum, particularized facts of the controlling person's conscious misbehavior or recklessness." Kalin v. Xanboo, Inc., 2007 WL 273546, *12 (S.D.N.Y. Jan. 31, 2007).

The Court should dismiss count II of the complaint against all of the individuals because Barron has not alleged, and indeed, cannot allege, a prima facie case of control person liability. As explained in detail above, Barron has not alleged sufficient facts to state a cause of action for a violation of the Federal securities laws.  Because Barron has "fail[ed] to allege any primary violation . . . it cannot establish control person liability." ATSI Communications, 493 F.3d at 108.

In addition, even if the Court were to conclude that Barron had stated a primary violation of Section 10b of the Securities Act and Rule 10b-5, the complaint does not allege sufficient facts to state a prima facie case of control person liability with respect to Kent Connally and Jeremy Warner.  Indeed, the complaint contains no allegations which suggest that either Jeremy Warner or Kent Connally exercised any control over Lab123 or Biosafe at the time of the purported misrepresentation.

The complaint contains no specific allegations regarding Jeremy Warner, other than to allege that he was the Director of Business Development for Biosafe.  Compl. ¶ 48.  Although paragraph 48 of the complaint alleges, in conclusory fashion, that Jeremy Warner made misrepresentations concerning Biosafe's financial outlook and earnings, the complaint alleges no specific facts regarding the date on which Jeremy Warner made the alleged representation, the manner or substance of the alleged misrepresentation, or the party to whom Jeremy Warner made the misrepresentation.

25

The allegations regarding Kent Connally are similarly deficient. Although the complaint alleges that Kent Connally was a director of Lab123, Compl. ¶ 49, it also establishes that Connally did not become a director of Lab123 until September 29, 2006, Compl. ¶ 105, which was after the alleged misrepresentations, Compl. ¶¶ 57, 68– 82, and the execution of the Stock Purchase Agreement. Compl. ¶¶ 102. Thus Connally was not involved in Lab123 or Biosafe until after events that Barron alleges to be violations of the Securities Exchange Act. Moreover, the only allegation concerning Connally's conduct involved a March 28, 2007 e-mail in which he complained about Mr. Worden's temper. Compl. ¶ 57. This conduct does not constitute "culpable behavior."

These bare bone allegations concerning Jeremy Warner and Kent Connally are plainly insufficient to demonstrate that they exercised any control over Biosafe or Lab123 during the relevant time period or that they were in any way culpable for the purported primary violation. Accordingly, the Court should dismiss count II with respect to them.

### 3. The Court Should Dismiss Counts V and VI, Which Allege Breaches of the Stock Purchase Agreement and the License Agreement

In counts V and VI, Barron seeks to recover for purported breaches of the Stock Purchase Agreement between it and Lab123 and as a third party beneficiary of the License Agreement between Lab123 and Biosafe, respectively. However, a fair reading of these contracts demonstrates that Lab123 has not breached the Stock Purchase Agreement and that Barron is not a third party beneficiary of the License Agreement. Accordingly, the Court should dismiss these counts for failure to state claims upon which relief can be granted.

Pursuant to both New York law, which governs the Stock Purchase Agreement, Ex. 33, ¶ 11.9, a party seeking to recover for breach of contract must demonstrate: "(1) the existence of a contract; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the

defendant; and, (4) damages." Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co.,
375 F.3d 168, 177 (2d Cir. 2004). The elements of a breach of contract action under Illinois law,
which governs the License Agreement, Ex. 22, ¶ 12.5, are identical. Van Der Molen v.
Washington Mutual Finance, Inc., 835 N.E.2d 61, 359 Ill.App.3d 813 (Ill. App. Ct. 2005). Zirp-
Burnham, LLC v. E. Terrell Associates, Inc., 826 N.E.2d 430, 356 Ill.App.3d 590 (Ill.App.Ct.
2005).   Thus, to state a claim for breach of contract, Barron must identify some contractual
obligation that defendants breached.

        Questions of contract interpretation are legal questions, which are decided by the Court,
unless the contractual language is ambiguous. Lucente v. IBM, 310 F.3d 243, 257 (2d Cir.
2002). Contract language is ambiguous "if it is capable of more than one meaning when viewed
objectively by a reasonably intelligent person who has examined the context of the entire
integrated agreement." Id. When Barron's breach of contract claims are measured against the
plain language of the contracts, it is clear that Barron has not, and indeed, cannot allege facts
which would establish a breach of contract.

