For example, Biosafe worked with the Nichols Institute, designer of the gold standard of TSH analysis (Nichols Institute Diagnostics Third Generation Chemiluminescence Assay) to modify the process to accommodate a diluted capillary whole blood sample.

For the PSA test, a serum sample is traditionally used, but Biosafe developed (and tested and proved accurate) a modified Hybritech Tandem-MP PSA Assay using capillary whole blood. The Company also developed a dried blood testing process for PSA, validated against the Hybritech method. For the cholesterol (total cholesterol and panel of HDL, LDL and triglycerides), the dried blood tests were validated against the typical serum-based sampling methods. Biosafe's patent to correct for blood volume in a serum analyte enables accurate measurement of analytes even in a dried blood sample.

20

Technology platforms in blood collections, transportation and analysis have simplified the process of conducting diagnostic, screening and monitoring tests by eliminating the venous blood draw and often reducing or eliminating physician appointments. In some testing instances, the value of a test would be increased with more immediate (or while you wait) results.

Since the blood collection methods are all simple for patients to complete on their own, the rapid test platform enables the possibility of at-home, real time tests. Alternatively, the delivery of results in a healthcare setting in real time can aid a physician in getting a treatment plan underway without a wait, or the necessity of a second visit. Many physician specialty practices do not regularly have a phlebotomist in the office, and the self collection approach removes that potential hurdle from point-of-care testing.

The challenge for rapid test technology is for it to deliver the same accuracy level of results as a comparable process in the laboratory. This was achieved this with the Rapid Test product for detection of anemia.

Developed in concert with Johnson & Johnson's Ortho Biotech subsidiary (but with all intellectual property ownership staying with Biosafe), the test provides quantitative results showing a reading of the proportion of red blood cells in the sample. A similar product is available which provides a qualitative guide (a yes/no as opposed to a numerical reading).

While not as "scientific" as other platforms, the test instruction "placemat" is a critical component of all of our tests. It is vitally important that the blood collection and transportation process be executed without error - otherwise the test has no value for anyone concerned. In addition, the FDA is concerned about patients being informed regarding the disease or condition related to the test, and that the results are communicated appropriately and in a way that avoids any adverse events.

A significant amount of study and testing has been devoted to perfecting the instruction set (available in English and Spanish) and, as a result, each product experiences a very low level of improperly collected samples. In addition, the FDA collects comments from the public regarding complaints and adverse effects of products it approves. None of Biosafe's products, include those licensed to us, have ever received an adverse FDA notice.

The kits in our products are simple, with about eight components. All the kits include standard-type components (e.g., plastic bandages, gauze pad, alcohol pad and lancets) as well as a specimen collection device and printed materials. Kits using treated paper for collection will include the paper component (different for each test type) and a foil bag for transportation. Kits using the patented BTS plastic collection device will include a special plastic bag to hold the plastic BTS.

All kits contain a postage paid mailing envelope for shipping the sample to the laboratory, a pre-numbered patient information and consent form, and the "placemat" of clear, step-by-step, easy to follow instructions, specific for each test as needed.

Each of our products includes the lab processing (except for the rapid tests), notification and customer service or follow-up. The patient sample is returned to the CLIA-certified, CAP accredited lab and, following standardized clinical laboratory protocols, processed with state of the art equipment and computer technology. Every test provides quantitative data on a laboratory result report including comparisons to norms and the patient's prior test results, if any. All the laboratory's medical technologists are specifically trained in microsample analysis and are directly supervised by the laboratory director.

Reporting of results, tracking of data and patient privacy are critical components of the service model. All kits are bar coded and tracked from manufacture through return of results to the patient and/or doctor. A kit labeling and tracking system ensures that patient data privacy is always maintained and that third parties receiving results, such as healthcare providers, insurance companies, disease managers, etc., are properly authorized to receive that patient's results.

Biosafe's proprietary tracking and information management system offers additional features beyond accuracy and sample integrity. The patient results are provided to the patient in customer-friendly, easy to understand language and with exclusive TestTracker charting.

In late 2004, a simpler, less expensive, readily customizable patient authorization form was developed. This new customized form allows us to offer/accomplish the following:

- Incorporation of a customer's logo (retail store) on the form
- Customized messages to patients
- Automated linkage to customized patient letters introducing the customer, the program process and/or the BioSafe test
- Automated individual patient shipments using the patient demographics as a "see thru" address on the form
- Highly tailored linkage of the compliance results to doctors, sales representatives, specific customer territories, etc.

