## Todd Kremin

| | |
|---|---|
| **From:** | Robert Trumpy |
| **Sent:** | Tuesday, June 20, 2006 5:52 PM |
| **To:** | 'mcs@barronpartners.com' |
| **Cc:** | Henry Warner |
| **Subject:** | Biosafe Newco License agreement |

**Attachments:** Barron Distributor and License Agreementv2.doc

Matt, here is the license agreement that is the basis of the relationship between Biosafe and Newco.

Rob Trumpy, CPA
SVP and CFO
BioSafe Medical Technologies, Inc.
100 Field Drive, Suite 240
Lake Forest, IL 60045
Work:847-234-8111
Fax:847-234-8222
rtrumpy@ebiosafe.com

Exhibit 22

4/28/2008

# AGREEMENT

## Effective as of June 15, 2006

## By and Between

## BIOSAFE MEDICAL TECHNOLOGIES, INC.

## And

## NEWCO, INC.

# TABLE OF CONTENTS

**ARTICLE**

**PAGE**

1. Rules of Construction
   1.1  References                                                    1
   1.2  Interpretation                                                2
   1.3  Headings                                                      2
   1.4  Effectiveness                                                 2
   1.5  Severability                                                  2
   1.6  No Drafting Presumption                                       2
   1.7  Exhibits                                                      3
                                                                      3

2. Definitions                                                        3
   2.1   "Affiliate"                                                  3
   2.2   "Agreement"                                                  3
   2.3   "Audit"                                                      3
   2.4   "BioSafe"                                                    3
   2.5   "BioSafe Indemnified Parties"                                3
   2.6   "BioSafe Marks"                                              3
   2.7   "BioSafe Patent Rights"                                      3
   2.8   "BioSafe Technology"                                         3
   2.9   "BioSafe Technology Rights"                                  3
   2.10  "BTS"                                                        4
   2.11  "Collection Card"                                            4
   2.12  "Company"                                                    4
   2.13  "Company Indemnified Party"                                  4
   2.14  "Confidential Information"                                   4
   2.15  "Determination"                                              4
   2.16  "Effective Date"                                             4
   2.17  "Exclusive Distribution Right"                               4
   2.18  "Exclusivity, License and Manufacturing Fee"                 4
   2.19  "Expenses"                                                   4
   2.20  "Future Product"                                             4
   2.21  "cGMPs"                                                      5
   2.22  "Governmental Body"                                          5
   2.23  "Indemnity Claim"                                            5
   2.24  "Intellectual Property"                                      5
   2.25  "Losses"                                                     5
   2.26  "Market"                                                     5
   2.27  "Net Collected Revenue"                                      5
   2.28  "Notice"                                                     5
   2.29  "Nutraceuticals"                                             5
   2.30  "Party" and "Parties"                                        5
   2.31  "Person"                                                     5
   2.32  "Pharmaceutical Company"                                     5

i

**ARTICLE**                                                                          **PAGE**

2.33    "Products" and Product"                                    6
2.34    "Royalties"                                                6
2.35    "Similar Products"                                         6
2.36    "Technology License"                                       6
2.37    "Term"                                                     6
2.38    "Territory"                                                6

3. Exclusive Distribution Right                                    6
    3.1    Grant of Exclusive Distribution Right                   6
    3.2    Independent Contractor Status                           7
    3.3    Operations and Expenses                                 8
    3.4    No Competitive Activities                               8
    3.5    Future Products-Right of First Refusal                  8
    3.6    The Company's Obligations                               8
    3.7    Terms of Sale of the Products                           10
    3.8    Royalties                                               12
    3.9    BioSafe Marks                                           13

4. Manufacture and Sale by the Company of Similar Products         14
    4.1    Grant                                                   14
    4.2    Manufacture of Similar Products by BioSafe              15
    4.3    BioSafe's Performance of Determinations                 15
    4.4    Sale of Similar Products                                15
    4.5    Collection Cards                                        16

5. License of BioSafe Technology                                   17
    5.1    Grant of Technology License                             17
    5.2    Conditions to Technology License                        17
    5.3    Use of BioSafe Laboratory Facilities                    18
    5.4    Training in BioSafe Processes                           18

6. Exclusivity, License and Manufacturing Fee                      20
    6.1    Defined                                                 20

7. Representations and Warranties                                  20
    7.1    The Company's Representations, Warranties and Covenants 20
    7.2    BioSafe's Representations, Warranties and Covenants     21

