UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

BARRON PARTNERS, LP,                              :    Index No.
                                                  :    07 CV 11135 (JSR)
                              Plaintiff,          :
                                                  :
        -against-                                 :
                                                  :
LAB123, INC., HENRY A. WARNER, FRED               :
FITZSIMMONS, KENT B. CONNALLY, KURT               :
KATZ, ROBERT TRUMPY, JEREMY J. WARNER,            :
DAVID FLEISNER, BIOSAFE LABORATORIES,             :
INC., and BIOSAFE MEDICAL TECHNOLOGIES, INC., :
                                                  :    **ECF CASE**
                              Defendants.         :
---------------------------------------------------------------x


**PLAINTIFF BARRON PARTNERS, LP'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

Lax & Neville, LLP
Attorneys for Plaintiff Barron
Partners, LP
1412 Broadway
Suite 1407
New York, NY 10018
(212) 696-1999

On the brief:
    Barry Lax, Esq.
    David S. Rich, Esq.
    Brent Burns, Esq.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................iv

PRELIMINARY STATEMENT ........................................................................................1

I.  STATEMENT OF FACTS................................................................................................3

    A.  Defendants Fraudulently Induce Barron to Invest .........................................................3

        1. Defendants Falsely Represent that Lab123 has Exclusive Rights to Sell
           Five Biosafe Customer Health Diagnostic Tests .................................................4

        2. Defendants Fraudulently Misrepresent Profit Margins, Sales, Income, and
           Projections for Lab123 and the Biosafe Entities .................................................5

        3. Defendants Misleadingly Boast to Plaintiff that Biosafe Imminently Will
           Reap a Windfall from Kellogg Corporation .......................................................7

        4. Defendants Falsely State to Plaintiff that Lab123 is Governed
           Independently of the Biosafe Entities, Fire an Independent Director of
           Lab123, and Lie to Plaintiff About Doing So......................................................7

        5. Defendants Purposely Conceal Defendant Warner's Control of The
           Ultimate Health Club, Inc..................................................................................9

    B.  The Purchase Agreement is Executed.........................................................................9

    C.  The Fraud Unravels ................................................................................................11

ARGUMENT....................................................................................................................12

I.  This Court Has Personal Jurisdiction Over Kent B. Connally and Jeremy J. Warner
    Under N.Y. C.P.L.R. 301, 302(a)(1), 302(a)(3)(i), and 302(a)(3)(ii) .......................12

    A.  This Court has Personal Jurisdiction over Kent Connally and Jeremy Warner
        Based on their Dealings in New York in a Corporate Capacity ..................................12

        1.  The Applicable Law...........................................................................................12

        2.  Application of Law to Facts...............................................................................12

B. This Court Has Personal Jurisdiction over Kent Connally and Jeremy Warner Because Lab 123, Biosafe, and Biosafe Labs Acted for the Benefit of and with the Knowledge and Consent of Connally and Jeremy Warner, and Because Connally and Jeremy Warner Exercised Some Control over Lab123 and the Biosafe Entities in the Matter ..................................................................15

    1. The Applicable Law..........................................................................16

    2. Application of Law to Facts...............................................................17

II. Barron States Claims for Fraud, for Negligent Misrepresentation, and under Securities Exchange Act § 10(b) and Rule 10(b)(5) (Counts I, III, and IV)............................19

  A. Barron Reasonably Relied on the Defendants' Misrepresentations............................19

    1. Barron Could Not Independently Verify or Test Defendants' Misrepresentations..............................................................................20

    2. Sections 5.7 & 11.4 of the Purchase Agreement Do Not Disavow Reliance by Barron on Defendants' Prior Representations ..............................21

  B. But for Defendants' Fraudulent Representations, Barron Would Not Have Purchased Lab123's Stock for $2,000,000; Further, Barron's Investment in Lab123 Proximately Caused Barron's Damages ........................................................25

III. Barron States a Claim Against the Individual Defendants under Section 20(a) of the Securities Exchange Act of 1934 (Count II)..........................................................27

IV. Barron States a Claim Upon Which Relief Can Be Granted Against Lab123 for Breach of the Purchase Agreement (Count V) ...................................................29

V. Barron States a Claim Upon Which Relief Can Be Granted Against Biosafe Labs and Lab123 for Breach of the Licensing Agreement (Count VI) ...........................................32

  A. The Applicable Law.........................................................................33

  B. Application of Law to Facts.................................................................34

    1. Biosafe Labs and Lab123 Breached the Licensing Agreement ........................34

    2. Barron is a Third-Party Beneficiary of the Licensing Agreement ...................34

VI.    Barron States a Claim Upon Which Relief Can Be Granted Against the
       Defendants For Unjust Enrichment (Count VII) ................................................................35

VII.   Barron States a Claim Against Defendants for Conversion (Count VIII) ..........................37

VIII.  Barron States Claims under the Illinois Consumer Fraud and Deceptive
       Business Practices Act and the Illinois Securities Act (Counts IX and X) ........................38

CONCLUSION...................................................................................................................................40

# TABLE OF AUTHORITIES

**Page**

**Cases**

ASI Acquisition, LLC v. Rayman, No. 01 C 165, 2002 WL 335311
(N.D. Ill. Feb. 28, 2002) ...................................................................................39

ATSI Commc's, Inc. v. Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007) .............................23, 26, 27

Banks v. Correctional Servs. Corp., 475 F. Supp.2d 189 (E.D.N.Y. 2007) ...........................30, 32

Berk v. Tradewell, Inc., Nos. 01 Civ. 9035, 01 Civ. 10068, 2003 WL 21664679
(S.D.N.Y. July 16, 2003) ...................................................................................36

Burnett v. Physicians' Online, Inc., No. 94 CIV. 2731, 1997 WL 470136
(S.D.N.Y. Aug. 15, 1997)..................................................................................40

B. Sanfield, Inc. v. Finlay Fine Jewelry Corp., 857 F. Supp. 1241 (N.D. Ill. 1994) ....................39

Castellano v. Young & Salvano v. Rubincam, Inc., 257 F.3d 171 (2d Cir. 2001) ........................26

Consolidated Risk Servs., Inc. v. Automobile Dealers WC Self Ins. Trust,
No. 1:06-CV-871, 2007 WL 951565 (N.D.N.Y. Mar. 27, 2007)............................38

Crigger v. Fahnestock & Co., 443 F.3d 230 (2d Cir. 2006) ..................................................20, 21

DKR Capital, Inc. v. AIG Int'l West Broadway Fund, Ltd., No. 03 Civ. 1568,
2003 WL 22283836 (S.D.N.Y. Oct. 2, 2003)...........................................................30

Doehla v. Wathne Ltd., No. 98 Civ. 6087, 1999 WL 566311 (S.D.N.Y. Aug. 3, 1999)...............21

Emergent Capital Inv. Mgmt. v. Stonepath Group, Inc., 343 F.3d 189
(2d Cir. 2003) ...............................................................................................23, 24, 25

Employers' Fire Ins. Co. v. Cotton, 245 N.Y. 102, 156 N.E. 629 (N.Y. 1927) ...........................37

Eternity Global Master Fund Ltd. v. Morgan Trust Co. of N.Y., 375 F.3d 168
(2d Cir. 2004) ...................................................................................................30

E*Trade Fin. Corp. v. Deutsche Bank AG, 420 F.Supp.2d 273 (S.D.N.Y. 2006) ..................20, 36

Europadisk Holdings, LLC v. Shelton, No. 03 Civ. 4505, 2004 WL 613109
(S.D.N.Y. March 26, 2004) .................................................................................21

Factory Mut. Ins. Co. v. CICA-TEC Terminal Equip. Corp., No. 05 C 4430,
    2006 WL 3825028, (N.D. Ill. Dec. 20, 2006)..........................................................33

Fantozzi v. Axsys Techs.., Inc., 2007 WL 2007 WL 2454109
    (S.D.N.Y. Aug. 20, 2007).....................................................................................37

First Frontier Pro Rodeo Circuit Finals LLC v. PCRA First Frontier Circuit,
    291 A.D.2d 645, 737 N.Y.S.2d 694 (3rd Dep't 2002) ............................................35

Fischbarg v. Doucet, 38 A.D.3d 270, 832 N.Y.S.2d 164 (1st Dep't 2007)..............................12, 15

Glidepath Holding, B.V. v. Spherion Corp., No. 04 Civ. 9758, 2007 WL 2176072
    (S.D.N.Y. July 26, 2007) ......................................................................................25

Hughes v. BCI Int'l Holdings, Inc., 452 F. Supp.2d 290 (S.D.N.Y. 2006) ...................................36

Andrew Velez Constr., Inc. v. Consolidated Edison Co. of N.Y., Inc.
    (In re Andrew Velez Constr., Inc.), 373 B.R. 262 (Bankr. S.D.N.Y. 2007)...........................36

In re Vivendi Universal, S.A. Securities Regulator, No. 02 Civ. 5571,
    2004 WL 3019766 (S.D.N.Y. Apr. 22, 2004) .........................................................29

JP Morgan Chase Bank v. Winnick, 350 F. Supp.2d 393 (S.D.N.Y. 2004)...................................20

Joseph Sternberg, Inc. v. Walber 36th St. Assocs., 187 A.D.2d 225,
    594 N.Y.S.2d 144  (1st Dep't 1993)........................................................................36

Keywell Corp. v. Weinstein, 33 F.3d 159 (2d Cir. 1994)............................................................20

Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 467, 522 N.E.2d 40,
    527 N.Y.S.2d 195 (N.Y. 1988)...................................................................15, 16, 18

Labajo v. Best Buy Stores, 478 F. Supp.2d 523 (S.D.N.Y. 2007).................................................36

Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531 (2d Cir. 1997) ...........................21

Meese v. Miller, 79 A.D.2d 237, 436 N.Y.S.2d 496 (4th Dep't 1981) .........................................37

New York City Transit Auth. v. Morris J. Eisen, P.C., 276 A.D.2d 78,
    715 N.Y.S.2d 232 (1st Dep't 2000)..........................................................................19

Plymack v. Copley Pharm., Inc., No. 93 Civ. 2655, 1995 WL 606272

(S.D.N.Y. Oct. 12, 1995) ............................................................................................ 40

Polley v. Plainshun Corp., 8 A.D.2d 638, 186 N.Y.S.2d 295 (2d Dep't 1959) ............................ 35

Polonetsky v. Better Homes Depot, Inc., 97 N.Y.2d 46, 760 N.E.2d 1274,
    735 N.Y.S.2d 479 (N.Y. 2001) ............................................................................................ 19

Primavera Familienstifung v. Askin, 130 F. Supp.2d 450(S.D.N.Y.), amended on
    reconsideration in part on other grounds, 137 F. Supp.2d 438 (S.D.N.Y.), and
    motion to reopen denied by Johnson v. Askin Capital Mgmt., L.P., 202 F.R.D. 112
    (S.D.N.Y. 2001) ............................................................................................ 22

Retail Software Servs., Inc. v. Lashlee, 854 F.2d 18 (2d Cir. 1988) ................................. 15, 16, 18

Robbins & Myers, Inc. v. J.M. Huber Corp., No. 01-CV-0201E(F), 2001 WL 967606
    (W.D.N.Y. Aug. 23, 2001) ............................................................................................ 40

Scotsman Group, Inc. v. Mid-America Distribs, Inc., No. 93 C 7320, 1994 WL 118458
    (N.D. Ill. Apr. 5, 1994) ............................................................................................ 39

SEC v. First Bullseye Jersey Sec. Inc., 101 F.3d 1471 (2d Cir. 1996) ........................................ 27

Smith v. Kirpatrick, 305 N.Y. 66, 111 N.E.2d 209 (N.Y. 1953), overruled in part on
    other grounds by O'Brien v. City of Syracuse, 429 N.E.2d 1158 (N.Y. 1981) ...................... 36

Sullivan's Wholesale Drug Co. v. Faryl's Pharmacy, Inc., 573 N.E.2d 1370
    (Ill. App. Ct. 1991) ............................................................................................ 39

Tradewinds Aviation, Inc. v. Jet Support Servs., No. 04 C 1406, 2004 WL 2533728
    (N.D. Ill. Sept. 28, 2004) ............................................................................................ 32, 33

Twinlab Corp. v. Paulson, 283 A.D.2d 570, 724 N.Y.S.2d 496 (2d Dep't 2001) ........................ 40

United States v. First Midwest Bank/Illinois, N.A., No. 97-C-7365, 1997 WL 675192
    (N.D. Ill. Oct. 28, 1997) ............................................................................................ 33

Wislow v. Wong, 713 F. Supp. 1103 (N.D. Ill. 1989) ................................................................ 39

## Statutes and Court Rules

17 C.F.R. § 240.10b-5 ...............................................................................................19

Fed. R. Civ. P. 8(e)(2)...................................................................................35, 37, 38

Fed. R. Civ. P. 12(b)(2) .......................................................................................1, 12

Fed. R. Civ. P. 12 (b)(6) ...............................................................1, 2, 3, 30, 40

