4.4.7 Be solely responsible for ensuring that all required packaging requirements, instructions, warnings, labels, phrases, language or markings that are required by applicable laws, rules, regulations and practices are satisfied for sale of the Similar Products in the Territory;

4.4.8 To the extent that the Company will perform Determinations in its own clinical laboratory, maintain its laboratory certification from BioSafe to use BioSafe's proprietary methods, procedures and techniques throughout the Term of this Agreement.

4.4.9 Be responsible for all of its own expenses, including those related to the advertising, marketing, promotion and sale of the Similar Product, and the analysis thereof, and to the assembling, sale, including any required translations, and analysis of the Similar Products;

4.4.10 Prominently display on the front of the packaging of the Similar Product, in a place approved by BioSafe, the BioSafe logo and the phrase "Science by BioSafe", the form of which will be furnished by BioSafe to the Company;

4.4.11 Not use any mark or logo identical with or confusingly similar to any of the BioSafe Marks.

4.5 **Collection Cards.** The Company acknowledges that BioSafe is not the manufacturer of the Collection Card and that BioSafe is solely reselling the card with a performance enhancing cover, where appropriate, that was purchased from an independent source, to the Company. BioSafe neither gives nor makes any warranties or conditions, express, implied or otherwise, with respect to the Collection Card. BioSafe specifically disclaims the implied warranties and conditions of merchantability, fitness for a particular purpose and non-infringement, and all other implied warranties or conditions arising from course of dealing, usage or trade or custom with respect to the Collection Card. Notwithstanding the foregoing, BioSafe does not exclude liability to the extent that such liability may not be excluded or limited by applicable law. The Company hereby releases BioSafe from any liability of any kind or nature whatsoever, and waives any right of recovery, arising out of or in any manner or way related to the Collection Card.

## ARTICLE 5
## LICENSE OF BIOSAFE TECHNOLOGY

5.1 **Grant of Technology License.** BioSafe hereby grants to the Company, and Company hereby accepts, a non-exclusive, non-transferable and non-assignable revocable (by BioSafe) license, without the right of sublicense, of the BioSafe Patent Rights and the BioSafe Technology Rights to use the BioSafe Technology for the purpose of processing, and making Determinations from, the Products and Similar Products in the Territory solely to, and in support of, the Market ("Technology License").

17

5.1.1  In connection with the Technology License, BioSafe: (i) will provide training to the Company and conduct certification and proficiency examinations in the use of BioSafe's proprietary methods, techniques and processes in accordance with the provisions of section 5.4; (ii) will provide the Company with a list of all components used in the Products to enable the Company, if it so chooses, to manufacture, as Similar Products, self-collection blood screen kits substantially identical to the Products; (iii) will provide Company with copies of all relevant printed collateral materials, including instructions used by BioSafe in its Products, and (iv) will make Collection Cards, the BTS and any other components which are proprietary to BioSafe and are required to be included in any Similar Product available for purchase to the Company at a charge not to exceed one hundred and fifty percent (150%) of BioSafe's fully allocated cost for such items.

5.2  Conditions to Technology License.  The Company understands and acknowledges that the Technology License is subject to the following conditions:

5.2.1  The grant of the Technology License is subject to (i) the Company being certified by BioSafe, and its continued use is subject to maintaining such certification by passing BioSafe proficiency tests, as a laboratory qualified to do Determinations of those Products and Similar Products requiring that a Determination using BioSafe's proprietary methods, techniques and processes be made; and (ii) to the continued fulfillment of all of the other terms and conditions of this Agreement.

5.2.2  Since the Technology License granted in Section 5.1 is non-exclusive, BioSafe reserves the right, at any time and from time to time, to grant to other Persons identical or similar licenses without breaching this Agreement.

5.2.3  Neither the Technology License granted to the Company in Section 5.1, nor any of the rights and technology included in the Technology License, are assignable or transferable in any manner or way whatsoever by the Company, including the right of the Company to grant any sub-licenses.

5.2.4  The Company will not, nor will it make any attempt to, reverse engineer or to analyze in any manner or way whatsoever the BioSafe Technology, the BioSafe Technology Rights or the BioSafe Patent Rights.

5.2.5  In order that the high standard of workmanship that characterizes BioSafe's methods, techniques and processes be maintained, and the excellent reputation of BioSafe's processes and techniques not be impaired, the Company agrees that, at all times, it will maintain the high standards of quality, workmanship and performance established by BioSafe.  To ensure that such standards are maintained, BioSafe will have the right at any time and from time to time to inspect the Company's facilities to determine if such standards are being met.  In addition, the Company understands and agrees that it will be subject to on-going proficiency testing as set forth herein.

18

5.2.6  If there is any tax liability imposed with respect to the Technology License granted herein, the Company shall pay all such taxes (except for any income taxes payable by BioSafe).

5.2.7  The Company will not sell, transfer or distribute, in any manner or way whatsoever, to any third party any data or other information, of any kind or nature whatsoever, obtained from Determinations or analysis of the Products or its use of the licenses granted hereby, except that such data and information may be distributed to the subject of any Determination, his or her health care practitioner and any governmental agency which has the authority to require the Company to deliver it and requests such information or data.

