# EXHIBIT D



February 10, 1999

Dear Shareholder,

**The Ultimate Health Club**, a subsidiary of **BioSafe Medical Technologies, Inc.**, was formed over two years ago to be the vehicle by which products and services would be sold over the Internet.

Enclosed is an Offering Memorandum describing an opportunity for the shareholders of **BioSafe Medical Technologies, Inc.** subsidiary companies to participate in the first round financing of this company.

Up to now the majority of capital expenditures throughout **BioSafe** has been necessarily directed towards developing and commercializing the core technologies of the enterprise. Also, the Internet itself was still in its infancy and commercial applications using that medium had yet to be validated.

The situation today is considerably different. Commerce on the Internet becomes more and more established every day and its applicability to the product sets which **BioSafe** has now developed is potentially significant. Although the **The Ultimate Health Club** intends to offer both **BioSafe** developed and third party products, the business model for professionally ordered laboratory testing follows:

Physician prescribed laboratory tests which are now commercially available from **BioSafe Laboratories, Inc.** include: Hemoglobin A1c for diabetes, Bone Alkaline Phosphatase for osteoporosis, Prostate Specific Antigen (PSA) for prostate cancer and a lipids panel (total cholesterol, HDL cholesterol, triglycerides and LDL cholesterol) for coronary heart disease or health risk assessment.

A customer desiring an offered test (or others as they are released) uses **The Ultimate Health Club** under the domain name of **eBioSafe.com** to complete a request form for the desired test and provides relevant personal data.

This form is then automatically routed by zip code to the appropriate physician/healthcare professional owned **BioSafe Healthcare Cyber-Clinic** franchise for approval. Twenty of these "Cyber-clinics" have already been requested with indications of interest received for dozens more. Indeed, **BioSafe Diagnostic Products,** franchiser of the Clinics, anticipates closing as many as 100 clinics by April 30, 1999. The Internet site is expected to be operational well before that date.

After electronic authorization by the appropriate Clinic, the customer is sent a blood collection kit. The customer then sends the sample to be tested using ordinary mail to **BioSafe Laboratories, Inc.** for analysis.

Results are reported back to the applicant with an interpretation letter from the designated clinic. E-mail correspondence with the clinic by the customer is also possible. A typical $40 PSA test has a direct cost of about $32 for lab services and professional interpretation. **The Ultimate Health Club** retains approximately $8 per test.

Additional revenues are expected to be generated from the sale of additional products and services. Highly focused advertising by advertisers utilizing the Internet vehicle should also contribute to revenues or cost reduction programs.

Proceeds from this offering will provide working capital to build the initial Web site and begin its commercial operation.

To the best of our knowledge, **BioSafe Laboratories, Inc.** is the only company in the world able to accurately perform this array of these micro-sample diagnostic tests. When combined with a network of healthcare professionals on-line serving every state and able to prescribe these tests, **The Ultimate Health Club** is expected to experience a long term sustainable competitive advantage in accurate field-collected micro-sample diagnostics.

Because the potential benefits of this business transcend virtually every **BioSafe** entity, this offering is designed to provide shareholders of **BioSafe Medical Technologies'** subsidiary companies with the opportunity to participate directly in this business,.

Please read the Offering Memorandum closely since, as with any other start-up company, substantial risks are involved. Note, however, that the deadline for response is 5:00 p.m., February 22, 1999. After that date, unsubscribed shares will be offered to those shareholders who have requested additional shares. Thereafter, other accredited investors may be offered shares.

With the assumption that the public market continues to find Initial Public Offerings (IPO's) and Internet investments attractive, the launching of **The Ultimate Health Club** seems well timed.

Call David Fleisner (847 821-7300) or William Lear (312 922-8703) with any questions. Many thanks for your prompt consideration.

Best regards,

William S. Lear, CFO

THIS CONFIDENTIAL SUMMARY SHALL UNDER NO CIRCUMSTANCES CONSTITUTE AN OFFER TO SELL OR SOLICITATION OF AN OFFER TO PURCHASE THE SECURITIES MENTIONED HEREIN. SUCH OFFER CAN ONLY BE MADE VIA THE PRIVATE PLACEMENT MEMORANDUM.

# INSTRUCTIONS FOR SUBSCRIPTION

1. Complete and sign both copies of the Subscription Agreement.

2. Make your check payable to:     The Ultimate Health Club

   The amount of your check should not exceed the amount of your subscription rights.

3. Return the Subscription Agreements with your check in the envelope provided.

The rights offering expires on February 22, 1999.   Un-subscribed shares, if any, will be immediately offered to accredited investors on a first come first serve basis.

### EXPRESSION OF ADDITIONAL INTEREST

If you would like to subscribe for shares exceeding your rights, please enclose your expression of interest with your subscription documents.

Name:_____

Number of <u>additional</u> shares requested:_____

SUBSCRIPTION AGREEMENT AND SIGNATURE PAGE

THE ULTIMATE HEALTH CLUB, INC. (DOMAIN "EBIOSAFE.COM")

Gentlemen:

The undersigned has received and read the Confidential Private Placement Memorandum dated February 8, 1999 (as amended or supplemented, the "Memorandum"), which offers to the undersigned the opportunity to purchase Common Stock, no par value per share (the "Shares"), in The Ultimate Health Club, Inc. (domain "eBioSafe.com")., an Illinois corporation (the "Company"). Terms used and not defined herein have the same meanings as in the Memorandum.

1.    Subscription.

(a)    Subject to the terms and conditions of this Subscription Agreement and the Memorandum, the undersigned hereby subscribes for the Shares in the aggregate amount set forth herein, and the undersigned hereby agrees that this subscription shall be irrevocable and shall survive the death or disability or the bankruptcy, insolvency, dissolution or other cessation to exist as a legal entity of the undersigned.

(b)    In the event that the undersigned is not accepted as a shareholder, the cash tendered by the undersigned herewith shall be returned to the undersigned, without any interest actually earned thereon.

2.    Acceptance of Subscription.    The undersigned acknowledges that the Company, in its sole discretion, has the right to accept or reject this subscription, in whole or in part, for any reason whatsoever and that this subscription shall be deemed to be accepted by the Company only when it is signed by one of the officers of the Company. The undersigned agrees that the Shares may be allocated in the event of over subscription. There is no minimum purchase.

3.    Understandings of the Undersigned.    The undersigned hereby represents and warrants to, and covenants with, the Company that the undersigned is aware and understands that:

(a)    There are substantial risks incident to the purchase of the Shares, as summarized under "Risk Factors" and in other portions of the Memorandum, an investment in the Shares is inherently speculative in nature and the undersigned may suffer a complete loss of his or her investment.  Among other matters, the Company has no financial and operating histories.

(b)    The transferability of the Shares is subject to substantial restrictions, an investment in the Shares is highly illiquid and the undersigned may have to bear the economic risk of its investment in the Company for an indefinite period of time.  There is no public market for the Shares and no such market is expected to develop in the future.

24

4.    <u>Representations, Warranties and Covenants of the Undersigned</u>. The undersigned hereby represents and warrants to and covenants with the Company as follows:

(a)    The undersigned has carefully reviewed the Memorandum, including all exhibits thereto and amendments or supplements thereof, has been furnished with all other materials which they consider relevant to an investment in the Company and has had a full opportunity to ask questions of and receive answers from the Company or persons acting on its behalf concerning the terms and conditions of an investment in the Company. No statement or printed material which is contrary to the Memorandum has been made or given to the undersigned by or on behalf of the Company.

(b)    In addition, the undersigned is an accredited investor as such term is defined in Rule 501 of Regulation D promulgated under the Act and has adequate means of providing for his current financial needs, including possible future personal financial contingencies, and the undersigned anticipates no need in the foreseeable future to sell the Shares for which it hereby subscribes. The undersigned is able to bear the economic risks of this investment and, consequently, without limiting the generality of the foregoing, is able to hold the Shares for an indefinite period of time and has a sufficient net worth and available funds to sustain a loss of the undersigned's entire investment in the Shares. The undersigned's overall commitment to investments which are not readily marketable is not more than 10% of the undersigned's net worth and the undersigned's investment in the Shares will not cause such overall commitment to exceed 10% of the undersigned's net worth or the undersigned's net worth with his or her spouse.

(c)    The undersigned has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of an investment in the Shares, and is aware of the risks of an investment in the Shares.

(d)    **The Shares for which the undersigned hereby subscribes are being acquired for the undersigned's own account, for long term investment and not with any view toward the resale or distribution thereof, and the undersigned does not have any reason to anticipate any change in the undersigned's circumstances which would cause the undersigned to sell the Shares.**

(e)    The undersigned, if a natural person, is over 21 years of age, a citizen of the United States and legally competent to execute this Subscription Agreement and the related Subscription Documents and to make the representations and warranties contained herein and therein. If the undersigned is a corporation, partnership or trust: (i) it is duly organized, validly existing and in good standing under the laws of the jurisdiction in which it was formed and all other jurisdictions where such qualification is necessary in light of the undersigned's activities; (ii) it has all the requisite power and authority to invest in the Shares as provided herein; (iii) such investment will not result in any violation of or conflict with any term of the charter, by-laws or organizational documents of the undersigned or any law or regulation applicable to it; (iv) such investment has been duly authorized by all necessary action on behalf of the undersigned; (v) this Subscription Agreement and the other subscription documents have, pursuant to proper authority, been duly executed and delivered on behalf of the undersigned and constitute legal, valid and binding agreements of the undersigned, enforceable against the undersigned in accordance with their terms; and (vi) the undersigned has not been organized or reorganized for the specific purpose, or for the purpose among other purposes, of acquiring the Shares.

26

104

The representations, warranties, covenants and agreements contained herein shall survive the delivery of and the payment for the Shares.

Printed name of Investor: _____ Dated: _____,199_

Number of Shares Subscribed for ($_____ per Share):_____

Number of Shares requested subject to availability for ($_____ per Share):_____

If Joint Ownership, check one:

| | |
|---|---|
| _____ | Joint Tenants with |
| | Right of Survivorship |
| _____ | Tenants in Common |
| _____ | Community Property |

If fiduciary, partnership or corporation, check one:

| | |
|---|---|
| ___ | Trust |
| ___ | Estate |
| ___ | Corporation |
| ___ | Partnership |
| ___ | Power of Attorney |
| ___ | Uniform Gift to Minors Act |
| ___ | Individual Retirement Account |

_____    _____    _____
Signature of Individual       Signature of                    If Investor is an Entity,
Investor                             Joint Investor (if any)      Name of Entity
                                        (All joint owners must
                                        sign)
                                                                        By:_____

State of Residence:_____

This subscription is accepted as of the ___day of _____, 199_.

**THE ULTIMATE HEALTH CLUB, INC.
(DOMAIN "EBIOSAFE.COM").**

By:_____
Title:_____

28

# EXHIBIT E

CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

# THE ULTIMATE HEALTH CLUB
## (domain "eBioSafe.com")
### $600,000
### 400,000 SHARES OF COMMON STOCK
### $1.50 Per Share, Minimum Purchase: None

The Ultimate Health Club, Inc., domain "eBioSafe.com" (the "Company"), a subsidiary of BioSafe Medical Technologies, Inc., is offering a private sale of up to 400,000 shares of its Common Stock, no par value (the "Shares"), at a purchase price of $1.50 per share (the "Offering"). The Shares are being offered exclusively to existing shareholders of BioSafe Allergy Services, Inc., BioSafe Diagnostic Products, Inc., BioSafe Laboratories, Inc. and BioSafe Diagnostics Corporation, all of which are subsidiaries of BioSafe Medical Technologies, Inc.("BioSafe"). In addition, such prospective investors must also be an accredited investor as such term is defined in Rule 501(a) of Regulation D under the Securities Act of 1933, as amended ("Accredited Investors"). To the extent that any of the Shares are not purchased by the existing shareholders, other accredited investors may be permitted to purchase the remaining shares. The Company is an Illinois corporation organized in July 1996 for the specific purpose of providing on-line and real-time health services via the Internet. The Company expects to be supported by a national network of physicians and healthcare professionals operating BioSafe Healthcare Clinics (franchises established by BioSafe Diagnostic Products, Inc.). The Company's principal office is located at 300 Knightsbridge Parkway, Suite 150, Lincolnshire, Illinois 60069. The telephone number is (847) 821-7300.