### a. Barron Cannot Establish A Breach of the Stock Purchase Agreement

        In count V, Barron alleges that Lab123 breached the Stock Purchase Agreement because
it provided misleading financial statements in violation of paragraphs 4.6 and 4.15, and by
failing to appoint an independent board of directors in violation of paragraph 4.16. Compl. ¶¶
160, 164 – 165. Both allegations are based upon strained mischaracterizations of the contract
itself. When the terms of the contract are viewed in accordance with settled principles of
contract construction, it is clear that Barron's breach of contract claim fails as a matter of law.

        It is well settled that a clear and unambiguous contract "must be enforced according to
the plain meaning of its terms." Eternity Global Master Fund, 375 F.3d  at 177. Furthermore, a

27

court must give "meaning and effect" to "every term of the contract," and make a "reasonable effort . . . to harmonize all of its terms." India.com, Inc. v. Dalal, 412 F.3d 315, 333 (2d Cir. 2005). Thus, a court should avoid any construction that would render any "contractual provision meaningless or without force." Ronnen v. Ajax Elec. Motor Corp., 88 N.Y.2d 582, 589, 648 N.Y.S.2d 422, 424 (1996). The construction proffered by Barron runs afoul of these principles.

Barron contends that Lab123 provided false financial data in violation paragraphs 4.6 and 4.15. Compl. ¶ 160. As Barron concedes, paragraph 4.6 obligated Lab123 to provide "audited financial statements, and paragraph 4.15, which stated that Lab 123 would not make any misrepresentation in the Stock Purchase Agreement and that none of the documents that Lab123 provided pursuant to the Stock Purchase Agreement would contain any material misstatement or omission. Id. Although the complaint makes a conclusory assertion that Lab123 provided false financial statements, Compl. ¶ 161, Barron's specific factual allegations regarding purported misrepresentations do not refer to Lab123's audited financial statements, but rather to Lab123's pro forma data regarding retail sales. Compl. ¶¶ 64, 65, 66.

However, no reasonable person would conclude that paragraphs 4.6 applied to this pro forma data, which was preliminary and unaudited. Indeed, the plain language of paragraph 4.6 referred to Lab 123's *audited financial statements,* not to *unaudited pro forma* projections. Thus, no reasonably intelligent person would conclude that paragraph 4.6 covered this preliminary, unaudited pro forma data.

Likewise, the plain language of paragraph 4.15 demonstrates that it does not cover the pro forma data. Although paragraph 4.15 stated that Lab123 did not make any misrepresentation in the Stock Purchas Agreement itself or in any document "furnished or to be furnished to the Investor pursuant to this Agreement." Ex. 33, ¶ 4.15, Compl. ¶ 150. Significantly, however, the

28

Stock Purchase Agreement expressly identified the documents "to be furnished" pursuant to the agreement and the Lab123's pro forma financials were not among those documents. Ex. 33, ¶¶ 1.3.20, 3.2, 3.3. Thus, the plain language of the Stock Purchase Agreement demonstrates that the pro forma retail projections are not covered by paragraph 4.15. Barron cannot now complain about the accuracy of representations in pre-contractual documents that are not included in the definition of "transaction documents," without rendering the express contractual definitions void and meaningless. This is plainly improper. Ronnen, 88 N.Y.2d at 589, 671 N.E.2d at 536.

Moreover, the Court cannot entertain Barron's breach claim without ignoring several other express provisions of the contract. As explained above, the Stock Purchase Agreement expressly stated that Barron had conducted due diligence and was satisfied with the information that is had received from Lab 123. Ex. 33, ¶¶ 5.4, 5.7. Additionally, the Stock Purchase Agreement contained a merger clause, indicating that it contained the entire agreement "and supersede[d] all prior agreements and undertakings." Ex. 33, ¶ 11.4. Barron therefore cannot state a breach of contract claim based upon alleged inaccuracies in the pro forma data unless the Court ignores several provisions of the contract. This would be plainly improper. Ronnen, 88 N.Y.2d at 589, 671 N.E.2d at 536.

Barron's contention that Lab123 violated paragraph 4.16 by failing to appoint a majority of independent directors within the meaning of NASD Rule 4200(a)(15) is even more severely flawed. Pursuant to the contract, Lab123 agreed that within 30 days of the closing, it would appoint five directors, three of whom would be independent "as defined in Rule 4200(a)(15). Compl. ¶ 164, Ex. 33, ¶ 4.16. According to NASD Rule 4200(a)(15) a director is independent if he is not "an officer or employee of the company or its subsidiaries," or if does not have any

"relationship which, in the opinion of the board of directors, would interfere with the exercise of independent judgment." NASD Rule 4200(a)(15), Compl. ¶ 165.