Under our license agreement with Biosafe, customer service is provided through their team of customer service representatives supported by medical professionals. They are available on call during business hours to answer questions about how to use the kits, the printed instructions, and the patient results reports. If there is an extremely abnormal test result the customer service representative will contact the patient directly to explain the test result in person.

**Competition**

Competition in the human medical diagnostics industry is significant. Our competitors range from development stage diagnostics companies to major domestic and international pharmaceutical and biotechnology companies. Many of these companies have financial, technical, marketing, sales, manufacturing, distribution and other resources significantly greater than we do. In addition, many of these companies have name recognition, established positions in the market and long standing relationships with customers and distributors. The diagnostics industry continues to experience significant consolidation in which many of the large domestic and international healthcare companies have been acquiring mid-sized diagnostics companies, further increasing the concentration of resources. However, competition in diagnostic medicine is highly fragmented, with no company holding a dominant position in autoimmune or vascular diseases. There can be no assurance that new, superior technologies will not be introduced that could be directly competitive with or superior to our technologies.

Our competitors include Flexsite Diagnostics, Inc. and AccuTech, LLC. We compete against these companies on the basis of product performance, customer service, and to a smaller extent, price.

**Markets for our products**

We currently have plans to market and distribute only proprietary medical diagnostic products developed and licensed to us by Biosafe. Our licensed markets are the retail drug outlets in the United States and internet based retail drug companies. The core technology in our products involves an integrated set of patented blood collection, transportation and diagnostic platforms which together provide an individual with a highly accurate diagnostic test result through the use of microsamples that can be easily self-collected outside a clinical environment and analyzed without the use of specialized equipment.

Our products are FDA cleared and/or CLIA validated diagnostic tests. Our products test for conditions such as thyroid activity (TSH), anemia (Hb), cholesterol concerns (full lipid profile), diabetes monitoring (HbA1c), and prostate screens (PSA). These diagnostic platforms are sufficiently unique that they are presently for sale in retail chains such as Albertson's, CVS and Walgreens and on the internet at Amazon.com and Drugstore.com.

Our licensed technology provides our retail drug company customers with several distinct competitive advantages.

- Virtually every major diagnostic laboratory continues to base its business model on the assumption that the testing process begins with three vials of blood obtained in the offices of its customer base: doctors and clinics. Our products, however, totally disrupt this model by empowering the major distributors/retailers to bypass the clinic and go direct-to-the-consumer with a wide range of well understood and widely accepted diagnostics. (Our licensor and laboratory operator, Biosafe, retains a contract staff of medical technicians who contact anyone with "out of range" results to be sure those patients are specifically urged to seek counsel from their healthcare professionals.)

- Some of our diagnostic products were originally created through the funding and support of world class research laboratories and pharmaceutical companies. As part of our license for these products, we have obtained the ability to utilize all the intellectual property associated with its technology platforms and products.

- The technology on which our products are based is in a broad platform form from which additional tests can be quickly derived. For example, expected time from proof of concept to FDA clearance for extension products is down to just six to ten months and at a probable cost of approximately $1,000,000. An entire new platform of rapid diagnostics is now feasible leveraging the technology behind our recently FDA certified anemia test.

- The accuracy and ease of availability of our diagnostic systems greatly increases the addressable market for each test.

It is now possible to service difficult to reach populations and to significantly improve compliance rates within existing ones. The reason is that no lab visit is required and collection of small blood samples (a finger nick as opposed to a venous draw of a vial of blood) is done at home or point-of-care. Sample kits can thus be mailed to anyone, anywhere with results are either learned at that time or within, on average, two days of receipt by our licensed lab. Results from rapid tests are available within minutes.

- The retail cost of our tests is, in most cases, less than half the amount charged by traditional laboratories and the opportunity cost of the hassle and expense of missing work just for a blood draw is eliminated.

Presently, there are more than 50,000 retail drug outlets in the United States.

22

**Warranties**

We will offer warranty coverage for all of our products, although we do not have a standard warranty program. The terms and conditions of our warranty coverage depend on our purchase orders with customers. Generally, we guarantee our customers' satisfaction with our products. If a customer has a complaint about a product, we will replace it. We may also refund the purchase price regardless of where the product was purchased.

**Our License Agreement with BioSafe**

On September 7, 2006, we entered into a distributor and license agreement with BioSafe for five diagnostic products (which are identified under the caption "Our Products" above) and the performance of Biosafe of services relating to four of such products. The agreement grants to us the exclusive right to distribute and sell the products to the Market. The Market means retail drug stores, retail drug mass merchandisers, and the distributors, marketers, brokers and group buyers who supply medical products to retail drug stores and retail drug mass merchandisers in the United States and internet-based retail drug companies, wherever they are located. To retain exclusivity we are required to sell and collect payment on certain minimum annual unit sales of the licensed products. If we fail to achieve such minimum annual sales, Biosafe can convert the foregoing license to a non-exclusive license.