8. Intellectual Property                                           22
    8.1    Ownership                                               22
    8.2    No Compensation                                         22
    8.3    Infringement                                            23

ii

**ARTICLE**

**PAGE**

9. Term and Termination
    9.1    Term
    9.2    Termination
    9.3    Rights Upon Expiration of the Term or Termination
    9.4    Survival of Prior Obligations

24
24
24
24
26

10. Confidential Information and Noncompetition
    10.1    Treatment of Confidential Information
    10.2    Release from Restrictions
    10.3    Ownership of Confidential Information
    10.4    No Warranties
    10.5    Non-Competition Agreement
    10.6    The Company's Acknowledgments
    10.7    Severability
    10.8    Injunctive Relief

26
26
26
27
27
27
28
28
28

11. Indemnification and Insurance
    11.1    Indemnification by the Company
    11.2    Indemnification by BioSafe
    11.3    Claims Procedure
    11.4    Insurance
    11.5    Survival

29
29
29
30
30
31

12. Miscellaneous
    12.1    Amendments And Waiver
    12.2    Assignment
    12.3    Benefit of Agreement
    12.4    Counterparts
    12.5    Governing Law
    12.6    Jurisdiction and Venue
    12.7    Notices
    12.8    Attorneys' Fees and Costs
    12.9    Announcements
    12.10    Cumulative Remedies and Waiver of Rights
    12.11    Limitation of Actions
    12.12    Further Assurances
    12.13    Interest
    12.14    Entire Agreement
    12.15    Limitation of Liability
    12.16    Force Majure

31
31
32
32
32
32
32
33
33
33
33
34
34
34
34
34
34

## EXHIBITS

Exhibit 1    Products
Exhibit 2    Promissory Note
Exhibit 3    Common Stock Purchase Warrant

## AGREEMENT

This agreement ("Agreement") is made and entered into as of the 15th day of June, 2006, ("Effective Date") by and between BioSafe Medical Technologies, Inc., an Illinois corporation, with corporate offices at 100 Field Drive, Suite 240, Lake Forest, Illinois 60045 ("BioSafe") and NEWCO, Inc., an Illinois corporation with corporate offices located at 100 Field Drive, Lake Forest, Illinois 60045 ("Company").

### WITNESSETH:

**WHEREAS**, BioSafe is in the business of developing, manufacturing and selling diagnostic screens and tests using micro-samples of human blood and currently has the Products enumerated on Exhibit 1 plus other tests not covered by this Agreement;

**WHEREAS**, on the terms and conditions hereinafter set forth, the Company desires, among other things (i) the exclusive right to distribute and sell the Products in the Territory solely to, and in support of, the Market, (ii) the exclusive right to manufacture and sell Similar Products in the Territory solely to, and in support of, the Market and (iii) a non-exclusive, non-transferable and non-assignable revocable right and license to use BioSafe's proprietary methods, techniques and processes to perform the Determinations of those Products and Similar Products requiring a laboratory analysis using BioSafe's proprietary methods, techniques and processes; and,

**WHEREAS**, on the terms and conditions hereinafter set forth, BioSafe is willing to grant to the Company, among other things (i) the exclusive right to distribute and sell the Products in the Territory solely to, and in support of, the Market, (ii) the exclusive right to manufacture and sell Similar Products in the Territory solely to, and in support of, the Market and (iii) a non-exclusive, non-transferable and non-assignable revocable right and license, solely in support of (i) and (ii) above, to use BioSafe's proprietary methods, techniques and processes to perform the Determinations of those Products and Similar Products requiring a laboratory analysis using BioSafe's proprietary methods, techniques and processes.

**NOW, THEREFORE**, in consideration of the premises and of the terms, covenants and conditions herein contained, and the mutual benefits to be derived herefrom, and other good and valuable considerations, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, hereby covenant and agree as follows:

## ARTICLE 1
## RULES OF CONSTRUCTION

For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

1

1.1 **References**. All references in this Agreement to designated "articles" "sections", "subsections" and other subdivisions are to the designated article, sections, subsections and subdivisions of this Agreement as originally executed.

1.2 **Intrepretation**. Whenever from the context it appears appropriate:

1.2.1 Each term stated in either the singular or the plural shall include the singular and the plural;

1.2.2 Pronouns stated in the masculine, the feminine or the neuter gender shall include the masculine, feminine and neuter gender where applicable;

1.2.3 "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the provisions hereof any matter which otherwise might be construed to be outside such scope;

1.2.4 "Including" shall mean "including but not limited to";

1.2.5 "Herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular article, section, subsection or other subdivision unless from the context it appears otherwise.

1.3 **Headings**. The headings of the several articles and subsections are inserted for convenience of reference only and are not intended to modify, interpret or affect the meaning or interpretation of the articles or sections at the beginning of which they appear or of this Agreement.