N.Y. C.P.L.R. 301 ...............................................................................................12, 13

N.Y. C.P.L.R. 302(a)(1) ............................................................................................12

N.Y. C.P.L.R. 302(a)(i) ..................................................................................12, 13, 15

N.Y. C.P.L.R. 302(a)(3) ............................................................................................13

N.Y. C.P.L.R. 302(a)(3)(i)....................................................................................12, 14

N.Y. C.P.L.R. 302(a)(3)(ii).....................................................................................12, 14

815 Ill. Comp. Stat. 505/1(b) ....................................................................................39

815 Ill. Comp. Stat. 505/1(c) ...............................................................................38, 39

815 Ill. Comp. Stat. 505/1(e) ....................................................................................39

815 Ill. Comp. Stat. 505/2.......................................................................................38, 39

815 Ill. Comp. Stat. 505/10a(a) ............................................................................38, 39

815 Ill. Comp. Stat. 5/12(F).......................................................................................40

815 Ill. Comp. Stat. 5/12(G).......................................................................................40

815 Ill. Comp. Stat. 5/12(H).......................................................................................40

815 Ill. Comp. Stat. 5/12(I).........................................................................................40

15 U.S.C. § 78j(b)....................................................................................................19

15 U.S.C. § 78t(a)....................................................................................................27

**<u>Treatises</u>**

New York Pattern Jury Instructions – Civil § 3:20 (2d ed. 2006).................................................19

New York Pattern Jury Instructions – Civil § 3:10 (2007)..........................................................37

## PRELIMINARY STATEMENT

Plaintiff Barron Partners, LP, ("Barron" or "Plaintiff") opposes the motion of Defendants Lab123, Inc. ("Lab123"), Biosafe Laboratories, Inc. ("Biosafe Labs"), Biosafe Medical Technologies, Inc. ("Biosafe"; together with Biosafe Labs, the "Biosafe Entities"), Henry A. Warner, Jeremy J. Warner, Robert Trumpy, and Kent B. Connally (collectively, the "Individual Defendants"), to dismiss the Amended Complaint, under Fed. R. Civ. P. 12(b)(2) and 12(b)(6), for lack of personal jurisdiction over Jeremy Warner and Kent Connally and failure to state a claim upon which relief can be granted.

This is an action for, inter alia, securities fraud. As the Amended Complaint explains, Defendants fraudulently induced Barron to invest $2,000,000 in Lab123 by artificially inflating the Biosafe Entities' revenues and Lab123's pro formas, making dozens of misrepresentations in response to Barron's due diligence Questionnaire, and stating that the Biosafe Entities was selling to Lab123 exclusive rights to market and sell five Biosafe customer health diagnostic tests for a 25 year term even though Defendants had previously sold those rights to insiders, affiliates, subsidiaries and/or third parties.

Defendants' motion is largely built on a flawed legal premise -- that sophisticated investors cannot maintain a securities fraud action, because, as a matter of law, such investors' knowledge concerning securities supposedly renders unreasonable any reliance by them on others' false or misleading statements. Defendants' mistaken premise contravenes the intent of Congress in enacting the Securities Exchange Act of 1934. Moreover, Defendants' erroneous legal premise would render toothless the Private Securities Litigation Reform Act, which Congress enacted, among other reasons, to empower institutional investors – who are arguably the most sophisticated investors – to

1

serve as lead plaintiffs in securities fraud class actions.

Further, Defendants' desperate efforts to challenge the Amended Complaint's factual allegations merely serve to highlight that Barron's factual allegations state claims upon which relief can be granted for all causes of action asserted in the Amended Complaint. At most, Defendants' submissions create factual disputes which, on a Rule 12(b)(6) motion, the Court cannot resolve in Defendants' favor.

Defendants submit three substantive declarations or affidavits and 43 documentary Exhibits totaling about 1,000 pages. Of Defendants' 43 documentary Exhibits, at least 27 are not mentioned or referred to in the Amended Complaint, and are not public records.[1] Defendants' brief repeatedly and flatly contradicts material, factual allegations of the Amended Complaint, either by bald assertion or by citing to the above-mentioned Affidavits and Exhibits. Two examples suffice:

- First, the Amended Complaint sets forth that Barron performed due diligence as to its then-contemplated investment in Lab123 by requiring Biosafe to complete Barron's due diligence Questionnaire and Director & Officer Form, by requesting a detailed accounting of Biosafe's 2006 sales and proof of Biosafe's revenue, and by requesting of Henry Warner a representation that Lab123 would be independent from Biosafe (Amended Complaint ¶¶ 53-54, 73, 79, 85-86, 96-97, attached as Ex. A to the Rich Decl.). However, by the Declaration of Henry Warner dated April 30, 2008 ("Henry Warner Decl."), Defendants argue that Barron's due diligence was supposedly inadequate and that Barron's Managing Partner Andrew B. Worden "was routinely unavailable during the [due diligence] process" (Henry Warner Decl. ¶¶ 10-11). Defendants append, as Exhibits to Henry Warner's Declaration, e-mails (not referenced in the Amended Complaint) purportedly demonstrating that Mr. Worden and Barron analyst Matt Samuel were absent from Barron's investigation of the Biosafe Entities' and Lab123's finances (Henry Warner Decl. Exs. 8, 9, 27; Henry Warner Decl. ¶ 11; Defs.' Br. at 7-8).

- Second, the Amended Complaint explains that Kent Connally – a member of Biosafe's and Lab123's respective Boards of Directors and of the Lab123 Board's audit and compensation committees -- personally participated in, and had actual

---

[1] Specifically, Defendants' documentary Exhibits 1-9, 12-15, 17-18, 24-25, 30-32, 34-36, 38, and 42-44 are not mentioned or referred to in the Amended Complaint, and are not public records (Declaration of David S. Rich dated May 20, 2008 ("Rich Decl.") ¶ 3).

knowledge of, Lab123's and the Biosafe Entities' fraud (Rich Decl. Ex. A ¶¶ 49, 146; see Defs.' Br. at 30 n.8. However, through the (substantive) Affidavit of Kent B. Connally sworn to February 5, 2008 ("Connally Aff."), attached as Exhibit 43 to the Henry Warner Declaration, Defendants (astoundingly) argue that Connally supposedly "has no personal knowledge relating to" (i) the Defendants' fraud as "asserted by Barron in its Complaint", (ii) "the negotiations or other communications between Barron and Lab123," or (iii) "Barron's equity investment in Lab123" (Connally Aff. ¶¶ 6-7; see Defs.' Br. at 26).

The Court ruled at the May 2, 2008 teleconference that the Court will not convert Defendants' motion to a summary judgment motion, and, thus, that the Court wouldn't consider the Defendants' Exhibits which are not referenced in the Amended Complaint. Defendants' efforts to challenge the Amended Complaint's allegations of fact by improperly introducing evidence outside the pleadings merely emphasize that the Amended Complaint properly pleads its claims. Defendants, at most, create factual disputes which, on this Rule 12(b)(6) motion, the Court must resolve in Plaintiff's favor.

## I.    STATEMENT OF FACTS

### A.    Defendants Fraudulently Induce Barron to Invest

Defendants fraudulently schemed to induce Barron, a private investment fund, to invest in a new public entity, Lab123, Inc., by making numerous misrepresentations, including, but not limited to: (i) falsely stating that Lab123 would have exclusive rights to market and sell the five home medical testing kits manufactured by the Biosafe Entities (ii) artificially inflating the revenues, profit margins, income and projections for Lab123 and the Biosafe Entities; (iii) misrepresenting that Lab123 would be an imminent beneficiary of a large transaction with Kellogg Corporation; (iv) falsely representing that Lab123 would be governed independently of the Biosafe Entities; and (v) failing to disclose that the Biosafe Entities had previously sold, to multiple other entities and persons, the same 'exclusive' rights to market and sell the same medical testing kits (Rich

3

Decl. Ex. A ¶¶ 1, 51-95).

### 1. Defendants Falsely Represent That Lab123 Has Exclusive Rights to Sell Five Biosafe Customer Health Diagnostic Tests

As part of Barron's due diligence in evaluating whether to invest in Lab123, Barron required Biosafe to complete one of Barron's standard due diligence forms (Form MDR) (the "Questionnaire"). Barron relies heavily on responses to these questionnaires in deciding whether to proceed with any transaction (Rich Decl. Ex. A ¶ 53).

On or before August 14, 2006, Henry A. Warner, Chairman of the Board of Lab123 and CEO and Chairman of the Biosafe Entities, Biosafe Director of Business Development Jeremy J. Warner (a son of Henry Warner), Biosafe Chief Financial Officer Robert Trumpy, and Kent B. Connally, a member of the Lab123 Board of Directors and of Lab123's Board of Directors' audit and compensation committees, completed and/or reviewed, on behalf of the Biosafe Entities, Defendants' responses to Barron's Questionnaire. Therein, Defendants stated that "Lab123 has the exclusive rights to market and sell," "in the retail, internet and disease management sales channels," "selected Biosafe customer health diagnostic tests," including those tests "covered by the license agreement between BMT and Lab 123" (Rich Decl. Ex. H at 7, Ex. A ¶ 55). That is, Defendants represented that Lab123 had exclusive rights to market and sell five Biosafe customer health diagnostic tests for a 25 year term, including those tests covered by the Agreement Effective as of September 7, 2006 By and Between Biosafe Laboratories, Inc. and Lab123, Inc. ("Licensing Agreement").[2]

---

[2] These five products are: (i) the Biosafe Cholesterol Panel including Total Cholesterol, HDL, LDL and Triglycerides (the "Cholesterol Panel"), (ii) the Rapid Result quantitative hemoglobin-measuring device marketed as Biosafe Anemia Meter (the "Anemia Test"), (iii) the Biosafe Prostate Specific Antigen Test (the "Prostate Screen"), (iv) the Biosafe Thyroid Stimulating Hormone test (the "Thyroid Test"), and (v) the Biosafe Hemoglobin A1c (the "Hemoglobin A1c") (Rich Decl. Ex. A ¶ 56).

4

These representations by Defendants were false and misleading, among other reasons, because (i) only 7 months after Plaintiff made its investment in Lab 123, Defendants wrongfully rescinded the granting of Lab123's 25 year exclusive right to market and sell five Biosafe customer health diagnostic tests; (ii) the Biosafe Entities had granted the 'exclusive' rights to market and sell the Anemia Test to at least three different companies – Lab 123, Johnson & Johnson ("J & J") and Rapid Response, which is a subsidiary of the Biosafe Entities (see Rich Decl. Ex. A ¶ 57(a)-57(c)); (iii) the Biosafe Entities had granted to two different companies – Lab123 and The Ultimate Health Club, Inc. ("Ultimate Health"), a corporate subsidiary of Biosafe of which Biosafe is the largest shareholder -- 'exclusive' rights to market and sell, on the internet, the Cholesterol Panel, the Anemia Test, the Prostate Screen, the Thyroid Test, and the Hemoglobin A1c (see Rich Decl. Exs. D at 1-2, Ex. E, and Ex. A ¶ 57(d)); (iv) Henry Warner had arranged for his son, Chris Warner, to market and sell Biosafe Entities products, including the Anemia Test, at a discount through various websites (see Rich Decl. Ex. A ¶ 57(e); Rich Decl. Ex. F) and (v) Defendants sold 350,000 Cholesterol Panels to Kellogg Company without remitting the proceeds from this sale to Lab123 (see Rich Decl. Ex. G, Ex. A ¶ 57(f), 57 (f)(1)).

### 2.    Defendants Fraudulently Misrepresent Profit Margins, Sales, Income, and Projections for Lab123 and the Biosafe Entities

The Questionnaire asked detailed questions about the Biosafe Entities' and Lab123's financials (see Rich Decl. Ex. H at 8, Ex. A ¶ 64). In response to these questions, the Defendants replied, "SEE FINANCIAL PROJECTIONS" (Rich Decl. Ex. H at 8, Ex. A ¶ 64). The financials provided by Defendants grossly misrepresented Lab123's sales and prospects. Thus, by referencing these projections in responding to the

above questions of the Questionnaire, Defendants made additional misrepresentations to Plaintiff (Rich Decl. Ex. A ¶ 64).[3]

On May 23, 2006, Henry Warner sent Plaintiff an e-mail attaching the Biosafe Entities' financials entitled "Retail proforma," which completely misrepresented (i) the Biosafe Entities' 2005 revenue for the five Biosafe customer health diagnostic tests which Biosafe Labs was to license exclusively to Lab123, (ii) the projected returns, for the remainder of 2006, for these five Biosafe diagnostic tests, and (iii) anticipated pro forma returns for 2007 through 2009 (Rich Decl. Ex. I, Ex. A ¶ 68).

Likewise, on June 20, 2006, Defendant Trumpy sent Plaintiff a document entitled "Biosafe Medical Technologies, Sales by Customer Summary, January 1 through June 7, 2006" (the "Sales by Customer Summary") to induce the Plaintiff to fund the investment in Lab123 (Rich Decl. Ex. J, Ex. A ¶ 73). The Defendants represented that the products listed in the Licensing Agreement had actual revenue of approximately $1 million from January 1 through June 7, 2006. This was a lie as the revenue during that period was less than $100,000 (Rich Decl. Ex. A ¶ 73).[4]

Again, on July 27, 2006, Trumpy sent an e-mail to Barron attaching a spreadsheet detailing the specific sales that purportedly supported the product revenue generated from

---

[3] Defendants also misrepresented that the Biosafe Labs - Lab123 Licensing Agreement was the only licensing agreement to which the Biosafe Entities were a party (see Rich Decl. Ex. A ¶ 66).