5.3  Use of BioSafe Laboratory Facilities.  Until such time that the Company has a laboratory that is certified by BioSafe to use its proprietary methods, techniques and processes and is operational, and at any time thereafter, BioSafe will perform Determinations and report the results of such Determinations for the Company on Products and Similar Products to the extent that it is able to integrate processing such Determinations into its then scheduled workload.  The charge to the Company for the foregoing shall be equal to BioSafe's fully allocated costs for performing such Determinations plus 20%.

5.4  Training in BioSafe Processes

5.4.1  BioSafe will provide to no more than two of the Company's employees up to five days of training in the techniques and procedures required by BioSafe to become certified by it as a laboratory to use BioSafe processes and techniques.  All training will be conducted at BioSafe's convenience at its Affiliate's laboratory facilities in Chicago, Illinois and/or at its corporate offices in Lake Forest, Illinois.  Training will consist of a review of all standard operating procedures, completion of checklist(s) and fulfilling competency assessment for all laboratory procedures.  The Company's two employees that receive such training must be proficient in speaking, reading and understanding English, or must be accompanied by an interpreter.  The initial training will be provided at no additional charge to the Company.  Any training subsequent to the initial training will be provided by BioSafe to the Company at BioSafe's then charges for such training.  With respect to any initial or subsequent training, any and all travel and related costs (such as plane fares, lodging, meals, ground transportation and incidentals and the fees incident to the use of an interpreter, if required) incurred by the Company, and all compensation of the Company's personnel, shall be the Company's responsibility and be paid by it.

5.4.2  In order for the Company to be allowed to use the Technology License herein granted to it, the Company must first be accredited as a BioSafe laboratory authorized to use BioSafe processes and techniques to perform Determinations.  Accreditation consists of the Company's successful completion of proficiency testing and an on-site laboratory inspection in accordance with the following:

19

(i) Within four weeks of the Company's completion of its training, the Company will be sent the first of three sets of proficiency test surveys for each Product to be analyzed by it. The remaining two surveys will be sent at approximately ten-day intervals thereafter. The Company will be required to return to BioSafe the completed analysis of the surveys within five business days of receipt. Each survey will include five test samples per analyte that are to be analyzed by the Company for the specific analytes. The Company must successfully identify the analytes in four of the five samples to pass the survey. The Company must pass two of the three initial surveys to be allowed to continue with the accreditation process.

(ii) Provided that the Company has successfully passed two of the three initial surveys, an on-site inspection of its laboratory facilities will be scheduled within one month of successful completion of the proficiency testing. Standardized checklists will be used to evaluate the facilities and will be sent to the Company at approximately the same time as the initial proficiency test surveys are sent. Any deficiencies noted during the on-site inspection, together with recommendations to correct such deficiencies, will be provided to the Company, which will have sixty days within which to correct any such deficiencies.

(iii) Since proficiency testing is essential to maintaining continuing accreditation as a BioSafe certified laboratory, such testing will be conducted on a semi-annual basis for the Company. On such semi-annual proficiency testing, the Company must maintain a passing status of correctly identifying four of the five samples per Product to maintain its BioSafe certification. Corrective action must be taken by the Company with respect to any surveys that do not pass. If the Company fails two consecutive surveys for the same analyte, it must then successfully pass two consecutive surveys to become re-accredited.

5.4.3. Upon successful completion of the proficiency testing and the on-site inspection, the Company will be certified as a BioSafe laboratory authorized to perform analysis on the Products. Subject to the successful completion of all proficiency testing, this certification will continue in effect until the first to occur of (1) the termination of this Agreement and (2) two years from the date of issue of the certification. At the end of two years from the date of issue of the certification and every two years thereafter, provided that this Agreement is still in effect, the Company will be required to conduct a self-inspection using the on-site inspection checklist and to send to BioSafe an inspection summary and a list of corrective actions to be taken. In addition, an on-site inspection will be conducted by BioSafe. Any deficiencies noted in such on-site inspection will require proof of corrective action within sixty days in order to maintain the BioSafe certification.

## ARTICLE 6
## EXCLUSIVITY, LICENSE AND MANUFACTURING FEE

6.1 Defined. In consideration of (i) the Exclusive Distribution Right granted to the Company pursuant to the provisions of section 3.1 hereof, (ii) the right to use the

-20-

BioSafe Marks granted to the Company pursuant to the provisions of section 3.9 hereof, (iii) the right to manufacture and sell Similar Products granted to the Company pursuant to the provisions of section 4.1 hereof and (iv) the Technology License granted to the Company granted to the Company pursuant to the provisions of section 5.1 hereof, the Company shall pay to BioSafe the following, all of which collectively shall be referred to herein as the "Exclusivity, License and Manufacturing Fee":

6.1.1 The aggregate sum of four million three hundred thousand dollars ($4,300,000), one million dollars ($1,000,000) of which shall be due and payable upon the execution of this Agreement, and the remaining three million three hundred dollars ($3,300,000) of which shall be paid in the form of six million fifty thousand (6,050,000) shares of common stock, par value $0.001 per shares of the Company (based upon a pro forma (giving effect to shares of the Company's Series A Convertible Preferred Stock and Warrants to be issued to a company providing financing to the Company and additional shares being issued to the President of the Company and one other person) fully diluted capitalization of the Company of approximately 11,500,000 shares of common stock in total) which shares shall be fully paid, non-assessable and voting common stock with an initial value of $0.53 per share. [will the Biosafe shares be registered for resale on the SB-2 as well? YES]

## ARTICLE 7
## REPRESENTATIONS AND WARRANTIES

7.1   The Company's Representations, Warranties and Covenants. The Company represents, warrants and covenants the following, all of which shall continue to be true and correct throughout the Term of this Agreement:

7.1.1 The Company shall not, directly or indirectly, in the name of, on behalf of, or for the benefit of BioSafe, any BioSafe Affiliates or itself offer, promise or authorize to pay, or pay, any compensation, or give anything of value to, any official, agent or employee of any government or governmental agency, or to any political party or officer, employee or agent thereof. The Company will require each of its directors, officers, employees and agents to comply with the provisions of this Section 7.1.