THE COMPANY OFFERS THESE SECURITIES PURSUANT TO EXEMPTIONS FROM REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED (the "ACT"), AND CERTAIN STATE SECURITIES LAWS. THESE SECURITIES HAVE NOT BEEN APPROVED, DISAPPROVED OR RECOMMENDED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES ADMINISTRATOR, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES ADMINISTRATOR PASSED UPON THE ACCURACY OR ADEQUACY OF THE DISCLOSURES CONTAINED IN THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM OR THE MERITS OF AN INVESTMENT IN THE SECURITIES OFFERED HEREIN. THE SECURITIES AND EXCHANGE COMMISSION HAS NOT MADE AN INDEPENDENT DETERMINATION THAT THE SECURITIES OFFERED HEREIN ARE EXEMPT FROM REGISTRATION. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE SECURITIES OFFERED HEREIN INVOLVE A HIGH DEGREE OF RISK AND SHOULD BE CONSIDERED ONLY BY INVESTORS WHO MEET CERTAIN SUITABILITY STANDARDS AND CAN AFFORD THE POSSIBLE LOSS OF THEIR ENTIRE INVESTMENT. SEE "RISK FACTORS" AND "INVESTOR SUITABILITY." THE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT, AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. SEE "RESTRICTIONS ON TRANSFER." THERE IS CURRENTLY NO PUBLIC OR OTHER MARKET FOR THE SECURITIES AND A PUBLIC OR OTHER MARKET IS NOT EXPECTED TO DEVELOP. EACH PROSPECTIVE INVESTOR SHOULD PROCEED ONLY ON THE ASSUMPTION THAT SUCH PROSPECTIVE INVESTORS MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

| Common Stock | Offering Price (1) | Selling Commissions (2) | Proceeds to Company (2,3) |
|---|---|---|---|
| Per Share | $1.50 | $0.00 | $1.50 |
| Maximum Offering (400,000 Shares) | $600,000.00 | $0.00 | $600,000.00 |

See Footnotes on Following Page

Name of Offeree_____    Memorandum Number_____

The date of this Memorandum is February 8, 1999
(COVER IS CONTINUED ON NEXT PAGE)

(1)    The offering price of the Shares has been determined by the Company and bears no relation to the Company's earnings, book value, net worth or other generally recognized criteria of value. There is no public market for the Shares and none is expected to develop following the completion of this Offering. See "Risk Factors."

(2)    The Offering will be made on a "best efforts" basis by the Company through its officers and directors without compensation.

(3)    Before deducting offering expenses payable by the Company estimated at $20,000.

---

### Please note the following:

THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM SHALL UNDER NO CIRCUMSTANCES CONSTITUTE AN OFFER TO SELL OR SOLICITATION OF AN OFFER TO PURCHASE, NOR SHALL THERE BE ANY OFFER OR SALE OF, THE SHARES IN ANY JURISDICTION IN WHICH SUCH OFFER, SOLICITATION, PURCHASE OR SALE WOULD BE UNLAWFUL PRIOR TO REGISTRATION OR QUALIFICATION UNDER THE SECURITIES LAWS OF SUCH JURISDICTION.

---

INVESTORS SHOULD NOT CONSTRUE THE CONTENTS OF THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM OR ANY COMMUNICATION FROM THE COMPANY OR ITS AFFILIATES REGARDING THE INVESTMENT CONTEMPLATED BY THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM, WHETHER WRITTEN OR ORAL, AS LEGAL, TAX, ACCOUNTING, INVESTMENT OR OTHER EXPERT ADVICE. NEITHER THE COMPANY NOR ANY OF ITS AFFILIATES MAKES ANY RECOMMENDATION AS TO WHETHER ANY OF THE SHARES SHOULD BE PURCHASED. EACH INVESTOR SHOULD CONSULT HIS OR HER OWN COUNSEL, ACCOUNTANT AND OTHER PROFESSIONAL ADVISORS AS TO LEGAL, TAX, ACCOUNTING AND OTHER MATTERS RELATED TO THE INVESTMENT.

---

THE INFORMATION CONTAINED IN THIS MEMORANDUM IS CONFIDENTIAL, AND THE OFFEREE NAMED ON THE COVER PAGE, BY ACCEPTING DELIVERY OF THIS MEMORANDUM, AGREES NOT TO REPRODUCE THIS MEMORANDUM AND TO RETURN IT AND ALL RELATED DOCUMENTS TO THE COMPANY IF THE OFFEREE DOES NOT PURCHASE ANY OF THE SHARES OFFERED HEREBY. ANY REPRODUCTION OR OTHER DISTRIBUTION OF THIS MEMORANDUM, IN WHOLE OR IN PART, WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMPANY IS PROHIBITED.

NO OFFERING LITERATURE OR ADVERTISING IN ANY FORM WHATSOEVER SHALL BE EMPLOYED IN THE OFFERING OF THE SECURITIES EXCEPT FOR THIS MEMORANDUM AND THE ATTACHMENTS ACCOMPANYING THIS MEMORANDUM, WHICH SHOULD BE READ IN CONJUNCTION WITH THIS MEMORANDUM.

THE COMPANY UNDERTAKES NO OBLIGATION TO UPDATE THE INFORMATION CONTAINED IN THIS MEMORANDUM TO REFLECT SUBSEQUENT EVENTS. IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON HIS OR HER OWN EXAMINATION OF THE COMPANY, INCLUDING THE MERITS AND RISKS INVOLVED. EACH PROSPECTIVE INVESTOR MUST RELY ON HIS OR HER OWN INVESTIGATION OF THE FACTS AND TO REVIEW ALL INFORMATION CONTAINED HEREIN WITH HIS OR HER LEGAL AND FINANCIAL ADVISORS.

AN OFFER TO SELL THE SHARES MAY BE MADE ONLY BY AUTHORIZED REPRESENTATIVES OF THE COMPANY. THE COMPANY WILL BE PLEASED TO DISCUSS ANY QUESTIONS OR COMMENTS WITH PROSPECTIVE INVESTORS. HOWEVER, NO PERSON IS AUTHORIZED TO PROVIDE ANY INFORMATION OR MAKE ANY REPRESENTATIONS ON BEHALF OF THE COMPANY EXCEPT INFORMATION OR STATEMENTS SET FORTH IN THIS MEMORANDUM AND THE ATTACHMENTS HERETO, OR IN A WRITTEN STATEMENT SIGNED BY THE AUTHORIZED REPRESENTATIVE OF THE COMPANY.

THE STATEMENTS AND INFORMATION CONTAINED IN THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM HAVE BEEN PREPARED AND FURNISHED SOLELY BY THE COMPANY. INFORMATION CONTAINED HEREIN AND ATTRIBUTED TO A SOURCE OTHER THAN THE COMPANY IS BELIEVED BY THE COMPANY TO BE RELIABLE, BUT THE COMPANY DOES NOT GUARANTEE THE ACCURACY, ADEQUACY OR COMPLETENESS OF SUCH INFORMATION.

THIS OFFERING IS SUBJECT TO WITHDRAWAL, CANCELLATION OR MODIFICATION BY THE COMPANY WITHOUT PRIOR NOTICE. THE COMPANY RESERVES THE RIGHT, IN ITS SOLE DISCRETION, TO REJECT ANY SUBSCRIPTION IN WHOLE OR IN PART FOR ANY REASON OR TO ALLOT TO ANY SUBSCRIBER LESS THAN THE NUMBER OF SHARES SUBSCRIBED FOR.

THIS OFFERING IS BEING MADE ON A BEST EFFORTS BASIS. THERE IS NO FIRM COMMITMENT BY ANY PERSON TO PURCHASE OR SELL ANY SHARES, AND THERE IS NO ASSURANCE THAT ANY SHARES WILL BE SOLD. THERE IS NO MINIMUM AGGREGATE SUBSCRIPTION REQUIRED BEFORE THE COMPANY CAN ACCEPT AN INVESTOR'S SUBSCRIPTION AND USE THE SUBSCRIPTION PAYMENT FOR THE COMPANY'S NEEDS. SUBSCRIPTIONS ARE IRREVOCABLE, EXCEPT AS MAY OTHERWISE BE ALLOWED UNDER APPLICABLE STATE LAW.

THIS OFFERING IS MADE, AND SALES OF SHARES WILL BE MADE, ONLY TO PURCHASERS WHO QUALIFY AS "ACCREDITED INVESTORS" UNDER REGULATION D PROMULGATED UNDER THE ACT.

# TABLE OF CONTENTS

|  | Page |
|---|---|
| Use of This Memorandum | 1 |
| Investor Suitability | 2 |
| Summary | 4 |
| Risk Factors | 7 |
| The Offering | 10 |
| Use of Proceeds | 12 |
| Dividend Policy | 12 |
| Dilution | 13 |
| Business of The Company | 13 |
| Management of the Company | 20 |
| Competition | 21 |
| Properties | 22 |
| Certain Agreements | 22 |
| Restrictions on Transfer | 22 |
| Additional Information | 23 |

## Exhibits

| Exhibit A1-A2: | Investor Subscription Documents |
|---|---|
| Exhibit R | Rights Calculation for Shareholder |

109

## USE OF THIS MEMORANDUM

This Confidential Private Placement Memorandum ("Memorandum") has been prepared by The Ultimate Health Club, Inc., domain "eBioSafe.com" (the "Company"), and is being furnished to investors on a strictly confidential basis, solely for the purpose of providing information about the Company in connection with the prospective investors' consideration of the investment described herein. By accepting a copy of this Memorandum, prospective investors agree (i) to keep confidential all information contained in this Memorandum or otherwise provided to or obtained by such investor relating to the Company and the securities described herein, (ii) not to reproduce this Memorandum or any other information provided by the Company with respect to the Offering, and (iii) to return this Memorandum and all such information to the Company if they do not purchase Shares.

No person has been authorized by the Company to give information or to make any representations with respect to the Company or this investment, other than those contained in this Memorandum, and, if given or made, such other information or representations must not be relied upon as having been authorized by the Company, unless contained in a written statement signed by the authorized representative of the Company. Information contained herein and attributed to a source other than the Company is believed by the Company to be reliable, but the Company does not guarantee the accuracy, adequacy or completeness of such information. The information and opinions expressed herein are stated as of the date of this Memorandum and are subject to change without notice, and neither the delivery of this Memorandum nor any consummated investment shall, under any circumstances, create any implication that there has been no change in such information or opinions since the date of this memorandum. In making any investment decision with respect to the Shares, investors must rely on their own independent examination of the Company and the terms of the Offering.

Prior to consummation of an investment, prospective investors will, upon request, be given access to additional information relating to the Company, provided such information is available without unreasonable effort or expense. In addition, officers of the Company will be available at appropriate times to answer appropriate questions concerning the current business and affairs of the Company as described in this Memorandum. All such information and answers provided are subject to the disclaimers set forth above. Prospective investors may be required, in the discretion of the Company and its counsel, to sign further confidentiality and non-disclosure agreements prior to obtaining additional information.