As Barron concedes, Lab123 appointed a five member board within 30 days. Compl. ¶ 105. It asserts, however, that one of the three independent directors, Kent Connally, was not independent within the meaning of Rule 4200(a)(15). Compl. ¶ 105. Barron does not explain, however, the basis for its assertion that Connally was not independent other than to baldly assert that Connally was "in thrall to Henry Warner." Compl. ¶ 49. Barron does not allege, as it cannot, that Connally was an employee or officer of Lab123 or its subsidiaries.[8] Accordingly, it must be relying upon the subjective portion of NASD Rule 4200(a)(15), which states that a director cannot qualify as independent if the board of directors believes the director has a relationship which would interfere with the exercise of independent judgment. Although Barron might have questioned Connally's judgment because it believes he is "in thrall to Henry Warner," whatever that means, Barron is not on Lab123's board of directors, and thus, its opinion regarding Connally's judgment is irrelevant to determining whether Connally was independent within the meaning of Stock Purchase Agreement.[9]

b. **Barron Cannot Establish that it was a Third Party Beneficiary of the License Agreement**

In count VI, Barron alleges that the Licensing Agreement between Lab123 and Biosafe was "intended for Plaintiff's benefit," Compl. ¶ 174 and that the language of the License Agreement "clearly evidences an intent to permit enforcement by Plaintiff." Compl. ¶ 178. As stated above, the License Agreement is governed by Illinois law, and it is well settled that under

---

[8] Connally became a director of Biosafe after the complaint was filed.

[9] Even if the Court concluded that this allegation stated a breach of contract claim, Barron could not recover $2 million for this purported breach because the contract contains a liquidated damages provision. Ex. 33, ¶ 6.11.

Illinois law "[f]or a third person to sue on a contract to which it was not a party, 'the promisor's intention must be evidenced by an express provision in the contract identifying the third-party beneficiary.'" <u>Am. Nat. Bank & Trust Co. of Chicago ex rel. Emerald Invs. LP v. AXA Client Solutions, LLC</u>, 2001 WL 743399, *8 (N.D.Ill. June 29, 2001)(citing <u>A.J. Maggio Co. v. Willis</u>, 738 N.E.2d 592, 599, 316 Ill.App.3d 1043 (Ill.App.Ct. 2000).

Barron has not, and indeed, cannot meet its burden of identifying any express provision of the License Agreement which identifies it as a third party beneficiary. Indeed, the License Agreement expressly states that there were no third party beneficiaries. The License Agreement plainly states:

> Nothing in this Agreement, expressed or implied, is intended, and shall be construed, to confer upon any Person, (other than the Parties hereto, their successors and permitted assigns, the Biosafe Indemnified Parties, and the Company Indemnified Parties) any rights or remedies under or by reason of this Agreement, including any rights of any kind or nature to enforce this Agreement.

Ex. 45, ¶ 12.3  Barron does not, and cannot, allege that it was a party to the License Agreement. Indeed, the only parties to the License Agreement were Lab123 and Biosafe. Ex. 45, Intro., p. 1 & ¶ 2.3. Likewise, Barron does not claim that it was a successor or assign of either Lab123 or Biosafe. Finally, Barron does not, and indeed, cannot allege that it was either a Biosafe Indemnified Party or a Company Indemnified Party. Those terms are defined in the License Agreement as the "[a]ffiliates . . . , directors, officers, employees and agents" of Biosafe and Lab123. Ex. 45, ¶¶ 11.1, 11.2. Barron was not, of course, an affiliate, director, officer, employee, or agent of either Biosafe Labs or Lab123.

In short, the License Agreement does not contain any express provision that identifies Barron as a third party beneficiary. To the contrary, the License Agreement plainly states that its only intended beneficiaries were Biosafe and Lab123. Thus, Barron's claim that it is a third

party beneficiary fails as a matter of law. <u>A.J. Maggio Co.</u>, 738 N.E.2d at 599. Accordingly, the Court should dismiss count VI of the complaint.