The license agreement grants us a non-exclusive, non-transferable and non-assignable license to use Biosafe's patents, trademarks and technology rights relating to the licensed products and the processing and reporting of laboratory analyses of samples collected using the products

The term of the license is 25 years.

As part of our license, Biosafe is obligated throughout the entire term of the license agreement to manufacture the products and provide laboratory testing services for the products for us based in each case on a cost plus 20% formula. We have the option of manufacturing the products ourselves and/or opening a clinical laboratory to process the test results. Whether we do so or not, we are required to pay to Biosafe an 8% royalty on our collections of sales of licensed products (the gross sales amount received less freight, taxes and returns borne by us) and we must conform to all packaging and manufacturing requirements imposed on Biosafe or any other manufacturer by the FDA or other regulatory body.

To acquire the license to the five products, we were required to pay to Biosafe a one time fee of $1,000,000 in cash and issue to Biosafe 6,050,000 shares of our common stock, valued at $3,300,000. We have the right, but not the obligation, to acquire an exclusive license to distribute in the Market additional products from Biosafe throughout the term of the license at an agreed upon price of not more than $1,000,000 per product plus royalties.

Under our license, BioSafe must maintain and fulfill all regulatory requirements appropriate to the products. This includes manufacturing under Good Manufacturing Practices, as modified, updated or changed. The laboratory where our samples are processed must be CLIA certified or accredited by the College of American Pathology. Presently, Biosafe's laboratory is both CLIA certified and CAP accredited.

Biosafe must maintain all FDA clearances or other approvals as may be required for the products to be legally sold in the United State. Presently, all products meet these requirements.

**Patents, Trade Secrets and Trademarks**

Under our license agreement with Biosafe, we have been granted a non-exclusive, non-transferable and non-

assignable license to use without additional cost all of Biosafe's patents and trademarks relating to the products we license from Biosafe. Biosafe has the obligation to maintain these patents and trademarks. We do not acquire any ownership rights in the patents or trademarks Biosafe has associated with the products but we may repackage the products using a trademark of our selection and design.

We do not own any intellectual property rights. Set forth below is information on the patents Biosafe licenses to us under the license agreement:

*Patents Issued:*
- **Method for Correcting for Blood Volume in a Serum Analyte Determination (#6,040,135; 6,187,531)**
  This patented process is the mathematical conversion from blood to serum based upon the red cell mass. It is the means by which the results of the test can be interpreted.
- **Biological Sample Storage Package and Method for Making Same (#6,176,371)**
  This is a desiccated foil bag that maintains the quality and stability of the blood sample during delivery to the laboratory and also extends the shelf life of the product when it is maintained in inventory.
- **Whole Blood Collection Device and Method (#6,406,919; 6,673,627)**
  A blood transport system and coating solution which keeps blood from clotting during the collection and delivery processes.

23

- **A Method for Stabilizing Amino Transferase Activity in a Biological Fluid (#6,465,202)**
  This is a test that measures liver enzymes to test liver function and detect early complications of liver damage due to adverse effects of therapeutic drugs.
- **Device for Collecting and Drying a Body Fluid (#6,524,533)**
  This device, which is used in conjunction with the liver enzyme test, collects and separates whole blood and dries the serum.
- **Anemia Meter (10/417,697, filed 4-17-03) To be Issued Sept 2006**
  An immediate response device for qualitative and quantitative anemia testing.

*Patents Pending:*

- **Body Fluid Collection Device (10/135,654, filed 4-30-02)**
  This is a method to enhance the filter paper onto which the blood sample is deposited. A spreading layer is placed on the filter paper which helps maintain a consistent flow of blood across surface of the filter paper. The even distribution of the blood improves the precision and accuracy of the test results and prevents rejection of the test due to poor sample quality.

Patent applications in the United States are maintained in secrecy until patents are issued. There can be no assurance that any patents that may be issued to us in the future, will afford protection against competitors with similar technology. In addition, no assurances can be given that the patents issued to us will not be infringed upon or designed around by others or that others will not obtain patents that we would need to license or design around. If the courts uphold existing or future patents containing broad claims over technology used by us, the holders of such patents could require us to obtain licenses to use such technology.