1.4 **Effectiveness**. This Agreement will not be binding upon the Parties until it has been signed below on behalf of each Party, in which event, it shall be effective as of the Effective Date.

1.5 **Severability**. If any provision contained in this Agreement is or becomes invalid, is ruled illegal by any court of competent jurisdiction or is deemed unenforceable under then current applicable law from time to time in effect during the Term hereof, it is the intention of the Parties that:

1.5.1 such provision shall be fully severable and this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, and the remaining provisions hereof shall remain in full force and effect and shall not be affected by the illegal, invalid or enforceable provision or by its severability herefrom; and,

1.5.2 In lieu of each such provision which is invalid, illegal, or unenforceable, there be substituted or added as part of this Agreement a provision which shall be as similar as possible in economic and business objectives as intended by the Parties to such invalid, illegal or unenforceable provision, but shall be valid, legal and enforceable.

2

1.6 **No Drafting Presumption**. Each Party to this Agreement hereby acknowledges that it has been represented by, or had the opportunity to be represented by, counsel of its own choosing and hereby agrees that the terms of this Agreement shall not be construed in favor of, or against, any Party on the basis that such Party acted as a draftsman of this Agreement.

1.7 **Exhibits**. Each exhibit attached to this Agreement is specifically made a part hereof as though it were fully set forth in the body of this Agreement. Any capitalized term used in any exhibit that is not defined in such exhibit shall have the meaning ascribed to it herein.

## ARTICLE 2
## DEFINITIONS

2.1 **"Affiliate"** means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by or is under common control with such Person. The term "control" means possession of the power to direct, or cause the direction of, the management and policies of such Person whether through the ownership of more than fifty percent of the voting securities, by contract or otherwise

2.2 **"Agreement"** means this Agreement and any exhibit, attachment, schedule, amendment or modification thereto.

2.3 **"Audit"** is defined in section 3.8.3 hereof.

2.4 **"BioSafe"** is defined in the preamble to this Agreement.

2.5 **"BioSafe Indemnified Parties"** are defined in section 11.1.

2.6 **"BioSafe Marks"** means all trademarks, trade names, logos and service marks, registered or not, and trademark applications now owned or licensed, or hereafter acquired or licensed during the Term of this Agreement, by or on behalf of BioSafe.

2.7 **"BioSafe Patent Rights"** means all patents and patent applications (which for purposes of this Agreement shall be deemed to include certificates of invention, applications for certificates of invention and utility models) throughout the world, covering or relating to the BioSafe Technology, including any substitutions, extensions, reissues, reexaminations, renewals, divisions, continuations or continuations-in-part, which BioSafe owns or controls.

2.8 **"BioSafe Technology"** means any technology, method or process owned or licensed by BioSafe relating to blood specimen analysis, testing, storage and transport, and compositions of reagents or solutions used in testing, analyzing, storing or transporting blood and its components.

3

2.9 **"BioSafe Technology Rights"** means all technical information, know-how, trade secrets, inventions, data and other information now owned or licensed by BioSafe, or hereafter acquired or licensed by BioSafe during the Term of this Agreement, whether patentable or not, relating to the BioSafe Technology, including medical, chemical and other scientific data and processes and methodology used in the development, testing and analysis of the Products.

2.10 **"BTS"** means the BioSafe patented whole blood collection device.

2.11 **"Collection Card"** means the BioSafe proprietary self-collection card on which specimens of human blood and its components are deposited and from which the laboratory analysis of such human blood and its components is performed.

2.12 **"Company"** is defined in the preamble to this Agreement.

2.13 **"Company Indemnified Party"** is defined in section 11.2 hereof.

2.14 **"Confidential Information"** means (i) any information or materials relating to BioSafe, its business, including business plans, customer names and requirements, prices, product information, research and development, (ii) any information which is designated in writing as confidential by BioSafe, (iii) any information disclosed orally or visually if such information is reduced to writing and such written document is delivered to the Company within forty-five days after such disclosure and (iv) the terms and conditions of this Agreement.

2.15 **"Determination"** means the result obtained from the analysis of an individual's human blood and its components for a Product and the reporting of the results thereof.

2.16 **"Effective Date"** is defined in the preamble to this Agreement.

2.17 **"Exclusive Distribution Right"** means the exclusive right herein granted to the Company to distribute and sell all or any one of the Products in the Territory solely to, and in support of, the Market.

2.18 **"Exclusivity, License and Manufacturing Fee"** is defined in section 6.1 hereof.