[4] In the Sales by Customer Summary, Defendants represented that, during the first 5 months and 1 week of 2006, Biosafe realized revenue of about $685,000 on products sold to CVS (Rich Decl. Ex. J at 2, Ex. A ¶ 74). In fact, Biosafe realized only a small fraction of that supposed revenue (Rich Decl. Ex. A ¶ 74). The Defendants' $685,000 actual revenue figure for sales to CVS was grounded on Defendants' false representation that Biosafe's contract with CVS (to sell Biosafe products in CVS retail stores) required 'net 30' payment, meaning that CVS would pay Biosafe 30 days after CVS's receipt of Biosafe's products. In fact, the Biosafe-CVS contract implemented a 'pay-on-scan,' or 'on consignment,' schedule, meaning that CVS was to pay Biosafe for a product only if and when that product was actually sold to a retail customer of CVS. CVS paid Biosafe, for the length of the contract between them, less than $50,000, all under a pay-on-scan schedule. CVS paid all of these monies to Biosafe after the August 2006 incorporation of Lab123. Accordingly, contrary to Defendants' false representation in the Sales by Customer Summary, CVS did not pay any monies to Biosafe entities from January 1, 2006 through June 7, 2006 (or, for that matter, in 2005) (Rich Decl. Ex. A ¶¶ 75-76).

the sales of the Biosafe products from January 1 through June 7, 2006. This spreadsheet is false, in that it purports to show that the revenue for the sales of the medical products was realized during that period (Rich Decl. Ex. K, Ex. A ¶ 74).

In responses to the Questionnaire, Defendants claimed that "the key advantage that the Lab123's retail and internet sales have over other sales channel [sic] is that the sales are very profitable with a gross margin that could approach 70-80%" (Rich Decl. Ex. H at 7, Ex. A ¶ 61). This statement is false and misleading, because (i) the Defendants misrepresented to Barron the referenced sales numbers and (ii) for example, there is a very small profit margin, if any such margin, on the sales of the Cholesterol Panel (Rich Decl. Ex. A ¶ 61).

**3.    Defendants Misleadingly Boast to Plaintiff That Biosafe Imminently Will Reap a Windfall from Kellogg Corporation**

In July 31, 2006 and August 7, 2006 e-mails to Barron's Managing Partner Andrew B. Worden and to Barron analyst Matt Samuel, Henry Warner pressured Plaintiff to complete the Lab123 transaction by falsely representing that Kellogg Corporation had placed an order with Biosafe for "500,000 Cholesterol Panels" to be delivered in fourth quarter 2006, and that this order would significantly benefit Lab123. Warner's representations were false, because (i) no such order was placed with Biosafe and (ii) when Kellogg did agree to purchase medical products in November 2006, Lab123 received no benefit whatsoever (Rich Decl. Ex. L, Ex. A ¶¶ 82, 83).

**4.    Defendants Falsely State to Plaintiff that Lab123 is Governed Independently of the Biosafe Entities, Fire an Independent Director of Lab123, and Lie to Plaintiff About Doing So**

By August 10, 2006 e-mail, Defendant Henry Warner assured Barron that Lab123 and Biosafe were completely separate and independent of one another, stating that

7

"Lab123 must operate totally independent of BIOSAFE" (Rich Decl. Ex. M, Ex. A ¶ 86). When Henry Warner so stated, Defendants did not intend for Lab123, or for a majority of Lab123's Board of Directors, to be independent.    Rather, as of August 14, 2006, Defendants intended for at least three of the five members of Lab123's Board of Directors to be controlled by Henry Warner (Rich Decl. Ex. A ¶ 86).

After Plaintiff's September 2006 investment in Lab123, Lab123's 5 directors were Board Chairman Henry Warner;  Kent Connolly; Michael Sosnowick; Frederick Fitzsimmons; and Kurt Katz.  Lab123 Board members Sosnowick and Connolly were controlled by Henry Warner.   Henry Warner, Sosnowick, and Connolly were not independent, and acted in Warner's, not Lab123's, best interests (Rich Decl. Ex. A ¶ 88).

Further, when Frederick Fitzsimmons -- a member of the Lab123 Board of Directors, and a member of Lab123's Board's audit and compensation committees – acted in accordance with his fiduciary duty by demanding from Lab123 the company's financials continuously over a six (6) month time period from September 2006 through March 2007, Defendants kicked Fitzsimmons off Lab123's Board and, to cover up their firing of an independent director and the fact that they had done so because he voiced concerns about the lack of financial disclosure to the Board, lied to Plaintiff by stating that Fitzsimmons voluntarily quit Lab123's Board.[5]

---

[5] On March 16, 2007, Fred Fitzsimmons submitted to Henry Warner, Kent Connally, Lab123's then-Chief Executive Officer Mary Rodino, Biosafe's CFO Robert Trumpy, and Kurt Katz a memo emphasizing numerous unsatisfactory conditions. By March 19, 2007, 7:04 A.M. e-mail, Henry Warner, instead of responding to Fitzsimmons' specific concerns, terminated Fitzsimmons (effective as of March 17, 2007) as a Board member of Lab123 (Rich Decl. Ex. N ¶¶ 16-17, Ex. A ¶¶ 92-93).    By  March  19, 2007, 7:44 A.M. e-mail to Plaintiff and Lab 123's then-CEO Mary Rodino, Henry Warner falsely stated that "Fred Fitzsimmons may be planning to leave the Board of Lab123" (Rich Decl. Ex. O, Ex. A ¶ 94). This representation by Warner was a lie, because Henry Warner had already fired Mr. Fitzsimmons from Lab123's Board, effective two days earlier (Rich Decl. Ex. A ¶ 94).

### 5.    Defendants Purposely Conceal Defendant Warner's Control of The Ultimate Health Club, Inc.

Plaintiff required Biosafe to complete Plaintiff's standard director/officer background form (Form DOB) (the "Director & Officer Form"). In responses to the Plaintiff's Director and Officer Form, which was reviewed and completed by the Individual Defendants on behalf of the Biosafe Entities in August 2006, Defendants represented (i) that Biosafe and Banc Street Acquisitions were the only two employers, businesses, or entities of which Defendant Henry Warner has been a director, a majority shareholder or a founder and (ii) except for Biosafe and Banc Street Acquisitions, Henry Warner has not advised, directed, or had any other non-employee relationship with any venture or project (Rich Decl. Ex. P at 2-4, Ex. A ¶ 98). This representation by Defendants was false because Henry Warner has been a director of, or has directed or had a non-employee relationship with, among other ventures or projects, The Ultimate Health Club, Inc. and Rapid Response (Rich Decl. Ex. A ¶¶ 99-100; Rich Decl. Ex. E at 25). As a result, Warner continues to control all operating and business matters of Biosafe and of Biosafe's subsidiary Ultimate Health (Rich Decl. Ex. A ¶ 100).[6]

### B.    The Purchase Agreement Is Executed

On September 6, 2006, Barron and Lab123 entered into a convertible preferred stock purchase agreement with Plaintiff to issue 3,774,000 shares of Series A Convertible Preferred Stock ("Series A Preferred") and a warrant to purchase 3,774,000 shares of common stock for $2,000,000 (the "Purchase Agreement") (Rich Decl. Ex. B, Ex. A ¶¶

---

[6] But for Defendants' failure to disclose that Defendant Henry Warner has been a director of Ultimate Health, Plaintiff, in deciding whether to invest in Lab123, would have investigated Ultimate Health; and would have discovered that the Biosafe Entities had already granted to Ultimate Health the 'exclusive' rights to market and sell, on the internet, the Cholesterol Panel, the Anemia Test, the Prostate Screen, the Thyroid Test, and the Hemoglobin A1c (Rich Decl. Ex. A ¶ 101).

16, 102). On the same day, Barron wired $2,000,000 to Lab123 (Rich Decl. Ex. A ¶ 102). After the Purchase Agreement was executed, Defendants continued to supply fraudulent financials to Barron (Rich Decl. Ex. A ¶ 103).[7]

On September 29, 2006, Lab123 elected three purportedly independent directors to its Board of Directors (Kent Connally, Fred Fitzsimmons, and Kurt Katz), and the Board established audit and compensation committees comprised solely by these three directors. In fact, however, Connally was not independent, but was controlled by the Chairman of Lab123's Board of Directors, Henry Warner (Rich Decl. Ex. A ¶ 105).

By October 20, 2006 letter to Lab123's President, the SEC questioned Lab123's revenue recognition policy set forth in Lab123's Form SB-2 filed September 22, 2006 (Rich Decl. Ex. R, Ex. A ¶ 106). In response, Lab123 filed a revised, but fraudulent, Form SB-2 with the SEC on November 22, 2006 (Rich Decl. Ex. S, Ex. A ¶ 106) [PL1034–82] Note 3 to Lab123's November 22, 2006 Form SB-2's financial statements, called "Revenue Recognition," states: "Revenue is recognized upon shipment of products. Sales discounts and allowances are recorded at the time product sales are recognized and are offset against sales revenue" (Rich Decl. Ex. S at 40, Ex. A ¶ 106) [PL1034–82] This statement is false in that, under the pay-on-scan system, the purchaser pays Lab123, and thus Lab123 recognizes revenue, only if and when the purchaser's drug store actually sells the product to a retail customer (Rich Decl. Ex. A ¶ 106).

From Barron's and Lab123's September 2006 entry into the Purchase Agreement to March 2007, Lab123 Board member, Lab 123 Board audit committee member, and

---

[7] For example, on September 21, 2006, Defendants sent Plaintiff a spreadsheet showing total sales for the Biosafe products in August 2006 of $227,612.73 (Rich Decl. Ex. Q, Ex. A ¶ 103). Defendants intentionally misrepresented these sales (Rich Decl. Ex. A ¶ 103). Defendants represented that they'd sold $87,000 of Biosafe's products to Walgreen's in August 2006 (Rich Decl. Ex. Q at 3, Ex. A ¶ 103). That revenue was not realized because the Biosafe Entities sold their products to Walgreen's on a pay-on-scan basis (Rich Decl. Ex. A ¶ 103).

Lab123 compensation committee member Fred Fitzsimmons made numerous requests of Henry Warner and Trumpy, at Board meetings and by memoranda and e-mails, for committees (i) Lab123's net income projections and (ii) the company's basic financials for 2006 and to-date 2007, including Lab123's balance sheet, income statement and cash flow statement. Continuously throughout the same period, Henry Warner and Biosafe CFO Trumpy refused to provide to Lab123's Board of Directors and to the Board's audit and compensation this financial information (Rich Decl. Ex. N ¶¶ 3-15, Ex. A ¶¶ 90-91). By withholding this financial information, Henry Warner and Trumpy covered up the Defendants' fraudulent financials.

### C.    The Fraud Unravels

Early in first quarter 2007, Lab123 CEO Michael Sosnowik resigned. He did so because he realized the financials that Defendants had provided to him were fraudulent (Rich Decl. Ex. A ¶ 107). Practically none of the revenue that had been purportedly realized was, in fact, realized. The consignment sales or pay-on-scan sales revenue had been booked as realized, and a significant percentage of Biosafe's products remained on the shelves of its customers' stores, like Albertsons and CVS (Rich Decl. Ex. A ¶ 107). Mr. Sosnowik realized the 70-80% margins for the sale of the Biosafe products were a complete fiction orchestrated by Defendants (Rich Decl. Ex. A ¶ 107)[8]

In April 2007, Lab123 disclosed to Barron that Lab123's Q1 revenues were only

---

[8] Also in March 2007, Biosafe was forced into involuntary bankruptcy by its creditors (Rich Decl. Ex. T, Ex. A ¶ 109). The bankruptcy petition alleged severe illegal conduct perpetrated by Henry Warner, including his taking of corporate monies for his own purposes (Rich Decl. Ex. U, Ex. A ¶ 109).

$37,000 -- about 15% of the pro forma numbers Defendants provided to Plaintiff prior to its investment. Further, Defendants informed Barron that the Biosafe Labs – Lab 123 Licensing Agreement was being (unlawfully) terminated (Rich Decl. Ex. A ¶ 110).[9]

## ARGUMENT

### I.    This Court Has Personal Jurisdiction Over Kent B. Connally and Jeremy J. Warner Under N.Y. C.P.L.R. 301, 302(a)(1), 302(a)(3)(i), and 302(a)(3)(ii)

This Court must deny Defendants Kent B. Connally and Jeremy J. Warner's motion, under Fed. R. Civ. P. 12(b)(2), to dismiss the Amended Complaint for lack of personal jurisdiction. This Court has personal jurisdiction over Defendants Kent B. Connally and Jeremy J. Warner under New York's long-arm statute, N.Y. C.P.L.R. 301, 302(a)(1), 302(a)(3)(i), and 302(a)(3)(ii) (Rich Decl. Ex. A ¶ 5).