7.1.2 The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, with full right, power and authority to enter into and perform this Agreement.

7.1.3 The execution, delivery and performance of this Agreement has been duly authorized by all corporate action and does not require any further authorization or consent. The person executing this Agreement on behalf of the Company has been duly authorized to do so by all requisite corporate action. The execution, delivery and performance of this Agreement does not conflict with, violate or breach the Company's articles of incorporation, by-laws or any agreement, judgment or consent decree to which the Company is a party nor does it materially violate any law or

21

regulation of any court governmental body or administrative or other agency having jurisdiction over it.

7.1.4  This Agreement, when signed by the Company, will have been duly executed and delivered by the Company, and is its legal, valid and binding obligation enforceable against it in accordance with its terms and provisions, except as enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium or other laws relating to or affecting generally the enforcement of creditors' rights.

7.1.5  The Company is not aware of any action, suit, inquiry or investigation instituted by any United States federal or state governmental agency which questions or threatens the validity of this Agreement or the Company's ability to purchase, distribute or sell the Products.

7.1.6  At all times, the Company will comply with all applicable laws, consent decrees, rules and regulations of any federal, state, foreign (where applicable) or other governmental authority, including all laws relating to the export of the Products.

7.1.7  If the Company operates a clinical laboratory, at all times it will have in full force and effect all permits, permissions, approvals, licenses and authorizations of any kind or nature required to operate as a clinical laboratory.

7.1.8  The Company knows of no fact or circumstance that does or could materially adversely affect its right to enter into, or to fulfill its obligations under, this Agreement.

7.1.9  The Company has the ability to perform its obligations under this Agreement.

7.2  BioSafe's Representations, Warranties and Covenants.  BioSafe represents, warrants and covenants the following:

7.2.1  BioSafe is a corporation duly organized, validly existing and in good standing under the laws of the state of Illinois, with full right, power and authority to enter into and perform this Agreement and to grant all of the rights, powers and authorities herein contained.

7.2.2  The execution, delivery and performance of this Agreement has been duly authorized by all corporate action and does not require any further authorization or consent.  The person executing this Agreement on behalf of BioSafe has been duly authorized to do so by all requisite corporate action.  The execution, delivery and performance of this Agreement does not conflict with, violate or breach BioSafe's articles of incorporation, by-laws or any agreement, judgment or consent decree to which BioSafe is a party nor does it materially violate any law or regulation of any court governmental body or administrative or other agency having jurisdiction over it.

22

7.2.3  This Agreement has been duly executed and delivered by BioSafe, and is its legal, valid and binding obligation enforceable against it in accordance with its terms and provisions, except as enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium or other laws relating to or affecting generally the enforcement of creditors' rights.

7.2.4  At all times, BioSafe will comply with all applicable laws, consent decrees and regulations of any federal, state, foreign, where applicable, or other governmental authority.

7.2.5  BioSafe has the ability to perform its obligations under this Agreement.

## ARTICLE 8
## INTELLECTUAL PROPERTY

8.1  **Ownership.**  Title and full ownership of BioSafe's Intellectual Property shall at all times remain with BioSafe. No term or provision of this Agreement or elsewhere grants to the Company any right of ownership or any other right of any kind or nature whatsoever in or to the BioSafe Intellectual Property, other than the right to use such rights and technology in accordance with the terms and provisions of this Agreement.

8.2  **No Compensation.**  The Company will not receive any compensation or remuneration of any kind or nature for any increased goodwill, improved reputation or other benefits arising from the Company's use of the BioSafe Patent Rights, the BioSafe Technology, the BioSafe Technology Rights, the BioSafe Marks and any other of its Intellectual Property; it being agreed and understood that any such increase or other benefit from such use shall inure to the benefit of BioSafe or its Affiliates, as the case may be.

8.3  **Infringement.**  If, during the Term of this Agreement, the Company becomes aware of any third party infringement or threatened infringement in the Territory of any BioSafe Patent Rights, the BioSafe Technology, the BioSafe Technology Rights, the BioSafe Marks or any of BioSafe's other Intellectual Property, the following shall be applicable:

8.3.1  The Company shall promptly notify BioSafe of any actual or suspected infringements, imitations or unauthorized use of which it becomes aware by a third.

8.3.2  BioSafe shall have the right, but not the obligation, (and the Company shall not have any right) to initiate an infringement action or other appropriate suit in its name, or in the name of the Company, if necessary, anywhere in the Territory against a third party at its own expense. The Company agrees to being joined as a party plaintiff and to cooperate in the prosecution thereof as is reasonably necessary, at

23

BioSafe's expense. If BioSafe decides to undertake such suit, then BioSafe shall have the sole right to select counsel, to control the prosecution, and the right to settle and compromise such action without the Company's consent. BioSafe shall not be liable to the Company for any lost profits, damages or other amounts of any kind or nature whatsoever if BioSafe decides not to initiate any action against a third party for alleged infringement. Any and all amounts of any kind or nature whatsoever received by BioSafe in connection with any claim or action of infringement, imitation or unauthorized use of BioSafe's Intellectual Property, including the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology and the BioSafe Marks, shall belong solely to BioSafe, and the Company shall not have, and irrevocably waives, any claim, right or interest of any kind or nature whatsoever to any portion thereof.