This Memorandum constitutes an offer only if a name and Memorandum Number appear in the spaces set forth on the cover page and then only to the person named. This Memorandum does not constitute an offer to any person in any jurisdiction where such offer would be unlawful nor an offer to any person who does not receive a copy of this Memorandum directly from the Company or its authorized agents. No offering literature or advertising, in whatever form, is authorized for use in connection with this private placement, except for this Memorandum and other information which indicates that it is expressly authorized by the Company.

THE DELIVERY OF THIS MEMORANDUM, ATTACHMENTS OR ADDITIONAL MATERIALS AT ANY TIME DOES NOT IMPLY THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SINCE THE DATE OF THIS MEMORANDUM. IN ADDITION, TO THE EXTENT THIS MEMORANDUM MAKES REFERENCE TO DOCUMENTS OR AGREEMENTS WHICH ARE NOT AS YET FINAL OR EXECUTED, OR TO PROPOSALS OR PLANS WHICH HAVE NOT YET BEEN IMPLEMENTED, THE PROSPECTIVE INVESTOR SHOULD BE AWARE THAT THE DEFINITIVE VERSIONS OF SUCH AGREEMENTS, DOCUMENTS, PLANS OR PROPOSALS MAY CONTAIN TERMS OR CONDITIONS WHICH VARY SIGNIFICANTLY FROM THE TERMS AND CONDITIONS DESCRIBED HEREIN AND THAT PROPOSALS OR PLANS DESCRIBED HEREIN MAY NEVER MATERIALIZE OR, IF THEY DO MATERIALIZE, MAY NEVER PROVE TO BE PROFITABLE.

Prospective investors are not to construe the contents of this Memorandum as constituting legal, financial or tax advice. Each prospective investor should consult his or her own legal counsel and financial advisor or accountant as to the legal, financial, tax and related considerations concerning any investment pursuant hereto.

## INVESTOR SUITABILITY

The Shares will be sold, at the discretion of the Company, only to investors that are currently shareholders in a subsidiary of BioSafe Medical Technologies, Inc., and are also Accredited Investors, and, in each case, whom the Company believes satisfy certain other general suitability standards as described below.

To qualify as an Accredited Investor, a purchaser must satisfy at least one of the following alternative criteria:

Alternative One:  The investor is a natural person whose individual net worth (or joint net worth with spouse) is in excess of $1,000,000 (net worth or joint net worth includes the equity in one's home);

Alternative Two:  The investor is a natural person whose individual income (not joint income with spouse) in each of the prior two years was in excess of $200,000 (or joint income with spouse in each of those years was in excess of $300,000) and has a reasonable expectation of reaching the same income level in the current year;

Alternative Three:  The investor is a trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Shares, whose purchase is directed by a person with such knowledge and experience in financial and business matters that he or she is capable of evaluating the merits and risks of an investment in the Shares;

2

111

Alternative Four: The investor is (i) a bank (as defined in section 3(a) (2) of the Act) or any savings and loan association or other institution (as defined in section 3 (a) (5) (A) of the Act) whether acting in its individual or fiduciary capacity; (ii) an insurance company (as defined in section 2 (13) of the Act); (iii) an investment company registered under the Investment Company Act of 1940, as amended (the "Investment Company Act"), or a business development company as defined in section 2 (a) (48) of the Investment Company Act; (iv) a Small Business Investment Company licensed by the U.S. Small Business Administration under sections 301(c) or (d) of the Small Business Investment Act of 1958, as amended; (v) a plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions for the benefit of its employees, if such plan has total assets in excess of $5,000,000; (vi) an employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, as amended, if the investment decision is made by a plan fiduciary, as defined in section 3 (21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if such employee benefit plan has total assets in excess of $5,000,000, or if a self-directed plan, with investment decisions made solely by Accredited Investors; or (vii) any broker-dealer registered pursuant to section 15 of the Securities Exchange Act of 1934;

Alternative Five: The investor is a private business development company as defined in section 202(a) (22) of the Investment Advisers Act of 1940, as amended;

Alternative Six: The investor is an organization described in section 501(c) (3) of the Internal Revenue Code, as amended (tax exempt organization), a corporation, Massachusetts or similar business trust or partnership, not formed for the specific purpose of acquiring the Shares, with total assets in excess of $5,000,000;

Alternative Seven: The investor is an executive officer of the Company; or

Alternative Eight: The investor is an entity in which all of the equity owners are "Accredited Investors" and qualify individually under Alternative One, Two, Three, Four, Five, Six, or Seven.

In addition, the Company has adopted a general investor suitability standard which requires that each subscriber for Shares be able to represent (and confirm in writing) that: (a) he or she is acquiring the Shares for investment and not with a view to resale or distribution; (b) he or she can bear the economic risk of losing his or her entire investment; (c) his or her net worth is at least $250,000 and his or her overall commitment to investments which are not readily marketable is not more than 10% of his or her net worth and his or her investment in the Shares will not cause such overall commitment to exceed 10% of his or her net worth or joint net worth with his or her spouse; (d) he or she has adequate means of providing for his or her current needs and personal contingencies and has no need of liquidity in his or her investment in the Shares; and (e) he or she has such knowledge and experience in making financial and business matters as to be capable of evaluating the risks and merits of an investment in the Shares.

3

112

Some states have established suitability standards for initial investors and subsequent transferees (if any) which are different from those described above. Prospective investors in such states who wish to purchase Shares are required to satisfy the standards applicable to such states in addition to the suitability standards described above. By executing the subscription documents, the prospective investor represents that such investor meets the suitability standards applicable to such investor.

The suitability standards referred to above represent minimum suitability requirements for prospective purchasers and the satisfaction of such standards by a prospective purchaser does not necessarily mean that the Shares are a suitable investment for such purchaser, or that the Company shall accept as investors any prospective investor who meets such standards.

If the Company is incorrect in its assumption that a particular person is a suitable prospective investor, then the delivery of this Memorandum to such person shall not be deemed to be an offer to sell or a solicitation of an offer to buy Shares, and this Memorandum must be returned immediately to the Company.

The Company reserves the right to reject any subscription in whole or in part or to allot to any prospective investor less than the amount of Shares subscribed for by such investor, in each case at the sole discretion of the Company. If a subscription is rejected in whole or in part, subscription amounts will promptly be returned to the subscriber without interest thereon (unless required by state law) or deduction therefrom.

Subscriptions will not necessarily be accepted in the order in which received. Subscriptions received by the Company will be accepted in the priority determined by and in the sole discretion of the Company.

## SUMMARY

**THE FOLLOWING SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE MORE DETAILED INFORMATION APPEARING ELSEWHERE IN THIS MEMORANDUM AND IS INTENDED FOR QUICK REFERENCE ONLY. PROSPECTIVE INVESTORS SHOULD READ THIS ENTIRE MEMORANDUM.**

The Company  The Ultimate Health Club, Inc. (domain "eBioSafe.com") was originally created by BioSafe as an Illinois subsidiary corporation in July, 1996 to serve as a provider of on-line and real-time home health services.  Capital constraints, a lack of products and Internet market immaturity caused management to refrain from executing the corporate mission statement.  With the Internet rapidly growing in market size and with a compliment of technically excellent disease management and screening products available, management believes now is an excellent time to enter the electronic marketing arena.

Ease of use, high compliance and diversity of testing form the basis upon which the Company intends to capture the new Internet market for in-home, in-business and "in the field" medical testing, disease management and product sales.  Using the Internet as a marketing medium, the Company intends to offer a wide variety of disease management and disease state screening products to the public.  Among the products offered by the

4

Company are those created by our affiliate, BioSafe Laboratories, Inc., ("BioSafe Products") which may require a licensed healthcare professional's prescription. In an attempt to set the Company apart from other Internet providers, a network of physicians and other healthcare professionals, licensed in the state(s) in which they will support customer requests, is being established through an agreement with the Company's affiliate, BioSafe Diagnostic Products, Inc., and its BioSafe Healthcare Clinic franchise program.

The Company's main offices are located at 300 Knightsbridge Parkway, Suite 150, Lincolnshire, Illinois 60069.

**The Products**    Many of the Company's products were and are being developed by its affiliate, BioSafe Laboratories, Inc. These products are designed to provide safe, convenient Dried Blood Spot (DBS) based diagnostic screens for selected conditions and diseases. Some products will require individual regulatory approval for sale in certain markets, and include:

      (1) Total Cholesterol and lipid fractions:
          (a) HDL Cholesterol
          (b) LDL Cholesterol
          (c) Triglycerides
      (2) Glucose
      (3) Hemoglobin $A_{1c}$ Health Risk Assessment--lifestyle questionnaire, total cholesterol, HDL, LDL, triglycerides, glucose
      (4) Bone Alkaline Phosphatase (Osteoporosis)
      (5) Lead Poisoning
      (6) PSA--Prostate Specific Antigen (Prostate Cancer Screen)

Other products include:

      (1) Carpal Care and Exercise Video
      (2) Health Risk Assessment Questionnaire and Report

BioSafe Laboratories, Inc., provides dried blood spot testing in support of these BioSafe Products. Further, BioSafe Laboratories, Inc., is expected to develop new and innovative diagnostic screens which also may be marketed through the Company.

**The Offering.**    The securities being offered are up to 400,000 Shares of the Company's common stock, no par value, at a price of $1.50 per share. These Shares are being made available only to existing shareholders of BioSafe Allergy Services, Inc., BioSafe Laboratories, Inc., BioSafe Diagnostic Products, Inc. and BioSafe Diagnostics Corporation, who are Accredited Investors and also satisfy the Company's other suitability requirements. To the extent that Shares are not purchased by the existing shareholders, other Accredited Investors may be permitted to purchase the remaining shares. There is no minimum subscription per investor. The Offering will continue until all of the Shares are sold or February 28, 1999, whichever occurs first, unless extended or terminated by the Company. There is no minimum aggregate subscription required before the Company can accept an investor's subscription and use the subscription payment for the Company's needs. Subscriptions will not necessarily be accepted in the order in which received. If a subscription is rejected in whole or in part, subscription amounts will promptly be returned to the subscriber without interest thereon (unless required by state law) or deduction

114

therefrom. Subscriptions are irrevocable except as otherwise may be allowable under applicable state law.

**Use of Proceeds** The net proceeds of the Offering will be added to the general funds of the Company and will be used to design and implement the Company's web site and establish and train the physician and healthcare professional network. The balance of the proceeds will be added to the Company's working capital. See "USE OF PROCEEDS."

**Risk Factors** An investment in the Shares is speculative and involves a high degree of risk. Only investors that can afford to lose their entire investment should consider purchasing the Shares. See "RISK FACTORS."

BioSafe Medical Technologies
Corporate Diagram including Subsidiaries



| Selected Financial Data | Actual | (unaudited) | As Adjusted (1) |
|---|---|---|---|
| | January 1, 1999 | | February 28, 1999 |
| Working Capital | $    1,000 | | $    581,000 |
| Total Assets | 0 | | 581,000 |
| Total Liabilities | 0 | | 0 |
| Shareholder Equity | 1,000 | | 581,000 |

(1)  Adjusted to give effect to the sale of the maximum amount of Shares offered hereby, an estimated $20,000 of expenses to be incurred in connection with the Offering. See "USE OF PROCEEDS".

6

115

__Operations and Plans__    The Company intends to market diagnostic and screening products through an Internet web site, eBioSafe.com. Utilizing the developmental and operational services provided by BioSafe Laboratories, Inc., the Company intends to bring to market both prescription and retail-based products to the home diagnostics market, professional medical market and insurance markets. Management believes these products have the potential to gain market share in the Internet market, and that this market penetration will be further enhanced through the strategic relationship with the BioSafe Healthcare Clinic network of physician and healthcare professional operated electronic based clinics. No assurances can be given that the marketplace will accept these products, or if accepted that they not be rendered obsolete and unmarketable by newer, improved products.

Additional market penetration is expected through traditional marketing and toll free telephone ordering services.