### 4.    The Court Should Dismiss Count VII for Failure to State a Claim

Barron's unjust enrichment claim also fails as a matter of law. It is well-settled that the existence of a valid and enforceable written contract governing a particular subject matter precludes recovery in quasi-contract for events arising out of the same subject matter. <u>Goldman v. Metro. Life Ins. Co.</u>, 5 N.Y.3d 561, 572, 807 N.Y.S.2d 583, 587-88 (2005). In <u>Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.</u>, 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653 (1987), the New York Court of Appeals expressly held that "[a] quasi-contract only applies in the absence of an express agreement and is not really a contract at all." <u>Clark-Fitzpatrick, Inc.</u>, 70 N.Y.2d at 388, 521 N.Y.S.2d at 653. Rather a quasi-contractual obligation is "imposed by law where there has been no agreement or expression of assent." <u>Id</u>.

Accordingly, courts generally dismiss quasi-contract claims on the pleadings "when it is clear from the face of the complaint that there exists an express contract that clearly controls." <u>Knudsen v. Quebecor Printing (U.S.A.) Inc.</u>, 792 F.Supp. 234, 237 (S.D.N.Y. 1992)(citations omitted); <u>see also</u> <u>Goldman</u>, 5 N.Y.3d at 572 (Plaintiff's quasi-contract claims were properly dismissed "because the matter was controlled by contract."); <u>Nikitovich v. O'Neal</u>, 40 A.D.3d 300, 301, 836 N.Y.S.2d 34, 35 (1st Dep't 2007) (Plaintiff's quasi-contract claim was properly dismissed, as duplicative of his breach of contract claim.) Because the complaint establishes that there was a written contract which governed the parties' rights and obligations with respect to Barron's investment, its claim for unjust enrichment should be dismissed.

The complaint clearly establishes that the parties executed a written contract governing Barron's investment in Lab123, which defined Barron's rights and obligations with respect to

that investment. Compl. ¶ 102. The claim set forth in count VII of the complaint clearly seeks to recover the money that Barron paid for its investment. Indeed, count VII alleges that defendants "received $2 million that [Barron] invested in Lab123," and that approximately $1 million of Barron's investment was a "partial payment for exclusive rights," to Biosafe's customer health diagnostic tests. Compl. ¶ 184.

The parties, however, executed a written Stock Purchase Agreement governing Barron's $2 million investment. Ex. 33. That written agreement expressly stated that Lab123 would use Barron's investment to pay for, among other things, "product rights, working capital, and acquisitions." Ex. 33, ¶ 6.13. The Stock Purchase Agreement thus expressly covered the same subject matter for which plaintiff seeks to recover in count VII. This fact is fatal to Barron's ability to state a claim for unjust enrichment and, therefore, count VII should be dismissed.[10]

### 5.    The Court Should Dismiss Count VII for Failure to State a Claim

In count VII, Barron alleges that defendants "unlawfully converted to their own use the $2 million which Plaintiff invested in Lab123." Compl. ¶ 198. Barron's conversion claim fails, however, because it simply an attempt to affix an alternative label to Barron's contract claims.

It is well settled law that an action for conversion cannot be predicated on a breach of contract "unless a legal duty independent of the contract itself has been violated." Clark-Fitzpatrick, 70 N.Y.2d at 389 (citations omitted); Rolls-Royce Motor Cars, Inc. v. Schudroff, 929 F.Supp. 117, 124 (S.D.N.Y. 1996). Barron makes no allegations in the complaint that a legal duty independent of the Purchase Agreement or the License Agreement has been violated sufficient to state a cause of action sounding in conversion. In an attempt to create a cause of

---

[10] Furthermore, Barron concealed the material fact of Worden's record, Emergent Capital, 343 F.3d at 192, 196. It thus does not have clean hands and cannot claim equitable relief. Penne Comm v. Merill Lynch, 372 F.3d 488, 493 (2d Cir 2004).

action and mask its deficiency, Barron merely employs the language of the elements of

conversion to describe what is clearly a cause of action sounding in breach of contract.

Therefore, the Court should dismiss count VIII of Plaintiff's Complaint.

### 6.    The Court Should Dismiss Count IX for Failure to State a Claim

In count IX of the complaint, Barron seeks to recover damages pursuant to the Illinois

Consumer Fraud and Deceptive Business Practices Act, ("the Illinois Act") 815 I.L.C.S. §§

505/1 -505/12.   However, the Stock Purchase Agreement is governed by New York law, and

therefore, Barron cannot assert a claim under the Illinois Act.  See DeJohn v. The .TV Corp., 245

Supp.2d 913, 922 (N.D. Ill. 2003) citing Scientific Holding Co. v. Plessey Inc., 510 F.2d 15, 22,

(2d Cir. 1974).   Moreover, even if the Court were to ignore the parties' express choice of law

provision, Barron still cannot recover under the Illinois Act for several reasons.