Where appropriate, we intend to obtain patent protection for our products and processes. We also rely on trade secrets and proprietary know-how in our manufacturing processes. We will require each of our employees, consultants and advisors to execute a confidentiality agreement upon the commencement of any employment, consulting or advisory relationship with us. Each agreement will provide that all confidential information developed or made known to the individual during the course of the relationship will be kept confidential and not be disclosed to third parties except in specified circumstances. In the case of employees, the agreements will provide that all inventions conceived of by an employee shall be the exclusive property of the Company.

**Regulation**

The testing, manufacturing and sale of our products are subject to regulation by numerous governmental authorities, principally the FDA. The FDA regulates the clinical testing, manufacture, labeling, distribution and promotion of medical devices, which includes diagnostic products. We are limited in our ability to commence marketing or selling diagnostic products in the United States until clearance is received from the FDA. In addition, various foreign countries in which our products may be sold impose local regulatory requirements. The preparation and filing of documentation for FDA and foreign regulatory review can be a lengthy, expensive and uncertain process.

In the United States, medical devices are classified by the FDA into one of three classes (Class I, II or III) on the basis of the controls deemed necessary by the FDA to ensure their safety and effectiveness in a reasonable manner. Class I devices are subject to general controls (e.g., labeling, pre-market notification and adherence to QSR requirements). Class II devices are subject to general and special controls (e.g., performance standards, post-market surveillance, patient registries and FDA guidelines). Generally, Class III devices are those that must receive pre-market approval by the FDA to ensure their safety and effectiveness (e.g., life-sustaining, life-supporting and implantable devices or new devices that have been found not to be substantially equivalent to legally marketed devices). All of our current products and products under development are or are expected to be classified as Class II devices.

Before a new device can be introduced in the market, we must obtain FDA clearance or approval through either

clearance of a 510(k) pre-market notification or approval of a pre market approval ("PMA") application, which is a more extensive and costly application. All of our products have been cleared using a 510(k) application and we expect that most future products will also qualify for clearance using a 510(k) application (as described in Section 510(k) of the Medical Device Amendments to the Food, Drug & Cosmetic Act of 1938).

It generally takes up to 90 days from submission to obtain 510(k) pre-market clearance but may take longer. The FDA may determine that a proposed device is not substantially equivalent to a legally marketed device or that additional information is needed before a substantial equivalence determination can be made. A "not substantially equivalent" determination, or a request for additional information, could prevent or delay the market introduction of new products that fall into this category. For any devices that are cleared through the 510(k) process, modifications or enhancements that could significantly affect safety or effectiveness, or constitute a major change in the intended use of the device, will require new 510(k) submissions. There can be no assurance that we will be able to obtain necessary regulatory approvals or clearances for our products on a timely basis, if at all, and delays in receipt of or failure to receive such approvals or clearances, the loss of previously received approvals or clearances, limitations on intended use imposed as a condition of such approvals or clearances, or failure to comply with existing or future regulatory requirements could have a material adverse effect on our business, financial condition and results of operations. See "Risk Factors."

Our customers using diagnostic tests for clinical purposes in the United States are also regulated under the Clinical Laboratory Information Act of 1988, or CLIA. The CLIA is intended to ensure the quality and reliability of all medical testing in laboratories in the United States by requiring that any health care facility in which testing is performed meets specified standards in the areas of personnel qualification, administration, participation in proficiency testing, patient test management, quality control, quality assurance and inspections. The regulations have established three levels of regulatory control based on test complexity: "waived," "moderately complex" and "highly complex." Under the CLIA regulations, all laboratories performing high or moderately complex tests are required to obtain either a registration certificate or certification of accreditation from the "Centers for Medicare and Medicaid Services" ("CMS"), formerly the United States Health Care Financing Administration. There can be no assurance that the CLIA regulations and future administrative interpretations of CLIA will not have an adverse impact on the potential market for our future products.

We are subject to numerous federal, state and local laws relating to such matters as safe working conditions, manufacturing practices, environmental protection, fire hazard control and disposal of hazardous or potentially hazardous substances. There can be no assurance that we will not incur significant costs to comply with laws and regulations in the future or that such laws or regulations will not have a material adverse effect upon our business, financial condition and results of operations.

**Employees**

As of September 21, 2006, we had one full time employee, our Chief Executive Officer, Michael Sosnowik. During the next twelve months the Company plans to hire at least three new employees, including a Chief Financial Officer, a sales executive and an administrative assistant, and depending on future strategies, sales successes and any other employee intensive strategies, it is possible that the Company may need to hire or retain additional employees or consultants.