2.19 **"Expenses"** means any and all expenses reasonably incurred in connection with investigating, preparing and defending, bringing or prosecuting any claim, action, suit or proceeding (including court filing fees, court costs, witness fees, and reasonable fees and disbursements of legal counsel, investigators, expert witnesses, accountants and other professionals).

4

2.20 **"Future Product"** means any BioSafe owned self-collection blood or other bodily fluid screen or test not set forth on Exhibit 1 developed subsequent to the Effective Date of this Agreement.

2.21 **"cGMPs"** shall mean all good manufacturing practices regulations promulgated by the United States Food and Drug Administration of the Department of Health and Human Services, or any successor agency, applicable to the Similar Products.

2.22 **"Governmental Body"** means any federal, state, local or foreign court, government, department, commission, board, agency, official or other regulatory, administrative or governmental authority.

2.23 **"Indemnity Claim"** is defined in section 11.3.1.

2.24 **"Intellectual Property"** means any and all BioSafe intellectual and proprietary property, including all trade secrets, technical information, data, materials, techniques, discoveries, copyrights, inventions, methods, processes, know-how, improvements, trade dress, BioSafe Marks, BioSafe Patent Rights, BioSafe Technology and BioSafe Technology Rights.

2.25 **"Losses"** means any and all losses, costs, obligations, liabilities, settlement payments, awards, judgments, fines, penalties, damages, expenses, deficiencies or other charges of any kind or nature whatsoever, but shall not include Expenses.

2.26 **"Market"** means manufacturers, distributors, marketers, brokers and consumers of products sold in the United States through retail drug stores, retail drug mass merchandisers and shall also include health screening and disease management companies with annual sales of less than $25 million. "Market" specifically excludes any Pharmaceutical Company and/or disease management company with annual sales greater than $25 million.

2.27 **"Net Collected Revenue"** means the amount received by the Company from the sale of a single unit of the Product, less freight, taxes and returns.

2.28 **"Notice"** is defined in section 12.7 hereof.

2.29 Intentionally left blank.

2.30 **"Party"** means BioSafe or the Company; **"Parties"** means BioSafe and the Company.

2.31 **"Person"** means an individual, a partnership, a corporation, a trust, a joint venture, a limited liability company or partnership, an unincorporated organization, any other legal entity and any Governmental Body, self-regulatory agency or authority or other private agency or authority.

5

2.32 **"Pharmaceutical Company"** means any company that manufactures and markets prescription drugs.

2.33 **"Products"** means the BioSafe diagnostic screening and tests using micro-samples of human blood enumerated on Exhibit 1. **"Product"** refers to any one of such BioSafe diagnostic screening and tests.

2.34 **"Royalties"** are defined in section 3.8 hereof.

2.35 **"Similar Products"** means a self-collection blood screen or test, the purpose of which is to provide a test to identify the same health condition or bio-marker as one of the Products or Future Products and the components of which are the same as those contained in the Product to which it is intended to be similar. Except for the Collection Card, BTS or any other BioSafe proprietary device, which must be purchased from BioSafe, such components may be purchased from sources other than those used by BioSafe. Notwithstanding any other provision herein contained, "Similar Products" does not include the BioSafe qualitative and quantitative anemia devices or any other BioSafe Product or Future Product that produces a Determination without the necessity of a laboratory analysis.

2.36 **"Technology License"** is defined in section 5.1 hereof.

2.37 **"Term"** is defined in section 9.1 hereof.

2.38 **"Territory"** means the United States of America.

## ARTICLE 3
## EXCLUSIVE DISTRIBUTION RIGHT

### 3.1 Grant of Exclusive Distribution Right

3.1.1 Subject to the terms and conditions herein contained, BioSafe hereby grants to the Company, and the Company hereby accepts, the Exclusive Distribution Right.

3.1.2 The Exclusive Distribution Right includes the right of the Company to advertise and to carry on other activities necessary to sell the Products in the Territory solely to, and in support of, the Market without competition from BioSafe or any other party authorized by BioSafe to sell any of the Products.

3.1.3 Notwithstanding any other provision herein contained, the Company understands, acknowledges and agrees that the Exclusive Distribution Right only allows the Company to sell the Products solely to, and in support of, the Market, and does not allow the Company to sell any of the Products to any Person for any purpose which is not solely to, and in support of, the Market, including sales to or in support of any Pharmaceutical Company manufacturing prescription drugs.