### A.    This Court Has Personal Jurisdiction over Kent Connally and Jeremy Warner based on their Dealings in New York in a Corporate Capacity

#### 1.    The applicable law

Out-of-state defendants, who are never physically present in New York State, nonetheless "transact[] . . . business" within New York State within the meaning of N.Y. C.P.L.R. 302(a)(i) by communicating, regarding business, by electronic mail, letter, telephone, and/or facsimile with an individual New York resident. Fischbarg v. Doucet, 38 A.D.3d 270, 271-275, 832 N.Y.S.2d 164, 165-169 (1st Dep't 2007).[10]

---

[9] After these disclosures, Plaintiff immediately demanded rescission of the Purchase Agreement, and return of the $2,000,000, plus interest (Rich Decl. Ex. A ¶ 111). Defendants agreed to this proposal, but have yet to rescind the Agreement or to return Barron's money (Rich Decl. Ex. A ¶ 111).

[10] In Fischbarg, a New York lawyer brought an action against individual clients residing in California, seeking to recover fees for representing the clients in a copyright infringement action in federal district court in Oregon. Fischbarg, 38 A.D.3d at 271-272, 832 N.Y.S.2d at 165-166. The clients "never physically came to New York," and the attorney "physically never appeared in Oregon and did all of his work in the Oregon lawsuit in New York." Fischbarg, 38 A.D.3d at 271-272. The First Department, affirming the lower Court's order denying the clients' motion to dismiss for lack of personal jurisdiction, held that the out-of-state clients "transact[ed] . . . business" under N.Y. C.P.L.R. 302(a)(i). Id. at 272. The Fischbarg Court explained that "Throughout plaintiff's representation, defendants made frequent phone calls to plaintiff in New York, and sent their fax communications to him in New York." Id. at 273.

### 2.    Application of law to facts

Here, <u>first</u>, Kent Connally and Jeremy Warner "transact[ed] . . . business" within New York State under N.Y. C.P.L.R. 302(a)(i).  <u>Second</u>, Connally and Jeremy Warner did business within New York under N.Y. C.P.L.R. 301.  For example:

- Connally, a member of Lab123's Board of Directors, was present at the January 11, 2007 meeting of Lab123's Board, which meeting was held at Lab123's outside counsel Guzov Ofsink's offices in New York City (Henry Warner Decl. Ex. 35 at 2; Rich Decl. Ex. N ¶ 6).

- In December 2006 and January 2007, Jeremy Warner and Barron analyst Matthew Samuel exchanged numerous e-mails by which Warner and Samuel formulated the content of Lab123's website.  Among other contributions, Jeremy Warner electronically supplied Barron with numerous images for Lab123's website of the five customer health diagnostic tests which the Biosafe Entities manufacture (Rich Decl. Ex. V).

- In February - March 2007, Jeremy Warner exchanged numerous e-mails with Barron analyst Matthew Samuel and then-Lab123 Chief Executive Officer Mary Rodino by which Warner, Samuel, and Rodino undertook to formulate a business plan for Lab123.  Among other things, Jeremy Warner, by e-mail to Barron's Matt Samuel, outlined 12 tasks which Warner argued were essential to Lab123's success (Rich Decl. Ex. W at 1-2).

<u>Third</u>, under N.Y. C.P.L.R. 302(a)(3), Connally and Jeremy Warner "commit[ted] . . . a tortious act" or tortious acts (in particular, fraud) without New York causing injury to person or property (specifically, Barron) within New York State.  For instance:

- On information and belief, Kent Connally and Jeremy Warner, on the Biosafe Entities' behalf, completed and/or reviewed (i) Defendants' fraudulent, August 14, 2006 responses to Barron's Due Diligence Questionnaire and (ii) Defendants' fraudulent, August 2006 responses to Barron's Director & Officer Form (Rich Decl. Ex. A ¶¶ 54, 97).

- Connally signed the revised, but fraudulent, Form SB-2 which Lab123 – through its (New York) outside counsel, Guzov Ofsink – filed with the SEC on November 22, 2006.  Rich Decl. Ex. S at 48; <u>see</u> Rich Decl. Ex. A ¶ 106; <u>supra</u> p. 10.

- By December 1, 2006 letter to Lab123's President, the SEC further questioned Lab123's "revenue recognition policy" set forth in Lab123's revised, but

fraudulent, Form SB-2 filed November 22, 2006 (Rich Decl. Ex. X at 5). In response, Lab123 filed with the SEC yet another revised, but fraudulent, Form SB-2 on or about December 11, 2006 (Rich Decl. Ex. Y).[1] At the behest of Jay Weil, Esq. of Lab123's (New York) outside counsel Guzov Ofsink, Connally reviewed and signed the revised, but fraudulent, December 11, 2006 Form SB-2 (Rich Decl. Ex. Z, Ex. Y at 60).

- When Plaintiff's Managing Partner, Andrew B. Worden, discovered, and protested to Defendants, that they didn't give to Lab123 any proceeds from Kellogg's November 2006 order, from the Biosafe Entities, of 350,000 Cholesterol Panels, (Rich Decl. Ex. A ¶ 57(f)(2); see Rich Decl. Ex. II), Kent Connally, by March 28, 2007 e-mail to Mr. Worden, snidely retorted that "the fact that you can become so 'incensed' over business disagreements . . . is disturbing to me" and that "I cannot, and will not, become embroiled in your temper tantrums," and demanded that Mr. Worden remove Connally from Mr. Worden's e-mail distribution list (Rich Decl. Ex. AA). By so sniping at Mr. Worden, Connally, a member of the Lab123 Board of Directors, breached his fiduciary duty to Lab123 to seek to compel Defendants to remit to Lab123 the proceeds from the Biosafe Entities-Kellogg agreement as per Henry Warner's July 31 and August 7, 2006 e-mails and the Licensing Agreement (Rich Decl. Ex. A ¶ 57(f)(2)).

- Henry Warner placed Jeremy Warner on Biosafe's payroll for sales commissions in excess of what comparable employees earn from Biosafe. Further, on information and belief, Jeremy Warner and Henry Warner together diverted a corporate opportunity from Biosafe to another entity they controlled and profited handsomely from this opportunity, all without disclosure to the Board of Directors (Rich Decl. Ex. U ¶ 15).

Under N.Y. C.P.L.R. 302(a)(3)(i), Connally and Jeremy Warner "regularly do[] or solicit[] business, or engage in . . . [an]other persistent course of conduct, or derive[] substantial revenue from goods used or consumed or services rendered," in New York State. Likewise, under N.Y. C.P.L.R. 302(a)(3)(ii), Connally and Warner "expect or should reasonably expect" their tortious act or tortious acts without New York State causing injury to Barron within New York State "to have consequences in" New York. Further, Connally and Warner "derive substantial revenue from interstate or international commerce" under N.Y. C.P.L.R. 302(a)(3)(ii) (Rich Decl. Ex. A ¶¶ 6-13).

Kent Connally's and Jeremy Warner's above-described transacting of business in New York significantly exceeds the out-of-state defendants' telephone phone calls to, and faxes to, an individual New York resident which the First Department, in Fischbarg, held were sufficient to ground long-arm jurisdiction over out-of-state defendants under N.Y. C.P.L.R. 302(a)(i). Fischbarg v. Doucet, 832 N.Y.S.2d 164, 165-169 (1st Dep't 2007).

Further, "the 'fiduciary shield doctrine,'"—which Defendants mistakenly argue provides that Connally and Jeremy Warner should not be subject to jurisdiction if their dealings in New York were solely in a corporate capacity (Defs.' Br. at 12)—"is not available to defeat jurisdiction under the New York long arm statute." Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 467, 472, 527 N.Y.S.2d 195, 199, 202 (N.Y. 1988); accord Retail Software Servs. Inc. v. Lashlee, 854 F.2d 18, 22 (2d Cir. 1988) ("the fiduciary shield doctrine, which shields a corporate employee from the exercise of personal jurisdiction over him if he acted solely in a corporate capacity within the forum state," "does not  apply to any of the provisions of New York's long-arm statute"). Connally's and Warner's motion to dismiss for lack of personal jurisdiction must fail.

**B.      This Court Has Personal Jurisdiction over Kent Connally and Jeremy Warner Because Lab 123, Biosafe, and Biosafe Labs Acted for the Benefit of and with the Knowledge and Consent of Connally and Jeremy Warner, and Because Connally and Jeremy Warner Exercised Some Control over Lab123 and the Biosafe Entities in the Matter**

Even putting aside that, under Fischbarg, Kreutter, and Retail Software Servs., the actions of Kent Connally and Jeremy Warner in their corporate capacities confer on this Court personal jurisdiction over them, this Court has personal jurisdiction over Connally and Jeremy Warner because Lab123's New York residency, Lab123's consent to personal jurisdiction, and the actions of Lab123 and the Biosafe Entities in New

15

York are imputed to Kent Connally and Jeremy Warner for personal jurisdiction purposes.

Lab 123, Biosafe, and Biosafe Labs acted for the benefit of and with the knowledge and consent of Defendants Connally and Jeremy Warner, and Connally and Jeremy Warner exercised some control over Lab123 and the Biosafe Entities in the matter (Rich Decl. Ex. A ¶ 15). Connally and Jeremy Warner exercised some control over Lab123 and the Biosafe Entities in the matter in that (i) from September 2006 to date, Connally has been a member of the Board of Directors of Lab123, and a member of the Audit Committee and the Compensation Committee of Lab123's Board of Directors, (ii) from 1995 to date, Connally has been a shareholder of Biosafe, (iii) Connally is a member of the Board of Directors of Biosafe, and (iv) Jeremy Warner is, and at all relevant times has been, the Director of Business Development of Biosafe.[11]

### 1.    The applicable law

> [To establish that the corporation] was acting as the agent of [the individual Defendant] so that its actions are attributable to [him] and support New York's assertion of jurisdiction over [him] . . . . Plaintiff need not establish a formal agency relationship between [the individual] defendant[] and [the corporation]. He need only convince the court that [the corporation] engaged in purposeful activities in this State in relation to his transaction for the benefit of and with the knowledge and consent of [the individual defendant] and that [the individual defendant] exercised some control over [the corporation] in the matter.

Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 467, 522 N.E.2d 40, 44, 527 N.Y.S.2d 195, 199 (N.Y. 1988) (citations omitted); accord Retail Software Servs., Inc. v. Lashlee, 854 F.2d 18, 22 (2d Cir. 1988).

---

[11] Connally Aff. ¶¶ 4-6; Minutes of Lab123, Inc. Board Mtg. of Sept. 29, 2006, Lab123, Inc. Audit Comm. Charter, and Lab123, Inc. Compensation Comm. Charter, attached as Ex. 35 to the Henry Warner Decl.; Defs.' Br. at 30 n.8 (admitting that "Connally became a director of Biosafe after . . . [Barron's original] [C]omplaint was filed" in December 2007); Rich Decl. Ex. A ¶¶ 48-49.

### 2.    Application of law to facts

In the Purchase Agreement, Lab123 has agreed that the federal courts sitting in New York have <u>exclusive</u> jurisdiction over the present lawsuit. Specifically, Lab123 has agreed that "If any action is brought among the parties [Lab123 and Plaintiff] with respect to [the Purchase] Agreement or otherwise, . . . . Exclusive jurisdiction and venue for any such action shall be the Federal Courts serving the State of New York" (Rich Decl. Ex. B § 11.10, Ex. A ¶ 18).

Lab123 is a New York resident.  At all relevant times, Lab123 was a Delaware corporation with its principal place of business at 233 Narragansett Avenue, Lawrence, New York (Ex. A ¶ 19; <u>e.g.</u>, Rich Decl. Ex. BB at 1-4).

Lab123's outside counsel is Guzov Ofsink, LLC (Rich Decl. Ex. A ¶ 20;  Henry Warner Decl. ¶ 4; Decl. of Darren Ofsink dated Apr. 30, 2008 ("Ofsink Decl.") ¶ 4).  Guzov Ofsink's place of business is 600 Madison Avenue in New York City (Rich Decl. Ex. A ¶ 20).  Guzov Ofsink, on Lab123's behalf, negotiated with Barron as to the Purchase Agreement (Rich Decl. Ex. A ¶ 20; Henry Warner Decl. ¶ 4; Ofsink Decl. ¶ 4). Guzov Ofsink attorneys Jay Weil and Darren Ofsink exchanged numerous e-mails with Barron about the Purchase Agreement and the negotiation of that Agreement.[12]  Guzov Ofsink made Lab 123's SEC filings, and communicated with the SEC (about Lab123's filings) by letter (Rich Decl. Ex. DD, Ex. A ¶ 23).[13]

In or about 2003, representatives of the Biosafe Entities, including Henry Warner, came to New York to solicit business from, and did successfully solicit business from, (i)

---

[12] (Rich Decl. Ex. A ¶ 20; <u>e.g.</u>, Rich Decl. Ex. CC).