8.3.3  BioSafe, at its own expense, has the right to defend, and at its option, to settle any third party claim, suit, action or proceeding brought against the Company alleging that any of the BioSafe Patent Rights, the BioSafe Technology, the BioSafe Technology Rights, the BioSafe Marks or any other BioSafe Intellectual Property infringes any patent, copyright or trademark or other intellectual property right of such third party. BioSafe shall have sole control of the defense and settlement of any such claim, suit, action or proceeding. BioSafe will pay any final judgment entered against the Company in such claim, suit, action or proceeding defended by BioSafe; provided, however, notwithstanding the foregoing provisions to the contrary, (i) BioSafe shall be relieved of any obligation to defend or pay for such defense unless the Company promptly notifies BioSafe in writing of such claim, suit, action or proceeding after becoming aware of it and the Company provides BioSafe with full and proper information and assistance, as BioSafe may request, to defend or settle such claim, suit, action or proceeding, and (ii) BioSafe shall not have any liability for any infringement which results from any act of the Company, including the Company's use of BioSafe's Intellectual Property in combination with some other technology, method or process not supplied by BioSafe, where BioSafe's rights, technology or property itself would not be infringing without the addition of such other technology, marks, method or process or the Company's modifications of BioSafe's rights, marks, technology or property.

## ARTICLE 9
## TERM AND TERMINATION

9.1  Term.  Subject to earlier termination of the Company's rights and licenses hereunder upon the occurrence of any event specified in section 9.2, the term of this Agreement shall be for a period of twenty-five years, commencing on the Effective Date and expiring at 5:00 p.m. central time, on the last day of such twenty-five year period ("Term").

24

9.2 Termination.

9.2.1 Either Party hereto shall have the right to terminate this Agreement immediately by written notice to the other Party if:

(i) the other Party breaches or is in default of any material obligation under this Agreement and the default or breach is not cured to the reasonable satisfaction of the non-breaching Party within thirty days after the defaulting Party's receipt of written notice of such default from the non-defaulting Party;

(ii) the other Party becomes insolvent, makes a general assignment for the benefit of creditors, suffers or permits the appointment of a receiver for its business or assets, becomes subject to any proceeding under any bankruptcy, insolvency or debtor's relief law, whether domestic or foreign, or has wound up or liquidated its business, voluntarily or otherwise or stops doing business as a going concern; or

(iii) an order or notice shall be published by any government or Governmental Body requiring the cessation of activities by the Company or BioSafe.

9.2.2 Notwithstanding any other provision herein contained to the contrary, BioSafe has the right to terminate this Agreement and the Company's rights and licenses hereunder prior to the expiration of the term immediately if the Company fails to make payment of the Exclusivity, Royalty, License and Manufacturing Fee in accordance with the provisions hereof. The application or payment of late fees does not extend or alter the payment due dates for the fees noted above.

9.3 Rights Upon Expiration of the Term or Termination. Upon expiration of the Term of this Agreement, or its termination prior thereto, in accordance with the provisions of this Agreement, the following shall be applicable:

9.3.1 Any and all rights and licenses that the Company has under this Agreement or otherwise to use any of the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology, the BioSafe Marks or any other of BioSafe's Intellectual Property shall immediately terminate and the Company shall immediately cease using them in any manner or way whatsoever and shall certify in writing to BioSafe that it has completely terminated its use thereof. The Company shall immediately return to BioSafe any and all materials relating to the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology, the BioSafe Marks or any of BioSafe's other Intellectual Property. The Company expressly waives the benefit or protection of any law, rule or regulation which purports to grant any right of any kind or nature to the Company to allow it to use any of the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology, the BioSafe Marks or BioSafe's other Intellectual Property subsequent to the expiration or termination of this Agreement.

9.3.2 Although the Company at no time has been granted any ownership rights in or to any of the subject matter of the Technology License, at the expiration of

25

the Term of this Agreement, or its termination prior thereto, any and all rights that the Company has acquired, owns or possesses in the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology or the BioSafe Marks, including any registration thereof in any foreign country, shall immediately pass to BioSafe, together with any goodwill thereon, without the necessity of any further action on the part of either of the Parties. The Company concedes and acknowledges, and binds itself not to dispute, that the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology or the BioSafe Marks are owned solely by and are the property of BioSafe and that any and all rights that the Company has acquired, owns or possesses has passed to and is owned by BioSafe. The Company agrees that it will cooperate fully with BioSafe in assuring such ownership in BioSafe and preserving the integrity and validity of all of the aforesaid property and rights.

9.3.3    The Company shall immediately cease all sales and other activities with respect to the Products and the Similar Products, and the Company shall take all action required to terminate the Company's registration, if any was required, as a seller of the Products and the Similar Products and shall furnish BioSafe with proof of such termination or a statement warranting that such registration was not required.

9.3.4    The Company shall immediately cease using and return to BioSafe all of BioSafe's Confidential Information.

9.3.5    All indebtedness of Company to BioSafe shall become immediately due and payable without further notice or demand, which is hereby expressly waived.