## RISK FACTORS

An investment in the Company involves a high degree of risk and is suitable only for those persons who meet certain suitability standards and can afford a total loss of their investment. See "Investor Suitability." Each prospective investor should carefully consider the risks attendant upon the purchase of the Shares, including, but not limited to, those discussed below. Further, each prospective investor should consult his or her own legal, tax and financial advisors with respect to these risks and the suitability of an investment in the Shares.

__Lack of Revenue__  The Company has been in existence since July 1996, and does not have an operating history which includes revenues.

__Market__  The use of the Internet as a primary method of advertising and distributing products is very new. No clear history concerning the success of this marketing strategy is available. Further, using a network of electronic, "virtual clinics" to support the sale of professionally ordered lab testing is untried. Although the Company believes there are potential markets for these services, the size of these markets is unknown to the Company, and actual sales may be much less than the Company's estimate of the market's potential. There can be no assurance that the marketing of health services on the Internet will be successful.

__Competition__  There are presently several companies pursuing various portions of the Company's market. In addition, the major sellers of the traditional medical devices for blood collection are likely to pursue these markets either by developing their own medical devices or by licensing or marketing other companies' devices. Further, clinical laboratories are presently offering competing products to many of the dried blood spot tests offered by the Company. Although the management of the Company believes it will be able to identify and develop markets, its competitors may be larger, better financed and better situated in the markets. In addition, its competitors may improve their products or develop new products superior to those offered by the Company and developed by its affiliates.

7

116

**Government Regulation**  The Safety Sampler™ lancet is an exempt device under CFR 848.4800 and the Company, through its affiliate, BioSafe Diagnostics Corporation, holds a FDA 510(k) clearance on the Safety Sampler™ dry blood collection system. Certain products currently planned for distribution or developed in the future for distribution by the Company will require regulatory clearance prior to sale in certain markets. Further, performance standards may be developed by the FDA which the products offered by the Company would then be required to meet. There is no assurance that such clearance will ever be obtained or that the product could meet such performance standards. In addition, there is always the possibility that additional regulations may be imposed in the future which might have a material adverse effect on the Company. Since the FDA continually regulates and inspects medical products and their manufacture, any actual or potential product failure could result in the imposition of administrative and/or judicial sanctions, including product recall, which might have a material adverse impact on the Company.

**Intellectual Property**  The Company believes that its success will depend in part on its affiliate corporations' ability to enforce and protect their rights under applicable intellectual property laws. There can be no assurance that any trademark, trade name, trade secret, patent, or patent application ultimately owned by the Company or any of its affiliate corporations will provide the Company with a significant competitive advantage, or that challenges will not be instituted against the validity and enforceability of the same, or, if instituted, that such challenges will not be successful. In addition, competitors of the Company may independently develop or patent products that are substantially equivalent or superior to those distributed by the Company.

**Investors Bear Disproportionate Risk of Loss**  Upon completion of this Offering, the current shareholders of the Company will have paid considerably less per share for their 6,250,000 Shares (approximately 94% of the Company's then issued and outstanding Shares), whereas investors in this Offering will have paid an aggregate of $600,000 for 400,000 Shares (approximately 6% of the Company's then issued and outstanding Shares). Accordingly, investors in this Offering will bear a disproportionate amount of the financial risk because of the disparity in purchase price.

**Management - Dependence on Key Personnel**  The success of the Company's operations is heavily dependent upon the management team being developed and its plans to add additional professionals. Competition for qualified employees is intense, and the loss of key personnel or the inability to attract, retain and motivate a sufficient number of qualified employees could materially adversely affect the Company's business. See "MANAGEMENT OF THE COMPANY."

**Dilution**  Purchasers of the Shares will experience immediate and substantial dilution in the net tangible book value of their Shares. See "DILUTION." Investors in this Offering are not protected from further dilution in the future. Accordingly, to the extent that the Company subsequently issues common stock at a price less than the price per share of this Offering following this Offering, there will be further dilution.

**Need for Additional Funds**  There can be no assurance that any or all of the Shares will be sold, and even if all of the Shares are sold, it is possible that the proceeds from this Offering will not be adequate to fund the Company's operations, in which case additional

8

117

funding may be required to support the Company's operations, and, if not obtained, the Company may be required to curtail its operations. The availability of such additional funds and the terms on which the Company may obtain any future financing are uncertain. Any additional equity financing may involve substantial dilution to the Company's then-existing shareholders. The Company has no current commitments or arrangements with respect to, or readily available sources of, additional financing. There can be no assurance that additional financing will be available to the Company when needed or, if available, that it can be obtained on commercially reasonable terms. The failure to secure future financing on favorable terms could materially adversely affect the Company.

**No Minimum Subscription**  There is no minimum subscription required before the Company can accept an investor's subscription and use the subscription payment for the Company's needs.

**Control**  Upon completion of the Offering, the existing shareholders will have the ability to elect all directors, authorize corporate transactions that require shareholder approval and otherwise control the Company and its policies, without the consent of investors who purchase Shares in the Offering.

**Determination of Offering Price**  The offering price for the Shares has been determined arbitrarily by the Company and does not bear any relationship to the assets, performance, book value or net worth of the Company or any other recognized criteria of value.

**Shares Are Not Readily Marketable**  No public market exists for the Shares and there is no expectation that such a market will develop. None of the Shares has been registered under the Act or under any applicable state securities laws; therefore, the Shares may not be resold unless they are registered under the Act and applicable state securities laws, or unless an exemption from registration is available. The Company does not have any plans to register the Shares in the future. Accordingly, the shareholder may not be able to sell them and may be required to bear the financial risks of an investment in the Shares for an indefinite period of time.

**No Independent Review**  Prospective investors in this Offering have not been represented by independent legal counsel in the structuring of this transaction and the preparation of this Memorandum.  Prospective investors are urged to consult with their attorneys, accountants and financial advisors with respect to an investment in the Company.

**Potential Product Liability and Potential Liability for Breach of Confidentiality**  The sale of the Company's products to consumers involves the risk of injury to the consumer and the risk that the test results obtained therefrom will be inaccurate or unreliable in a fashion which could result in serious harm to a consumer or other persons relying on the tests or their results. There can be no assurance that the Company will have sufficient resources to satisfy any liability resulting from any claim. Although the Company maintains product liability insurance in the amount of $2,000,000, there can be no assurance that such insurance is adequate to protect the Company against material adverse effects or that the Company will be able to maintain adequate levels of product liability or other insurance in the future.

118

**Absence of Dividends**  The Company has never had any revenues or earnings. Payment of dividends will be at the discretion of the Company's Board of Directors and will depend, among other factors, upon the earnings, capital requirements, operations and financial condition of the Company. The Company does not anticipate paying any dividends for the foreseeable future; it being anticipated that any earnings would be retained by the Company to finance its operations and future growth. Accordingly, investors needing immediate or future income by way of dividends should not purchase the Shares offered.

**Broad Discretion in Application of the Proceeds**  Although the Company has tentatively allocated the net proceeds from this Offering for various uses, the projected expenditures are estimates and approximations and do not represent firm commitments of the Company. Accordingly, management of the Company had broad discretion to adjust the application and allocation of the net proceeds of this Offering.

**Future Issuances of Stock by the Company without Shareholder Approval**  Assuming all 400,000 Shares are sold, following the completion of this Offering, the Company will have outstanding 6,650,000 shares of common stock out of an authorized total of 20,000,000 shares. The remaining 13,350,000 are not issued or reserved for any specific purpose and may be issued without any action or approval of the Company's shareholders.

**Licensed Healthcare Professional Support Required**  Each "virtual" healthcare clinic must be supported by a physician or other licensed healthcare professional that can prescribe products offered for sale that require a prescription. If a physician or other licensed healthcare professional cannot be found to support a virtual clinic, that clinic will be unable to sell most of the products offered for sale, which will materially affect the revenue to the Company from that clinic. No assurances can be given that this network of healthcare professionals will be established, or if established, will continue to be maintained.


THIS LISTING OF RISK FACTORS IS INTENDED TO ALERT INVESTORS TO MAJOR RISKS PECULIAR TO THE COMPANY AND DOES NOT TAKE INTO ACCOUNT NORMAL BUSINESS RISKS.   ANY INVESTOR IS INVITED TO DISCUSS ANY MATTER DESCRIBED IN THIS MEMORANDUM WITH THE MANAGEMENT OF THE COMPANY.


## THE OFFERING

**TERMS OF THE OFFERING**  The securities being offered are up to 400,000 Shares of the Common Stock of the Company, no par value, at a purchase price of $1.50 per share. Further, these securities are being offered exclusively to holders of shares in BioSafe Allergy Services, Inc., BioSafe Diagnostic Products, Inc., BioSafe Laboratories, Inc. and BioSafe Diagnostics Corporation, all of which are subsidiaries of BioSafe (the "Affiliated Companies"), and who are Accredited Investors and also meet the Company's other suitability standards. To the extent that Shares are not purchased by the existing shareholders, other accredited investors may be permitted to purchase the remaining shares. There is no minimum subscription. The total number of shares first offered to each

10

shareholder in one or more of the Affiliated Companies will be calculated by adding the total number of shares the potential investor holds in all of the Affiliated Companies and dividing that total number by three. Shareholders of Affiliated Companies that purchase Shares will be given the opportunity to purchase any Shares not purchased by other shareholders of Affiliated Companies. Shares available and details concerning the calculation of available Shares appears as Exhibit R attached hereto. The Offering will continue until all of the Shares are sold or February 28, 1999, whichever occurs first; unless extended or terminated by the Company in its sole discretion. There is no minimum aggregate subscription required before the Company can accept an investor's subscription and use the subscription payment for the Company's needs. There is no assurance that any or all of the Shares will be sold. Accordingly, an investor should not purchase any Shares with the expectation that any or all of the remaining Shares will be sold.

All subscriptions will be accepted or rejected on an as-received basis. The Company reserves the right to reject any subscription in whole or in part or to allocate to any prospective investor less than the number of Shares subscribed for by such investor.

**THE SHARES**    The Company's Articles of Incorporation authorize 20,000,000 shares of Common Stock, no par value. The Shares available in the Offering are original, authorized but unissued shares. Holders of the Shares are entitled to cast one vote for each share held at all stockholder meetings for all purposes, including the election of directors. Cumulative voting for the election of directors is permitted. This means that every shareholder shall have the right to vote the number of shares owned by such shareholder for as many persons as there are directors to be elected, or to accumulate such votes and give one candidate as many votes as shall equal the number of directors, multiplied by the number of such shares, or to distribute such cumulative votes in any proportion among any number of candidates.

**OWNERSHIP**    The following table summarizes, as of the date of this Memorandum, the relative ownership of the Company by existing stockholders and new investors assuming all of the Shares are sold. BioSafe Medical Technologies, Inc. is currently the sole shareholder of the Company.

| | Actual | | Pro Forma | |
|---|---|---|---|---|
| | Shares | % | Shares | % |
| Existing Shareholders | | | | |
| BioSafe Medical Technologies, Inc. | 6,250,000 | 100.00% | 6,250,000 | 93.98% |
| Total | 6,250,000 | 100.00% | 6,250,000 | 93.98% |
| New Shareholders | | | 400,000 | 6.02% |
| | | | 6,650,000 | 100.00% |

**SUBSCRIPTION PERIOD AND EFFECTIVE DATE**    The Offering commences on the date of this Memorandum and ends on February 28, 1999 or upon being fully subscribed, unless the Company, in its sole discretion, extends the Offering to later than February 28, 1999 or terminates it. The Offering will be made on a "best efforts" basis on behalf of the Company by its officers and directors, who will receive no commissions. All subscriptions will be accepted or rejected on an as-received basis.