First, Barron is not a "consumer" within the meaning of the Illinois Act.  The statute

defines a consumer as "any person who purchases or contracts for the purchase of merchandise

*not for resale in the ordinary course of his trade or business but for his use or that of a member*

*of his household.*" 815 ILCS 505/1(e).   However, "the mere purchasing of assets from another

corporation . . . does not establish plaintiff as a consumer."  American Roller Co. v. Foster-

Adams Leasing, 472 F.Supp. 2d 1019, 1022 (N.D. Ill 2007).   In this case, Barron did not

purchase merchandise for use in its household, and thus is not a consumer.[11]

---

[11] Because Barron is not a consumer, to state a claim under the Illinois Act, it must allege some
nexus between defendants' conduct and general consumer protection concerns.  Lake County
Grading Co. v. Adv. Medical Contractors, 275 Ill. App.3d 452, 211, 654 N.E.Ed. 1109, 1116 (Ill.
App. 1995).   Barron has not done so, and pursuant to F.R.C.P.  9(b), this Court should not
presume any consumer injury, but rather should dismiss the complaint.  New Freedom Mortgage
Corp. v. C&R Mortgage Corp., 2004 WL 783206, * 10 (Jan. 15, 2004 N.D. Ill.) (citations
omitted).

Likewise, the stock which Barron purchased is not "merchandise" within the meaning of the Illinois Act. Securities "may be considered 'merchandise' only when sold as a business's 'product.'" American Roller Co., 472 F.Supp. 2d at 1022 n.3 (N.D. Ill 2007). For example, "commodities futures are 'merchandise' when purchased from commodities futures brokers." Id. quoting Heinold Commodities Inc. v. McCarty, 513 F.Supp. 311, 313 (N.D. Ill. 1979). The complaint in this case firmly establishes that defendants were not in the business of selling securities, but rather, sold health diagnostic kits. Compl. ¶¶ 42, 52.

Finally, Barron is not a resident of Illinois. However, the "[t]he Act's purpose was to protect Illinois consumers and businesses." Oliveira v. Amoco Oil Co., 726 N.E.2d 51, 61, 311 Ill.App.3d 886 (Ill.App.Ct. 2000). It was not intended to apply to transactions that take place outside Illinois. Phillips v. Bally Total Fitness Holding Corp., 865 N.E.2d 310, 316, 372 Ill.App.3d 53 (Ill. App. Ct. 2007).

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court dismiss the Complaint.

Respectfully submitted,

 /s/ Janene M. Marasciullo
Janene M. Marasciullo
Todd D. Kremin
Kaufman Dolowich & Voluck LLP
135 Crossways Park Drive, Suite 201
Woodbury, New York 11797
(516) 681-1100

ND: 4845-0866-5090, v. 3

35

# EXHIBIT LIST

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| A | Henry A. Warner's Affidavit. |
| 1 | Excerpts from Barron Partner's Website. |
| 2 | May 11, 2006 e-mail from Zangani to Worden introducing Worden to Biosafe. |
| 3 | September 7, 2006 e-mail from Plaintiff to Warner with statement regarding Barron's capability for accelerated due diligence. |
| 4 | Andrew Worden's Indictment and Superseded Information. |
| 5 | *Worden v. Bell Cohen & Malad* – Worden admitting his prior conviction. |
| 6 | May 11, 2006 e-mail from Worden to Warner regarding Barron's references. |
| 7 | May 23, 2006 e-mail from Warner to Worden regarding transfer of Biosafe licenses to a separate company for the new retail venture. |
| 8 | August 29, 2006 e-mail from Samuel to Warner stating Worden's unavailability. |
| 9 | August 30, 2008 e-mail from Samuel to Warner stating Worden's unavailability. |
| 10 | June 2, 2006 e-mail from Samuel to Warner indicating that he looked forward to becoming financial partners. |
| 11 | Barron Partner initial Letter of Intent ("LOI"). |
| 12 | June 5, 2006 e-mail from Warner to Samuel questioning Barron's EBITDA assumptions in the LOI. |
| 13 | June 5, 2006 e-mail from Samuel to Warner attaching Barron's Intrinsic Value calculation. |
| 14 | June 5, 2006 e-mail from Samuel to Warner indicating that Worden was "very firm on the price." |
| 15 | June 8, 2006 e-mail from Trumpy to Samuel attaching the revised LOI. |
| 16 | June 12, 2006 e-mail from Trumpy to Samuel with the second LOI. |
| 17 | Executed LOI. |