**Description of Property**

We do not own any real estate or office equipment. Our headquarters are located temporarily in an office provided to the Company by Mr. Sosnowik at 233 Narragansett Avenue, Lawrence, New York 11559. The Company does not pay rent to Mr. Sosnowik for such space, but it reimburses Mr. Sosnowik for all office expenses incurred by him. This arrangement is temporary until the Company locates its permanent office location within the next six months.


## DIRECTORS, EXECUTIVE OFFICERS, PROMOTERS AND CONTROL PERSONS

**Directors and Executive Officers**

The following table sets forth certain information with respect to the directors and executive officers of Lab123 as of September 21, 2006:

| Name | Age | Position | Director/Officer Since |
|---|---|---|---|
| Michael Sosnowik | 48 | Chief Executive Officer and Chairman of the Board | August 2006 |
| Henry Warner | 58 | Director | August 2006 |

Michael Sosnowik, was elected as the Chief Executive and a Chairman of the Board in August 2006. Mr. Sosnowik's experience includes being President of Q.K. Healthcare, Inc., a $2 billion specialty product distributor to primarily retailers from 1995 through 2004, Executive Vice President of Choice Drug Systems, responsible for the southern region operations from 1992 through 1995 and Executive Vice President and an owner of a $20 million national pharmacy provider from 1989

through 1992. Mr. Sosnowik is a 1980 graduate of the University of Maryland, School of Pharmacy.

Henry Warner was elected as a director in August 2006. Mr. Warner is the Chief Executive Officer and Chairman of Biosafe Medical Technologies, Inc. ("Biosafe"), the manufacturer, lab processor and licensor of Lab123's primary sales products and a substantial stockholder of Lab123, Inc. Mr. Warner has operated as chief executive officer of several small businesses over his 30 year career and has been the President and Chief Executive Officer and, indirectly through a family owned company, the majority shareholder, of Biosafe since 1996.

**Board Committees**

Our business, property and affairs are managed by or under the direction of our Board of Directors. Members of the Board are and will be kept informed of our business through discussion with the chief executive and financial officers and other officers, by reviewing materials provided to them and by participating at meetings of the board and its committees.

We intend to elect two independent directors to our Board of Directors and such persons shall serve as members of two committee of the Board of Directors that we intend to establish - the audit committee and the compensation committee.

Our audit committee will be involved in discussions with our independent auditor with respect to the scope and results of our year-end audit, our quarterly results of operations, our internal accounting controls and the professional services furnished by the independent auditor. Our Board of Directors will adopt a written charter for the audit committee which the audit committee will review and reassess for adequacy on an annual basis.

The compensation committee will serves as the stock option committee for any stock option plan hat we may adopt, and it will review and approves any employment agreements with management and changes in compensation for our executive officers.

## EXECUTIVE COMPENSATION

**Executive Compensation**

Michael Sosnowik became the first employee of the Company when he was hired as the Chief Executive Officer on August 30, 2006. The Company has had no other employees or officers since its inception on August 25, 2006.

**Employment Agreement with Michael Sosnowik**

Michael Sosnowik serves on a full-time basis as the President, Chief Executive Officer and Chairman of the Board of the Company pursuant to an employment agreement with the Company dated as of August 30, 2006. The agreement has a five year term. The term is automatically renewed on a year to year basis unless either party gives written notice of termination to the other party at least 60 days before the end of the current term of the agreement. However, Mr. Sosnowik's employment under the agreement shall be immediately terminated upon his death or total disability or upon notice of termination by the Company for cause or without cause.

Under the agreement Mr. Sosnowik receives a base salary at the rate of $200,000 per annum. In addition, if, with respect to any fiscal year beginning with fiscal year 2007 during the term of the agreement, the Company reports an EBITDA in excess of a specified Target Amount (2007- $2,983,000; 2008 - $5,525,000; 2009 - $5,525,000) for such fiscal year, Mr. Sosnowik shall be paid a bonus of $200,000. Prior to 2010, EBITDA targets for 2010 and 2011 shall be mutually agreed upon by Mr. Sosnowik and the Compensation Committee of the Board of Directors.

Pursuant to the employment agreement the Company has also issued to Mr. Sosnowik an aggregate of 1,500,000 shares of the Company's common stock. 300,000 of such shares were issued free of any contractual restrictions. The remaining 1,200,000 shares are subject to forfeiture if Mr. Sosnowik's employment is terminated. 300,000 of such shares shall become vested and not subject to forfeiture on each of the first through fourth anniversaries of the date of Mr. Sosnowik's employment agreement (September 1, 2006) if Mr. Sosnowik is then employed by the Company.