6

3.1.4  As long as BioSafe does not sell any of the Products to the Market, BioSafe may sell any of the Products to the same Persons as the Company without BioSafe being deemed to be in competition with the Company or in violation of any provision of this Agreement.  For illustration purposes only, and not by way of limitation, the following is an example of the foregoing provisions of this section 3.1.4:

The Company sells one of the Products to distributor A to be re-sold to distributor's retail drugstore customers.  BioSafe can also sell the same Product to disributor A provided that the Product sold by BioSafe is re-sold to distributor A's physician or hospital customers and not its retail drugstore customers.

3.1.5  To retain the Exclusive Distribution Right, the Company must sell and collect for no less than two hundred and fifty thousand (250,000) units of the Products by December 31, 2007 and three hundred thousand (300,000) units of the Products in each calendar year thereafter.  If the Company fails to sell and collect for no less than two hundred fifty thousand (250,000) units of the Products by December 31, 2007 and three hundred thousand (300,000) units of the Products in each calendar year thereafter, BioSafe may convert the Exclusive Distribution Right to a non-exclusive license to sell solely to and in support of the Market upon giving the Company thirty days written notice.  During such thirty-day period, the Company may elect to maintain its Exclusive Distribution Right by paying BioSafe the difference between the Royalties actually paid to BioSafe and the Royalties that would have been paid to BioSafe if the Company had purchased the minimum units required to maintain exclusivity of the Exclusive Distribution Right Such difference payment calculation shall utilize the same average unit selling price that had been incurred during the respective year.

3.1.6  The Company may appoint sub-distributors to act on behalf of the Company only on the prior written approval of BioSafe; provided, however, in all events, the Company shall be primary responsible to, and in accordance with the provisions of Article 11 hereof shall indemnify, BioSafe for any liability it incurs as a result of any act or omission of any such sub-distributor.  Any agreement between the Company and any a sub-distributor must be coterminous with this Agreement.

3.1.7  Notwithstanding the grant of the distribution right, BioSafe, in its sole discretion and without incurring any liability to the Company, reserves the right at any time to discontinue any Product;  provided, however, if BioSafe discontinues a Product within five years from the date the Company receives the right under this Agreement to distribute such Product, then, and only in such event, the Company shall be entitled to receive from BioSafe a credit in an amount equal to two hundred thousand dollars ($200,000) multiplied by a fraction, the numerator of which is sixty (60) less the number of months remaining in such five year period beginning with the month in which Product has been discontinued, and denominator of which is sixty (60).

3.2  **Independent Contractor Status**.  The relationship of BioSafe and the Company established by this Agreement is that of independent contractors, and no other

relationship is intended. This Agreement does not constitute and shall not be construed as constituting a partnership, joint venture, franchise, agency, employer-employee, fiduciary or relationship other than independent contractors between BioSafe and the Company. Neither Party is any employee, agent, partner, joint venturer or legal representative of the other. Accordingly, nothing contained herein shall authorize or empower either Party to assume or create any obligation or responsibility of any kind or nature whatsoever, express or implied, on behalf of or in the name of the other Party, or to bind the other Party in any manner, or to make any representation, warranty or commitment on behalf of the other Party. Neither Party shall act in a manner that expresses or implies a relationship between them other than that of independent contractors. All agreements of any kind or nature (including a sales agreement) between the Company and its customers are the Company's sole responsibility and will have no effect on any right or obligation of the Parties under this Agreement.

3.3 **Operations and Expenses**. As an independent contractor, (i) the operations of the Company are subject to the sole control and management of the Company, (ii) the Company is responsible for all of its own expenses and employees, and (iii) shall provide, at its own expense, such office space and facilities, and hire and train such personnel, as may be required to carry out its obligations under this Agreement. The Company shall not incur any expense chargeable to BioSafe except where BioSafe has specifically authorized in writing such expense prior to its being incurred.

3.4 **No Competitive Activities**. Pursuant to the provisions of section 10.5 hereof, during the Term of this Agreement, the Company will not act as a distributor, will not sell or offer for sale or act as a sales agent for the solicitation of orders to the Market for any product in the Territory which is competitive with any of the Products.

3.5 **Future Products-Right of First Refusal**. During the Term of this Agreement the Company shall have the first right and option to be the exclusive distributor of any Future Product to the Market in the Territory. If the Company wishes to exercise such right and option, it must send written notice to BioSafe advising it that the Company elects to be and become such exclusive distributor. The Company's written notice must be received by BioSafe no later than thirty business days following the date of a notice sent by BioSafe advising the Company of the availability of the Future Product for sale. BioSafe's notice shall set forth all material terms and conditions, including the cost and payment terms which shall not exceed $1 million per product plus Royalty, upon which the Company may become the exclusive distributor for such Future Product; provided, however, unless otherwise specified in BioSafe's notice to the Company, all of the terms and conditions of this Agreement shall be applicable to such Future Product.