[13] Marcum & Kliegman LLP has served and does serve as Lab123's independent auditor (Rich Decl. Ex. A ¶ 26; <u>e.g.</u>, Rich Decl. Ex. EE at 1-3).  Marcum & Kliegman's principal places of business are in Manhattan, and in Melville, New York (<u>see</u> Rich Decl. Ex. A ¶ 26).

Pfizer Incorporated, a publicly listed drug company based in Manhattan, (ii) A. Alexander Arnold, III, an individual domiciled in Manhattan who was and is the largest minority shareholder of Biosafe, and (iii) Omnicom Group, a publicly listed, strategic holding company based in Manhattan (see Rich Decl. Ex. A ¶¶ 27- 29).

Biosafe Labs holds a New York State Laboratory Permit approving it to perform laboratory tests in the categories of Clinical Chemistry, Endocrinology, and Oncology - Sera and Soluble Tumor Markers testing (Rich Decl. Ex. FF, Ex. A ¶ 31).[14]

Lab123 and the Biosafe Entities so acted for the benefit of and with the knowledge and consent of Kent Connally and Jeremy Warner, and Connally and Jeremy Warner exercised some control over Lab123 and the Biosafe Entities in the matter. Kent Connally and Jeremy Warner knew and consented to these activities, and exercised some control over Lab123 and the Biosafe Entities in the matter, because Connally is a member of Lab123's Board of Directors, is a member of the Audit Committee and the Compensation Committee of Lab123's Board of Directors, is a member of Biosafe's Board of Directors, and is a shareholder of Biosafe, and because Jeremy Warner is Biosafe's Director of Business Development. Thus, this Court has personal jurisdiction over Defendants Kent B. Connally and Jeremy J. Warner under New York's long-arm statute. Kreutter, 522 N.E.2d at 467; Retail Software Servs., Inc., 854 F.2d at 22.

---

[14] To obtain this Laboratory Permit from New York State, Biosafe Labs was required to, and did, (i) complete and submit to the New York State Department of Health (the "NYS DOH") an Initial Laboratory Permit Application (Form DOH-3494), (ii) pay over $1,100 in fees to the NYS DOH, (iii) designate for New York a laboratory director and assistant directors certified in each of the three above-mentioned permit categories, (iii) successfully participate in proficiency testing administered by the NYS DOH, and (iv) complete a successful on-site inspection by the NYS DOH (Rich Decl. Ex. GG, Ex. JJ at 3, Ex. A ¶ 32).

II.  **Barron States Claims for Fraud, for Negligent Misrepresentation, and under Securities Exchange Act § 10(b) and Rule 10(b)(5) (Counts I, III, and IV)**

Barron states claims against the Defendants for fraud (Count III),[15] for negligent misrepresentation (Count IV),[16] and for violation of section 10(b) of the Securities Exchange Act of 1934 (the "Securities Exchange Act" or the "SEA"), 15 U.S.C. § 78j(b), and Rule 10b-5 under that Act, 17 C.F.R. 240.10b-5 (Count I).

A.  **Barron Reasonably Relied on the Defendants' Misrepresentations**

Defendants baselessly argue that (i) Barron should have known that the financial and due diligence documents Defendants supplied to it were lies, (ii) in sections 5.7 and 11.4 of the Purchase Agreement, Barron disclaimed its reliance on misrepresentations made by Defendants, but that were not set forth in that Agreement, and (iii) as a result, Barron's reliance on Defendants' lies was not reasonable for purposes of Barron's SEA § 10(b)(5) claim. Defendants' arguments lack merit. Barron had no independent means of verifying or testing Defendants' misrepresentations. Sections 5.7 and 11.4 of the Purchase Agreement do not waive Barron's right to rely reasonably on false statements made by Defendants outside of the Agreement. Rather, section 11.4 merely states that all

---

[15] "In an action to recover for fraud, the plaintiff must prove a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury." Leon D. Lazer, et.al., New York Pattern Jury Instructions – Civil § 3:20, at 150 (2d ed. 2006); see New York City Transit Auth. v. Morris J. Eisen, P.C., 276 A.D.2d 78, 85, 715 N.Y.S.2d 232, 237 (1st Dep't 2000) ("an actionable fraud claim requires proof that defendant made a misrepresentation of fact which was false and known to be false. It also requires a showing that the misrepresentation was made with the intent to induce another party's reliance upon it"); "Corporate officers and directors can be individually liable for fraud based on their personal participation of actual knowledge of the fraud." 2 Leon D. Lazer et al., New York Pattern Jury Instructions § 3:20, at 163 (2d ed. 2006): see Polonetsky v. Better Homes Depot, Inc., 97 N.Y.2d 46, 55, 760 N.E.2d 1274, 1278, 735 N.Y.S.2d 479, 483 (N.Y. 2001) ("In actions for fraud, corporate officers and directors may be held individually liable if they participated in or had knowledge of the fraud, even if they did not stand to gain personally").

[16] While Defendants seek to dismiss the entire Amended Complaint, they offer no reasons why the Court should dismiss of Barron's negligent misrepresentation claim (Count IV) or Barron's claim for fraud in inducement of entry into the Purchase Agreement (Count XI). The Court should deny Defendants' bid to dismiss Barron's negligent misrepresentation and fraud-in-the-inducement claims.

terms of the Agreement are contained therein.

### 1.    Barron Could Not Independently Verify or Test Defendants' Misrepresentations

For purposes of an SEA § 10(b)(5) claim, "Reasonable reliance entails a duty to investigate the legitimacy of an investment opportunity where 'plaintiff was placed on guard or practically faced with the facts.'" Crigger v. Fahnestock & Co., 443 F.3d 230, 234 (2d Cir. 2006). "One party reasonably relies on another party's documentation if the documents 'would not, on their face, have alerted [plaintiffs] to potential fraud.'" E*Trade Fin. Corp. v. Deutsche Bank AG, 420 F.Supp.2d 273, 288 (S.D.N.Y. 2006). "No authority holds reliance to be unreasonable unless the plaintiff saw 'red flags' or 'other circumstances' existed that made reliance 'unquestionably unreasonable.'" E*Trade Fin. Corp., 420 F.Supp.2d at 288; see also JP Morgan Chase Bank v. Winnick, 350 F. Supp.2d 393, 408 (S.D.N.Y. 2004) (only "direct evidence of mistake or fraud or 'arouse[d] suspicion' would make reliance unreasonable"). The federal courts within New York have recognized that "Whether or not reliance on alleged misrepresentations is reasonable in the context of a particular case is intensely fact-specific and generally considered inappropriate for determination on a motion to dismiss." Doehla v. Wathne Ltd., No. 98 Civ. 6087, 1999 WL 566311 (S.D.N.Y. Aug. 3, 1999).[17]

Generally, "[t]he greater the sophistication of the investor, the more inquiry that is required." Crigger, 443 F.3d at 235. However, "[w]hen matters are . . . peculiarly within defendant's knowledge, . . . plaintiff may rely without prosecuting an investigation, as he

---

[17] See also Keywell Corp. v. Weinstein, 33 F.3d 159, 164 (2d Cir. 1994) (dismissal under Rule 12 for lack of reasonable reliance is permissible only where plaintiff 'was placed on guard or practically faced with the facts.")

has no independent means of ascertaining the truth."[18]  A plaintiff need not show that

"the information had to be available only to the defendant and absolutely unknowable by

the plaintiff before reliance can be deemed justified." Lazard Freres & Co., 108 F.3d at

1542 n.9.  The Second Circuit has observed that "some cases have imposed liability in

situations in which plaintiff could have determined the truth with relatively modest

investigation." Id.

     Here, Barron was not "placed on guard" or "faced with the facts" of Defendants'

misrepresentations.  The Biosafe Entities are private, closely held corporations.  Lab123

was formed simultaneously with the Purchase Agreement, and is not listed on a stock

exchange.  Only the Biosafe Entities, Lab123, and the Individual Defendants knew the

falsity of their representations.  Barron had no independent means of verifying the truth.

     Indeed, Defendants do not identify any specific document, or any particular fact

Barron knew, which placed Barron on notice of the falsity of Defendants' statements.

    **2.    Sections 5.7 & 11.4 of the Purchase Agreement Do not Disavow
Reliance by Barron on Defendants' Prior Representations**

Section 11.4 of the Purchase Agreement states:

> **Entire Agreement.**  This Agreement (together with the Schedule,
> Exhibits, Warrants and documents referred to herein) constitute the entire
> agreement of the parties and supersede all prior agreements and
> undertakings, both written and oral, between the parties, or any of them,
> with respect to the subject matter hereof.

(Rich Decl. Ex. B ¶ 11.4).  This Court has held that language almost identical to section

11.4 does not disclaim reliance on prior representations outside the agreement.  See

Europadisk Holdings, LLC v. Shelton, No. 03 Civ. 4505, 2004 WL 613109, at *2-*3

(S.D.N.Y. March 26, 2004) (investor company stated claims upon which relief could be

---

[18] Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1542 (2d Cir. 1997); accord
Crigger v. Fahnestock, 443 F.3d at 234.

granted against individual seller for fraud and for violation of section 10(b) of the
Securities Exchange Act, despite stock purchase agreement's clause stating that "This
Agreement (including the documents referred to herein) constitutes the entire agreement
between the Parties and supersedes any prior understandings, agreements, or
representations by or among the Parties, written or oral, to the extent that they related in
any way to the subject matter hereof"; "Because the integration clause contained [in] . . .
the written agreement between plaintiff and defendant does not specifically disclaim
reliance on defendant's representations as to its accounts payable, it does not bar
plaintiff's present claim").

Likewise, contrary to Defendants' assertions (Defs.' Br. at 19-21), section 5.7 of
the Purchase Agreement – stating that Barron "ha[s] . . . been afforded the opportunity to
ask questions of the Company and ha[s] . . . received complete and satisfactory answers
to any such inquiries" (Rich Decl. Ex. B § 5.7) -- does not, for purposes of Barron's SEA
§ 10(b) claim, render unreasonable Barron's reliance on Defendants' false statements.
Again, this Court has held that language nearly identical to section 5.7 of the Purchase
Agreement does not preclude reliance on prior representations outside the Agreement.
Primavera Familienstifung v. Askin, 130 F. Supp.2d 450, 497 (S.D.N.Y.) (in investors'
action against brokerage firms for aiding and abetting fund managers' fraud in
persuading plaintiffs to invest in hedge funds which later collapsed, genuine issues of
material fact, precluding, in pertinent part, entry of summary judgment for brokerage
firms, existed as to whether it was reasonable for the investors to rely on fund managers'
statements outside subscription agreements executed by the investors, notwithstanding
that the subscription agreements stated that "there was the opportunity to ask questions

of [the fund managers] and receive responses"), amended on reconsideration in part on other grounds, 137 F. Supp.2d 438 (S.D.N.Y.), and motion to reopen denied by Johnson v. Askin Capital Mgmt., L.P., 202 F.R.D. 112 (S.D.N.Y. 2001). Thus, Barron does not, under sections 5.7 and 11.4 of the Purchase Agreement, waive reliance on prior misrepresentations made by Defendants outside the Agreement.

In support of their mistaken argument that sections 5.7 and 11.4 of the Purchase Agreement preclude Barron from reasonably relying on Defendants' pre-Agreement misrepresentations, Defendants cite ATSI Communications, Inv. v. Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007) and Emergent Capital Investment Management v. Stonepath Group, Inc., 343 F.3d 189 (2d Cir. 2003) (Defs.' Br. at 18-22). These cases are inapposite. In ATSI, the agreement "plainly state[d] that the only promises, restrictions, and warranties to the transaction were those set forth in the transaction documents." ATSI, 493 F.3d at 105. Here, the Purchase Agreement contains no similar clause.

In Emergent Capital, an investor company's action for fraud and violations of Securities Exchange Act §§ 10(b) and 20(a), the Second Circuit held that, given, among other factors, the "standard merger clause" in the parties' stock purchase agreement, (i) the investor did not reasonably rely upon the target company's officers' misrepresentation that the target had a $14 million investment (rather than, in fact, a $4 million investment) in a third company, Brightstreet.com, ("Brightstreet"), but that the investor did reasonably rely on the officers' failure to disclose one officer's "history of failed investment projects undertaken in collaboration with" an individual barred from the securities industry by the NASD. Emergent Capital, 343 F.3d at 191, 193. Thus, the Emergent Capital Court affirmed in part, vacated in part, and remanded the district

court's judgment dismissing the investor's amended complaint for failure to state a claim. Id. at 191-192. The Second Circuit explained that "because the[] causes of action" "premised on [the officer's] investment history and [the target company's] ties to [the disbarred individual]" "are based on omissions rather than affirmative misstatements, [the investor company] had no notice of the omitted facts and could not have protected itself by insisting on corresponding contractual representations." Id. at 196.