9.3.6    The Company shall immediately remove from its property and immediately discontinue all use, directly or indirectly, of the BioSafe Marks, trade names, logos and other Intellectual Property of BioSafe or its Affiliates or of any word, title, expression, trademark, design or marking that, in the opinion of BioSafe, is confusingly similar thereto. The Company shall certify in writing to BioSafe that it has completely terminated its use of any and all such trademarks, designs or markings or any other word, title or expression similar thereto that appeared in or on any Products or other material.

9.3.7    BioSafe shall not have any obligation to repurchase or to credit the Company for its inventory of Collection Cards, BTS devices, the Products or the Similar Products at such time.

9.3.8    BioSafe, at its option, shall have the right to cancel any and all accepted purchase orders that have not yet been filled.

9.4    **Survival of Prior Obligations.**    Notwithstanding any thing herein contained to the contrary, termination of this Agreement, whether by expiration of the Term or otherwise: (i) shall not relieve either Party of any obligation incurred prior to such termination; and (ii) all provisions hereunder which by their nature are intended to survive any such termination, shall survive and continue to be enforceable.

26

## ARTICLE 10
## CONFIDENTIAL INFORMATION AND NONCOMPETITION

10.1  **Treatment of Confidential Information**. The Company acknowledges that: (i) during the Term of this Agreement, it will have access to Confidential Information; and (ii) the inclusion of the provisions of this Article 10 relating to Confidential Information is a material inducement to BioSafe to enter into this Agreement, and that BioSafe would not have entered into it if these confidentiality provisions were not contained herein. Accordingly, during the Term hereof and for so long as the Confidential Information is not generally known or generally disclosed, the Company shall keep confidential, shall maintain in the strictest secrecy and shall not disclose, divulge or otherwise communicate to others or use for any purpose other than as authorized herein any Confidential Information supplied by BioSafe, its agents or representatives. The Company shall exercise every precaution to prevent and restrain the unauthorized disclosure of any Confidential Information. Confidential Information shall be disclosed by the Company only to its employees who have a "need-to-know" and who have executed a nondisclosure agreement with the Company at least as restrictive as the terms of this Agreement. The Company will not disclose any Confidential Information to any third party without first obtaining BioSafe's written consent to such disclosure.

10.2  **Release from Restrictions**. The provisions of section 10.1 shall not apply to any Confidential Information disclosed hereunder which:

10.2.1  was known or used by the Company prior to its date of disclosure by BioSafe to the Company, as evidenced by the prior written records of the Company;

10.2.2  was lawfully disclosed to the Company by sources other than BioSafe rightfully in possession of the Confidential Information;

10.2.3  becomes published or generally known to the public without the Company's breach of any obligation owed to BioSafe;

10.2.4  is independently developed by the Company without reference to or reliance upon the Confidential Information or as a result of a breach of this Agreement;

10.2.5  is required to be disclosed by the Company to comply with applicable laws, to defend or prosecute litigation or to comply with governmental regulations, provided that the Company provides prior written notice of such disclosure to BioSafe to the extent practicable and legally permissible in order to enable BioSafe to seek an appropriate protective order or other remedy, and the Company cooperates with BioSafe, at BioSafe's expense, in connection therewith and shall seek to obtain confidential treatment for any such disclosure required to be made; or

27

10.2.6 was permitted to be disclosed by the prior written consent of BioSafe.

10.3 **Ownership of Confidential Information.** All Confidential Information is and shall remain the sole and exclusive property of BioSafe. Upon termination of this Agreement for any reason, all Confidential Information, and all copies thereof, in whatever form or medium, will immediately be returned by the Company to BioSafe, with the Company not retaining any copies, in any form or medium.

10.4 **No Warranties.** The Confidential Information disclosed by BioSafe is provided "AS-IS" with no express or implied warranties of any kind, including any warranties of merchantability, fitness for a particular purpose or non-infringement of any patent, copyright or other third party intellectual property right.

10.5 **Non-Competition Agreement.** In consideration of BioSafe entering into this Agreement, during the Term hereof and for a period of two (2) years following the expiration of the Term, or its termination prior thereto in accordance with the provisions hereof, except as is provided in this Agreement, the Company will not, and will not permit any of its employees and directors to:

10.5.1 directly or indirectly participate, assist, perform any services for or otherwise be involved or concerned, financially or otherwise, as a member, director, consultant, advisor, contractor, principal, agent, manager, beneficiary, partner, associate, trustee, financier, lender or otherwise in any business or activity conducting operations in the Territory which perform any analysis on a human blood component using the specimen format employed by BioSafe or which are competitive, in any manner or way whatsoever, with the business activities engaged in by BioSafe as of the date of the expiration of the Term, or its termination prior thereto;

10.5.2 use any of the Intellectual Property granted or licensed hereunder for any form of research or commercial use or exploitation;

10.5.3 directly or indirectly interfere or seek to interfere with any relationship between BioSafe and any of its customers, employees, suppliers or vendors;

10.5.4 solicit any business related to the business activities conducted by BioSafe as of the date of the expiration of the Term, or its termination prior thereto, from any customers of BioSafe as of such date;

10.5.5 induce or attempt to induce any employee of BioSafe to terminate such employment relationship; or,

10.5.6 disparage any of the products, services or directors or employee of BioSafe.