11

**SUBSCRIPTION PROCEDURES**  Persons desiring to subscribe for Shares must send two executed copies of the Subscription Agreement and signature page in the form of Exhibit A-1 attached hereto, with the number of Shares desired indicated thereon, and one (1) executed copy of the applicable Pre-Sale Investor Questionnaire, Exhibit A-2 hereto (collectively, the "Subscription Documents") to the Company.  The Subscription Documents must be accompanied by a check, payable to "The Ultimate Health Club, Inc." in the amount of the subscription ($1.50 x number of Shares not to exceed the number of shares available to the individual investor as described on Exhibit R).  Upon receipt of the executed Subscription Documents, the Company will determine whether to accept or reject the subscription by countersigning one (1) copy of the Subscription Agreement and signature page and mailing such copy to the investor.  In the event the Company accepts less than the number of Shares subscribed, the Company will indicate such lesser number on the Subscription Agreement and signature page returned to the investor.  Since there is no minimum aggregate subscription, the Company will accept or reject all subscriptions on an "as-received" basis and may utilize the subscription funds immediately upon acceptance.

Subscription payments will be deposited directly to the account of the Company upon acceptance of a subscription.  Subscription amounts rejected in whole or in part will be promptly repaid to the investor without interest or deduction unless required by law.

**USE OF PROCEEDS**  The Company plans to use the net proceeds of the Offering (assuming all 400,000 Shares are sold and Offering expenses of $20,000) as set forth in the table below.  All numbers in the table are estimates and approximations only, and the Company reserves the right to reallocate funds based upon actual amounts raised or as otherwise required.

| | |
|---|---|
| Web site Design and implementation | $ 180,000 |
| Assist in establishing & training Clinic Network | $ 50,000 |
| Working Capital | $ 350,000 |
| TOTAL | $ 580,000 |

The Company anticipates that the bulk of the amounts allocated to Working Capital will be used in support of marketing, product development, establishing order fulfillment and advertising programs.

The Company's future working capital and capital requirements will depend upon some factors not under the Company's control, which could require the Company to allocate the proceeds of the Offering in a manner different from that presently intended.

**DIVIDEND POLICY**  The payment of dividends, if any, in the future is within the discretion of the Company's Board of Directors and will depend upon the Company's earnings, if any, its capital requirements and financial condition and other relevant factors. To date, the Company has not had any earnings and therefore could not declare any cash dividends.  The Company intends to retain any earnings for use in the Company and does not intend to pay cash dividends in the foreseeable future.  Accordingly, investors needing immediate or future income by way of dividends should not purchase the Shares offered in this Offering.

12

**DILUTION**    Purchasers of the Shares will pay $1.50 per Share. Such per share price is more than the per share price paid by the existing shareholders. The following table sets forth the per share dilution if all of the 400,000 Shares offered hereby are sold.

| | |
|---|---:|
| Offering price per share | $1.50 |
| Net book value per share prior to Offering (1) | $0.00016 |
| Increase in book value per share attributable to sale of Shares (2) | $0.08984 |
| Pro forma book value per share after the sale of Shares (2) | $0.09 |
| Dilution per share to new shareholders | $1.41 |

(1) Determined by dividing the number of shares of the Company's common stock into the net worth of the Company as of January 29, 1999.
(2) After deducting an estimated $20,000 for expenses of the Offering.

The following table summarizes, on an unaudited, pro forma basis as of the date of this Memorandum, the number of shares of common stock purchased from the Company, the total consideration paid and the average cash price per share paid by the existing shareholders and by new shareholders purchasing Shares in the Offering, before deduction of selling commissions and estimated offering expenses.

| | Shares Purchased | | Total Consideration |
|---|---|---|---|
| | Number | Percent | Amount (and average price per share) |
| Existing Shareholders | 6,250,000 | 100.00% | $  .00016 |
| New Shareholders | 400,000 | 6.02% | $ 1.50 |
| Total | 6,650,000 | 100.00% | $601,000 |

## THE BUSINESS OF THE COMPANY

### The Company

The Ultimate Health Club, Inc. (the "Company"), an Illinois corporation, was originally created by BioSafe Medical Technologies, Inc. in July, 1996 to serve as a provider of on-line and real-time home health services. Capital constraints, a lack of products, and Internet market immaturity caused management to refrain from executing the corporate mission statement until recently. Now, with the Internet rapidly growing in market size, the Company has decided to move forward with development of an Internet presence as a means of taking advantage of the potential marketing opportunities presented by the World Wide Web. All indicators seem to project a continued growth in the number of people gaining access to on-line commerce. The Company believes its current disease management and screening product set may have substantial appeal to this "virtual" audience.

The Centers for Disease Control and Prevention (CDC), an agency of the Department of Health and Human Services and located in Atlanta, Georgia, estimates that during 1996 there were over 138,000,000 tests conducted in the United States for Cholesterol, over 11,000,000 tests conducted for Prostate Specific Antigen (PSA); and

13

almost 10,000,000 tests conducted for Hemoglobin A1c (Diabetes). Since these numbers only represent the known tests actually performed, the total tests required by the American public is substantially larger but are not performed each year for various reasons.

Ease of use, ease of access, high compliance and diversity of testing form the basis upon which the Company intends to capture the new Internet market for in-home, in-business and "in-the-field" medical testing, disease management and product sales. Using the Internet as a marketing medium, the Company intends to offer a wide variety of disease state management and disease screening products to the public. Since many products intended for distribution by the Company were created by BioSafe Laboratories, Inc. and require a prescription and in an attempt to set The Ultimate Health Club, Inc. apart from other Internet providers, a network of physicians and other healthcare professionals licensed in the state(s) in which they will support customer requests is being established through an agreement with the Company's affiliate, BioSafe Diagnostic Products, Inc., and its franchised BioSafe Healthcare Clinic franchise program utilizing a new form of healthcare clinic, the virtual or electronic healthcare clinic. Another affiliate, BioSafe Acceptance Corporation, may provide money management services to the Company.

In addition to standard Internet order fulfillment procedures, the Company also plans to process orders through a toll free telephone system. Even though acceptance of Internet commerce has markedly increased, management believes that a statistically significant number of customers would still prefer to use their telephones to place orders. It is believed that this is due to fears of credit card fraud and Internet connection security. Additionally, the Company intends to advertise in more traditional media where the Internet address may be prominently featured. However, the prospective customer will always be able to order directly using the toll free telephone service without the need for Internet access.

Product shipment, fulfillment, testing and results reporting will be provided to the Company's customers by BioSafe Laboratories, Inc. in the same fashion BioSafe Laboratories, Inc. performs these services for non-affiliated customers.

### The Products
As the trend toward health consciousness and the degree of time constraints continues to increase, increasingly few seem to have time to see a doctor for routine diagnostic services. Some tests involve embarrassment or discomfort. Many men do not like seeing a physician under any circumstances. Recent published and broadcast medical research reports have given rise to concerns about a number of severe, degenerative and even life-threatening diseases. These concerns have subsequently created a market for a number of field-collected, highly reliable, professionally supervised medical screenings.

The BioSafe Product set created by BioSafe Laboratories, Inc. was designed to address the above concerns through achievement of the following three objectives:

1) Develop products that meet the requirements of the growing market needs created by contemporary disease diagnosis, treatment and/or management;

14

**123**

2)  Develop products that achieve or exceed accepted scientific standards; and

3)  Develop products that are unique and proprietary.

It is through the distribution of these product types and the utilization of the new marketing methodologies created by the Internet that the Company hopes to make a significant impact on the healthcare related requirements of the American public and world wide markets.

**BioSafe PSA Kit** (a dry blood test used in the determination of an abnormal prostate condition). The American Cancer Institute recommends that all men over fifty receive an annual PSA test along with a digital rectal exam (DRR). Men in high-risk groups, such as those with a family history of prostate cancer, are advised to begin screening at an earlier age. Also, African-American males have been shown to develop prostate cancer at an earlier age; and annual screenings for this group are recommended starting at age forty.

According to the January 1996 issue of the Journal of the American Medical Association (JAMA), there were 244,000 new cases of prostate cancer diagnosed and 44,400 prostate cancer deaths in 1995. Moreover, JAMA states, 30% to 40% of all men over 50 have some form of prostate cancer today with 8% of these expected to become "clinically significant." The Company believes that the use of the BioSafe PSA kit can have a material effect on reducing the impact of this disease by greatly increasing the prospect of early detection.



Marketed through the Internet, PSA screening will permit large numbers of men to determine with a high degree of accuracy their PSA levels. This blood test is a significant indicator of the presence of the disease. Traditionally, concerns regarding the existence of prostate cancer have been addressed by individuals having physical examinations by physicians and a blood test at least once a year. The Company believes that many men do not have a thorough annual physical and that the availability of this blood test will increase the likelihood of early disease detection. When a man notices that he has symptoms of potential prostate disease, such as a weak urine stream and frequent night-time urination, the Company anticipates that many men will find the convenience and privacy of using the BioSafe PSA product appealing. This simple procedure can afford men of any age group and their families peace of mind when their symptoms are a normal result of aging and

15

direct those with elevated PSA levels to their doctors for early treatment.

The Safety Sampler™ serves as the enabling technology by which advances in dried blood technology for many diseases can reach the consumer market in a cost-effective and user-friendly way. The Company anticipates PSA testing as well as other gender specific testing to become a significant part of the Company's operations.

**BioSafe Bone Alkaline Phosphatase** (a dry blood test used in the determination of skeletal conditions including Osteoporosis) Osteoporosis is considered a silent disease. One cannot feel his/her bones becoming weak. Researchers predict that as many as one in every two women, and one in every eight men, will suffer a fracture (many of them debilitating) because of osteoporosis. Often, people will not know they suffer from osteoporosis until a bone breaks.

Because bones are living tissue, they are breaking down and rebuilding continuously. Bone Mineral Density (BMD) tests, which are most commonly administered in clinics or doctor's offices, provide an assessment of how strong one's bones are at the time the test was administered, much like taking a still-shot photograph of the bone. The BioSafe Bone Alkaline Phosphatase screen, by comparison, demonstrates current bone activity, much like watching a movie of bone development. The amount of Bone Alkaline Phosphatase in the blood stream indicates the level of bone activity to be normal or abnormal. An abnormal indication could be a indication of the presence of disease.

After using a BMD test to establish a base line measurement, it may take six months to two years before a BMD test will show a significant change in bone strength. A BioSafe Bone Alkaline Phosphatase screen, however, can provide both a base line result while demonstrating current bone activity. Often, a change in activity or strength can be determined very quickly.

**BioSafe Cholesterol Screen (including lipid fractions)** (a dry blood test used in the management and determination of Coronary Heart Disease) The BioSafe Cholesterol Screen with lipid fractions provides a result for Total Cholesterol, HDL, LDL & Triglycerides. High cholesterol is one of the major risk factors for heart disease that can be controlled. That's why knowing one's total blood cholesterol level is an important first step in a person determining his or her risk for heart disease. However, knowing ones total cholesterol is not enough. To accurately determine an individual's condition, the subjects HDL and LDL must also be known. Management believes that the BioSafe Cholesterol Screen is the only dried blood spot home test kit currently on the market that measures HDL blood cholesterol levels.

The American Heart Association urges all Americans to have their physicians determine their total and HDL blood cholesterol levels. This is particularly important for those people with a family history of heart disease, high blood pressure or stroke.

**BioSafe Hemoglobin A1c** (a dry blood test used in monitoring the long term effects of diabetes). The BioSafe Hemoglobin A1c kit is an important component in the management of this disease state. While routine blood glucose testing is necessary for daily

16

management of the disease, only the Hemoglobin $A1_C$ determination gives both the patient and his physician a report on the effectiveness of daily disease management and possible progression of the disease.