| | |
|---|---|
| 18 | June 13, 2006 e-mail from Samuel to Trumpy attaching Barron's Form MDR and requesting additional information. |
| 19 | June 15, 2006 e-mail from Trumpy to Warner attaching revised Retail Proforma reducing projections. |
| 20 | June 20, 2006 e-mail from Trumpy to Samuel regarding responses to Barron's Form MDR. |
| 21 | BMT Sales by Customer Summary spreadsheet and initial responses to Barron's Form MDR. |
| 22 | June 20, 2006 e-mail from Trumpy to Samuel attaching the Draft License Agreement. |
| 23 | June 26, 2006 e-mail from Worden to Warner with Guzov Ofsink's contact information. |
| 24 | July 6, 2006 e-mail from Samuel to Trumpy attaching Barron's basic drafts of its deal documents. |
| 25 | Barron's initial draft of the Purchase Agreement. |
| 26 | July 27, 2006 e-mail from Samuel to Trumpy and Warner stating Barron's need for more proof of revenue. |
| 27 | July 27, 2006 e-mail from Trumpy to Samuel attaching invoice level spreadsheet indicating that he was willing to provide the supporting documentation upon request. |
| 28 | July 27, 2006 e-mail from Trumpy to Samuel attaching revised Retail Proforma further decreasing projections. |
| 29 | August 14, 2006 e-mail from Trumpy to Samuel attaching revised responses to Barron's Form MDR. |
| 30 | August 16, 2006 e-mail from Warner to Samuel planning Barron's due diligence visit. |
| 31 | August 17, 2006 e-mail from Warner to Samuel acknowledging Samuel's due diligence visit and attaching Sosnowik's resume. |
| 32 | August 22, 2006 e-mail from Samuel to Warner stating Barron's approval of Sosnowik after his interview with them. |
| 33 | Stock Purchase Agreement. |

| 34 | September 21, 2006 e-mail from Samuel to the escrow agent indicating that Barron was ready to break escrow. |
|---|---|
| 35 | Lab123's September 29, 2006 board meeting minutes electing independent directors. |
| 36 | October 12, 2006 e-mail from Samuel to Weil acknowledging the election of the independent directors. |
| 37 | Lab123's SB-2. |
| 38 | SEC's October 20, 2006 comment letter on Lab123's SB-2. |
| 39 | Lab123's November 22, 2006 SB-2/A excerpts on Lab123's revenue recognition policy. |
| 40 | Lab123's 2006 annual report filed with the SEC on June 20m 2007, excerpts on Ratcheting Provision. |
| 41 | Lab123's latest quarterly report filed with the SEC on January 18, 2008, excerpts on License Agreement. |
| 42 | January 26, 2007 e-mail from Worden to Warner recommending that Biosafe merge into Lab123. |
| 43 | Connally Affidavit stating he resides in Colorado. |
| 44 | Declaration from Darren Ofsink of Guzov Ofsink |
| 45 | License Agreement |

## CERTIFICATE OF SERVICE

I, **TODD D. KREMIN, ESQUIRE**, attorney for Defendants, LAB123, INC.,

BIOSAFE LABORATORIES, INC., BIOSAFE MEDICAL TECHNOLOGIES, INC.,

HENRY A. WARNER, KENT B. CONNALLY, ROBERT TRUMPY and JEREMY

J. WARNER, do hereby certify that a true and correct copy of the

DEFENDANTS' corrected MEMORANDUM OF LAW IN SUPPORT OF ITS

MOTION TO DISMISS THE COMPLAINT WITH ACCOMPANYING EXHIBITS

was filed electronically with the Court using the CM/ECF system, which sent

notification to the following parties:

> Barry R. Lax, Esq.
> Lax & Neville, LLP
> Attorneys for Plaintiff
> 1412 Broadway
> Suite 1407
> New York, NY 10018
> (212) 696-1999

First Class Mail Only

> Arthur W. Aufmann, Esq.
> Edward T. Joyce & Associates, P.C.
> Attorneys for Settling Defendants
> 11 South LaSalle St., Suite 1600
> Chicago, Illinois 60603
> (312) 641-2600

Dated: May 2, 2008

_____
TODD D. KREMIN, ESQ. (TK-0102)

ND: 4840-9166-0290, v. 1