If termination of the employment agreement is by the Company for "Cause", as result of Mr. Sosnowik's Total Disability, death or retirement or if Mr. Sosnowik terminates the agreement for other than Good Reason, the only compensation of any kind or nature that Mr. Sosnowik shall be entitled to receive under the agreement following such

termination shall be such compensation earned by him prior to the date of termination and which is then unpaid

If termination of the agreement is by the Company for any reason other than Cause or by Mr. Sosnowik for Good Reason, then and only in such event, commencing with the last day of the month following the month in which termination of his employment with the Company occurs and on the last day of each month thereafter for eleven consecutive calendar months, Mr. Sosnowik will be entitled to receive one-twelfth of his base salary on the date of termination.

"Cause" shall mean the occurrence of any one or more of the following with respect to Mr. Sosnowik:

- his conviction of a felony (through trial or plea);
- his conviction of any crime (be it a felony or otherwise) involving misuse or misappropriation of money or other property or involving a breach of trust;

26

- any act of dishonesty that either is intended to or results in his substantial and improper personal enrichment at the expense of the Company or adversely affects the business or financial condition of the Company;
- the willful commission of acts of misconduct that result in injury to the Company or its assets or business;
- his breach of any covenant or agreement under the agreement and his failure to cure such breach (if such breach can be cured) within thirty (30) days after written notice thereof has been given to him by the Company;
- any failure, neglect or refusal by him to perform any material obligation under the agreement;
- his violation of any statutory or common law duty of loyalty to the Company;
- his habitual intoxication; or
- his drug addiction.

Good Reason" shall mean, without Mr. Sosnowik's written consent:

- the assignment to him of duties inconsistent with those of President of the Company, or a reduction in such duties;

- the breach by the Company of any provision of the agreement where such breach has not been cured within thirty (30) days from the Company's receipt of written notice from Mr. Sosnowik to cure such breach; or

- the Board of Directors requiring Mr. Sosnowik to perform, ignore, supervise or otherwise participate in illegal, unethical or materially misleading acts.

If, at any time while the agreement is in force, the Company is sold or otherwise experiences a Change in Control, then either the Company or Mr. Sosnowik may terminate Mr. Sosnowik's employment without breaching any provision hereof and without having to compensate Mr. Sosnowik, except that Mr. Sosnowik shall immediately vest in all shares issued to him and the Company shall compensate him as if the agreement was terminated by him for Good Reason. The term "Change of Control" means the effect of any transaction in which holders of the Company's voting power immediately prior to such transaction do not continue after such transaction to hold securities of the Company having the voting power necessary to elect a majority of the members of the board of directors of the Company.

**Directors' Compensation**

Each independent director shall receive an annual directors' fee of $5,000. In addition, each such person shall be reimbursed for all out of pocket expenses in connection the person's service as a director of the Company.

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table sets forth, as of September 20, 2006, certain information regarding the ownership of Lab123's common stock by (i) each person known by Lab123 to be the beneficial owner of more than 5% of the outstanding shares of common stock, (ii) each of Lab123's directors, (iii) each executive officer and (iv) all of Lab123's executive officers and directors as a group. Beneficial ownership, for purposes of this table, includes preferred stock convertible into common stock and warrants to purchase common stock that are either currently exercisable or convertible or will be exercisable or convertible within 60 days of September 20, 2006.

The percentage ownership data is based on 7,675,000 shares of our common stock outstanding as of September 20, 2006. Under the rules of the SEC, beneficial ownership includes shares over which the indicated beneficial owner exercises voting and/or investment power. Shares of common stock subject to warrants or underlying convertible preferred stock that are currently exercisable or convertible, or will become exercisable or convertible, within 60 days of September 20, 2006 are

deemed outstanding for the purpose of computing the percentage ownership of the person holding the warrant or convertible preferred stock, but are not deemed outstanding for the purpose of computing the percentage ownership of any other person. Except as otherwise noted, we believe that the beneficial owners of the shares of common stock listed below have sole voting and investment power with respect to all shares beneficially owned.