3.6 **The Company's Obligations**. In connection with its Exclusive Distribution Right, the Company will:

3.6.1 Conduct its business of distributing solely in the Company's name, at its sole cost and expense, in an ethical manner and by using its best efforts to distribute

8

the Products, and not do, cause to be done or permit any of its employees or agents to do, any act that could injure BioSafe, its reputation or goodwill;

3.6.2  Avoid deceptive and misleading practices that are or might be detrimental to BioSafe or the Products;

3.6.3  Maintain competent, well-trained personnel of its own selection who shall engage in the distribution of the Products;

3.6.4  Develop and implement sales programs for the promotion of the Products;

3.6.5  Maintain an adequate inventory of items of the Product and supplies necessary to meet customer demands;

3.6.6  Refrain from advertising the Products or entering into any commitment to advertise the Products without first obtaining written approval from BioSafe of the proposed advertising.  BioSafe's refusal to approve advertising which in BioSafe' judgment makes any false or misleading health claims with respect to any Product shall not be deemed an unreasonable withholding of approval;

3.6.7  Comply with all laws, regulations and rules relating to the sale, resale, distribution and advertising of the Products in the Territory, including any and all laws, regulations or orders that govern or affect the ordering, export, shipment, import (including government procurement), and delivery, sale or resale of the Products;

3.6.8  At its expense, obtain all import, export and other licenses, permits, registrations and approvals, governmental or otherwise, and pay all import and export duties and taxes and all other taxes, excises and payments, that are required for it to distribute and resell the Products in the Territory to the Market;

3.6.9  Notify BioSafe with respect to all health, safety, environmental and other standards, specifications and other requirements imposed by law, regulation, rule or order in the Territory and applicable to the Products, including any packaging requirements, instructions, warnings, labels, phrases, language or markings that are required or desirable to be placed on or inside of the Products or its packaging to comply with all applicable laws, rules, regulations and practices in the Territory of which the Company is aware;

3.6.10  Notify BioSafe of the existence and content of any provision of law, rule or regulation in the Territory or other applicable law, rule or regulation, of which the Company is aware, that conflicts with any provision of this Agreement.

3.6.11  Use its best efforts to ensure that each Product is resold with sufficient time remaining before the expiration date on the Product;

9

3.6.12 Not alter or change, in any manner or way, the composition of the Products or any component thereof or repackage or re-label the Products without first obtaining BioSafe's written consent;

3.6.13 Not sell, distribute or license any Product except as expressly set forth in this Agreement;

3.6.14 Not use, quote from or employ in any form any materials or make any Product claim or representation not authorized in writing by BioSafe; and

3.6.15 Prepare at its sole cost and expense translations of all sales literature used by it in the Territory into the language of the country where such literature is to be used.

3.7 **Terms of Sale of the Products**. The Products shall be sold by BioSafe to the Company on the following terms and conditions:

3.7.1 The Company shall submit purchase orders to BioSafe for the Products it desires to purchase, setting forth in each purchase order the number of units of Product to be purchased and the desired date of delivery which shall be not less than thirty (30) days after the date of the purchase order. All purchase orders for the Products are subject to acceptance in writing by BioSafe, and BioSafe shall not have any liability to the Company with respect to purchase orders that are not accepted. No partial acceptance of a purchase order shall constitute the acceptance of the entire purchase order. Purchase orders shall be governed by the terms of this Agreement. Accordingly, nothing contained in any purchase order shall in any way modify or change the terms and conditions contained herein or add any additional or different terms or conditions to the terms and conditions of this Agreement.

3.7.2 Although BioSafe will attempt to deliver the Products by the requested delivery date, if, for any reason, it is unable to do, it will deliver the Products as soon as it is commercially reason to do so. BioSafe shall issue order acknowledgments against the Company's purchase orders, which shall specify the shipping date against the desired date of delivery specified by the Company in the purchase order. If BioSafe is unable to deliver the Products within a reasonable time period of the requested delivery date, then, and only in such event, the Company has the right to cancel the purchase order provided it sends written notice of such cancellation to BioSafe within fifteen (15) days of the Company's receipt of BioSafe's order acknowledgment. Except as is provided in the immediately preceding sentence, purchase orders may be canceled only with BioSafe's prior written approval, and if approved, such cancellation shall be subject to a restocking charge equal to fifteen percent (15%) of the aggregate value of such purchase order.