Similarly, here, Defendants fraudulently induced Barron to invest $2,000,000 in Lab123 by, among other ruses and machinations, failing to disclose facts material to that transaction, such as (i) that the Biosafe Entities had previously sold, to multiple other entities and persons, the same 'exclusive' rights to market and sell five Biosafe customer health diagnostic tests that, in the Licensing Agreement, Biosafe was selling to Lab123 and (ii) that Henry Warner is a director of, and controls all operating and business matters of, Ultimate Health. Rich Decl. Ex. A ¶¶ 56-57, 96-101; see supra p. 9. Because Barron's causes of action, insofar as they are premised on the Biosafe Entities' pre-Licensing Agreement sales to various entities and individuals, of exclusive rights to market and sell the five Biosafe customer health diagnostic tests and Henry Warner's control of Ultimate Health, "are based on omissions rather than affirmative misstatements, [Barron] had no notice of the omitted facts and could not have protected itself by insisting on corresponding contractual representations" in the Purchase Agreement. Emergent Capital, 343 F.3d at 196. As a result, section 11.4 of the Purchase Agreement, read in light of the Emergent Capital decision, does not preclude Barron from reasonably relying on Defendants' pre-Agreement misrepresentations.

Further, in a fraud action, the U.S. District Court for the Southern District of New

York, distinguishing the <u>Emergent Capital</u> case, has held that investors' reliance on misrepresentations made by a seller, prior to and outside of the purchase agreement, about the "market for [the target subsidiary's] business" is reasonable where "[the investors] allege that they did perform due diligence" and "[the investors] claim that Defendant thwarted that due diligence by misrepresenting information related to those requests." <u>Glidepath Holding, B.V. v. Spherion Corp.</u>, No. 04 Civ. 9758, 2007 WL 2176072, at *11, *19 (S.D.N.Y. July 26, 2007).

Such is the case here. Barron performed extensive due diligence as to its then-contemplated investment in Lab123, <u>inter alia</u>, by requiring Biosafe to complete Barron's due diligence Questionnaire and Barron's Director & Officer Form, by requesting a detailed accounting of Biosafe's 2006 sales and proof of Biosafe's revenue, and by requesting of Henry Warner a representation that Lab123 would be completely separate and independent from Biosafe (Rich Decl. Ex. A ¶¶ 53-54, 73, 79, 85-86, 96-97). However, Defendants "thwarted that due diligence" by making numerous misrepresentations "related to those requests." <u>Glidepath Holding, B.V.</u>, No. 04 Civ. 9758, 2007 WL 2176072, at *11, *19; Rich Decl. Ex. A ¶¶ 55-67, 73-77, 79, 86-95, 98-101. Accordingly, here -- in contrast to the <u>Emergent Capital</u> case and in accordance with this Court's <u>Glidepath Holding, B.V.</u> decision – the plaintiff (Barron) was justified in relying on the misrepresentations made by the Defendants before entry into, and outside of, the Purchase Agreement.

**B.    But For Defendants' Fraudulent Representations, Barron Would Not Have Purchased Lab123's Stock for $2,000,000; Further, Barron's Investment in Lab123 Proximately Caused Barron's Damages**

Under the federal securities laws, "a plaintiff must allege both transaction

25

causation, i.e., that <u>but for</u> the fraudulent statement or omission, the plaintiff would not have entered in the transaction; and loss causation, i.e. that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." <u>Castellano v. Young & Rubincam, Inc.</u>, 257 F.3d 171, 186 (2d Cir. 2001) (emphasis in original).

"[T]ransaction causation is generally understood as reliance." <u>Castellano</u>, 257 F.3d at 186. "In the securities fraud context, transaction causation is presumed when a claim rests on a material omission." <u>Id.</u>. Here, Barron relied upon Defendants' knowing omissions of material facts. For example, Defendants failed to inform Barron that it had already sold Lab123's 'exclusive' rights to market and sell Biosafe diagnostic tests to Johnson & Johnson, Rapid Response, Ultimate Health, and Chris Warner. Thus, Barron properly pleads transactional causation.

"Loss causation . . . is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." <u>ATSI Communications Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 106 (2d Cir. 2007). To adequately plead loss causation, a "plaintiff's complaint must plead that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." <u>Id.</u> at 107.

Before Barron's entry into the Purchase Agreement, Defendants made many material misstatements to Barron as to the Biosafe Entities' revenues and Lab123's exclusive rights to sell Biosafe customer health diagnostic tests (Rich Decl. Ex. A ¶¶ 51-101). Barron, in assessing the risk of investing $2,000,000 in Lab123, relied on Defendants' lies. Barron (reasonably) believed that the risk of investing $2,000,000 in Lab123 was mitigated by Defendants' (false) representations. Indeed, the value of the shares of Lab123 purchased by Barron depended entirely on Biosafe's prior revenues and

Lab123's exclusive right to sell Biosafe diagnostic tests. Once Defendants' fraud was exposed, the value of Barron's investment in Lab123 plunged to zero (Rich Decl. Ex. A ¶¶ 1-3). Defendants' lies and omissions proximately caused Barron's loss.

## III. Barron States a Claim Against the Individual Defendants under Section 20(a) of the Securities Exchange Act of 1934 (Count II)

Barron properly pleads that Henry Warner, Robert Trumpy, Jeremy Warner, and Kent Connally are liable as control persons under section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a) (Count II).[19]

Control person liability requires (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud. ATSI Communications, Inc. v. Staar Fund, Ltd., 493 F.3d 87, 108 (2d Cir. 2007). "Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise.'" SEC v. First Jersey Sec. Inc., 101 F.3d 1471, 1472-1473 (2d Cir. 1996).

Here, Biosafe, Biosafe Labs, and Lab123 each primarily and repeatedly violated SEA § 10(b). The Biosafe Entities and Lab123 misrepresented to Barron that Lab123 had the exclusive rights to market and sell five Biosafe customer health diagnostic tests; misrepresented Lab123's profit margin, sales and prospects; provided to Barron false financial revenues and projections; provided Barron with fraudulent 2006 year-to-date Biosafe revenue figures, along with fictitious supporting documentation; falsely

---

[19] Section 20(a) provides in pertinent part, "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person is liable. . ." 15 U.S.C. § 78t(a).

represented that Kellogg was immediately going to buy 500,000 Cholesterol Panels from Biosafe for the benefit of Lab123; and misrepresented that Lab123 would govern itself independently from the Biosafe Entities (Rich Decl. Ex. A ¶¶ 55-95). By these lies, Defendants intended to induce, and did induce, Barron to invest $2,000,000 in Lab123.

Henry and Jeremy Warner, Trumpy, and Connally controlled the Biosafe Entities and Lab123. The Individual Defendants, because of their senior management positions with, and their ownership of voting securities of, the Biosafe Entities and Lab123, possessed, and exercised, the power to direct or cause the direction of the management and policies of the Biosafe Entities and Lab123 (Rich Decl. Ex. A ¶¶ 126-127).

Henry Warner, Trumpy, Jeremy Warner, and Connally meaningfully and culpably participated in the fraud perpetrated by the Biosafe Entities and Lab123. The Individual Defendants participated in the day-to-day management and overall direction of the Biosafe Entities and Lab123 and prepared or helped prepare the documents containing false and misleading statements. The Individual Defendants each participated in meetings and telephone conferences and wrote e-mails or letters, in which they made false and deceptive statements to Barron (Rich Decl. Ex. A ¶¶ 128, 130).

Contrary to Defendants' arguments, (see Defs.' Br. at 25-26), Kent Connally and Jeremy Warner repeatedly and culpably participated in the fraud perpetrated by the Biosafe Entities and Lab123. For example, (i) on information and belief, Connally and Jeremy Warner, on the Biosafe Entities' behalf, completed and/or reviewed Defendants' fraudulent responses to Barron's due diligence Questionnaire and to Barron's Director & Officer Form, and (ii) Connally reviewed and signed two fraudulent SB-2 Forms which Lab123 filed with the SEC (Rich Decl. Ex. A ¶¶ 54, 97, 106, Ex. S). See In re Vivendi

Universal, S.A., No. 02 CIV. 5571, 2004 WL 876050, at *10 (S.D.N.Y. Apr. 22, 2004)

(corporation stated claims under SEA § 20(a) upon which relief could be granted against

Vivendi's CFO who "executed materially false and misleading financial statements" and

against Vivendi's CEO and Chairman who "issued statements and took other actions to

control Vivendi's growing liquidity crisis" in connection with the execution of a merger

agreement).[20]

Because Barron states a claim under section 20(a) of the Securities Exchange Act

(Count II), the Defendants' motion to dismiss that cause of action must be denied.

## IV.    Barron States a Claim Upon Which Relief Can Be Granted Against Lab123 for Breach of the Purchase Agreement (Count V)

Defendants argue that Barron's cause of action against Lab123 for breach of the

Purchase Agreement (Count V) must be dismissed because, though the documents which

Lab123 furnished to Barron – including Defendants' August 14, 2006 Questionnaire

responses, Defendants' May 23, 2006  spreadsheet entitled "Retail Newco Projected

Income Statement," Defendants' June 12, 2006 revised Letter of Intent, Defendants' June

12, 2006 Sales by Customer Summary, Defendants' August 2006 Director & Officer

Form responses, Defendants' September 21, 2006 e-mail to Barron analyst Matt Samuel

falsely stating that August 2006 sales for Biosafe products were $227,612.73, and Note 3

to the Financial Statements of Lab123's revised, November 22, 2006 Form SB-2 – are

chock full of lies, Lab123 did not furnish such documents to Barron "pursuant to," (Rich

Decl. Ex. B § 4.15), the Purchase Agreement (Defs.' Br. at 28-29).[21]  That is, Defendants

---

[20] For a more detailed rendering of Kent Connally's and Jeremy Warner's aiding and abetting of the Biosafe Entities' and Lab123's fraudulent scheme, see supra pp. 13-14.

[21] In the September 6, 2006 Purchase Agreement, Lab123 agreed:

- That "the audited financial statements of [Lab123]" which Lab123 was to provide to Barron would contain no false or misleading statements of material fact; and

argue that, because the numerous fraudulent documents which Lab123 provided to Barron were not "expressly identified," (Defs.' Br. at 29), in the Purchase Agreement as documents which Lab123 was to provide to Barron, Lab123 has not breached section 4.15 of the Purchase Agreement. Defendants' argument is frivolous.

Defendants' tortured interpretation of section 4.15 of the Purchase Agreement — that Lab123's representation and warranty that the "certificate[s] or document[s] furnished or to be furnished [by Lab123] to [Barron] pursuant to this [Purchase] Agreement," (Rich Decl. Ex. B § 4.15), are truthful and not misleading encompasses only documents "expressly identified," by title, in the Purchase Agreement (Defs.' Br. at 29) -- cannot be entertained by this Court on Defendants' present motion to dismiss for failure to state a claim upon which relief can be granted. This is so because where, as here, on "[a] motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6)," "the interpretation of a contract is at issue," "all contractual ambiguities must be resolved in the plaintiff's favor." Banks v. Correctional Servs. Corp., 475 F. Supp.2d 189, 194-196 (E.D.N.Y. 2007); accord DKR Capital, Inc. v. AIG Int'l West Broadway Fund, Ltd., No. 03 Civ. 1568, 2003 WL 22283836, at *1 (S.D.N.Y. Oct. 2, 2003) (on a motion under Fed. R. Civ. P. 12(b)(6), "Where the interpretation of a contract is at issue . . . all contractual ambiguities must be resolved in the plaintiff's favor"); see also Eternity Global Master Fund Ltd. v. Morgan Trust Co. of N.Y., 375 F.3d 168, 178 (2d Cir. 2004) ("if a contract is ambiguous as applied to a particular set of facts, a court has insufficient data to dismiss a complaint for failure to state a claim"). Here, for purposes of Defendants' motion to

---

- That "No representation or warranty made by [Lab123] in this [Purchase] Agreement and no certificate or document furnished or to be furnished to [Barron] pursuant to this [Purchase] Agreement" would contain false or misleading statements of material fact.

(Rich Decl. Ex. B §§ 4.6, 4.15, Ex. A ¶¶ 159-161).

dismiss, this Court must construe section 4.15's reference to documents furnished by Lab123 to Barron "pursuant to this [Purchase] Agreement" to include documents not expressly identified, by name, in the Purchase Agreement.

Thus, Lab123 breached sections 4.6 and 4.15 of the Purchase Agreement.[22]

Likewise, Lab123 breached section 4.16 of the Purchase Agreement, in which Lab123 agreed:

- That at least 3 of the 5 members of the Board of Directors of Lab123 would be "independent" directors within the meaning of NASD Rule 4200(a)(15); and
- That all the members of the Audit Committee, and all the members of the Compensation Committee, of Lab123's Board of Directors would be "independent" directors (Rich Decl. Ex. B §§ 4.6, 4.15, 4.16, Ex. A ¶¶ 159-161, 163-165).[23]

Accordingly, this Court must sustain Barron's cause of action against Lab123 for

---

[22] Specifically, Lab123 breached Purchase Agreement §§ 4.6 and 4.15 in that numerous false and misleading statements of material fact are contained in the financial statements and other documents which Lab123 provided to Barron, including the following: (i) Defendants' August 14, 2006 responses to Barron's Questionnaire; (ii) the spreadsheet entitled "Retail Newco Projected Income Statement" and attached to Defendants' May 23, 2006 e-mail to Barron's Managing Partner Andrew B. Worden; (iii) Defendants' June 12, 2006 revised Letter of Intent; (iv) Defendants' June 12, 2006 Sales by Customer Summary; (v) Defendants' August 2006 responses to Barron's Director & Officer Form; (vi) Defendants' September 21, 2006 e-mail to Barron analyst Matthew Samuel falsely stating that the August 2006 sales for Biosafe products were $227,612.73; and (vii) Note 3 to the Financial Statements of Lab123's revised, November 22, 2006 Form SB-2 (Rich Decl. Ex. A ¶¶ 161-162, 53-68, 70-71, 73-77, 96-101, 103, 106).