Notwithstanding any provision herein contained to the contrary:

28

(i) the Company has no right, title or interest of any kind or nature whatsoever to use in any manner or way whatsoever any of BioSafe's Intellectual Property without BioSafe's prior written consent; and

(ii) the Company and its employees and directors shall not be prohibited from owning, directly or indirectly, up to five percent of the outstanding equity interest in any company, the stock of which is publicly traded, which is in competition with BioSafe.

**10.6 The Company's Acknowledgments.** The Company acknowledges:

10.6.1 The prohibitions and restrictions contained in this article 10 are reasonable and necessary to the preservation and protection of BioSafe's business and proprietary properties and are fair and reasonable in its terms, including time and scope;

10.6.2 That BioSafe would not have entered into this Agreement without the inclusion of the provisions of this article 10; and,

10.6.3 The Company has received valuable consideration for agreeing to the covenants in this article 10.

**10.7 Severability.** To the extent permitted by applicable law, if it should be held that any provision contained in this article 10 does not contain reasonable limits as to time, geographical area or scope of activity to be restrained, then any court of competent jurisdiction shall reform such provisions as to the extent necessary to contain reasonable limitations to be restrained and to give maximum permissible effect to the intentions of the Parties as set forth in this article 10. In addition, such court shall enforce the provisions as so reformed.

**10.8 Injunctive Relief.** The Company acknowledges that if it violates any of their agreements contained in this article 10, it will be difficult to compute the amount of damage or loss to BioSafe and BioSafe will be without an adequate legal remedy and any such violation may cause substantial irreparable injury and damage to BioSafe that is not fully compensable by monetary damages. Accordingly, in the event of an actual or threatened breach of these provisions, BioSafe shall be entitled to preliminary and permanent injunctive relief (without the necessity of posting any bond and without proof of actual damages) in any court of competent jurisdiction to restrain the Company from committing any breach of this article 10 and/or to compel specific performance or other equitable relief of these provisions, and BioSafe shall be entitled to recover from the Company all Losses and Expenses sustained or incurred in obtaining such relief. The Company waives any right that it may have to oppose the granting of such relief. The restriction period set forth in section 10.5 shall be tolled during any period in which the Company violates any of these provisions. Any such remedy shall not be deemed to be the exclusive remedy for a breach of these provisions but shall be in addition to any and all other remedies available to BioSafe at law or in equity. The Company shall reimburse

29

BioSafe for all Losses and Expenses incurred by BioSafe in attempting to enforce these provisions.

## ARTICLE 11
## INDEMNIFICATION AND INSURANCE

11.1  **Indemnification by the Company.** The Company shall indemnify and hold harmless BioSafe, its Affiliates, each of their respective directors, officers, employees and agents, and each of the heirs, executors, administrators, successors and assigns of each of the foregoing (collectively, the "BioSafe Indemnified Parties") from and against any and all Losses and Expenses incurred by any BioSafe Indemnified Party in connection with, resulting from or arising out of:

11.1.1  any breach by the Company of, or any failure by the Company to perform, any of its covenants, agreements or obligations in this Agreement;

11.1.2  any breach by the Company any representation or warranty given herein; or

11.1.3  any act or omission to act by the Company, including the analysis of the tests in the Products and the Similar Products by the Company or any of its Affiliates;

11.2  **Indemnification by BioSafe.** BioSafe shall indemnify and hold harmless the Company, its Affiliates, each of their respective directors, officers, employees and agents, and each of the heirs, executors, administrators, successors and assigns of each of the foregoing (collectively, the "Company Indemnified Parties") from and against any and all Losses and Expenses incurred by any Company Indemnified Party in connection with, resulting from or arising out of :

11.2.1  any breach by BioSafe of, or any failure by BioSafe to perform, any of its covenants, agreements or obligations in this Agreement;

11.2.2  any breach by BioSafe of any representation or warranty given herein; or

11.2.3  any act or omission to act by BioSafe.

11.3  **Claims Procedure.**

11.3.1  An indemnified party shall notify an indemnifying party of any claim for indemnification hereunder (including any claim for indemnification based upon a claim asserted by a third party (herein called "Indemnity Claim")) within a reasonable time after the indemnified party first becomes aware of the existence of such claim. Such

30

notice shall specify the nature of such claim in reasonable detail and the indemnifying party shall be given reasonable access to any documents or properties within the control of the indemnified party as may be useful in the investigation of the basis for such claim. The failure to so notify the indemnifying party within a reasonable time shall not constitute a waiver of such claim, but an indemnified party shall not be entitled to receive any indemnification with respect to any Losses or Expenses that occur as a result of the delay or failure of such indemnified person to give such notice.

11.3.2 The indemnifying party shall have the right to participate jointly with the indemnified party in the indemnified party's defense, settlement or other disposition of any Indemnity Claim; provided, however, notwithstanding the foregoing, with respect to any Indemnity Claim relating solely to the payment of money damages and which could not result in the indemnified party's becoming subject to injunctive or other equitable relief or otherwise adversely affect the business of the indemnified party in any manner, and as to which the indemnifying party shall have acknowledged in writing the obligation to indemnify the indemnified party hereunder, the indemnifying party shall have the sole right to defend, settle or otherwise dispose of such Indemnity Claim, on such terms as the indemnifying party, in its sole discretion, shall deem appropriate; provided that the indemnifying party shall provide reasonable evidence of its ability to pay any damages claimed and with respect to any such settlement shall have obtained the written release of the indemnified party from the Indemnity Claim. The indemnifying party shall obtain the written consent of the indemnified party prior to ceasing to defend, settling or otherwise disposing of any Indemnity Claim if as a result thereof the indemnified party would become subject to injunctive or other equitable relief or the business of the indemnified party would be adversely affected in any manner.