Diabetes - Currently, according to the American Diabetes Association, over 16 million people in the United States are estimated to suffer with diabetes, nearly half of whom are not aware they have the disease. Diabetes is a lifelong illness that requires intensive treatment and constant monitoring. Compliance with the prescribed treatment programs is an arduous and expensive task for the diabetic patient. Frequent checkups are a vital part of that treatment program and blood testing is an important part of monitoring and maintenance of the disease. Unfortunately, two physician visits are often required because patients need to obtain blood tests in advance of their physician examination. The first visit is required to have blood drawn, an inconvenient and expensive proposition in the best case and potentially impossible in some settings, and a second visit to see the physician for the examination. The BioSafe Diabetes Assessment Kit (Hemoglobin $A1_c$) is designed to provide the convenience of home collection and the accuracy of a certified clinical laboratory, all at a reduced cost. The kit will determine a patient's long term glycemic control by Hemoglobin $A1_c$ testing, the most effective known marker. Because of the frequency of testing and the patient's experience with blood collection, this patient population is ideally suited for self-collected dried blood spot analysis. Adult diabetic patients also require yearly monitoring of their lipid and lipoprotein status. These profiles are also well suited for dried blood analysis.

Diabetics are classified by the severity of their disease as Class 1 (most severe), and Class II. Class 1 diabetics require four Hemoglobin $A1_c$ tests each year. Class II diabetics require two Hemoglobin $A1_c$ tests each year. Recent federal law requires managed care organizations to provide Hemoglobin $A1_c$ tests to their diabetic populations according to the above schedule. Further, of the 8.6 million diabetics diagnosed in the United States, approximately 40%, or 3.4 million diabetics, do not have insurance coverage, suggesting a huge Internet market for this product because of its relatively low cost and unique convenience.

Additional products included for distribution are expected to include:

1) **BioSafe Carpal Care** (for the treatment of carpal tunnel syndrome)
2) **BioSafe Health Risk Assessment** (a health and lifestyle questionnaire designed for BioSafe by the Wellsource Corporation) and enhanced by the BioSafe Cholesterol and Lipid Fraction test system.

## Operations

The Company intends to sell BioSafe proprietary products and services, as well as products and services purchased from other vendors, to Internet buyers through an Internet web site. The Company has registered a web site domain address called eBioSafe.com and intends to operate the Internet connection under that name. The Company is presently contracting with outside experts in Internet design and implementation who are expected to create The Ultimate Health Club, Inc. (domain "eBioSafe.com") web site employing state-

17

126

of-the-art graphics technology and cutting-edge order fulfillment capabilities.   The expectation is that the site will not only appeal to a customer's needs, but will also attract the customer through the unique and educational nature of the planned presentation.

Promotion of the eBioSafe.com web site is expected to be accomplished through agreements with experienced Internet marketing groups.   The Company hopes to attract customers to the site through the use of on-line advertising, advertising insertions with major Internet search engines, electronic and traditional promotions, hot-links to affiliated and non-affiliated web sites, public relations and other media advertising and promotional events.

The Company will purchase clinical screening and disease management products, at standard wholesale, from BioSafe Laboratories, Inc., and other suppliers, for retail sale to Internet buyers through its eBioSafe.com web site.

When prospective customers access the eBioSafe.com web site they will be presented with four planned options; Consumer Reference and Product Information, Professional Ordered Healthcare Products, Retail Healthcare Products, and Disease Management Services.

The Company anticipates including in the Professional Ordered Healthcare Products section Prostate Specific Antigen (PSA), Hemoglobin A1c (Diabetes), Bone Alkaline Phosphatase (Osteoporosis), Cholesterol, HDL, LDL & Triglycerides and other products of this kind as they become available.

The Company anticipates including in the Retail Healthcare Products section BioSafe Carpal Care (a carpal tunnel syndrome exercise device), BioSafe's Health Risk Assessment and other devices or services of this kind.   Direct links to other companies offering health and fitness related products are expected to be included and it is hoped will add to the Company's total revenue.

Customers will normally order products using standard e-Commerce technology. BioSafe Acceptance Corporation will provide collection services for the Company and administer funds management.   It is anticipated that the majority of transactions will be secured by credit card thereby eliminating those situations where collection efforts might become necessary.

Customers' health related questions and requirements will be administered through a contractual arrangement between BioSafe Diagnostic Products, Inc. and the Company. Because of the requirement in many states for certain clinical blood tests to be ordered by a state licensed healthcare provider, BioSafe Diagnostic Products, Inc. is in the process of developing a nationwide network of "virtual clinic" franchises to support the mission of the Company.   Operated as "Virtual" BioSafe Healthcare Clinics, each physician or licensed healthcare provider operating one of these electronic clinics will have paid a $29,000 franchise fee and a $500 non-refundable application fee to BioSafe Diagnostic Products, Inc. confirming a high level of commitment for each physician or healthcare provider in the network.   Each Clinic's geographic territory will likely encompass a population of

18

127

approximately one million people defined by zip codes. Based on current demographic information, it is anticipated that approximately 250 total clinics can be sold nationwide.

## System Operation

After accessing the eBioSafe.com site, a customer will be asked for his home zip code which will route him to the Virtual BioSafe Healthcare Clinic serving him. Upon entering the Virtual BioSafe Healthcare Clinic, the customer will have the option of reviewing product information, getting assistance with product directions, participating in a celebrity chat which may be scheduled, review specific disease management products and information and ultimately ordering products.

Products selected by the customer are placed in a "shopping cart" until checkout. At checkout, the customer provides shipping information, credit card information and certain other demographic information useful to the Company in building and maintaining an informational database. Confirmation of this order and any prescriptions written are confirmed via E-mail (toll free telephone orders collect this same information and confirmations are mailed.)

After receipt of a clinical product requiring a blood sample, the customer is directed by instructions in the package or through additional instruction at the web site on the proper method of collection, form preparation, sample repackaging and mailing. The ease and convenience of the BioSafe products are important features the Company believes will appeal to the home-test market.

To collect the blood sample, the customer will simply use the patented BioSafe Safety Sampler™ to nick the finger. After applying a few drops of finger-stick blood to the enclosed collection card and allowing 10 minutes of drying time, the dry blood sample is mailed in the supplied, postage pre-paid return envelope to BioSafe Laboratories, Inc. for processing. After processing, BioSafe Laboratories, Inc. E-mails the test results to the customer along with an appropriate letter of explanation of the results from the Virtual BioSafe Healthcare Clinic servicing this customer.

A copy of the results are also sent to the Virtual BioSafe Healthcare Clinic servicing this customer. If the lab results warrant further discussion with the customer, a further physician letter may be generated by the clinic to the customer. The healthcare professional may call the customer in certain severe situations as deemed appropriate. Customers using toll free telephone service will have their results and correspondence from the Virtual BioSafe Healthcare Clinic mailed.

## Membership (in THE ULTIMATE HEALTH CLUB)

In order to create a feeling of family or community, the Company may sell memberships in The Ultimate Health Club, Inc. Members of the club are expected to enjoy certain benefits including discounts on club products, "free" admission to special celebrity presentations and other special promotional items and events. Further, members can be identified by their membership number upon signing into the site eliminating the need to re-enter name, address and credit card number when ordering – an important consideration in e-Commerce.

19

128

While it is necessary to charge a membership fee to acknowledge value, the Company does not believe that a membership fee should become a barrier to entry. Therefore, the Company intends to charge a membership fee of $4.95 (lifetime) and give an immediate credit of $5.00 on the member's first purchase.

## MANAGEMENT OF THE COMPANY

The following persons serve as directors or executive officers of the Company.

Jeffrey Heilbrunn, President, *(President, BioSafe Diagnostic Products, Inc.):* Mr. Heilbrunn attended the University of Illinois, Chicago, graduating with Honors with a Bachelor of Science degree in marketing and received a Masters of Business Administration with a Marketing concentration from Loyola University of Chicago.

Over 20 years, Mr. Heilbrunn has held marketing positions at Northern Telecom and Quasar Electronics (Matsushita). Additionally, Mr. Heilbrunn has worked for two associations including eight years as the president of the American Marketing Association. He has also worked in the entertainment production business.

Mr. Heilbrunn was the first person ever given Honorary Membership in the Japan Marketing Association. His monthly column on marketing appears in one of Japan's leading marketing publications. He is a fellow of the Australian marketing Association. In May 1995 his book, "The Marketing Encyclopedia," was published by NTC Publishing Company.

In 1994, Mr. Heilbrunn founded The NOW Group, giving clients marketing advice on an as needed basis. He has consulted with several manufacturing firms as well as associations in the promotional, sales, as well as general marketing areas.

Mr. Heilbrunn is serving the Company as its interim president until the position can be permanently filled.

William S. Lear, Director, CFO, Secretary *(Sr. Vice President, Chief Financial Officer, Director-BioSafe Medical Technologies, Inc.):* Mr. Lear is the owner and founder of Bridge Investment Corporation. Formed June 1, 1994, BIC works with emerging growth companies seeking capital pending becoming creditworthy through traditional financing sources. Mr. Lear is a former Senior Vice President of The First National Bank of Chicago. In his twenty-one years with the Bank he was responsible for managing three of its major relationship banking groups and for five years he had responsibility for the Bank's Private Market Finance initiative. In that capacity this Division became one of the ten largest Private Placement agents in the country. Prior to joining the bank, Mr. Lear was Vice President of Corporate Finance with the investment banking firm Hornblower & Weeks; Hemphill Noyes. Mr. Lear is a past President of the Better Government Association and currently sits on the Board of Directors. A graduate of Yale University and the Harvard Business School, Mr. Lear serves on the Board of Directors for numerous organizations and is a National Trustee of the Leukemia Society of America.

David C. Fleisner, Treasurer, Director *(Senior Vice President, Treasurer, BioSafe Medical Technologies, Inc., Inc.):* Mr. Fleisner is the former Managing Director of Capital Programs Advisory Corporation, a privately held financial planning and investment advisory firm. In his ten years with the company, he was responsible for directing financial planning strategy

20

for a clientele with a cumulative net worth in excess of $350,000,000. Mr. Fleisner is a Certified Financial Planner, registered with the Securities and Exchange Commission as an Investment Advisor, holds Series 7 and 63 securities licenses, and an insurance brokers certificate. He received a B.S. degree in Finance from the University of Illinois at Chicago.

Strategic Financial Corporation was formed June 1, 1995 by Mr. Fleisner to provide comprehensive financial strategy for clients seeking to maximize and preserve the value of their estates. Mr. Fleisner is married and lives with his wife and two children in Lake Bluff, Illinois. Mr. Fleisner is responsible for the development of products and markets in the insurance industry.

Henry A. Warner, Director ( *President, Director; BioSafe Medical Technologies, Inc.):*    Mr. Warner is a graduate of the University of Illinois, Bachelor of Science 1972, and received his Master of Science degree from the University of Illinois in Computer Science in 1974. Mr. Warner started his career as a design consultant in the computer industry and in 1976 opened his first consulting company. Since that date, Mr. Warner has served as a consultant to major corporate entities including Amoco, World Book Encyclopedia, First National Bank of Chicago, PacTel, University of Illinois, and scores of small companies throughout the U.S. Mr. Warner is published in the area of medical computing including, specifically, the graphic display of biomedical numeric data and has served as a delegate to the National Bureau of Standards for the development of medical computing languages. He is married and lives with his wife and three children in Lake Forest, Illinois.

In May 1996, Mr. Warner negotiated the acquisition of a controlling interest in BioSafe Diagnostics Corporation by Illinois Medical Technologies, Inc. On May 15, 1996, Mr. Warner assumed the responsibility as president for Illinois Medical Technologies, Inc., under the new corporate name, BioSafe Medical Technologies, Inc.