27

| Name of Beneficial Owner | Shares Beneficially Owned | |
|---|---|---|
| | Number | Percent of Class |
| Barron Partners LP<br>c/o Barron Capital Advisors, LLC<br>730 Fifth Avenue, 25th Floor<br>New York, NY 10019 (1) | 7,548,000 | 49.6% |
| BioSafe Laboratories, Inc.<br>8600 West Catalpa<br>Chicago, Illinois 60656 | 6,050,000 | 78.8% |
| Michael Sosnowik<br>233 Narragansett Avenue<br>Lawrence, New York 11559 | 300,000(2) | 3.9% |
| Henry Warner<br>c/o BioSafe Medical Technologies, Inc.<br>100 Field Drive, Suite 240<br>Lake Forest, Illinois 60045 | 0(3) | 0% |
| All current directors and current executive officers as a group (2 persons) | 300,000(2)(3) | 3.9% |

(1) Contractual restrictions in the Barron preferred stock purchase agreement and warrants prohibit Barron from exercising any warrants or converting any preferred stock if such conversion or exercise would cause it to exceed 4.9% beneficial ownership of Lab123. Barron Partners holds 3,774,000 shares of Series A Convertible Preferred Stock (currently convertible into Lab123 common stock on a share for share basis) plus warrants to purchase up to an aggregate of 3,774,000 shares of common stock of Lab123, in each case not giving effect to the contractual restrictions.

(2) Under his employment agreement with the Company, dated as of August 30, 2006, on such date Mr. Sosnowik was issued 1,500,000 shares of the Company's common stock, of which 300,000 shares were fully vested on issuance and 300,000 shares shall become vested on the each of the first through fourth anniversaries of August 30, 2006 provided that Mr. Sosnowik is then employed by the Company under the agreement. Therefore, the 1,200,000 shares of common stock of the Company which were issued to Mr. Sosnowik on August 30, 2006, but which are not yet vested on the date of this prospectus are not reported in the table as beneficially owned by Mr. Sosnowik.

(5) Mr. Warner is the Chief Executive Officer and Chairman of the Board of Biosafe, which directly owns 6,050,000 shares of common stock of Lab123. Mr. Warner is the managing member of a limited liability company which owns approximately 54% of the outstanding common stock of Biosafe.

### DESCRIPTION OF SECURITIES

The Company currently has 15,000,000 authorized shares of common stock, $.001 par value, of which 7,675,000 shares are issued and outstanding and 3,774,000 shares are reserved for issuance upon the exercise of outstanding stock warrants and 3,774,000 shares are reserved for issuance upon conversion of outstanding shares of convertible preferred stock. In addition, the Company has 5,000,000 authorized shares of preferred stock, of which 3,774,000 shares of Series A Stock are issued and outstanding which shares are without dividend rights, but are convertible into an aggregate of 3,774,000 shares of common stock upon their exercise. The conversion rate into common stock of the shares of Series A Stock is subject to adjustment upon the occurrence of certain specified events, including the issuance of additional shares of common stock or a subdivision or combining of shares of common stock. In addition, if the Company's EBITDA for the three months ending December 31, 2006 and the fiscal year ending December 31, 2007 as reported in the audited financial statements of the

Company for such periods, are less than certain targeted amounts, the conversion rate shall be adjusted based upon a formula. The Series A Stock have no voting rights. However, so long as any shares of Series A Stock are outstanding, the Company shall not, without the affirmative approval of the holders of the shares of the Series A Stock then outstanding, (a) alter or change adversely the powers, preferences or rights given to the Series A Stock or alter or amend the Certificate of Designation of the Series A Stock, (b) authorize or create any class of stock ranking as to dividends or distribution of assets upon a liquidation of the Company senior to or otherwise pari passu with the Series A Stock, or any of preferred stock possessing greater voting rights or the right to convert at a more favorable price than the Series A Stock, (c) amend its certificate or articles of incorporation or other charter documents in breach of any of the provisions of the Series A Stock, (d) increase the authorized number of shares of Series A Stock, or (e) enter into any agreement with respect to the foregoing.

The conversion right as contained in the Certificate of Designations of the Series A Stock provides that a holder may not convert an amount of Series A Stock to the extent that the number of shares held by the holder, when added to the number of shares of common stock beneficially owned by such holder or issuable if the holder exercised one or more of its warrants immediately prior to conversion, would exceed 4.9% of the Company's issued and outstanding common stock after giving effect to such conversion.

Upon any liquidation, dissolution or winding-up of the Company, whether voluntary or involuntary, the holder of shares of Series A Preferred Stock are entitled to receive out of the assets of the Company, for each share of Series A Preferred Stock, an amount equal to $0.53 per share before any distribution or payment shall be made to the holders of any junior securities. Certain change in control transactions may also, at the election of the holder of the Series A Stock, be treated as a liquidation.

Each share of outstanding common stock is entitled to one vote. Shares of common stock have no preemptive rights.

The rights, preferences, privileges and limitations of the remaining preferred stock have not been established, and no series of preferred stock has been established. The rights, preferences, privileges and limitations of the preferred stock, in one or more series, may be established by the Board without the approval of the holders of the common stock.