3.7.3 Products delivered pursuant to the terms and provisions of this Agreement shall be suitably packed for shipment to the destination specified in the purchase order and delivered to the carrier agent f.o.b. BioSafe's shipping point(s), at

10

which time the risk of loss shall pass to the Company. Unless specified in writing by the Company in its purchase order, BioSafe shall select the carrier. All freight, insurance and other shipping expenses and expenses for any special packing requested by the Company and provided by BioSafe shall be paid by the Company. BioSafe will advance and pay on the Company's behalf any and all shipping and freight costs from BioSafe's shipping point to the delivery points specified by the Company, and the Company shall pay such amounts back to BioSafe with the payment for the Products.

　　　　　3.7.4  For each unit of Product purchased by it, the Company shall pay to BioSafe an amount equal to BioSafe's fully allocated cost for the Product plus an amount not to exceed twenty percent (20%) of such cost. The Company can sell the Product to the Market for any price it desires without the prior approval of BioSafe. The Company has the responsibility to collect and remit all taxes and duties imposed on any sale by it of a Product. In no way shall BioSafe be liable for any such taxes or duties, and the Company, in accordance with the provisions of Article 11 hereof, shall indemnify BioSafe in connection therewith.

　　　　　3.7.5  The prices of the Products to be paid by the Company to BioSafe does not include and are net of any foreign or domestic taxes or charges of any kind that may be applicable to the sale, including excise, sales, use, valued-added or other taxes, customs or other import duties or other tariffs or duties. The Company shall be responsible for and shall pay all such taxes and charges levied in respect of it purchase of the Products.

　　　　　3.7.6  Payment for any order of Products, including shipping and freight costs advanced by BioSafe, and for any taxes, tariffs or other charges, must be in United States currency and must be **received** by BioSafe no later than thirty days of from the date of BioSafe's invoice to the Company. All payments by the Company shall be made free and clear of, and without reduction for, any withholding taxes. Any payments received after the due date shall carry a late fee of one and one half percent (1.5%) for each month or portion of a month that is late.

　　　　　3.7.7  Subject to the provisions of section 3.1.5, at no time during the Term of this Agreement shall the Company have any obligation to purchase any of the Products and failure to place any order shall not be a breach of this Agreement. Any order placed by the Company for any of the Product must be for a minimum of one thousand (1,000) units.

　　　　　3.7.8  The Company shall inspect all Products promptly upon receipt thereof. BioSafe will replace any defective Product shipped to the Company. To obtain replacement for any defective Product, the Company must, within thirty calendar days of the date that the Product is shipped to the Company, send written notice to BioSafe of its claim of receipt of defective Products and immediately return to BioSafe each defective Product. The sole responsibility of BioSafe with respect to any defective Product is to replace such defective Product (such replacement to include all shipping costs related to

11

the return to BioSafe of the defective Product and the reshipment to the Company of the replacement Product).

3.7.9  BioSafe reserves the right at any time, and from time to time, in its sole discretion, without incurring any liability to the Company with respect to any previously placed purchase order, to discontinue or limit its production of any Product, to allocate, terminate or limit deliveries of any Product in time of shortage, to alter the design or construction of any Product.

3.7.10  BioSafe warrants that each of the Products will be merchantable and fit for the purpose for which it is intended for a period of one year from the date of shipment thereof by BioSafe. In the event of a breach of the foregoing warranties, BioSafe shall, as the Company's sole and exclusive remedy, replace any defective Product. Except as expressly set forth in this section 3.7.10, BioSafe disclaims all other warranties, express or implied, and any conditions arising from course of dealing, usage of trade or custom with respect to the Products. Notwithstanding the foregoing, BioSafe does not exclude liability to the extent that such liability may not be excluded or limited by applicable law.

3.7.11  If the Company offers a money-back guarantee to any purchaser of the Products, BioSafe shall not have any liability of any kind or nature with respect to such guarantee, and the Company, in accordance with the provisions of Article 11 hereof, hereby indemnifies BioSafe in connection therewith.

### 3.8  Royalties

3.8.1.  In addition to the Exclusivity, License and Manufacturing Fee to be paid by the Company to BioSafe as set forth in section 6.1 hereof and in addition to any other fees, charges or payments of any kind or nature payable by the Company to BioSafe hereunder or otherwise, the Company shall also pay to BioSafe on each unit of Product sold by it the following amounts (hereinafter collectively referred to as "Royalties"):

(i) If the amount received by the Company for the sale of a unit of the Product includes both the sale price of the Product and the chargefor the laboratory analysis of the Product's test and no additional fee is thereafter charged for the laboratory analysis of the Product's test, or if it is a Product that does not require a laboratory analysis to produce a result of the Product's test, the Company shall pay to BioSafe for each unit of such Product sold an amount equal to eight percent (8%) of the Net Collected Revenue.