[23] Specifically, Lab123 breached section 4.16 of the Purchase Agreement in that:

- In September 2006, Lab123 elected three purportedly independent directors to its Board of Directors (Kent Connally, Fred Fitzsimmons, and Kurt Katz), and the Lab123 Board established Audit and Compensation Committees comprised solely by these three supposed independent directors. In fact, however, Connally was not independent. Rather, Connally was controlled by the Chairman of Lab123's Board of Directors, Henry Warner (Rich Decl. Ex. A ¶¶ 105, 166-168). While Defendants baldly assert that "Connally was [indeed] independent" (Defs.' Br. at 30), this dispute of fact is not one that may be resolved on a motion to dismiss for failure to state a claim.
- When Lab123 Board member, Lab 123 Board Audit Committee member, and Lab123 Compensation Committee member Fred Fitzsimmons acted independently and pursuant to his fiduciary duty by demanding from Lab123 the company's financials, Defendants kicked Fitzsimmons off Lab123's Board and lied to Barron by stating Fitzsimmons voluntarily quit the Board (Rich Decl. Ex. A ¶¶ 89-95).

breach of the Purchase Agreement (Count V).

**V.     Barron States a Claim Upon Which Relief Can Be Granted Against Biosafe Labs and Lab123 for Breach of the Licensing Agreement (Count VI)**

The Defendants argue that Barron fails to state a claim for breach of the Licensing Agreement because section 12.3 of that Agreement supposedly "expressly states that there were no third party beneficiaries" (Defs.' Br. at 31).[24] The Defendants' argument fails for two reasons. First, section 12.3 of the Licensing Agreement does not expressly state that there are no third party beneficiaries, and this Court must "resolve" "all contractual ambiguities . . . in the plaintiff [Barron]'s favor," on Defendants' motion to dismiss. See Banks v. Correctional Servs. Corp., No. 03 Civ. 1568, 2003 WL 22283836, at *1 (S.D.N.Y. Oct. 2, 2003).

Second, because Biosafe Labs and Lab123 "intended [Barron] to benefit from the [Licensing Agreement]," Barron, "although not a party to the contract," would "have standing to sue on" the Licensing Agreement even if "the contract expressly exclude[d] . . . third-party beneficiaries." Tradewinds Aviation, Inc. v. Jet Support Servs., No. 04 C1406, 2004 WL 2533728, at *2-*3 (N.D. Ill. Sept. 28, 2004). In any event, the Licensing Agreement does not expressly exclude third-party beneficiaries, but rather sets forth numerous and expansive categories of third-party beneficiaries under the Licensing

---

[24] Section 12.3 of the Licensing Agreement states:

> **Benefit of the Agreement.** This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and to their respective successors, permitted assigns and to the benefit of the Biosafe Indemnified Parties and the Company [Lab123] Indemnified Parties. Any assignee of Biosafe shall have the same rights and remedies as Biosafe and the rights of such assignee will not be subject to any claims [Lab123] may have against Biosafe. Nothing contained in this Agreement, express or implied, is intended, and shall not be construed, to confer upon or create in any Person (other than the Parties hereto, their successors and permitted assigns, the Biosafe Indemnified Parties and the Company Indemnified Parties) any rights or remedies under or by reason of this Agreement, including any rights of any kind or nature to enforce this Agreement.

(Henry Warner Decl. Ex. 22 § 12.3).

Agreement (see Rich Decl. Ex. C § 11.1, 11.2; Henry Warner Decl. Ex. 22 § 12.3).

### A.    The Applicable Law

Illinois law governs claims of breach of the Licensing Agreement (Rich Decl. Ex. C § 12.5).  In Illinois, "A person who is not a party to a contract may nevertheless sue based on the contract if that person is directly benefited by the contract."  United States v. First Midwest Bank/Illinois, N.A., No. 97-C-7365, 1997 WL 675192, at *19 (N.D. Ill. Oct. 28, 1997).  This is so even if the contract explicitly states that the plaintiff "is not intended as a party to the contract."  Factory Mut. Ins. Co. v. CICA-TEC Terminal Equip. Corp., No. 05 C 4430, 2006 WL 3825028, at *4 (N.D. Ill. Dec. 20, 2006) (holding that "the mere fact that the . . . Agreement [between a contractor and a subcontractor] states that the City is not intended as a party to the contract does not preclude a finding that the City is nonetheless a direct beneficiary of that Agreement").

Additionally, "a third-party beneficiary does have standing to sue on a contract, although not a party to the contract, if the contracting parties intended the third party to benefit from the contract."  Tradewinds Aviation, Inc. v. Jet Support Servs., No. 04 C1406, 2004 WL 2533728, at *2 (N.D. Ill. Sept. 28, 2004).  This is the case even if "the contract expressly excludes third-party beneficiaries."  Tradewinds Aviation, Inc., No. 04 C 1406, 2004 WL 2533728, at *2-*3.  Thus, in Tradewinds Aviation, the District Court, applying Illinois law, denied an aircraft repair company's motion to dismiss, for failure to state a claim, an aircraft owner's action for breach of a contract between the movant and an aircraft management company, even though the contract stated "that the rights and obligations of the parties are for the exclusive benefit of such parties and shall not benefit any unrelated third parties."  Tradewinds, 2004 WL 2533728, at *2-*3.

**B.      Application of Law to Facts**

1.      **Biosafe Labs and Lab123 breached the Licensing Agreement**

In the September 7, 2006 Licensing Agreement, Biosafe Labs agreed that Lab123 would have, for a 25 year period, the exclusive rights to market and sell the five customer health diagnostic tests which the Biosafe Entities manufacture (Rich Decl. Ex. C preamble; Rich Decl. Ex. C §§ 2.26, 2.33, 3.1(1), 3.1(2), 9.1; Exhibit 1 to Rich Decl. Ex. C; Rich Decl. Ex. A).

Biosafe Labs breached the Licensing Agreement in numerous respects.[25] Lab123, too, breached the Licensing Agreement.[26] Indeed, Defendants do not dispute that Biosafe Labs and Lab123 breached the Licensing Agreement (see Defs.' Br. at 26-32).

2.      **Barron is a third-party beneficiary of the Licensing Agreement**

Barron is directly benefited by the Licensing Agreement, and Biosafe Labs and Lab123 intended that Agreement for Barron's benefit (Rich Decl. Ex. A ¶¶ 174-176). That Barron is directly benefited by the Licensing Agreement, and that the Licensing Agreement was intended for Barron's benefit, are corroborated by the following facts:

---

[25] Biosafe Labs' breaches of the Licensing Agreement included the following:

- The Biosafe Entities had already sold or given away, to several other persons or entities – including Johnson & Johnson, Rapid Response, the Ultimate Health Club, Inc., and Chris Warner - 'exclusive' rights to market and sell the five customer health diagnostic tests (Rich Decl. Ex. A ¶¶ 1-2, 55-57(e), 60, 67, 71, 78, 136-137, 179);
- In November 2006, the Biosafe Entities sold to Kellogg Company 350,000 Cholesterol Panels, and the Biosafe Entities did not give to Lab123 all or any of the proceeds from Kellogg's order (Rich Decl. Ex. G, Ex. A ¶¶ 1-2, 55-57(f)(2), 82, 92(d)); and
- In April 2007 – only 7 months into the Licensing Agreement's 25 year term - Henry Warner, the CEO and Chairman of the Biosafe Entities and the Chairman of the Board of Lab123, unlawfully terminated the Licensing Agreement. Rich Decl. Ex. A ¶¶ 1-2, 63, 67, 110; see Rich Decl. Ex. C art. 6 & §§ 6.1(1), 9.2(1), 9.2(2) (providing that Biosafe may terminate the Licensing Agreement only if Lab123 is in default as to its material obligations under the Agreement or if Lab123 fails to pay to Biosafe Labs the contractually-specified licensing fee).

[26] Lab123 breached the Licensing Agreement in that, among other things, Lab123 and its Board of Directors, which Board was controlled by Henry Warner, refused to assert its exclusive rights, under the Licensing Agreement, to market and sell the five Biosafe diagnostic tests (Rich Decl. Ex. A ¶ 2; see Rich Decl. Ex. A ¶¶ 57(f)(2).

- In determining whether to invest in Lab123's securities, Barron was concerned about the then-proposed Licensing Agreement between Biosafe Labs and Lab123. On June 20, 2006, Defendant Henry Warner attempted to allay Plaintiff's fears by providing Plaintiff with the then-proposed Licensing Agreement, which set forth that Lab123 had exclusive rights to market and sell five Biosafe customer health diagnostic tests (Rich Decl. Ex. HH, Ex. A ¶¶ 174-176).

- The Licensing Agreement between Biosafe Labs and Lab123 was the basic foundation for Barron's investment in Lab123. Because the Biosafe Entities, for years, had been selling, and recognizing revenues for sales of, the five Biosafe customer health diagnostic tests, Lab123 would enjoy an established client base, and Barron would be able readily to predict, and would face little risk concerning, the future revenues of Lab123 (Rich Decl. Ex. A ¶¶ 174-176).

- On September 1, 2006, Biosafe Labs and Lab 123 entered into the Licensing Agreement; only five days later, on September 6, 2006, Barron and Lab123 entered into the Purchase Agreement (Rich Decl. Ex. A ¶¶ 174-176).

Because Barron is directly benefited by the Licensing Agreement, and because Biosafe Labs and Lab123 intended that Agreement for Barron's benefit, Barron is a third-party beneficiary of the Licensing Agreement, and has standing to sue on that Agreement. The Court must sustain Barron's breach-of-Licensing Agreement claim.

## VI.    Barron States a Claim Upon Which Relief Can Be Granted Against the Defendants for Unjust Enrichment (Count VII)

Because Barron states a claim upon which relief can be granted for unjust enrichment, the Court must deny Defendants' motion to dismiss Barron's unjust enrichment claim. Causes of action for breach of contract and unjust enrichment may be pleaded simultaneously.[27] In federal court, alternative pleading of breach of contract and unjust enrichment claims is expressly authorized by Fed. R. Civ. P. 8(e)(2).[28]

---

[27] See Polley v. Plainshun Corp., 8 A.D.2d 638, 638, 186 N.Y.S.2d 295, 297 (2d Dep't 1959) ("on . . . a motion []to dismiss for insufficiency . . . , the existence of an express contract covering the subject matter [does not] bar[] recovery . . . on a quasi contract, which is implied in law"); see also First Frontier Pro Rodeo Circuit Finals LLC v. PCRA First Frontier Circuit, 291 A.D.2d 645, 646, 737 N.Y.S.2d 694, 695 (3rd Dep't 2002) ("disagree[ing] with," and rejecting, defendants' argument" "[that] plaintiff's cause of action for unjust enrichment . . . sounds in quasi contract and the existence of a valid and enforceable written contract precludes a recovery on a theory of unjust enrichment") (emphasis added).

[28] Fed. R. Civ. P. 8(e)(2) states in part, "A party may set forth two or more statements of a claim

"In this State where a litigant fails to establish[] the right to recover upon an express contract he may, in the same action, recover in quantum meruit. If warranted by the pleadings and the proof, the case may be submitted to a jury on both theories and an election need not be made."[29]  Federal district courts sitting within New York repeatedly have denied motions to dismiss, for failure to state a claim or for judgment on the pleadings, complaints alleging claims of both breach of contract and unjust enrichment.[30]

Defendants haplessly argue that Barron's cause of action for unjust enrichment (Count VII) fails to state a claim upon which relief can be granted because it supposedly is "duplicative of" Barron's cause of action against Lab123 for breach of the Purchase Agreement (Defs.' Br. at 32).  However, "[Defendants'] argument misses the point. Although [Defendants are] correct that [Barron is] precluded from recovering [against Lab123] under both breach of contract and quantum meruit, [Barron] may plead both in the alternative." Berk v. Tradewell, Inc., Nos. 01 Civ. 9035, 01 Civ. 10068, 2003 WL 21664679, at *8 (S.D.N.Y. July 16, 2003) (denying, in pertinent part, defendants' motion to dismiss for failure to state a claim upon which relief can be granted); accord In re Andrew Velez Constr., Inc., 373 B.R. 262, 279 (Bankr. S.D.N.Y. 2007) (same).

Further, insofar as the Amended Complaint seeks recovery from Biosafe, Biosafe Labs, and the Individual Defendants for unjust enrichment, there is no "duplicati[on],"

---

. . . alternatively or hypothetically, either in one count . . . or in separate counts. . . . A party may also state as many separate claims . . . as the party has regardless of consistency and whether based on legal[] [or equitable . . . grounds." See also Labajo v. Best Buy Stores, 478 F. Supp.2d 523, 531 (S.D.N.Y. 2007).