11.4 **Insurance.** The Company shall, at its sole cost and expense, procure and maintain, and cause its subcontractors to procure and maintain, the following types and amounts of insurance, to cover any claims arising out of the Company's performance under this Agreement:

| Type of Coverage | Amount |
| --- | --- |
| Products Liability Insurance | $1,000,000 per occurrence $2,000,000 aggregate |
| Commercial General Liability Insurance | $1,000,000 per occurrence $2,000,000 aggregate |
| Workers' Compensation Insurance | Statutory limits |

The Company shall furnish BioSafe with certificates of insurance, naming BioSafe, BioSafe's directors, employees and agents as additional insureds (except with respect to workers' compensation insurance), providing for such insurance and requiring no less than thirty days prior written notice to BioSafe of any cancellation or expiration of such insurance. The Company's insurance shall be primary and non-contributing with

31

any other insurance available to BioSafe and shall contain a waiver of subrogation in favor of BioSafe (except for coverages under which BioSafe is named as an additional insured). The coverages set forth above shall have reasonable and customary deductible amounts, provided that in no event shall such deductible amounts exceed $10,000 per occurrence. All insurance shall be provided by responsible, licensed insurance carriers. The insurance coverages set forth herein shall be maintained until the expiration of any applicable statute of limitations, but in any event for a period of not less than five years following the termination of this Agreement. The Company shall not violate any conditions or terms of such policies of insurance. If any of the insurance required to be maintained contains aggregate limits which apply to the operations of the Company other than those operations which are the subject of this Agreement, and such limits are diminished by more than $10,000 after any one or more incidents, occurrences, claims, settlements or judgments against such insurance, the Company shall take immediate steps to restore such aggregate limits or shall maintain other insurance protection for such aggregate limits.

11.5 **Survival**. The provisions of this article 11 shall survive the termination of the term of the Agreement.

## ARTICLE 12
## MISCELLANEOUS

12.1 **Amendments And Waiver**. The Parties, by mutual agreement in writing signed by both of the Parties, may amend, modify or supplement this Agreement. Any term or provision of this Agreement may be waived solely by a writing signed by the Party entitled to the benefit thereof. The failure of a Party to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement, or any part hereof, or the right of a Party thereafter to enforce each and every provision. No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach. No custom or practice of a Party in variance with the terms hereof shall constitute a waiver by such Party to demand exact compliance with the terms hereof. Any waiver or consent may be given subject to satisfaction of the conditions stated therein.

12.2 **Assignment**. This Agreement is personal to the Company; therefore, the Company's rights and obligations under this Agreement may not be sold, transferred or assigned without the prior written consent of BioSafe. No rights under this Agreement shall devolve by operation law or otherwise to any receiver, liquidator or trustee of the Company. BioSafe may assign this Agreement and any or all of its rights and obligations hereunder without the consent of Company.

12.3 **Benefit of Agreement**. This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and to their respective successors, permitted assigns and to the benefit of the BioSafe Indemnified Parties and the Company Indemnified Parties. Any assignee of BioSafe shall have the same rights and remedies as BioSafe and the rights of such assignee will not be subject to any claims the Company

32

may have against BioSafe. Nothing contained in this Agreement, expressed or implied, is intended, and shall not be construed, to confer upon or create in any Person (other than the Parties hereto, their successors and permitted assigns, the BioSafe Indemnified Parties and the Company Indemnified Parties) any rights or remedies under or by reason of this Agreement, including any rights of any kind or nature to enforce this Agreement.

12.4  **Counterparts.** This Agreement may be executed in several counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, binding upon both of the Parties, notwithstanding that both the Parties are not signatories to the same counterpart. In pleading or proving any provision of this Agreement, it shall not be necessary to produce more than one such counterparts.

12.5  **Governing Law.** The validity, interpretation, construction and performance of this Agreement shall be governed by the applicable laws of the United States and the domestic substantive laws of the State of Illinois, applicable to contracts to be wholly performed within that state without giving effect to any choice or conflict of laws provision or rule that would cause the application of the domestic substantive laws of any other jurisdiction. Each of the Parties expressly waives all rights to a trial by jury.

12.6  **Jurisdiction and Venue.** Any claims and actions of any kind or nature whatsoever arising out of or related in any way whatsoever to this Agreement must be maintained in a federal or state court of competent jurisdiction located in Cook or Lake counties, Illinois. Accordingly, each of the Parties hereby absolutely and irrevocably:

12.6.1  Consents and submits to the jurisdiction of the courts of the State of Illinois and of any federal court located in Cook or Lake counties, in connection with any suit, claim, action or proceeding brought against one Party by the other Party arising out of or relating to this Agreement;

12.6.2  Agrees that all claims of any kind or nature whatsoever in respect of any such action or proceeding may only be heard and determined in any such court;

12.6.3  Waives any and all objections to jurisdiction and venue of Illinois courts;

12.6.4  Waives personal service of any summons, complaint, declaration or other process; and,

12.6.5  Agrees that the service thereof may be made by certified or registered mail directed to it at its last known address.