**COMPENSATION**    Mr. Heilbrunn, president of BioSafe Diagnostic Products, Inc., serves as the temporary president of the Company until a permanent president can be hired. BioSafe Diagnostic Products, Inc., is compensated for Mr. Heilbrunn's time at the rate of $5000 per month. No compensation is currently paid to the Company's Directors. Currently, there are no other employees and no other compensation to employees is being paid by the Company.

All sales and marketing personnel, when hired, are expected to be commission based. The Company expects that appropriate, competitive compensation will be paid for all other employees.

## COMPETITION

Initially, the Company expects its primary competition to come from major sellers of traditional medical devices, clinical laboratories and pharmaceutical companies. The Company believes that it will compete effectively with the major sellers of traditional medical products because of its unique product set and support from the network of physicians and healthcare professionals, although there can be no assurance of this. While the Company's competitors may be substantially larger and have substantially greater resources, the management of the Company believes the design and operation of the Company's products will allow the Company to compete effectively.

## PROPERTIES

The Company's principal executive offices are located in approximately 2,000 square feet of leased office space in an office building at 300 Knightsbridge Parkway, Suite 150, Lincolnshire, Illinois 60069 which it shares with other BioSafe affiliates. BioSafe Laboratories, Inc., is located in approximately 14,600 square feet of laboratory space at 8600 West Catalpa, Chicago, Illinois 60656. Management believes the space should be adequate for the foreseeable future.

## CERTAIN AGREEMENTS

The Company has entered into an agreement with BioSafe Diagnostic Products, Inc. to provide a network of physicians and healthcare professionals using the BioSafe Healthcare Clinic franchise program. BioSafe products are purchased from BioSafe Laboratories at the best volume price available as published in BioSafe Laboratories, Inc. wholesale price lists. BioSafe Acceptance Corporation has entered into an agreement with the Company to manage credit card relationships and credit card collections. No agreement between the Company and any BioSafe affiliate has been entered into at arm's length.

## RESTRICTION ON TRANSFER

The Company has not registered the Shares under the Act, or any applicable state securities laws, and is offering the Shares in reliance upon certain exemptions from registration under the Act and other such laws. As a consequence, purchasers may not sell or otherwise transfer Shares purchased in the Offering unless such securities are subsequently registered under the Act and appropriate state securities laws or an exemption from such registration is available. Each subscriber for Shares will be required to agree not to sell, transfer or otherwise dispose of the Shares unless and until such securities are registered under applicable federal and state securities laws or an exemption from such registration is available and (i) the transferor or transferee provides to the Company an opinion of counsel, satisfactory in form and substance to the Company and its legal counsel, in its sole discretion, that the proposed transfer or assignment may be effected in compliance with all applicable federal and state securities laws and regulations, (ii) all of the Company's costs in connection with such transfer are to be paid by the transferor or transferee, and (iii) such other documentation as the Company may require is provided. In order to promote compliance with the foregoing restrictions by shareholders wishing to effect transfers of its securities, the Company will place a legend upon each share certificate and issue appropriate transfer agent instructions (including a notation in its stockholder records) concerning such restrictions.

In light of the limitations on the transferability of the Shares, and because holders of such securities do not have the right to require the Company to register all or any part of such securities under the Act or state securities laws, a purchaser of Shares must be prepared to bear the economic risk of such investment for an indefinite period of time.

131

## ADDITIONAL INFORMATION

In addition to the information contained in this Memorandum, the Company will make available, during the course of the Offering and prior to any sale, to each offeree and/or their offeree representative(s), the opportunity to ask questions of, and receive answers from, the Company, its officers, and any person acting on their behalf concerning the terms and conditions of the Offering and to obtain any additional information, to the extent the Company possesses such information or can acquire it without unreasonable effort or expense, necessary to verify the accuracy of the information contained in this Memorandum. Copies of the Company's Articles of Incorporation and By-Laws are available upon request.

23

132

Exhibit A-1

SUBSCRIPTION AGREEMENT AND SIGNATURE PAGE

THE ULTIMATE HEALTH CLUB, INC. (DOMAIN "EBIOSAFE.COM")

Gentlemen:

The undersigned has received and read the Confidential Private Placement Memorandum dated February 8, 1999 (as amended or supplemented, the "Memorandum"), which offers to the undersigned the opportunity to purchase Common Stock, no par value per share (the "Shares"), in The Ultimate Health Club, Inc. (domain "eBioSafe.com")., an Illinois corporation (the "Company"). Terms used and not defined herein have the same meanings as in the Memorandum.

1.    Subscription.

(a)    Subject to the terms and conditions of this Subscription Agreement and the Memorandum, the undersigned hereby subscribes for the Shares in the aggregate amount set forth herein, and the undersigned hereby agrees that this subscription shall be irrevocable and shall survive the death or disability or the bankruptcy, insolvency, dissolution or other cessation to exist as a legal entity of the undersigned.

(b)    In the event that the undersigned is not accepted as a shareholder, the cash tendered by the undersigned herewith shall be returned to the undersigned, without any interest actually earned thereon.

2.    Acceptance of Subscription.    The undersigned acknowledges that the Company, in its sole discretion, has the right to accept or reject this subscription, in whole or in part, for any reason whatsoever and that this subscription shall be deemed to be accepted by the Company only when it is signed by one of the officers of the Company. The undersigned agrees that the Shares may be allocated in the event of over subscription. There is no minimum purchase.

3.    Understandings of the Undersigned. The undersigned hereby represents and warrants to, and covenants with, the Company that the undersigned is aware and understands that:

(a)    There are substantial risks incident to the purchase of the Shares, as summarized under "Risk Factors" and in other portions of the Memorandum, an investment in the Shares is inherently speculative in nature and the undersigned may suffer a complete loss of his or her investment. Among other matters, the Company has no financial and operating histories.

(b)    The transferability of the Shares is subject to substantial restrictions, an investment in the Shares is highly illiquid and the undersigned may have to bear the economic risk of its investment in the Company for an indefinite period of time. There is no public market for the Shares and no such market is expected to develop in the future.

24

The Shares have not been registered under the Securities Act of 1933 (the "Act"), as amended, nor under the securities laws of any state or other jurisdiction, but rather are being offered and sold pursuant to exemptions from registration the availability of which depends, in part, upon the accuracy of the information provided by the undersigned herein and in the Pre-Sale Investor Questionnaire. The Shares cannot be sold, transferred or assigned except with full compliance of all applicable Federal and state securities laws, including any requirements governing exemptions from the registration provisions thereof. The Company is under no obligation to register the Shares. It may not be possible to liquidate the undersigned's investment and the undersigned will be obligated to pay all expenses of the Company incurred in connection with any transfer, sale or assignment of the Shares.

(c)     No Federal or state agency has passed upon the Memorandum or the Shares nor has any such agency made any finding or determination as to the fairness or suitability of an investment in the Shares.

(d)     The acceptance of the undersigned's subscription is conditioned upon, but not limited to, the undersigned's completion, execution and delivery to the Company of this Subscription Agreement and a Pre-Sale Investor Questionnaire.

(e)     Nothing contained in this Subscription Agreement or in any other document delivered by the Company in connection herewith should be construed as legal, tax, accounting, investment, or other expert advice;

(f)     The information contained in this Subscription Agreement and in the Memorandum is confidential, and the undersigned agrees not to copy or distribute the same;

(g)     The Company undertakes no obligation to update the information contained in this Subscription Agreement or the Memorandum to reflect subsequent events;

(h)     The undersigned is an "accredited investor" as defined in the Memorandum and meets the suitability standards set forth therein; and

(i)     The undersigned has been well advised regarding the risks of investing in the Company.

(j)     The undersigned will not sell or otherwise transfer any of the shares, or any interest therein, unless and until (i) the shares have first been registered under the Act and all applicable state securities laws, or (ii) the undersigned shall have first delivered to the Company a written opinion of counsel (which counsel and opinion, in form and substance, shall be reasonably satisfactory to the Company and its counsel), to the effect that the proposed sale or transfer is exempt from registration provisions of the Act and all applicable state securities laws.

(k)     The undersigned if an individual is a resident of the state specified on the signature page hereof, and the undersigned has no present intention of changing his residence from such state.

(l)     The undersigned understands that this subscription is irrevocable by the undersigned, except as otherwise may be provided by applicable state law, and that the Company may, in its sole discretion, reject the subscription, in whole or in part and withdraw, cancel or modify the offering at any time, and may allot to the undersigned less than the amount subscribed for. If the Company rejects the subscription, the Company will return to the undersigned the full amount tendered without interest and without deduction for any costs or charges.

4.    <u>Representations, Warranties and Covenants of the Undersigned</u>. The undersigned hereby represents and warrants to and covenants with the Company as follows:

(a)    The undersigned has carefully reviewed the Memorandum, including all exhibits thereto and amendments or supplements thereof, has been furnished with all other materials which they consider relevant to an investment in the Company and has had a full opportunity to ask questions of and receive answers from the Company or persons acting on its behalf concerning the terms and conditions of an investment in the Company. No statement or printed material which is contrary to the Memorandum has been made or given to the undersigned by or on behalf of the Company.

(b)    In addition, the undersigned is an accredited investor as such term is defined in Rule 501 of Regulation D promulgated under the Act and has adequate means of providing for his current financial needs, including possible future personal financial contingencies, and the undersigned anticipates no need in the foreseeable future to sell the Shares for which it hereby subscribes. The undersigned is able to bear the economic risks of this investment and, consequently, without limiting the generality of the foregoing, is able to hold the Shares for an indefinite period of time and has a sufficient net worth and available funds to sustain a loss of the undersigned's entire investment in the Shares. The undersigned's overall commitment to investments which are not readily marketable is not more than 10% of the undersigned's net worth and the undersigned's investment in the Shares will not cause such overall commitment to exceed 10% of the undersigned's net worth or the undersigned's net worth with his or her spouse.

(c)    The undersigned has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of an investment in the Shares, and is aware of the risks of an investment in the Shares.

(d)    The Shares for which the undersigned hereby subscribes are being acquired for the undersigned's own account, for long term investment and not with any view toward the resale or distribution thereof, and the undersigned does not have any reason to anticipate any change in the undersigned's circumstances which would cause the undersigned to sell the Shares.

(e)    The undersigned, if a natural person, is over 21 years of age, a citizen of the United States and legally competent to execute this Subscription Agreement and the related Subscription Documents and to make the representations and warranties contained herein and therein. If the undersigned is a corporation, partnership or trust: (i) it is duly organized, validly existing and in good standing under the laws of the jurisdiction in which it was formed and all other jurisdictions where such qualification is necessary in light of the undersigned's activities; (ii) it has all the requisite power and authority to invest in the Shares as provided herein; (iii) such investment will not result in any violation of or conflict with any term of the charter, by-laws or organizational documents of the undersigned or any law or regulation applicable to it; (iv) such investment has been duly authorized by all necessary action on behalf of the undersigned; (v) this Subscription Agreement and the other subscription documents have, pursuant to proper authority, been duly executed and delivered on behalf of the undersigned and constitute legal, valid and binding agreements of the undersigned, enforceable against the undersigned in accordance with their terms; and (vi) the undersigned has not been organized or reorganized for the specific purpose, or for the purpose among other purposes, of acquiring the Shares.

(f)    The undersigned has not distributed the Memorandum to anyone and no one other than the undersigned has used the Memorandum.

26

(g)    All information which the undersigned has provided to the Company concerning itself, its financial position and its knowledge of financial and business matters, or, in the case of a corporation, partnership, trust or other entity, the knowledge of financial and business matters of the person making the investment decision on behalf of such entity, including all information contained herein and in the accompanying Pre-Sale Investor Questionnaire, is correct and complete as of the date set forth at the end hereof and may be relied upon by the Company, and if there should be any material adverse change in such information prior to this subscription being accepted, the undersigned will immediately provide the Company with such information.