Authorized but unissued common stock may be issued for such consideration as the Board determines to be adequate. Issuance of common stock could have a dilutive effect on current stockholders. Stockholders may or may not be given the opportunity to vote on the issuance of common stock, depending upon the nature of any such transactions, applicable law, the rules and policies of the national securities exchange on which the common stock is then trading, if any, and the judgment of the Board. Having a substantial number of authorized and unreserved shares of common stock and preferred stock could have the effect of making it more difficult for a third party to acquire a majority of the Company's outstanding voting stock. Management could use the additional shares to resist a takeover effort even if the terms of the takeover offer are favored by a majority of the independent stockholders. This could delay, defer, or prevent a change of control.

## CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

There have not been any transactions, or series of similar transactions, since the inception of the Company, or any currently proposed transaction, or series of similar transactions, to which the Company or any of its subsidiaries was or is to be a party, in which the amount involved exceeds $60,000 and in which any director or executive officer of the Company, nominee for election as a director, any five percent security holder or any member of the immediate family of any of the foregoing persons had, or will have, a direct or indirect material interest, except that on September 7, 2006 the Company and Lab123 entered into the License Agreement described in "DESCRIPTION OF BUSINESS- Our License Agreement with Biosafe."

## MARKET FOR COMMON EQUITY AND RELATED STOCKHOLDER MATTERS

There is no market for our common stock.

As of September 7, 2006, we had 3 record holders of our common stock.

We have not paid dividends on our common stock, and the terms of Certificate of Designations relating to the creation of the Series A Stock prohibit us from paying dividends. We plan to retain future earnings, if any, for use in our business. We do not anticipate paying dividends on our common stock in the foreseeable future.

As of September 7, 2006, there were reserved for issuance a total of 7,548,000 shares, of which 3,774,000 were issuable upon conversion of the Series A Stock and 3,774,000 shares were reserved for issuance upon exercise of the warrants. No shares are available for sale pursuant to Rule 144 as of the date of this prospectus.

See "Selling Stockholders" for information relating to the issuance of stock since our organization.

**Equity Compensation Plan Information**

As of the date of this prospectus, the Company does not have any equity compensation plans.

**Transfer Agent**

The Company currently acts as its own transfer agent, but plans to engage a transfer agent when, and if, a trading market for its common stock develops.

**Penny Stock Regulations**

The SEC has adopted regulations which generally define "penny stock" to be an equity security that has a market price of less than $5.00 per share. The Company's common stock, when and if a trading market develops, may fall within the definition of penny stock and subject to rules that impose additional sales practice requirements on broker-dealers who sell such securities to persons other than established customers and accredited investors (generally those with assets in excess of $1,000,000, or annual incomes exceeding $200,000 or $300,000, together with their spouse).

29

For transactions covered by these rules, the broker-dealer must make a special suitability determination for the purchase of such securities and have received the purchaser's prior written consent to the transaction. Additionally, for any transaction, other than exempt transactions, involving a penny stock, the rules require the delivery, prior to the transaction, of a risk disclosure document mandated by the SEC relating to the penny stock market. The broker-dealer also must disclose the commissions payable to both the broker-dealer and the registered representative, current quotations for the securities and, if the broker-dealer is the sole market-maker, the broker-dealer must disclose this fact and the broker-dealer's presumed control over the market. Finally, monthly statements must be sent disclosing recent price information for the penny stock held in the account and information on the limited market in penny stocks. Consequently, the "penny stock" rules may restrict the ability of broker-dealers to sell the Company's common stock and may affect the ability of investors to sell our common stock in the secondary market.

## LEGAL PROCEEDINGS

Lab 123 is not a party to any litigation or legal proceeding.

## EXPERTS

The financial statements of Lab123, Inc. at August 31, 2006 and for the period from August 25, 2006 (inception) to August 31, 2006 included in this prospectus to the extent and for the periods indicated in its report, have been audited by Marcum & Kliegman, LLP, independent registered public accountants, and are included herein in reliance upon the authority of such firm as an expert in accounting and auditing in giving such report.

## LEGAL MATTERS

The validity of the shares of common stock offered through this prospectus will be passed on by Guzov Ofsink, LLC, New York, New York.

## INDEX TO FINANCIAL STATEMENTS

**Lab123, Inc.**

**Financial Statements**

**As of August 31, 2006 and from August 25, 2006 (Inception) to August 31, 2006**

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-1 |
| Balance Sheet | F-2 |
| Statements of Operations and Comprehensive Loss | F-3 |
| Statement of Changes in Stockholders' Equity (Deficiency) | F-4 |
| Statement of Cash Flows | F-5 |
| Notes to Financial Statements | F-6 |