(ii) If the amount received by the Company for the sale of a unit of the Product does not include the charge for the laboratory analysis of the Product's test and an additional fee is thereafter charged for the laboratory analysis of the Product's test, the Company shall pay to BioSafe the following:

12

(1) an amount on each unit of such Product sold equal to eight percent (8%) of the Net Collected Revenue received for a unit of the Product; plus,

(2) an amount equal to eight percent (8%) of the amount charged by the Company to process the laboratory analysis to make the Determination.

Since, depending upon the laboratory analysis being performed, it is possible that more than one Determination can be made on a Product, the Company acknowledges and agrees that the amounts set forth in this section 3.8.1(ii) (2) will be payable on each Determination where there is more than one Determination being made on such Product.

3.8.2  The Royalties will be paid quarterly and will be sent to BioSafe Medical Technologies, Inc. at the address provided above. Each payment will be for the aggregate number of units of Product sold by the Company and laboratory analyses performed in the calendar quarter immediately preceding the calendar quarter in which payment is to be made. Payment will be made no later than the end of the month immediately following the end of the calendar quarter for which payment is to be made. Accompanying each such payment will be a detailed written report setting forth the manner in which the Royalties were determined and shall include, at the minimum, the number of units of each Product sold, the selling price of each unit of each Product, the number of units of laboratory analyses that were processed and the laboratory processing fee for each unit during the calendar quarter for which payment is to be made and the calculations showing the manner in which the Royalties for each Product were determined.

3.8.3  The Company shall maintain complete and accurate books of account and records relating to the Royalties. The Company shall maintain all such books and records for a period of at least five years following the expiration of the Term of this Agreement or its termination prior thereto. BioSafe shall have the right, upon reasonable written notice, to inspect, or have its designated representatives inspect, and make copies of all such records relating to the Royalties no more than once per calendar quarter ("Audit"). Such inspections shall take place during the Company's normal working hours at the offices of the Company and at BioSafe's expense; provided, however, that should any inspection disclose amounts owed to BioSafe in an amount greater than the amount actually paid, then, without prejudice to any other rights that BioSafe may have:

(i)  The Company shall immediately pay the amount of such underpayment to BioSafe, together with interest thereon at the rate of the lesser of one and one-half percent (1 ½%) per month  or the highest rate allowable by applicable law commencing from the date payment of such Royalty should have been made to BioSafe to and including the date such payment is received by BioSafe; and

13

(ii)  The Company shall immediately reimburse BioSafe for all costs and Expenses of any kind or nature incurred by BioSafe in conducting any Audit in which the underpayment was discovered.

### 3.9  BioSafe Marks

3.9.1  BioSafe hereby grants to the Company a royalty-free, non-exclusive, non-transferable and non-assignable license to use BioSafe Marks solely during the Term of this Agreement solely in connection with its Exclusive Distribution Right; provided, however, nothing contained in this Agreement shall be construed as conferring upon the Company any right to use in advertising, publicity, or other promotional activities any BioSafe Marks or other designation of BioSafe or the designation "BioSafe Medical Technologies, Inc." or "BioSafe Laboratories, Inc." (including any contraction, abbreviation or simulation of any of the foregoing) without the prior written approval of BioSafe in its sole and absolute discretion.

3.9.2  The Company acknowledges and agrees that:

(i)  The Company's rights to use the BioSafe Marks are limited to those rights expressly granted herein, that the license granted herein to the BioSafe Marks is not assignable or transferable in any manner or way by the Company, including the right to sublicense.

(ii)  As between the Company and BioSafe, BioSafe is the sole owner of all rights in and to each of the BioSafe Marks, and, other than as provided in section 3.9.1, nothing contained in this Agreement gives the Company any right, title or interest in or to any of the BioSafe Marks, trade names or other BioSafe Intellectual Property, or the goodwill associated therewith;

(iii)  The Company will not take any action in derogation of BioSafe's rights to the BioSafe Marks;

(iv)  The Company will not combine any other logo, trade name, trademark or trademark notice with the BioSafe Marks without the prior written approval of BioSafe in its sole and absolute discretion; and,

(v)  The Company may not under any circumstances use the BioSafe name or the BioSafe Marks, singularly or in combination with any other name or marks, as the brand name of its products without the prior written permission from BioSafe.

### ARTICLE 4
## MANUFACTURE AND SALE BY THE COMPANY OF SIMILAR PRODUCTS

4.1  **Grant**.  During the Term of this Agreement, the Company has the right, but not the obligation, at any time, and from time to time, to manufacture for sale under its