[29] Smith v. Kirpatrick, 305 N.Y. 66, 73, 111 N.E.2d 209, 213 (N.Y. 1953), overruled in part on other grounds by O'Brien v. City of Syracuse, 429 N.E.2d 1158 (N.Y. 1981); accord Joseph Sternberg, Inc. v. Walber 36th St. Assocs., 187 A.D.2d 225, 228, 594 N.Y.S.2d 144, 146 (1st Dep't 1993).

[30] See, e.g., Hughes v. BCI Int'l Holdings, Inc., 452 F. Supp.2d 290, 311 (S.D.N.Y. 2006) ("plaintiffs correctly assert that they may plead [breach of contract and unjust enrichment as] alternate theories of liability"); E*Trade Financial Corp. v. Deutsche Bank, AG, 420 F. Supp.2d 273, 291 (S.D.N.Y. 2006) ("E*Trade can plead these [unjust enrichment] claims alongside contract claims"); Labajo, 478 F. Supp.2d at 531 ("an unjust enrichment claim may be alleged alongside a breach of contract claim").

because the Complaint does not accuse those Defendants, who are not parties to the Purchase Agreement, of violating that Agreement.

## VII.    Barron States a Claim Against Defendants for Conversion (Count VIII)

Barron properly pleads conversion (Count VIII).[31]    Defendants unlawfully converted to their own use at least $2,000,000 belonging to Barron – specifically, the $2,000,000 which Barron invested in Lab123's securities.  In possessing and retaining Barron's $2,000,000, Defendants acted with intent to interfere with those funds to the exclusion of the rights of the true owner, Barron.  Barron has the right to possession of the $2,000,000 (Rich Decl. Ex. A ¶ 197-198, 200-201).  Further, Barron demanded that Defendants return the $2,000,000, with interest, to Barron, and Defendants refused to do so (Rich Decl. Ex. A ¶ 111, 199).  Because Barron states a claim for conversion, the Defendants' motion to dismiss Count VIII must be denied.

Defendants spuriously argue that Barron's cause of action for conversion (Count VIII) fails to state a claim because, supposedly, "it simply [sic] an attempt to affix an alternative label to Barron's" cause of action against Lab123 for breach of the Purchase Agreement (Defs.' Br. at 33).  Defendants' argument fails because, in federal court, Fed. R. Civ. P. 8(e)(2) expressly authorizes a litigant to plead, alternatively, conversion and breach of contract claims.  Thus, federal district courts sitting within New York repeatedly have denied motions to dismiss, for failure to state a claim on which relief can be granted, complaints with causes of action for both breach of contract and conversion. See, e.g., Fantozzi v. Axsys Techs.., Inc., 2007 WL 24554109, at *3 (S.D.N.Y. Aug. 20,

---

[31] The elements of conversion are (1) "intent," Meese v. Miller, 79 A.D.2d 237, 243, 436 N.Y.S.2d 496, 501 (4th Dep't 1981), (2) interference "to the exclusion of the owner's rights," Employers' Fire Ins. Co. v. Cotton, 156 N.E. 629, 630 (N.Y. 1927), and (3) "possession or the right to possession." Meese, 436 N.Y.S.2d at 501; see 2 Leon D. Lazer et al., New York Pattern Jury Instructions – Civil § 3:10 (2007).

2007) ("'[Fed. R. Civ. P.] 8(e)(2) . . . permits plaintiffs to 'plead two or more statements of a claim, even within the same count, regardless of consistency ' ' "; therefore, "Plaintiffs' [conversion and unjust enrichment] claims are not subject to dismissal on the ground that they are duplicative of plaintiffs' breach of contract claim")[32]

**VIII.  Barron States Claims under the Illinois Consumer Fraud and Deceptive Business Practices Act and the Illinois Securities Act (Counts IX and X)**

Barron's Amended Complaint properly pleads a cause of action against Defendants under the Illinois Consumer Fraud and Deceptive Business Practices Act (the "ICFDBPA"), 815 Ill. Comp. Stat. 505/1 – 505/12.[33]  Because Barron is a "partnership" or "business entity," ICFDBPA § 1(c), 815 Ill. Comp. Stat. 505/1(c), Barron is a "'person'" under section 1(c) of the ICFDBPA, 815 Ill. Comp. Stat. 505/1(c).  Since Barron is a "person" under the ICFDBPA, Barron has standing to sue Defendants under

---

[32] See also Consolidated Risk Servs., Inc. v. Automobile Dealers WC Self Ins. Trust, No. 1:06-CV-871, 2007 WL 951565, at *3 (N.D.N.Y. Mar. 27, 2007).  Further, insofar as the Complaint seeks recovery from the Biosafe Entities and the Individual Defendants for conversion, there is no "duplicat[ion]," (Defs.' Br. at 32), because those Defendants are not parties to the Purchase Agreement. Id. at *4 ("because . . . [defendant/counterclaimant] has not . . . alleged that it had a contractual relationship with [one of the two plaintiffs/counterclaim defendants,] . . . [counterclaimant's] tort counterclaims against [that counterclaim defendant] are not duplicative").

[33] The ICFDBPA states in pertinent part:

> Sec. 2. Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, . . . in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. . . .
>
> . . . .
>
> Sec. 10a. Action for actual damages. (a) Any person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual economic damages or any other relief which the court deems proper . . . .

ICFDBPA §§ 2, 10a(a), 815 Ill. Comp. Stat. 505/2, 505/10a(a). The ICFDBPA states: "The term 'person' includes any natural person or his legal representative, partnership, corporation (domestic and foreign), company, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestui que trust thereof." Id. 505/1(c).

section 10(a) of the Act, 815 Ill. Comp. Stat. 505/10a(a).[34]    Defendants fraudulently

persuaded Barron to invest $2,000,000 in Lab123 by artificially inflating the Biosafe

Entities' revenues and Lab123's pro formas, making dozens of misrepresentations in

response to Barron's Questionnaire, and stating that the Biosafe Entities was selling to

Lab123, for 25 years, exclusive rights to market and sell the five Biosafe customer health

diagnostic tests.  Defendants thereby engaged in "unfair or deceptive acts or practices,

including . . . the use or employment of . . . deception, fraud, false pretense, false

promise, misrepresentation or the concealment, suppression or omission of

material fact[s], with intent that [Barron] rely upon the concealment, suppression or

omission of such material fact[s]." 815 Ill. Comp. Stat. 505/2.

    Barron also properly pleads a cause of action against Defendants under section 12

of the Illinois Securities Law of 1953 (the "Illinois Securities Law"), 85 Ill. Comp. Stat.

5/12.  Thus, Defendants' motion to dismiss Counts IX and X must be denied.  By

---

[34] Defendants baselessly argue that Barron doesn't state a claim since Barron supposedly "is not a 'consumer' within the meaning of" ICFDBPA § 1(e), 815 Ill. Comp. Stat. 505/1(e). Defendants' argument fails because "there is no requirement that the plaintiff [in an ICFDBPA action] be a consumer." Scotsman Group, Inc. v. Mid-America Distributors, Inc., No. 93 C 7320, 1994 WL 118458, at *5 (N.D. Ill. Apr. 5, 1994); accord Sullivan's Wholesale Drug Co. v. Faryl's Pharmacy, Inc., 573 N.E.2d 1370, 1376 (Ill. App. Ct. 1991) ("The protections of the statute [the ICFDBPA] are not limited to consumers. . . . aggrieved business men do have standing to bring suit under the Act"); B. Sanfield, Inc. v. Finlay Fine Jewelry Corp., 857 F. Supp. 1241, 1248-1249 (N.D. Ill. 1994). Rather, as stated, supra p. __, "any 'person' damaged by a violation of [the ICFDBPA] may sue." Scotsman Group, Inc., 1994 WL 118458, at *5.

    Similarly, Defendants frivolously argue Barron fails to state a claim because, supposedly, "the [Lab123] stock which Barron purchased is not 'merchandise' within the meaning of" section 1(b) of the ICFDBPA, 815 Ill. Comp. Stat. 505/1(b) (Defs.' Br. at 35). Defendants' argument is both wrong as a matter of law, and irrelevant. It is well settled that "stocks qualify as 'merchandise' . . . under the [Illinois] Consumer Fraud Act." ASI Acquisition, LLC v. Rayman, No. 01 C 165, 2002 WL 335311, at *2 (N.D. Ill. Feb. 28, 2002); accord Wislow v. Wong, 713 F. Supp. 1103, 1107 (N.D. Ill. 1989) ("securities transactions are subject to the Consumer Fraud Act"). Further, one need not sell or purchase "merchandise," ICFDBPA § 1(b), 815 Ill. Comp. Stat. 505/1(b), to sue under the ICFDBPA. While the ICFDBPA defines a "'consumer,'" in pertinent part, as "any person who purchases or contracts for the purchase of merchandise," 815 Ill. Comp. Stat. 505/1(e), one need not be a consumer to bring an ICFDBPA action. Supra p. 39 n.34. Rather, to sue under the ICFDBPA, one need only be a "'person'" within the meaning of section 1(c) of that Act, 815 Ill. Comp. Stat. § 505/1(c). See ICFDBPA § 10a(a), 815 Ill. Comp. Stat. 505/10a(a).  Barron is a "'person'" under section 1(c) of the ICFDBPA, 815 Ill. Comp. Stat. 505/1(c). Supra p. 38.

fraudulently persuading Barron to invest $2,000,000 in Lab123, Defendants:

- "engaged in . . . [a] transaction . . . in connection with the sale . . . of securities which work[ed] . . . or tend[ed] . . . to work a fraud or deceit upon the purchaser or seller thereof," 85 I.L.C.S. 5/12(F);
- "obtain[ed] money or property through the sale of securities by means of . . . untrue statement[s] of . . . material fact[s] or . . . omission[s] to state . . . material fact[s] necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," id. 5/12(G);
- "circulate[d] . . . statement[s]" to Barron "pertaining to . . . securit[ies] . . . knowing or having reasonable grounds to know . . . material representation[s] therein contained to be false or untrue," id. 5/12(H); and
- "employ[ed] . . . a scheme or artifice to defraud in connection with the sale or purchase of . . . securit[ies], id. 5/12(I).[35]

### CONCLUSION

For these reasons, Barron asks this Court to deny the Defendants' motion to dismiss the Amended Complaint for lack of personal jurisdiction over Jeremy Warner and Kent Connally and failure to state a claim upon which relief can be granted.

Dated: New York, New York
        May 20, 2008

---

[35] Section 11.9 of the Purchase Agreement, entitled "Governing Law," states: "This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to applicable principles of conflicts of law" (Rich Ex. B at 25). The Defendants argue that, because "the . . . Purchase Agreement is governed by New York law, . . . Barron cannot assert a claim under the Illinois [Consumer Fraud and Deceptive Business Practices] Act," (Defs.' Br. at 34), or "under the Illinois [S]ecurities [L]aw" (Defs.' Br. at 17 n.5). The Defendants' argument is specious.

First, as the Defendants concede, "Illinois law . . . . governs the Licens[ing] Agreement" (Defs.' Br. at 27), and Barron properly pleads a claim against Biosafe Labs and Lab123 for breach of the Licensing Agreement. See supra pp. 32-35. Thus, the ICFDBPA and the Illinois Securities Law apply here. Second, under New York law, "[a] contractual choice-of-law provision . . . does not bind the parties with respect to non-contractual causes of action." Plymack v. Copley Pharmaceutical, Inc., No. 93 Civ. 2655, 1995 WL 606272, at *5 (S.D.N.Y. Oct. 12, 1995); see Robbins & Myers, Inc. v. J.M. Huber Corp., No. 01-CV-0201E(F), 2001 WL 967606, at *1-*3, *6 (W.D.N.Y. Aug. 23, 2001) (in corporate investor's fraud action, denying defendants' motion to dismiss, under Fed. R. Civ. P. 12(b)(6), corporate investor's claims under Texas securities statutes and under Texas statutory fraud laws; rejecting defendants' argument "that New Jersey law applies" to investor's statutory claims based on provision of stock purchase agreement stating: "'Governing Law. This Agreement shall be construed in accordance with and governed by the substantive laws of the State of New Jersey regardless of the laws that might otherwise govern under principles of conflict of law applicable thereto'"); Burnett v. Physicians' Online, Inc., 1997 WL 470136, at *4, *11-*12 (S.D.N.Y. Aug. 15, 1997); Twinlab Corp. v. Paulson, 283 A.D.2d 570, 571, 724 N.Y.S.2d 496, 496-497 (2d Dep't 2001). Thus, while New York law governs claims for breach of the Purchase Agreement, Barron may sue the Defendants under the ICFDBPA and under Illinois Securities Law § 12.

40

LAX & NEVILLE, LLP

s/Barry R. Lax

Barry R. Lax, Esq. (BL 1302)
David S. Rich, Esq. (DR 2492)
Brent Burns, Esq. (BB    )
1412 Broadway, Suite 1407
New York, NY 10018
Tel:  (212) 696-1999
*Attorneys for Plaintiff Barron Partners, LP*