12.7  **Notices.** All notices, consents, approvals and other communications (collectively, "Notice") required or permitted to be given or made hereunder shall be in writing and sent (i) by first class certified or registered mail, postage prepaid, or by reputable overnight courier, and properly addressed, to the address of the party to be notified as shown below, or to such other address as to which a party may notify the other

33

in writing, or (ii) by confirmed facsimile, to the facsimile number shown below, or to such other facsimile number as to which a Party may notify the other in writing; provided that, any Notice sent by facsimile shall also be sent by hard copy in accordance with clause (i) of this section 12.7. Notice shall be effective on the date it is received.

If to BioSafe, to:

> BIOSAFE Laboratories, Inc.
> 100 Field Drive, Suite 240
> Lake Forest, Illinois 60045
> Attention: President
> Facsimile: 847.234.8222
> Confirmation Phone No.: 847.234.8111

If to Company, to:

> Lab123, Inc.
> 100 Field Drive, Suite 240
> Lake Forest, Illinois 60045
> Attention: President
> Facsimile:
> Confirmation Phone No.:

or to such other address as the recipient Party may indicate by a Notice delivered to the sending Party (such change of address notice to be deemed given, delivered and received only upon actual receipt thereof by the recipient of such Notice).

12.8   **Attorneys' Fees and Costs.**  In addition to any other relief awarded, the prevailing Party in any action arising out of this Agreement is entitled to reasonable attorneys' fees and costs and expenses.

12.9   **Announcements.**  Neither Party shall issue any press release or other publicity materials with respect to the existence of this Agreement or the terms and conditions hereof without the prior written consent of the other Party, such consent not to be unreasonably withheld.  This restriction shall not apply to disclosures required by law or regulation.

12.10   **Cumulative Remedies and Waiver of Rights.**  If either Party breaches this Agreement, the non-breaching Party shall have the right to assert all legal and equitable remedies available, with no remedy being exclusive.

12.11   **Limitation of Actions.**  Any legal action arising out of this Agreement shall be forever barred unless commenced within one year from the date of occurrence of the act or omission giving rise to such action; provided, however, the foregoing limitation shall not apply to any actions asserted against the Company by BioSafe arising from any delinquencies in any amount due hereunder.

34

12.12. **Further Assurances.** Each of the Parties agrees that at any time, and from time to time, before and after the termination of this Agreement for any reason whatsoever, it will do all such things and execute and deliver all such agreements, assignments, instruments, other documents and assurances as the other Party or its counsel reasonably deems necessary or desirable in order to carry out the terms and conditions of this Agreement.

12.13. **Interest.** Any amount due hereunder not paid when due shall bear interest at the rate of the lesser of the maximum rate allowable under applicable law and one and one-half per cent per month, or fraction thereof, until payment in full is received.

12.14. **Entire Agreement.** This Agreement constitutes the entire agreements and understandings between the Parties hereto with respect to the subject matter hereof and supercedes all prior negotiations, representations, agreements, letters of intent, commitments, contracts, arrangements, covenants, promises, conditions, understandings, inducements and negotiations, expressed or implied, written or oral, between them as to such subject matter. Neither Party to this Agreement shall be bound by or charged with any matter not specifically set forth in this Agreement.

12.15  **Limitation of Liability.** In no event shall BioSafe's liability arising out of or relating to this Agreement exceed the aggregate amounts paid by the Company to BioSafe hereunder.  In no event shall BioSafe be liable under any legal or equitable theory, and the Company waives any right to or recovery, for lost profits or anticipated income, loss of goodwill, cost of procurement of substitute goods, or any other direct, indirect, special, reliance, incidental, consequential, punitive or multiplied damages of any kind or nature whatsoever, however caused, suffered by the Company, its customers or others for all causes of action or claims of any kind or nature whatsoever.

12.16  **Force Majeure.** Neither Party shall be in default under the provisions of this Agreement (except with respect to the payment of money) by reason of any failure or delay in the performance of any obligation under this Agreement where such failure or delay arises out of any cause beyond the reasonable control and without the fault or negligence of such Party, including an act of God, war or insurrection, civil commotion, terrorist attacks, destruction of essential facilities or materials by earthquake, fire, flood or storm, labor disturbance, epidemic or other similar event; provided, however, that the Party so affected will give prompt notice of such event and shall use its best efforts to avoid, remove or alleviate such causes of non-performance and shall continue performance hereunder with the utmost dispatch whenever such causes are removed.

35

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the day and year first above written.

BIOSAFE LABORATORIES, INC.

By: _____
Dr. Jack Maggiore, President


Lab123, INC.

By: _____
Mike Sosnowik, Chief Executive Officer

36

EXHIBIT 1
TO
AGREEMENT EFFECTIVE AS OF SEPTEMBER 1, 2006
BY AND BETWEEN
BIOSAFE LABORATORIES, INC.
AND
Lab123, INC.

For purposes of the Agreement, "Products" means the following:

1. BIOSAFE Cholesterol Panel including Total Cholesterol, HDL, LDL and Triglycerides

2. Rapid Result quantitative hemoglobin-measuring device marketed as BIOSAFE Anemia Meter

3. BIOSAFE Prostate Specific Antigen test (PSA)

4. BIOSAFE Thyroid Stimulating Hormone test (TSH)

5. BIOSAFE Hemoglobin A1c (Diabetes)

1.