5.    Indemnification.  The undersigned acknowledges that it understands the meaning and legal consequences of the representations, warranties, covenants, agreements and restrictions contained herein and in the other subscription documents and that these representations, warranties, covenants, agreements and restrictions will be relied upon by the Company in accepting the undersigned as a Stockholder.  With regard to the representations, warranties, covenants, agreements and restrictions contained herein or in the other subscription documents, the undersigned hereby agrees to indemnify and hold harmless the Company and its officers, directors, controlling persons, agents and employees, from and against any and all loss, damage or liability, together with all costs and expenses including reasonable attorneys' fees and disbursements, which any of them may incur by reason of any breach thereof and any false, misleading or inaccurate information contained herein and therein.  All representations, warranties, covenants, agreements and restrictions contained in this Subscription Agreement and in the other subscription documents and the indemnification contained in this paragraph 5 shall survive the acceptance of this subscription and the dissolution of the Company.

6.    Binding Effect.  This Subscription Agreement and the other subscription documents shall be binding upon and inure to the benefit of the undersigned, its successors and permitted assigns and shall not be assignable by the undersigned without prior written consent of the Company.  This Subscription Agreement, upon acceptance by the Company shall, where applicable, be binding upon the Company and its successors and assigns.  This Subscription Agreement shall not be binding upon the Company until it accepts it, which acceptance is at the sole discretion of the Company and is to be evidenced by the Company's execution of the Subscription Agreement.

7.    Modification and Choice of Law.    This Subscription Agreement (a) may only be modified by a written instrument executed by the undersigned and the Company; (b) sets forth the entire agreement of the undersigned and the Company with respect to the subject matter hereof; and (c) shall be governed by the laws of the State of Illinois applicable to contracts to be made and to be fully performed therein, without regard to conflicts of laws rules or principles.

8.    Miscellaneous.    The undersigned agrees that (i) any legal suit, action or proceeding arising out of or relating to this Subscription Agreement shall be instituted exclusively in Illinois Circuit Courts, Lake County, or in the United States District Court for the Northern District, Eastern Division, of the State of Illinois, each and any of which shall apply Illinois law without reference to its conflicts of laws rules or principles, (ii) waives any objection which the undersigned may have now or hereafter to the venue of such suit, action or proceeding, and (iii) irrevocably consents to the jurisdiction of the Illinois Circuit Courts, County of Lake, and the United States District Court for the Northern District of Illinois, Eastern Division, in any such suit, action or proceeding.  The undersigned further agrees to accept and acknowledge service of any and all process which may be served in any such suit, action or proceeding.

27

The representations, warranties, covenants and agreements contained herein shall survive the delivery of and the payment for the Shares.

Printed name of Investor: _____ Dated: ___ ___ ___,199__

Number of Shares Subscribed for ($_____ per Share): ___ ___ ___

Number of Shares requested subject to availability for ($_____ per Share): ___ ___ ___

If Joint Ownership, check one:                    If fiduciary, partnership or
                                                   corporation, check one:

_____   Joint Tenants with              _____   Trust
        Right of Survivorship           _____   Estate
_____   Tenants in Common               _____   Corporation
_____   Community Property              _____   Partnership
                                        _____   Power of Attorney
                                        _____   Uniform Gift to Minors Act
                                        _____   Individual Retirement Account


_____    _____    _____
Signature of Individual     Signature of                If Investor is an Entity,
Investor                    Joint Investor (if any)      Name of Entity
                            (All joint owners must
                            sign)                        By: _____


State of Residence:_____

This subscription is accepted as of the ___day of _____, 199_.

THE ULTIMATE HEALTH CLUB, INC.
(DOMAIN "EBIOSAFE.COM").

By:_____
Title:_____

28

137

## PRE-SALE INVESTOR QUESTIONNAIRE - INDIVIDUALS

## THE ULTIMATE HEALTH CLUB, INC. (DOMAIN "EBIOSAFE.COM").

I am interested in purchasing Common Stock, no par value per share (the "Shares"), of The Ultimate Health Club, Inc. (domain "eBioSafe.com"), an Illinois corporation (the "Company"). I understand that the Shares will not be registered under the Securities Act of 1933, as amended (the "Act"), or any applicable state securities laws, but rather are being offered and sold pursuant to the exemption from registration provided by the Act, Regulation D promulgated thereunder and certain state exemptions. I understand that the Company cannot allow me to make such an investment unless I am a person who meets certain standards set forth in the Act and any applicable state securities laws. In order to enable the Company to permit my investment and so that the Company will qualify for an exemption from the registration requirements of the Act and any applicable state securities laws, I hereby provide the information and make the representations contained herein. I understand that certain capitalized terms used but not defined herein have the meanings set forth in the Confidential Private Placement Memorandum dated February 8, 1999.

No sale of securities will be made to the undersigned until the information requested pursuant to this Pre-Sale Investor Questionnaire is submitted to the Company and a purchase by the undersigned is approved by the Company.

The undersigned understands and agrees that, although the Company will keep this Pre-Sale Investor Questionnaire strictly confidential, the Company may present this Pre-Sale Investor Questionnaire to such parties as it deems advisable to establish the availability under any federal or state securities laws of an exemption from registration of this private placement of the Shares.

Please complete, sign, date and return one (1) copy of this Pre-Sale Investor Questionnaire to the Company. The other copy of this Pre-Sale Investor Questionnaire, attached to the Confidential Private Placement Memorandum dated February 8, 1999, is for your files.

In accordance with the foregoing, the following representations and information are hereby made and provided:

I.    REPRESENTATIONS OF INVESTOR

This item is presented in alternative form. Please check the appropriate alternative.

(  )   ALTERNATIVE ONE:  The undersigned is not relying upon the advice of an attorney, accountant or other advisor in making a final investment decision to purchase the Shares because the undersigned believes that it has sufficient knowledge and experience in financial and business matters to be capable of evaluating the merits and risks of this offering.

( ) ALTERNATIVE TWO: The undersigned will rely upon the advice of, and hereby designates as its Purchaser Representative, the individual named below, who will assist it in evaluating the merits and risks of an investment in the Shares. IF YOU HAVE CHECKED ALTERNATIVE TWO, THIS PRE-SALE INVESTOR QUESTIONNAIRE MUST BE ACCOMPANIED BY A COMPLETED AND SIGNED PURCHASER REPRESENTATIVE QUESTIONNAIRE AND CERTIFICATE WHICH MUST BE ACKNOWLEDGED BY YOU.

Name of Purchaser Representative_____ . ____
Address:_____ . _____

The undersigned believes that it and the named Purchaser Representative together have such knowledge and experience in financial and business matters that they are capable of evaluating the merits and risks of an investment in the Shares.

II.    ACCREDITED INVESTOR SUITABILITY STANDARDS

THE COMPANY WILL SELL THE SHARES ONLY TO PERSONS WHO QUALIFY AS "ACCREDITED INVESTORS" AS THAT TERM IS DEFINED IN REGULATION D UNDER THE ACT. THE COMPANY WILL REJECT THE SUBSCRIPTION AGREEMENT OF ANY PERSON THE COMPANY DOES NOT HAVE REASONABLE GROUNDS TO BELIEVE QUALIFIES AS AN ACCREDITED INVESTOR.

For purposes of an individual investor, please check whichever of the following definitions, if any, of an "Accredited Investor" you meet:

( ) The undersigned has a net worth (either individually or jointly with spouse) in excess of $1,000,000.

( ) The undersigned had an individual income (not joint income with spouse) in excess of $200,000, or had a joint income with the undersigned's spouse in excess of $300,000, in each of the last two calendar years and reasonably expects such an individual income in excess of $200,000 (or $300,000 in the case of joint income) in the current calendar year. For these purposes, "individual income" means adjusted gross income, as reported for federal income tax purposes, less any income attributable to a spouse or to property owned by a spouse, increased by the following amounts (but not including any amounts attributable to a spouse or to property owned by a spouse): (i) the amount of any tax-exempt interest received, (ii) the amount of any losses claimed as a limited partner in a limited partnership, (iii) the amount of any deduction claimed for depletion, and (iv) the amount of any deduction for long-term capital gains. "Joint income" is defined in the same manner except that income attributable to a spouse or property owned by a spouse is to be included.

( ) I do not meet either of the above definitions.

30

**139**

III.    INVESTOR INFORMATION

    (1)   Name:_____  _____  _____ ___

    (2)   Home Address and Phone Number: _____  _____  ___

           _____ _____  _____ .

    (3)   Date of Birth and Citizenship:    ____  _____

    (4)   Marital Status:   _____  _____

    (5)   Social Security Number:   _____ ____   ___

           Spouse's Social Security Number (if any): _____ :_____

    (6)   1 prefer to have the Company's communications sent to (please provide address):

          Home Address                          Business Address

          _____             _____

          _____             _____

          _____             _____

IV.    BACKGROUND INFORMATION

    (1)   Educational Background

          School                Major            ·   Degree (if any)

          _____       _____      _____

          _____       _____      _____

(2)    Employment Information

Occupation or Profession and Nature of Business:_____

Name of Employer:_____

Address: _____

_____

Current Position or Title:_____

Office Telephone Number:_____
                          (Area Code)(Number)

31

140

If in your current occupation or position less than 5 years, please list previous occupations or positions and the nature of the business over last 5 years:_____    _____

(3)    Prior Investment Experience

Please check which of the following you have invested in:

( )    Real Estate Syndications
( )    Stocks, Bonds, or Debentures
( )    Equipment Leasing
( )    Oil and Gas Drilling Programs
( )    Investments or Other Securities
( )    Not Enumerated Above (please specify) _____

_____

Please provide the following information with respect to such investments:

| Indicate type of investment (e.g., real estate, stocks, bonds or debentures) | Amount Invested (if over $25,000, Simply so state) | Did you rely on an investment advisor in making this investment (Please circle)? |
|---|---|---|
| _____ | _____ | YES    NO |
| _____ | _____ | YES    NO |
| _____ | _____ | YES    NO |
| _____ | _____ | YES    NO |

Please provide any additional information regarding your overall business and investment experience or knowledge which you believe demonstrates your financial expertise:_____

_____

V.    SIGNATURE AND IRS CERTIFICATION

        The undersigned represents to the Company that (a) the information contained herein is current, complete and accurate and may be relied upon by the Company, particularly for purposes of determining compliance with federal and state securities laws, (b) the undersigned will notify the Company immediately of any material change in any of such information occurring prior to the acceptance of

32

141

its subscription by the Company and (c) the undersigned understands that a false statement herein may be a violation of law and could result in a claim for damages against the undersigned.

(   )   I am not a nonresident alien and certify as follows:

To avoid withholding which would otherwise be required by Section 1441 of the Internal Revenue Code of 1986, as amended, the Company requires that each investor provide the following certification:

I am not a nonresident alien for purposes of U.S. income taxation. I hereby agree that if I become a nonresident alien, I will notify the Company within sixty (60) days of doing so. I understand that this certification may be disclosed to the Internal Revenue Service by the Company and that any false statement I have made here could be punished by fine, imprisonment, or both.

By signing below, I declare, under penalties of perjury, that I have examined this certification and to best of my knowledge and belief it is true, correct, and complete.

(   )   I am a nonresident alien and do not make the foregoing certifications.

_____          _____
Print Name of Prospective Investor          Signature of Prospective Investor


_____          _____
Print name of Joint Holder,          Signature of Joint Holder,
if applicable          if applicable


Dated:_____, 199_


## FOR COMPANY USE ONLY

Pre-Sale Investor Questionnaire reviewed by The Ultimate Health Club, Inc. (domain "eBioSafe.com").

Date Reviewed: _____

SALE TO PURCHASER APPROVED BY THE COMPANY:  YES_____    NO_____

The Ultimate Health Club, Inc. (domain "eBioSafe.com").

By:_____

33