# EXHIBIT A

LAX & NEVILLE, LLP
BARRY R. LAX (BL 1302)
1412 Broadway, Suite 1407
New York, NY 10018
Tel: (212) 696-1999
Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------x

BARRON PARTNERS, LP,                              :        Index No.
                                                  :        07 CV 11135 (JSR)
                          Plaintiff,              :
                                                  :        **FIRST AMENDED**
        -against-                                 :        **COMPLAINT**
                                                  :
LAB123, INC., HENRY A. WARNER, FRED               :        **JURY TRIAL**
FITZSIMMONS, KENT B. CONNALLY, KURT               :        **DEMANDED**
KATZ, ROBERT TRUMPY, JEREMY J. WARNER,            :
DAVID FLEISNER, BIOSAFE LABORATORIES,             :
INC., and BIOSAFE MEDICAL TECHNOLOGIES, INC., :
                                                  :        **ECF CASE**
                          Defendants.             :
-----------------------------------------------------------------------x

        Now comes Plaintiff, Barron Partners, LP, ("Plaintiff"), by its attorneys, Lax &

Neville, LLP, and complaining of the Defendants Lab123, Inc. ("Lab123"), Biosafe

Laboratories, Inc. ("Biosafe Labs"), Biosafe Medical Technologies, Inc. ("Biosafe" and

collectively with Biosafe Labs as the "Biosafe Entities"), Henry A. Warner, Jeremy J.

Warner, Robert Trumpy, and Kent B. Connally (collectively referred to herein as the

"Individual Defendants"), states as follows:

## NATURE OF THE ACTION

        1.      Plaintiff brings this action to recover damages against Defendants for

violations of the Securities Exchange Act of 1934 (the "Exchange Act"), the Illinois

Securities Act and various other statutes and principles of common law. In essence, the

Defendants fraudulently obtained $2,000,000 from the Plaintiff, a private investment

1

fund, by (i) artificially inflating the revenues of the Biosafe Entities and the pro formas of Lab123, (ii) making dozens of misrepresentations in responses to Plaintiff's due diligence questionnaire, which requested due diligence information from the Biosafe Entities prior to the $2,000,000 investment, (iii) stating that the Biosafe Entities would be selling to Lab123, pursuant to a 25-year licensing agreement between those companies, the exclusive rights to sell, market and distribute the five customer health diagnostic tests which the Biosafe Entities manufacture, which statement was false and misleading in that (a) the BioSafe Entities had already sold most, if not all, of those rights to one or more other entities, (b) at the time that Defendants so stated, they intended to flout the licensing agreement by selling 300,000 units of one of the Biosafe customer health diagnostic tests to Kellogg Company without remitting to Plaintiff the sale proceeds, and (c) at the time that Defendants so stated, they intended to terminate, unjustifiably and without cause, the licensing agreement between Biosafe Labs and Lab123. The Defendants' fraudulent scheme rendered worthless Plaintiff's $2,000,000 investment in Lab123, because Plaintiff, in deciding to so invest, relied on Defendants' representations as to the Biosafe Entities' financials and Lab123's pro forma financials, on Defendants' responses to Plaintiff's due diligence questionnaire, and on the existence of the licensing agreement granting to Lab123, for 25 years, exclusive rights to market and sell the Biosafe Entities' five diagnostic tests.

2.    In early April 2007, the truth regarding Defendants' fraudulent actions emerged when Lab123 disclosed to Plaintiff that its revenues for the first quarter were only $37,000 -- approximately 15% of the pro forma numbers that were provided to Plaintiff prior to its investment. At the same time, defendant Warner, the CEO and

Chairman of the Board of Directors of the Biosafe Entities and Chairman of the Board of

Directors of Lab123, told Plaintiff that -- in violation of the licensing agreement between

Biosafe Labs and Lab123, and contrary to Warner's written, pre-investment

representations to Plaintiff – the Biosafe Entities would retain, and would not remit to

Lab123, the proceeds from the Biosafe Entities' recent sale to Kellogg Company of

300,000 units of one of the five diagnostic tests covered by the licensing agreement.

Also at that time, Defendant Warner told Plaintiff that he was terminating the licensing

agreement between Biosafe Labs and Lab123 simply because he (Warner) had simply

changed his mind, which clearly is not a basis for termination pursuant to that agreement.

Even putting aside Defendant Warner's unlawful termination of the Biosafe Labs –

Lab123 licensing agreement, that agreement, as a practical matter, was worthless to

Lab123 – and to Plaintiff, the licensing agreement's third-party beneficiary -- because (i)

the Biosafe Entities had previously sold to other entities the 'exclusive' right to market

and sell the five Biosafe customer health diagnostic tests and (ii) Lab123 and its board of

directors, which board was controlled by Warner, refused to assert its supposedly

exclusive rights, under the licensing agreement, to market and sell the five Biosafe

diagnostic tests. In other words, Lab123 (an entity that is 98% owned by Biosafe Labs)

gave Biosafe Labs $1,000,000 (which came directly and entirely from Plaintiff) for the

exclusive license to sell and market Biosafe Labs' five products for 25 years, and seven

months after that agreement was executed, defendant Warner (with the $1,000,000 in his

pocket) unlawfully cancelled the Biosafe Labs – Lab 123 licensing agreement.

     3.     In the end, Defendants misappropriated the Plaintiff's $2,000,000

investment leaving Plaintiff's investment in Lab123 practically worthless as Lab123's

entire business model was based and formed on the above-mentioned licensing agreement and on the Defendants' fraudulent financials.

## JURISDICTION AND VENUE

Subject Matter Jurisdiction

4.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §§1331, 1332 and 1337. The federal claims asserted herein arise under Section 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the Securities and Exchange Commission. Jurisdiction over the claims arising under state law is founded on this Court's supplemental jurisdiction pursuant to 28 U.S.C. §1367.

Personal Jurisdiction

5.    This Court has jurisdiction over the persons of the Defendants pursuant to N.Y. C.P.L.R. 301, 302(a)(1), 302(a)(3)(i), and 302(a)(3)(ii).

6.    Defendants did business within the State of New York within the meaning of N.Y. C.P.L.R. 301.

7.    Defendants transacted business within the State of New York within the meaning of N.Y. C.P.L.R. 302(a)(1).

8.    Within the meaning of N.Y. C.P.L.R. 302(a)(3), Defendants committed a tortious act or tortious acts without the State of New York causing injury to person or property within the State of New York.

9.    Without limitation, Defendants committed a tortious act or tortious acts without the State of New York causing injury to Plaintiff.

4

10. Within the meaning of N.Y. C.P.L.R. 302(a)(3)(i), Defendants regularly do or solicit business, or engage in another persistent course of conduct, or derive substantial revenue from goods used or services rendered, in the State of New York.

11. Within the meaning of N.Y. C.P.L.R. 302(a)(3)(ii), Defendants expect or should reasonably expect their tortious act or tortious acts without the State of New York causing injury to person or property within the State of New York to have consequences in the State of New York.

12. Without limitation, Defendants expect or should reasonably expect their tortious act or tortious acts without the State of New York causing injury to Plaintiff to have consequences in the State of New York.

13. Defendants derive substantial revenue from interstate or international commerce within the meaning of N.Y. C.P.L.R. 302(a)(3)(ii).

14. Further, in connection with Defendants' violations and conduct, Defendants directly and indirectly used the instrumentalities and means of interstate commerce, including mails, electronic mail messages, telecommunications, and other means located in this State.

15. Lab123 and the Biosafe Entities acted for the benefit of and with the knowledge and consent of the Individual Defendants and the Individual Defendants exercised some control over Lab123 and the Biosafe Entities in the matter.

16. As discussed in greater detail below, infra ¶ 102, on September 6, 2006, Lab123 entered into a convertible preferred stock purchase agreement with Plaintiff to issue 3,774,000 shares of Series A Convertible Preferred Stock ("Series A Preferred")

and a warrant to purchase 3,774,000 shares of common stock for $2,000,000 (the "Purchase Agreement" or the "Preferred Stock Purchase Agreement").

17.     Lab123, by written contract, has agreed that, in any action brought among Lab123 and Plaintiff with respect to the Purchase Agreement or otherwise, exclusive jurisdiction and venue for such action shall be the federal courts situated within the State of New York.

18.     Specifically, section 11.10 of the Purchase Agreement states, in pertinent part, that "If any action is brought among the parties [Lab123 and Plaintiff] with respect to this Agreement or otherwise, . . . . Exclusive jurisdiction and venue for any such action shall be the Federal Courts serving the State of New York."

19.     At all relevant times, Lab123 was a Delaware corporation with a principal place of business located at 233 Narragansett Avenue, Lawrence, New York 11559.

20.     At all relevant times, Lab123's outside counsel was the law firm of Guzov Ofsink, LLC ("Guzov Ofsink"). Guzov Ofsink's principal place of business is located at 600 Madison Avenue, New York, New York 10022.

21.     Guzov Ofsink, on Lab123's behalf, engaged in negotiations with Plaintiff concerning the Purchase Agreement.

22.     Without limitation, Guzov Ofsink exchanged numerous e-mails with Plaintiff concerning the Purchase Agreement and the negotiation of that Agreement.

23.     At all relevant times, Guzov Ofsink made Lab 123's filings with the Securities and Exchange Commission ("SEC"), and communicated with the SEC (concerning Lab123's filings), without limitation, by letter.

6

24.    At all relevant times, another New York law firm -- Sichenzia Ross Friedman Ference LLP ("Sichenzia Ross") -- also served as counsel to Lab123 and the Biosafe Entities concerning Lab123's filings with the SEC.  Sichenzia Ross's principal place of business is located at 1065 Avenue of the Americas, New York, New York.

25.    Without limitation, Sichenzia Ross exchanged various e-mails with Lab123 and the Biosafe Entities concerning Lab123's filings with the SEC.

26.    At all relevant times, the accounting firm of Marcum & Kliegman LLP served as Lab123's independent auditors.  Marcum & Kliegman's principal places of business are located at 655 Third Avenue, 16th Floor, New York, New York 10017, and Melville Park Road, Melville, New York 11747-3146.

27.    In or about 2003, representatives of the Biosafe Entities, including Defendant Henry Warner, came to New York State for the purpose of soliciting business from, and did solicit business from, Pfizer Incorporated ("Pfizer").  Pfizer is a publicly listed pharmaceutical company with its principal place of business located at 235 East 42nd Street, New York, New York.

28.    In or about 2003, representatives of the Biosafe Entities, including Henry Warner, came to New York State for the purpose of soliciting business from, and did successfully solicit business from, A. Alexander Arnold, III.  Mr. Arnold is an individual domiciled at 460 East 79th Street, Apartment 16B, New York, New York.  Mr. Arnold is, and at all relevant times was, the largest minority shareholder of Biosafe.

29.    In or about 2003, representatives of the Biosafe Entities, including Henry Warner, came to New York State for the purpose of soliciting business from, and did successfully solicit business from, Omnicom Group ("Omnicom").  Omnicom is a

7

publicly listed, strategic holding company that manages a portfolio of global market leaders. Omincom's principal place of business is located at 437 Madison Avenue, New York, New York.

30.    In 2005 and 2006, Biosafe Entities paid the public relations firm of L.G. Zangani LLC ("Zangani") to solicit, and through Zangani did solicit, business from many persons and entities in New York State.

31.    Biosafe Labs holds a New York State Laboratory Permit approving it to perform laboratory tests in the categories of Clinical Chemistry, Endocrinology, and Oncology - Sera and Soluble Tumor Markers testing.

32.    In order to obtain this Laboratory Permit from the State of New York, Biosafe Labs was required to, and upon information and belief did, among other things, (i) complete and submit to the New York State Department of Health a nine-page, single spaced Initial Laboratory Permit Application (Form DOH-3494), (ii) pay a $1,100 registration, inspection and reference fee, as well as an on-site survey fee, to the New York State Department of Health, (iii) designate for New York State a laboratory director and assistant directors with Certificates of Qualification in each of the three above-mentioned permit categories, (iii) successfully participate, for each of the three above-mentioned permit categories, in proficiency testing administered by the New York State Department of Health, and (iv) complete a successful on-site inspection by the New York State Department of Health.

8

Venue

33.    Venue is proper in the U.S. District Court for the Southern District of New York pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §§1391(b) and (c).

34.    The present action is a suit or action to enforce a liability or liabilities, or a duty or duties, created by Chapter 2B-1 (Securities Investor Protection) of Title 15 of the U.S. Code or rules and regulations under that Chapter.

35.    The Defendants are found in or are inhabitants of or transact business in this District within the meaning of Section 27 of the Exchange Act, 15 U.S.C. §78aa.

36.    The Defendants, directly and indirectly, made use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the transactions, acts, practices and courses of business alleged herein. Practically all of the Defendants' false and misleading statements were made in this District.

37.    In connection with Defendants' violations and conduct, Defendants directly and indirectly used the instrumentalities and means of interstate commerce, including mails, electronic mail messages, telecommunications, and other means located in this District.

38.    Without limitation, Lab123, the Biosafe Entities, and the Individual Defendants participated in various telephone conversations with Plaintiff in connection with the transactions, acts, practices and courses of business alleged herein.

39.    Without limitation, Lab123, the Biosafe Entities, and the Individual Defendants exchanged numerous e-mails with Plaintiff in connection with the transactions, acts, practices and courses of business alleged herein.

40.    A substantial part of the events or omissions giving rise to the Plaintiff's claims occurred, or a substantial part of property that is the subject of this action is situated, in this District.

## PARTIES

41.    Plaintiff Barron is a limited partnership organized under the laws of the State of New York with a principal place of business located at 730 Fifth Avenue, 25th Floor, New York, New York.  On September 6, 2006, Plaintiff executed transactions in Lab123 securities at artificially inflated prices due to Defendants' fraudulent actions.

42.    Defendant Lab123 is a marketing, distributing and manufacturing public company whose objective is to license, broker or acquire retail medical diagnostic products and services to sell into retail drug stores and chains the United States and internet drug retailers.  Lab123's common stock is not currently listed on an exchange although it is a public company.

43.    Defendant Biosafe Labs is a Delaware corporation with a principal place of business located at 8600 West Catalpa, Chicago, Illinois.  Biosafe Labs owns approximately 98% of the outstanding common stock of Lab123.

44.    Defendant Biosafe is a Delaware corporation controlled by defendant Henry A. Warner with a principal place of business at 100 Field Drive, Suite 240, Lake Forrest, Illinois.  Biosafe owns 99% of Biosafe Labs.  In May 2007, Biosafe transferred all of its patents and intellectual property to Biosafe Labs pursuant to the settlement of Biosafe's involuntary bankruptcy petition.

45.    The Biosafe Entities manufacture, market and sell home medical blood-testing kits that do not require professionals to draw blood from the end user.

10

46.    At all relevant times, Defendant Robert Trumpy ("Trumpy"), an individual domiciled in the State of Illinois, was the Chief Financial Officer of Biosafe. Trumpy assisted in the preparation of the false financial statements, and repeated the contents therein to Plaintiff. Further, Trumpy directly made written and oral misrepresentations and/or omissions to Plaintiff regarding the financial condition, position, outlook and earnings of Biosafe and Lab123.

47.    At all relevant times, Defendant Henry A. Warner ("Warner"), an individual domiciled in the State of Illinois, was the Chairman of the Board of Lab123, and the Chief Executive Officer and Chairman of the Biosafe Entities. Warner has been the President and Chief Executive Officer and, indirectly through a family owned company, the majority shareholder, of the Biosafe Entities since 1996. Warner assisted in the preparation of the false financial statements, and repeated the contents therein to Plaintiff. Further, Warner directly made written and oral misrepresentations and/or omissions to Plaintiff regarding the financial condition, position, outlook and earnings of the Biosafe Entities and Lab123.

48.    At all relevant times, Jeremy J. Warner ("Jeremy Warner"), an individual domiciled in the State of Illinois, was the Director of Business Development of Biosafe. Jeremy Warner assisted in the preparation of the false financial statements, and repeated the contents therein to Plaintiff. Further, Jeremy Warner directly made written and oral misrepresentations and/or omissions to Plaintiff regarding the financial condition, position, outlook and earnings of the Biosafe Entities and Lab123.

49.    At all relevant times, Defendant Kent B. Connally ("Connally") was a member of the Board of Directors of Lab123, and its audit and compensation committees.

11

Connally purports to be an independent Director of Lab 123. In fact, Connally is in thrall to Henry Warner. As a Lab123 Director, Connally at all relevant times has acted in the best interests of Henry Warner, rather than in the best interests of Lab123.

50.     The individuals named as defendants in paragraphs 46-49 are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with Lab123 and the Biosafe Entities, were "control persons" of such entities in that they exercised the power, ability and authority to control the management and policies of Lab123 and the Biosafe Entities. Because of their positions, the Individual Defendants had the ability and power to direct and prevent the fraudulent conduct and statements at issue in this Complaint.

## FACTS

## Defendants Fraudulently Induce Plaintiff to Invest

51.     Plaintiff, a private investment fund, is committed to perform extensive due diligence prior to investing its raised capital either in a private or public company. Specifically, Plaintiff requires the potential investment target to have positive cash flow as measured by EBITDA; strong shareholder-oriented management and board of directors; strong independent corporate governance; strong revenue growth historically, presently and in the future; competitive advantage; high profit margins and high return on capital. If all of these criteria are met, Plaintiff will begin the process of negotiating an investment in the target.

52.     Defendants concocted a fraudulent scheme to use the above directives and goals to induce the Plaintiff to invest in a new venture called Lab123. The Biosafe Entities had historically been focused on the research, development and manufacturing of

the home based medical testing kits with very little emphasis on sales and marketing. Accordingly, Defendants had a seemingly good idea of spinning off a public company (Lab123) to sell, market and distribute the Biosafe products. Lab123 would start the ball rolling with an established client base because the Biosafe Entities had already been selling their products for years. Moreover, the investment was attractive to Plaintiff because the future revenue of Lab123 would be relatively easy and conservative to predict as the Biosafe Entities had been recognizing revenue for sales of their products for years. Sales also would presumably increase as an entire company would be dedicated towards that goal. Further, earnings should also be easily predictable because the Biosafe Entities obviously are aware of their profit margins, which were represented by the Defendants to be between 70-80%.

53.    As Plaintiff believed the investment idea to be intriguing, it decided to slowly and cautiously move forward by investigating the Biosafe Entities. As part of their due diligence procedures in evaluating whether or not to invest in Lab123, Plaintiff required Biosafe to complete one of Plaintiff's standard due diligence forms (Form MDR) (the "Questionnaire"). Plaintiff relies heavily on the responses to these questionnaires in deciding whether to proceed with any such transaction.

54.    By responses of August 14, 2006, Defendants completed the Plaintiff's Questionnaire. Upon information and belief, the Defendants' responses of August 14, 2006 to the Questionnaire were completed and/or reviewed by each of the Individual Defendants on behalf of the Biosafe Entities.

13

Defendants Fraudulently Misrepresent to Plaintiff
That Lab123 Has Exclusive Rights to Market
<u>and Sell Five Biosafe Customer Health Diagnostic Tests</u>

55.    In responses to the Questionnaire, Defendants represented that "Lab123 has the exclusive rights to market and sell," "in the retail, internet and disease management sales channels," "selected Biosafe customer health diagnostic tests," including those tests "covered by the license agreement between BMT and Lab 123."

56.    That is, Defendants represented that Lab123 had exclusive rights to market and sell selected Biosafe customer health diagnostic tests, including those tests covered by the Agreement Effective as of September 7, 2006 By and Between Biosafe Laboratories, Inc. and Lab123, Inc. (the "Licensing Agreement"), <u>i.e.</u>, (i) the Biosafe Cholesterol Panel including Total Cholesterol, HDL, LDL and Triglycerides (the "Cholesterol Panel"), (ii) the Rapid Result quantitative hemoglobin-measuring device marketed as Biosafe Anemia Meter (the "Anemia Test"), (iii) the Biosafe Prostate Specific Antigen Test (the "Prostate Screen"), (iv) the Biosafe Thyroid Stimulating Hormone test (the "Thyroid Test"), and (v) the Biosafe Hemoglobin A1c (the "Hemoglobin A1c").

57.    Plaintiff relied upon these representations when determining to invest in Lab123. However, for at least six reasons, these representations by Defendants were false and misleading.

a.    First, as described in greater detail below, <u>infra</u> ¶ 93, and only seven months after Plaintiff made its investment in Lab 123, Defendants wrongfully rescinded the granting of Lab123's exclusive rights to market and sell selected Biosafe customer health diagnostic tests.

14

b.    Second, unbeknownst to Plaintiff, the Biosafe Entities had granted the 'exclusive' rights to market and sell the Anemia Test to two different companies – Lab 123 and Johnson & Johnson. Specifically, before Biosafe Labs and Lab123 entered into the Licensing Agreement, the Biosafe Entities had entered into an agreement with Johnson & Johnson ("J & J") granting to J & J exclusive rights to market and sell the Anemia Pro, a Biosafe Entities product. The Anemia Pro is identical to the Anemia Test which the Licensing Agreement granted to Lab123 exclusive rights to market and sell. Upon information and belief, the agreement between the Biosafe Entities and J & J remained in effect after the Biosafe Entities and Lab123 entered into the Licensing Agreement.

c.    Third, unbeknownst to Plaintiff, and upon information and belief, the Biosafe Entities had also granted rights to market and sell the Anemia Test to a third company, Rapid Response. Specifically, upon information and belief, before Biosafe Labs and Lab123 entered into the Licensing Agreement, the Biosafe Entities had entered into an agreement with Rapid Response granting to Rapid Response rights to market and sell all Biosafe Entities anemia products, including the Anemia Test which the Licensing Agreement granted to Lab123 exclusive rights to market and sell. Rapid Response is a subsidiary of the Biosafe Entities.

d.    Fourth, unbeknownst to Plaintiff, and upon information and belief, the Biosafe Entities had granted to two different companies – Lab123 and The Ultimate Health Club, Inc. ("Ultimate Health") -- the 'exclusive' rights to market and sell, on the internet, the Cholesterol Panel, the Anemia Test, the Prostate Screen, the Thyroid Test, and the Hemoglobin A1c. Specifically, and upon information and belief, the Biosafe

15

Entities had sold to Ultimate Health, in perpetuity, the exclusive rights to market and sell over the internet both the Biosafe Entities' existing products and products to be developed by the Biosafe Entities.  Ultimate Health is a corporate subsidiary of Biosafe. Biosafe is the largest shareholder of Ultimate Health.

        e.    Fifth, unbeknownst to Plaintiff, and upon information and belief, defendant Henry Warner had arranged for his son, Chris Warner, to market and sell Biosafe Entities products, including the Anemia Test, at a discount through websites linked to the Biosafe Entities' website.  The Anemia Test is among the Biosafe customer health diagnostic tests which the Licensing Agreement granted to Lab123 exclusive rights to market and sell.

        f.    Sixth, by the above representations, supra ¶¶ 55-56, Defendants falsely promised Plaintiff to carry out future action.  Specifically, Defendants falsely promised Plaintiff to abide by the Licensing Agreement between Biosafe Labs and Lab123, and to afford Lab123 exclusive rights to market and sell selected Biosafe customer health diagnostic tests, including the five tests covered by the Licensing Agreement.  When Defendants made these representations, they possessed a present intent not to carry out these promises of future action.  Without limitation, when Defendants made these representations, they possessed a present intent to flout the Licensing Agreement by selling 300,000 Cholesterol Panels, or products indistinguishable from Cholesterol Panels, to Kellogg Company without remitting all or any of the proceeds from this sale to Lab123.

        1)    At the time of Defendants' August 14, 2006 responses to the Plaintiff's Questionnaire, and from summer 2006 to November 2006, Biosafe Labs

was negotiating an agreement with Kellogg Company ("Kellogg") by which Biosafe was

to sell to Kellogg 300,000 Cholesterol Panels, or products identical to Cholesterol Panels.

Indeed, by July 31, 2006 e-mail to Barron Partners analyst Matt Samuel, Defendant

Warner represented that Kellogg was imminently going to buy 500,000 Cholesterol

Panels from Biosafe.  Similarly, by August 7, 2006 e-mail to Plaintiff's Managing

Partner, Andrew B. Worden, and to Barron Partners analyst Matthew Samuel, Defendant

Warner represented that Kellogg had placed an order with Biosafe for "500,000

Cholesterol Panels" to be delivered in the fourth quarter of 2006.  As of July 31, 2006,

however, Defendants did not intend to give to Lab123 all or any of the proceeds from the

Biosafe Entities-Kellogg agreement, even though the Cholesterol Panel is among the

Biosafe customer health diagnostic tests which the Licensing Agreement granted to

Lab123 exclusive rights to market and sell.

        2)      Defendants' present intent -- when they promised Plaintiff,

inter alia, to afford Lab123 exclusive rights to market and sell selected Biosafe customer

health diagnostic tests, including the five tests covered by the Licensing Agreement – not

to carry out this promise is corroborated by the facts that (i) in November 2006, Kellogg

and Biosafe Entities entered into their agreement, and Lab123 was not a party to it, (ii)

also in November 2006, Kellogg, pursuant to the Biosafe Entities-Kellogg agreement,

ordered, from the Biosafe Entities, 300,000 Cholesterol Panels, or products

indistinguishable from Cholesterol Panels, (iii) Defendants did not give to Lab123 all or

any of the proceeds from Kellogg's order, (iv) when Plaintiff's Managing Partner,

Andrew B. Worden,  discovered, and protested to Defendants, the fact that Defendants

did not give to Lab123 all or any of the proceeds from Kellogg's November 2006 order,

17

from the Biosafe Entities, of 300,000 Cholesterol Panels, defendant Henry Warner falsely

argued, in a March 28, 2007 reply e-mail to Plaintiff, that "Clearly, Kellogg is not

covered by the license agreement between BIOSAFE and Lab123," and (v) also when

Plaintiff's Managing Partner so protested to Defendants, Defendant Kent Connally, by

March 28, 2007 e-mail to Mr. Worden, snidely retorted that "the fact that you can

become so 'incensed' over business disagreements . . . is disturbing to me" and that "I

cannot, and will not, become embroiled in your temper tantrums," and demanded that Mr.

Worden remove Connally from Mr. Worden's e-mail distribution list. Kent Connally so

sniped at Mr. Worden despite the fact that, as a member of the Board of Directors of

Lab123, Connally owed a fiduciary duty to Lab123 to seek to compel Defendants to

remit to Lab123 the proceeds from the Biosafe Entities-Kellogg agreement as per Henry

Warner's July 31 and August 7, 2006 e-mails and the Licensing Agreement.

58.    In responses to the Questionnaire, Defendants made the following

representations regarding Biosafe's sales:

> Biosafe products are in approximately 15,000 retail
> locations. There are approximately 25 disease management
> and health screening companies currently using Biosafe
> products on a regular basis. All of these and the Biosafe
> internet site will "seed" this company with mature account
> relationships.

These representations, combined with the Biosafe sales figures, which were forwarded to

Plaintiff, gave a distorted view as to the value of the "mature account relationships."

59.    In responses to the Questionnaire, Defendants claimed that Lab123 was

attractive to investors because "Biosafe is seeding this company [Lab123] with sales

relationships and exclusives." As described below, however, infra ¶¶ 61-81, Defendants

18

grossly misrepresented to Plaintiff these sales relationships and the supposed actual sales numbers, rendering Defendants' responses to the Questionnaire, false.

60.    Further, the Defendants' representation that Biosafe had granted "exclusives" to Lab123 was false or misleading because (i) Defendants withdrew those supposed exclusive rights only seven months after Plaintiff made its investment in Lab123, (ii) the Biosafe Entities had separately granted the 'exclusive' rights to market and sell the Anemia Test to both Lab 123 and Johnson & Johnson, thereby forcing Lab123 to compete with J & J for sales of essentially the same product, (iii) while the Licensing Agreement granted to Lab123 supposed exclusive rights to market and sell the Anemia Test, the Biosafe Entities had also granted rights to market and sell the Anemia Test to Rapid Response, (iv) the Biosafe Entities had separately granted to Lab123 and Ultimate Health the 'exclusive' rights to market and sell, on the internet, the Cholesterol Panel, the Anemia Test, the Prostate Screen, the Thyroid Test, and the Hemoglobin A1c, (v) defendant Henry Warner had arranged for his son, Chris Warner, to market and sell Biosafe Entities products, including the Anemia Test, at a discount through websites linked to the Biosafe Entities' website, and (vi) when Defendants made this representation, they possessed a present intent to flout the Licensing Agreement by selling 300,000 Cholesterol Panels, or products indistinguishable from Cholesterol Panels, to Kellogg Company without remitting all or any of the proceeds of this sale to Lab123.

Defendants Fraudulently Misrepresent
to Plaintiffs, Among Other Material Facts,
Lab123's Profit Margins, Sales, and Prospects

61.    In responses to the Questionnaire, Defendants go as far as to claim that

"the key advantage that the Lab123's retail and internet sales have over other sales

channel [sic] is that the sales are very profitable with a gross margin that could approach

70-80%." The fact that the sales numbers were misrepresented to Plaintiff, as described

herein, makes the forgoing statement false and misleading.

62.    Defendants' statement that Lab123's sales "are very profitable" and that

the "gross margin [on those sales] could approach 70-80%" is also false and misleading

because, by way of example, there is a very small profit margin, if any such margin, on

the sales of the Cholesterol Panel and of the Biosafe Entities' other cholesterol products.

63.    Defendants represented in responses to the Questionnaire that, of

Plaintiff's then-contemplated $2,000,000 investment in Lab123, Lab123 would pay

$1,000,000 to Biosafe as licensing fees.   Defendants also represented that the term of the

licensing would be twenty-five years.   As described herein, Defendants withdrew those

rights less than six months after Plaintiff made its investment in Lab123, thereby making

Defendants' representations in the Questionnaire and in the Biosafe Labs - Lab123

Licensing Agreement false.

64.    The Questionnaire asked the following series of questions regarding

financials:

        1.    Monthly GAAP income statements for the
              Company and Acquisition Target(s) for the past six
              months. The format should give the greatest detail
              possible, but at a minimum must break out revenue
              and cost of sales by major products/divisions,

SG&A, depreciation and amortization, interest expense and taxes accrued.

2. Quarterly and Annual GAAP financial statements for the Company and Acquisition Target(s) for the past two years in the same format as above. Audited financial statements (when available) must also be submitted but are not substitute of the detailed statements.

3. The most recent GAAP balance sheet available.

4. Detailed Schedule of Current Assets with Aged Accounts Receivable summary.

5. Detailed Schedule of Current Liabilities with Aged Accounts Payable summary and summaries of accrued expenses and accrued compensation.

6. Detailed Schedule of Long Term Liabilities outlining basic terms of each outstanding debt or preferred stock series.

7. Pro Forma historical and projected financials for the Company and each Acquisition Target (breaking each division out separately).

8. Pro Forma projected working capital and monthly cash flow projections for six months.

9. Pro Forma projected capital expenditures for 12 months.

10. Pro Forma schedule of largest customers as a percentage of total revenue.

In response to these questions, Defendants merely replied, "SEE FINANCIAL PROJECTIONS". As discussed herein, the financials provided by Defendants grossly misrepresented the sales and prospects of Lab123. Therefore, by referencing those projections in answering the above questions, Defendants made separate and additional misrepresentations to Plaintiff.

65.     In responses to the Questionnaire, Defendants also made the following representations regarding customer sales:

Question: Provide a worksheet showing sales by customer for the last twelve months covering at least 80% of total revenues.
Response: Provided under separate cover.

21

> Question: Projected sales by customer (including new customers) for the next 12 months covering at least 80% of total projected revenues. Indicate the percentage likelihood of achieving the projected sales level for each customer.
> Response: See fin. projections

> Question: For both worksheets, please indicate for each customer the percentage of total revenues.
> Response: Historical has been provided under separate cover.

As discussed herein, the financials provided by Defendants grossly misrepresented the sales and prospects of Lab123. Therefore, by referencing those projections in answering the above questions, Defendants made separate and additional misrepresentation to Plaintiff.

66.     In responding to the Questionnaire, Defendants also misrepresented that the Licensing Agreement between Biosafe Labs and Lab123 was the only royalty or licensing agreement, or other significant agreement, to which the Biosafe Entities were a party. Defendants' responses to the Questionnaire stated, in pertinent part:

> Question:  Provide copies of any significant agreements, e.g. royalty or license agreements, long term sales contracts or distribution agreements.

> Response:  License agreement with Biosafe is the primary agreement and a draft copy has been provided under separate cover.

67.     Defendants' representation the only royalty or licensing agreement, or other significant agreement, to which the Biosafe Entities were a party was the Licensing Agreement affording Lab123 exclusive rights to market and sell selected Biosafe customer health diagnostic tests, including the Cholesterol Panel, the Anemia Test, the Prostate Screen, the Thyroid Test, and the Hemoglobin A1c, was false and misleading because (i) Defendants withdrew those supposed exclusive rights only seven months after

22

Plaintiff made its investment in Lab123, (ii) the Biosafe Entities had separately granted the 'exclusive' rights to market and sell the Anemia Test to both Lab 123 and Johnson & Johnson, thereby forcing Lab123 to compete with J & J for sales of essentially the same product, (iii) while the Licensing Agreement granted to Lab123 supposed exclusive rights to market and sell the Anemia Test, the Biosafe Entities had also granted rights to market and sell the Anemia Test to Rapid Response, (iv) the Biosafe Entities had separately granted to Lab123 and Ultimate Health the 'exclusive' rights to market and sell, on the internet, the Cholesterol Panel, the Anemia Test, the Prostate Screen, the Thyroid Test, and the Hemoglobin A1c, (v) defendant Henry Warner had arranged for his son, Chris Warner, to market and sell Biosafe Entities products, including the Anemia Test, at a discount through websites linked to the Biosafe Entities' website, and (vi) when Defendants made this representation, they possessed a present intent to flout the Licensing Agreement by selling 300,000 Cholesterol Panels, or products indistinguishable from Cholesterol Panels, to Kellogg Company without remitting all or any of the proceeds of this sale to Lab123.

**Defendants Bombard Plaintiff With False
and Fictitious Financial Revenues and
Projections for Lab123 and the Biosafe
Entities**

68.    From May through September 2006, the Defendants continuously barraged Plaintiff with e-mails, false financial statements, false pro formas, and false due diligence documents to induce Plaintiff to invest in a new venture. Indeed, Defendant Warner's very first e-mail to Plaintiff contained false financial revenues and projections. On May 23, 2006, Defendant Warner sent Plaintiff an e-mail attaching the Biosafe Entities' financials entitled "Retail proforma" purporting to show, among other things, (i)

23

the Biosafe Entities' 2005 revenue for the five Biosafe customer health diagnostic tests which Biosafe Labs was to license exclusively to Lab123, (ii) the projected returns, for the remainder of 2006, for these five Biosafe diagnostic tests, and (iii) anticipated pro forma returns for 2007 through 2009. All of these financials were misrepresentations as the contained false and misleading information. The 2005 total revenue figure, reported by the financials, for the five Biosafe customer health diagnostic tests -- $1,582,838 -- was false. In fact, the Biosafe Entities' 2005 revenue derived from these five Biosafe diagnostic tests was less than $150,000. Further, the pro forma numbers were fraudulent as they were based on fictitious revenues from the previous time periods.

69.     Based upon the misrepresentations made above and other oral misrepresentations made by Defendants, Plaintiff entered into negotiations with Defendants and, on June 2, 2006, forwarded a proposal in which Plaintiff used a multiple of 7 to value its then-contemplated investment in Lab123. Plaintiff based this valuation wholly on its review of the Biosafe Entities' artificially inflated revenue for the five Biosafe customer health diagnostic tests which Biosafe Labs was to license, to Lab123, the exclusive rights to market and sell. Further, Plaintiff, relying on Defendants' misrepresentations, began drafting deal documents for the funding of Lab123.

70.     On or about June 12, 2006, Defendant Trumpy sent to Plaintiff a revised Letter of Intent which incorporated the financials that Defendants had presented to Plaintiff and set forth many of Defendants' representations underlying the then-contemplated transaction between Lab123 and Plaintiff. One of these representations involved the previous sales figures for Biosafe:

24

**Assumptions:**

1) $1.85 million in run-rate seasonal adjusted annualized EBITDA minus $0.40 million in additional legal and public costs and $0.18 million recurring capital expenditures from BIOSAFE Medical Technologies, Inc ("BIOSAFE") licensed products to Company

This representation by Defendants in their revised Letter of Intent, however, was false and misleading as was the financial information previously produced to Plaintiff.

71.    The revised Letter of Intent also contained certain representations by Defendants regarding the Licensing Agreement between Biosafe Labs and Lab123:

**Assumptions:**
. . . .

10)    BIOSAFE will require execution by Company of license agreement for the products licensed to Company

. . . .

**Total Initial Purchase Price:**

Use of Proceeds:

| | | |
|---|---|---|
| 1) | Barron Due Diligence Fee | $85,000 |
| 2) | Banking Fees and Closing Costs | $145,000 |
| 3) | Biosafe License fee ($200,000 per product) | $1,000,000 |
| 4) | Company Working Capital | $760,000 |
| | Total | $2,000,000 |

So too, Defendants' representation, in the revised Letter of Intent that a viable Licensing Agreement existed was false, because, among other reasons, the Biosafe Entities had already sold the 'exclusive' rights to market and sell the Cholesterol Panel, the Anemia Test, the Prostate Screen, the Thyroid Test, and the Hemoglobin A1c. However, the

25

revised Letter of Intent clearly evidences that $1,000,000 of Plaintiff's money was to be used to purchase the licensing fees of five different products from Biosafe.

72.    On June 15, 2006, Defendant Trumpy sent an e-mail to Plaintiff providing revised projections of income for the new entity, Lab123, for use in a conference call. These revised projections decreased the future revenue of Lab123; however, they were still based on the artificially inflated revenues of the product sales for the year 2005. Accordingly, all of these financials were misrepresentations as they contained false and misleading information.

**Defendants Supply Plaintiff With False
and Fraudulent 2006 Year-to-Date Revenue
Figures for Biosafe, and with Phony
Documentation for These Revenue Figures**

73.    Plaintiff was not satisfied with the above pro formas, so Plaintiff requested a detailed accounting of Biosafe's sales for the year 2006. On June 20, 2006, Defendant Trumpy sent Plaintiff a document entitled "Biosafe Medical Technologies, Sales by Customer Summary, January 1 through June 7, 2006" (the "Sales by Customer Summary") to induce the Plaintiff to fund the investment in Lab123. This document provided to Plaintiff, for January 1, 2006 through June 7, 2006, false, fraudulent and artificially inflated revenue for the five customer health diagnostic tests which Biosafe Labs was to license to Lab123 exclusive rights to market and sell. In this document, the Defendants represented that, from January 1, 2006 through June 7, 2006, for the Cholesterol Panel, the Anemia Test, the Prostate Screen, the Thyroid Test, and the Hemoglobin A1c, Defendants had actual revenue of $1,044,848.57. In fact, the revenue during that time period was less than 10% of that amount.

74.    For example, in the Sales by Customer Summary, Defendants represented that, during the first five months and one week of 2006, Biosafe realized revenue of approximately $685,000 on products sold to CVS. In fact, Biosafe realized only a small fraction of that supposed revenue.

75.    The Defendants' $685,000 actual revenue figure for sales to CVS was grounded on Defendants' false representation that Biosafe's contract with CVS (to sell Biosafe products in CVS retail stores) required 'net 30' payment, meaning that CVS would pay Biosafe 30 days after CVS's receipt of Biosafe's products. In fact, the Biosafe-CVS contract implemented a 'pay-on-scan,' or 'on consignment,' schedule, meaning that CVS was to pay Biosafe for a product only if and when that product was actually sold to a retail customer of CVS.

76.    Upon information and belief, CVS paid Biosafe, for the length of the contract between them, less than $50,000, all under a pay-on-scan schedule. CVS paid all of these monies to Biosafe after the August 2006 incorporation of Lab123. Accordingly, contrary to Defendants' false representation in the Sales by Customer Summary, CVS did not pay any monies to Biosafe entities from January 1, 2006 through June 7, 2006 (or, for that matter, in 2005).

77.    Another example of the fraudulent numbers used by Defendants to induce Plaintiff to invest in Lab123 was their representation that Walgreen's had purchased $80,000 worth of products from January 1, 2006 through June 7, 2006. Again, no such revenues were realized by Biosafe.

78.    Plaintiff was concerned not only about the financials of the Biosafe Entities, but also by the contemplated Licensing Agreement between Biosafe and

27

Lab123, which was the basic foundation for the investment. Defendant Warner had attempted to allay the fears of Plaintiff by providing Plaintiff on June 20, 2006 with the then-proposed, 25-year Licensing Agreement between Biosafe Labs and the new entity, Lab123. Also on June 20, 2006, Defendant Warner sent an e-mail to Plaintiff explicitly representing that $1,000,000 from the potential investment would be used by the new entity to purchase licenses for the sale of products from Biosafe. Defendants knew all along that the Biosafe Entities had previously sold, to various companies and persons, Lab123's 'exclusive' rights to market and sell the five Biosafe customer health diagnostic tests. The Licensing Agreement was an illusory contract devised by Defendants to induce Plaintiff to invest in Lab123.

79.    In response to a request from Plaintiff for "proof of revenue," on July 27, 2006, Defendant Trumpy sent an e-mail to Plaintiff attaching a spreadsheet that details the specific sales that purportedly supported the product revenue generated from the sales of the Biosafe products from January 1, 2006 through June 7, 2006. This spreadsheet is false and misleading, in that it purports to show that the revenue for the sales of the medical products was realized during that period. Defendants artificially inflated these revenue numbers and supplied them to Plaintiff in order to induce Plaintiff to invest in Lab123.

80.    Later on that same day, Defendant Trumpy sent another e-mail to Plaintiff revising the pro forma financial projections for a third time. The projections, however, were still based on the artificially inflated revenues of the product sales for the year 2005. Accordingly, all of these financials were misrepresentations as they contained false and misleading information.

28

81.    Again, on August 1, 2006, Defendant Trumpy re-sent these same

fraudulent financials to Plaintiff to induce it to invest in Lab123.

**Defendants Misleadingly Boast
to Plaintiff That Biosafe Entities
Is Imminently Going To Reap a
Windfall from Kellogg Corporation**

82.    Defendants were aggressively trying to fund the Lab123 transaction

without Plaintiff adequately completing its due diligence, and misrepresenting facts so

that Plaintiff would complete such funding on an expedited basis. For example, in a July

31, 2006 e-mail to Barron Partners analyst Matthew Samuel, Defendant Warner

pressured Plaintiff to complete paperwork by representing that Kellogg Corporation was

imminently going to buy 500,000 Cholesterol Panels from Biosafe. Defendant Warner's

representation was false and misleading, because (i) Kellogg had not bought such

products from Biosafe, (ii) Kellogg did not buy any products at all from Biosafe until

November 2006, four months after Warner's statement, (iii) when, in November 2006,

Kellogg bought from Biosafe 300,000 Cholesterol Panels, Biosafe did not remit all or any

of the proceeds of this sale to Lab123.

83.    Because Defendants were concerned that Plaintiff was not moving quickly

enough on investing in Lab123, and so as to pressure Plaintiff to complete the Lab123

transaction, Defendant Warner, by August 7, 2006 e-mail to Plaintiff's Managing Partner,

Andrew B. Worden, and to Barron Partners analyst Matthew Samuel, reiterated and

expanded upon the Defendants' July 31, 2006 misrepresentations regarding Kellogg.

Specifically, in his August 7, 2006 e-mail, Defendant Warner represented that Kellogg

had placed an order with Biosafe for "500,000 Cholesterol Panels" to be delivered in the

fourth quarter of 2006. Defendant Warner's representation was false and misleading and

29

was only intended to fraudulently induce Plaintiff to invest in Lab123, because no such order was placed with Biosafe.

84.    On that same day, Plaintiff prepared its own intrinsic value and earnings target calculations based upon Defendants' prior misrepresentations. The language specifically provided for "Price Adjustment Based on 2006 and 2007 earnings per share." The Plaintiff was simply attempting to protect its investment in Lab123 if the earnings per share declined by 50% during those two years. The following day, Defendants accepted the proposed language knowing that such language was irrelevant because all of the financial information produced to the Plaintiff was inaccurate.

**Defendants Deceptively Represent to Plaintiff that Lab123 is Governed Independently of the Biosafe Entities; an Independent Director of Lab123 Demands, of Defendants, Lab123's Financials, as a Result of Which Defendants Fire the Independent Director and Lie to Plaintiff About Having Doing So**

85.    On August 9, 2006, in response to Defendant Henry Warner's e-mail, Plaintiff expressed its several concerns regarding the completion of the proposed transaction: namely, the independence of Lab123 from Biosafe. Plaintiff wanted to be reassured that the entities were completely separate and independent. Indeed, in section 4.16 of the Purchase Agreement, Lab123 agreed that "Not later than 30 days after the Closing" of the Purchase Agreement, the majority of Lab123's Board of Directors "shall be independent as such term is defined in" National Association of Securities Dealers ("NASD") Rule 4200(a)(15) – that is, that the majority of Lab 123's directors shall be independent.

86.    On August 10, 2006, Defendant Henry Warner responded by e-mail to the

Plaintiff reassuring it of the independence of the two entities, and stating that "Lab123

must operate totally independent of BIOSAFE."  Henry Warner's August 10, 2006

statement was a misrepresentation, because, when Warner made it, Defendants did not

intend for Lab123, or for a majority of Lab123's Board of Directors, to be independent.

Rather, as of August 14, 2006, Defendants intended for at least three of the five members

of Lab123's Board of Directors to be controlled by and beholden to Henry Warner.

87.    Defendants' present intent -- when they promised Plaintiff that Lab123

would operate entirely independently of Biosafe and that a majority of Lab123's directors

would be independent – not to carry out this promise is corroborated by the facts that

(i) Biosafe Labs owned 98% of the outstanding shares of Lab123, (ii) a limited liability

company known as Renraw, LLC is the majority shareholder of Biosafe, (ii) Defendant

Henry Warner is the managing member of, and controls, Renraw, LLC,  (iv) subsequent

to Plaintiff's September 2006 investment, Henry Warner, through Renraw, LLC and

otherwise, continued to control all operating and business matters of the Biosafe Entities

and Lab123, and (v) that, after Plaintiff's September 2006 investment in Lab123,

Defendants failed to appoint three "independent" directors to the Board of Directors of

Lab123.

88.    After Plaintiff's September 2006 investment in Lab123, Lab123's five

directors were Defendant and Board Chairman Henry Warner; Defendant Kent Connolly;

Michael Sosnowick; Frederick Fitzsimmons; and Kurt Katz.  Lab123 Board members

Sosnowick and Connolly were controlled by and beholden to Henry Warner.  Throughout

their tenure on Lab123's Board, Henry Warner, Sosnowick, and Connolly were not

31

independent, and acted in the best interests of Henry Warner rather than in the best interests of Lab123.

89.    Defendants' present intent not to carry out their promise is further corroborated by the facts that, when Lab123 Board member Frederick Fitzsimmons acted independently and in accordance with his fiduciary duty by demanding from Lab123 the company's financials, Defendants kicked Fitzsimmons off Lab123's Board and, in an effort to cover up their firing of an independent director, lied to Plaintiff by stating that Fitzsimmons voluntarily quit Lab123's Board.

90.    In September 2006, Defendants appointed Frederick Fitzsimmons a member of the Board of Directors of Lab123, and a member of Lab123's audit and compensation committee. Upon information and belief, because Mr. Fitzsimmons was also a member of the Board of Directors of Biosafe, Defendants expected to control Mr. Fitzsimmons and expected Mr. Fitzsimmons to be loyal to Henry Warner rather than to Lab123.

91.    Contrary to Defendants' apparent expectations, and to Defendants' alarm, Fred Fitzsimmons acted in accordance with his fiduciary duty as a Lab123 Board member. Continuously from September 2006 to March 2007, Henry Warner and Biosafe Chief Financial Officer Robert Trumpy failed and refused to provide to Lab123's Board of Directors and to the Board's audit and compensation committee (i) Lab123's net income projections and (ii) the company's basic financials for 2006 and to-date 2007, including Lab123's balance sheet, income statement and cash flow statement. Throughout this period, Mr. Fitzsimmons made numerous requests of Henry Warner and

32

Robert Trumpy, at Board meetings, by memoranda, and by e-mails, for this financial

information.

92.    On March 16, 2007, Fred Fitzsimmons submitted to Henry Warner, Kent

Connally, Lab123's then-Chief Executive Officer Mary Rodino, Biosafe's Chief

Financial Officer Robert Trumpy, and Kurt Katz a memorandum emphasizing the

following unsatisfactory conditions:

a.    The refusal by Henry Warner to allow the Lab123 Board's audit

and compensation committee access to the January and February 2007 financials;

b.    The admission by Henry Warner and Robert Trumpy that the $400,000

CVS revenue which Lab123 had recorded in the fourth quarter of 2006 was rejected by

Lab 123's auditors;

c.    The admission by Warner that the deduction of the $400,000 from

Lab123's fourth quarter 2006 revenue would trigger the preferred stock and warrant

clauses of Lab123's Licensing Agreement with Plaintiff, thereby requiring Lab123, for

2006, to pay to Plaintiff large sums of money;

d.    The proposal by Warner for Lab123 to solve the problem (of Lab123's

substantial liability to Plaintiff) by recording, in place of the disallowed CVS revenue,

revenue from Biosafe's November 2006 sale to Kellogg of 300,000 Cholesterol Panels,

even though the Board of Directors of Biosafe had not approved such a revenue trade

(and, although Mr. Fitzsimmons' memorandum did not address this issue, even though

Biosafe, in violation of the Licensing Agreement, had failed to remit to Lab123 all or any

of the proceeds of Biosafe's above-mentioned sale to Kellogg); and

e.    The admission by Warner that, even if, as he proposed, Lab123, rather

33

than Biosafe, were to record revenue from Biosafe's sale to Kellogg of 300,000

Cholesterol Panels, the revenue shortfalls which Lab123 anticipated for 2007 would

trigger the preferred stock and warrant clauses of Lab123's Licensing Agreement with

Plaintiff, thereby requiring Lab123, for 2007, to pay to Plaintiff large sums of money.

93.    By March 19, 2007, 7:04 A.M. e-mail, Henry Warner, instead of

responding to Fred Fitzsimmons' specific concerns, terminated Fitzsimmons (effective as

of March 17, 2007) as a Board member of Lab123.

94.    By March 19, 2007, 7:44 A.M. e-mail to Plaintiff and Lab 123's then-

CEO Mary Rodino, Henry Warner falsely stated that "Fred Fitzsimmons may be planning

to leave the Board of Lab123." This representation by Warner was a lie and was false

and misleading, because Henry Warner had already fired Mr. Fitzsimmons from

Lab123's Board, effective two days earlier.

95.    Henry Warner, in falsely representing to Plaintiff and Rodino that Fred

Fitzsimmons intended voluntarily to leave Lab 123's Board of Directors, intended to, and

did, conceal from to Plaintiff the fact that Defendants terminated Mr. Fitzsimmons

because Fitzsimmons acted as an independent director and because Fitzsimmons sought,

from Defendants, financials which would have made plain Defendants' fraudulent

scheme as to Plaintiff.

Defendants Purposely Conceal
Defendant Warner's Control
of The Ultimate Health Club, Inc.

96.    As part of their due diligence procedures in evaluating whether or not to

invest in Lab123, Plaintiff required Biosafe to complete one of Plaintiff's standard

director/officer background forms (Form DOB) (the "Director & Officer Form").

34

Plaintiff relies heavily on the responses to these forms in its overall evaluations in any such transaction.

97.    By responses of in or about August 2006, Defendants completed the Plaintiff's Director & Officer Form.  Upon information and belief, the Defendants' responses in or about August 2006 to the Director and Officer Form were completed and/or reviewed by each of the Individual Defendants on behalf of the Biosafe Entities.

98.    In their responses to section 4 of the Plaintiff's Director and Officer Form, Defendants represented (i) that Biosafe and Banc Street Acquisitions were the only two employers, businesses, or entities of which Defendant Henry Warner has been or is a director, a primary or majority shareholder or a founder and (ii) except for Biosafe and Banc Street Acquisitions, Defendant Warner has not advised, directed, or had any other non-employee relationship with any venture or project.

99.    This representation by Defendants was false or misleading because, at all pertinent times, Defendant Warner has directed or had a non-employee relationship with, among other ventures or projects, The Ultimate Health Club, Inc. and Rapid Response.

100.    Specifically, Defendant Henry Warner has been the managing member of, and has controlled, the limited liability company (Renraw, LLC) which is the majority shareholder of Biosafe, and The Ultimate Health Club, Inc. is a subsidiary of Biosafe.  As a result, subsequent to Plaintiff's September 2006 investment, Henry Warner, through Renraw, LLC and otherwise, continued to control all operating and business matters of Biosafe and of Biosafe's subsidiary Ultimate Health.

101.    But for Defendants' misrepresentation that Defendant Henry Warner has not directed, and has not had a non-employee relationship with, The Ultimate Health

35

Club, Inc., Plaintiff, as part of its due diligence procedures in deciding whether to invest

in Lab123, would have investigated Ultimate Health. By this investigation, Plaintiff

would have discovered that, prior to the September 2006 Purchase Agreement, the

Biosafe Entities had already granted to Ultimate Health the 'exclusive' rights to market

and sell, on the internet, the Cholesterol Panel, the Anemia Test, the Prostate Screen, the

Thyroid Test, and the Hemoglobin A1c. Based on this material adverse information

which Defendants did not disclose, Plaintiff would not have executed transactions in

Lab123 securities at the artificially inflated prices that it did.

### The Purchase Agreement Is Executed

102.    On September 6, 2006, Lab123 entered into a convertible preferred stock

purchase agreement with Plaintiff to issue 3,774,000 shares of Series A Convertible

Preferred Stock ("Series A Preferred") and a warrant to purchase 3,774,000 shares of

common stock for $2,000,000 (the "Purchase Agreement") based entirely on all of the

above fraudulent financials and other misrepresentations. Plaintiff agreed to notify the

escrow company to release the $2,000,000 in funds to Lab123, and accordingly wired

that amount on September 6, 2007. Half of these proceeds ($1,000,000) were to be used

to partially fund the license Lab123 obtained from Biosafe Labs of certain retail medical

diagnostic products to sell into the retail drug stores and chains the United States and

internet drug retailers. The Licensing Agreement, which was so pivotal to Plaintiff's

investment, was a complete sham as detailed above.

103.    Even after the Purchase Agreement was executed, the Defendants

continued to procure fraudulent financials to Plaintiff. On September 21, 2006,

Defendants sent Plaintiff an excel spreadsheet showing total sales for the Biosafe

products between August 1, 2006 to August 31, 2006 of $227,612.73. Defendants intentionally misrepresented these sales. Defendants represented that they had sold $87,000 worth of Biosafe's products to Walgreen's in the month of August. In fact, that revenue was not realized because the Biosafe Entities sold their products to Walgreen's on a pay-on-scan basis.

104.    Also, right after the Purchase Agreement was executed in October 2006, Biosafe decided to charge Lab123 $15,000 a month for office space and administrative functions. Before Plaintiff invested in Lab123, Defendants had explicitly informed Plaintiff that there would be no monthly charges for such facilities and services.

105.    On September 29, 2006, Lab123 elected three purportedly independent directors to its Board of Directors (Kent Connally, Frederick Fitzsimmons, and Kurt Katz), and the Board allegedly established audit and compensation committees comprised solely by these three supposed independent directors. In fact, however, Defendant Connally was not independent. Rather, Defendant Connally was controlled by and/or beholden to the Chairman of Lab123's Board of Directors, Defendant Henry Warner.

106.    In a letter dated October 20, 2006, the SEC sent the President of Lab123, Inc. a letter with comments and questions regarding their Form SB-2 which was filed with the Commission on September 22, 2006. The SEC specifically questioned Lab123's revenue recognition policy. In response to this request, Lab123 submitted a revised, but fraudulent, Form SB-2 to the SEC on or about November 22, 2006. The Notes to the financial statements provide:

*Revenue Recognition*

> Revenue is recognized upon shipment of products. Sales discounts and allowances are recorded at the time product sales are recognized and are offset against sales revenue.

As discussed above, these statements were misrepresentations in that – pursuant to the pay-on-scan system - the purchaser pays Lab123, and thus Lab123 recognizes revenue, only if and when the purchaser's drug store actually sells the product to the retail customer.

## The Fraud Unravels

107.    In the beginning of the first quarter of 2007, the CEO of Lab123, Michael Sosnowik, resigned. He did so because he realized that all of the financials that Defendants provided to him before his employment by Lab123 were fraudulent. In short, practically none of the revenue that had been purportedly realized was, in fact, realized. Simply, the consignment sales or pay-on-scan sales revenue had been booked as realized, and a significant percentage of Biosafe's products remained on the shelves of its customers' stores, like Albertsons and CVS. Mr. Sosnowik was also having extreme difficulty in attempting to have Lab123 be independent of the Biosafe Entities. It was impossible to do so, because Defendant Warner controlled everything concerning these companies and would not relinquish any control whatsoever. Mr. Sosnowik also realized that the 70-80% margins for the sale of the Biosafe products were a complete fiction orchestrated by Defendants. Finally, Henry Warner insisted that Lab123 purchase, for about $100,000, the website of Henry Warner's son Chris Warner, and Sosnowick flatly refused to have Lab123 do so.

108.    After Mr. Sosnowik's resignation, the board undertook to hire a new CEO to run Lab123. Mary Rodino was hired as the new CEO to be effective March 1, 2007. Less than three weeks after her appointment, Ms. Rodino resigned. Upon information and belief, she did so due for the same reasons as Mr. Sosnowik.

109.    Also, in March 2007, Biosafe was forced into involuntary bankruptcy by several of its creditors, including Mr. Fitzsimmons, the alleged independent director of Lab123. The bankruptcy petition alleged severe illegal conduct perpetrated by Defendant Warner, including, but not limited to, his taking of corporate monies for his own purposes.

110.    In April 2007, Lab123 disclosed to Plaintiff that its revenues for the first quarter were only $37,000 -- approximately 15% of the pro forma numbers that were provided to Plaintiff prior to its investment. Plaintiff was also told that there were no revenues from Kellogg, which was seemingly impossible as Defendant Warner represented that there was a 500,000 product order in hand from Kellogg, which was supposed to be delivered in the fourth quarter of 2006. Finally, Defendants informed the Plaintiff that the Licensing Agreement between Biosafe Labs and Lab123 was being terminated because Defendant Warner had simply changed his mind, which is clearly not a basis for termination pursuant to the Licensing Agreement. Clearly, Defendant Warner never had an intention of honoring the Licensing Agreement, which was paid for expressly by Plaintiff's investment in Lab123.

111.    After these disclosures, Plaintiff immediately demanded rescission of the Purchase Agreement, and return of the $2,000,000, plus interest. Defendants agreed to this proposal, but have yet to act on such agreement.

39

112.    Each Defendant is liable for (i) making false statements, or (ii) failing to disclose adverse facts known to him about the Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on Plaintiff. Defendants' fraudulent scheme was a success, as it (i) deceived the Plaintiff regarding the Biosafe Entities and Lab123's prospects and business; (ii) artificially inflated the revenues and the prices for the securities that Plaintiff purchased pursuant to the Purchase Agreement; and (iii) caused Plaintiff to execute transactions in Lab123 securities at inflated prices.

113.    As a result of the false statements and/or omissions of Defendants, Lab123's stock price was artificially inflated when Plaintiff invested in Lab123. However, after the Defendants' admissions, Lab123's value is worthless. In sum, as the truth about Defendants' fraud was revealed, the artificial inflation came out of the stock and Plaintiff was damaged by suffering severe economic losses.

### Inapplicability of the Safe Harbor

114.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was

40

false, and/or the forward-looking statement was authorized and/or approved by an

executive officer of Lab123 and/or the Biosafe Entities who knew that those statements

were false when made.

## CAUSES OF ACTION

### COUNT I

**AGAINST ALL DEFENDANTS FOR VIOLATION OF SECTION 10(b) OF THE
SECURITIES EXCHANGE ACT OF 1934 AND RULE 10B-5 THEREUNDER**

115.    Plaintiff repeats and realleges each and every allegation above, as if set

forth in full herein.

116.    Defendants, individually and in concert, directly or indirectly, by the use

and means of instrumentalities of interstate commerce and the mails, engaged and

participated in a common plan, scheme and course of conduct described herein, pursuant

to which they knowingly or recklessly engaged in acts, transactions, practices and a

continuous course of business which operated as a fraud upon Plaintiff; made various

false statements of material facts and omitted to state material facts to make the

statements made not misleading to Plaintiff; and employed manipulative or deceptive

devices and contrivances in connection with the purchase and sale of Lab123 securities.

117.    The purpose and effect of Defendants' plan, scheme and course of conduct

were to artificially inflate the price of Lab123's securities.

118.    The Individual Defendants, who were the top officers of the Biosafe

Entities and/or Lab123, had actual knowledge of the material omissions and/or the falsity

of the material statements set forth above, and intended to deceive, manipulate, or

defraud Plaintiff or, in the alternative, acted with reckless disregard for the truth when

they failed to ascertain and disclose the true facts in the statements made by them.

41

119.    As a result of the foregoing, the valuation of Lab123's securities was materially and artificially inflated when Plaintiff purchased the securities in September 2006. In ignorance of the falsity of the Defendants' statements and representations concerning the operating results and performance of the Biosafe Entities, Plaintiff, to its damage, reasonably relied on the statements and communications described above in executing transactions in Lab 123 securities at prices which were artificially inflated as a result of Defendants' false and misleading statements.

120.    Had Plaintiff known of the material adverse information which Defendants did not disclose, it would not have executed transactions in Lab123 securities at the artificially inflated prices that it did.

121.    Defendants' concealment of this material information served only to harm Plaintiff in ignorance of the financial risk to it as a result of such nondisclosures.

122.    As a proximate result of the wrongful conduct alleged herein, Plaintiff suffered substantial damages in connection with its execution of transactions in Lab123 securities.

123.    By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and are liable to the Plaintiff for damages in an amount to be established at trial, but in excess of $2,000,000.

## COUNT II

### AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF SECTION 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934

124.    Plaintiff repeats and realleges each and every allegation above, as if set forth in full herein.

125.    The Individual Defendants, directly or indirectly, controlled Defendant Lab123 and the Defendant Biosafe Entities.

126.    The Individual Defendants, by reason of their senior management positions with, and their ownership of voting securities of, the Biosafe Entities and Lab123, directly or indirectly possessed the power to direct or cause the direction of the management and policies of the Biosafe Entities and Lab 123.

127.    The Individual Defendants exercised this power.

128.    The Individual Defendants were in a meaningful sense culpable participants in the fraud perpetrated by the Biosafe Entities and Lab123.

129.    The Individual Defendants consciously misbehaved or acted recklessly with respect to the perpetrated by the Biosafe Entities and Lab123.

130.    Among other things, the Individual Defendants participated in the day-to-day management and overall direction of the Biosafe Entities and/or Lab123 and prepared or helped prepare the documents containing statements alleged herein to be false and misleading.  The Individual Defendants each participated in meetings and telephone conferences and wrote e-mails or letters, in which they made false and misleading statements to Plaintiff as set forth above.

131.    Defendant Henry Warner's false or misleading representations of material fact to Plaintiff included, among others, the following:

a.    Defendant Warner falsely represented to Plaintiff that Kellogg Corporation was imminently going to buy 500,000 products from Biosafe.

b.    By e-mail to Plaintiff, Defendant Warner falsely represented that Lab123 operates totally independently of the Biosafe Entities.

43

132.   Defendant Robert Trumpy's false or misleading representations of material fact to Plaintiff included, among others, the following:

a.    Defendant Trumpy sent Plaintiff a Letter of Intent which incorporated the fraudulent financials that had been presented to Plaintiff and detailed several of the false "assumptions" which underlined the transaction between the parties.

b.    Defendant Trumpy sent an e-mail to Plaintiff providing revised, but still false, projections of income for the new entity, Lab123, for use in a conference call.

c.    Defendant Trumpy sent Plaintiff the Sales by Customer Summary, which  document provided Plaintiff with false, fraudulent and artificially inflated revenue for the periods January 1, 2006 through June 7, 2006.

d.    In response to a request from Plaintiff for "proof of revenue," on July 27, 2006, Defendant Trumpy sent an e-mail to Plaintiff attaching a false and misleading spreadsheet that details the specific invoices that purportedly supported the product revenue generated from the sales of the Biosafe products from January 1, 2006, through June 7, 2006.

e.    Defendant Trumpy sent another e-mail to Plaintiff revising the pro forma financial projections for a third time.  These projections, however, were based on the artificially inflated revenues of the product sales for the year 2005, and thus were false and misleading.

f.    Again, Defendant Trumpy re-sent these same fraudulent financials to Plaintiff.

133.    Plaintiff would not have gone forward with its investment in Lab123 if it had known either of the false and misleading nature of the Individual Defendants' statements as set forth above or of the Individual Defendants' omissions of fact as set forth above. Moreover, the Individual Defendants' false and misleading statements and omissions related directly to the fact of Lab123's financial stability, which stability led to Plaintiff's investment.

134.    By reason of the foregoing, Defendants have violated Section 20(a) of the Exchange Act, and are liable to the Plaintiff for damages in an amount to be established at trial, but in excess of $2,000,000.

## COUNT III

## <u>AGAINST ALL DEFENDANTS FOR FRAUD</u>

135.    Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

136.    In order to induce Plaintiff to invest in Lab123's securities at an artificially inflated price, Defendants made the above-mentioned material representations of presently existing or past facts, with knowledge that the representations were false and with intention that Plaintiff rely on these representations. By way of example and without limitation, these material representations include the following:

●      Defendants falsely represented to Plaintiff that Lab123 has exclusive rights to market and sell the five Biosafe customer health diagnostic tests covered by the Licensing Agreement between Biosafe Labs and Lab123, that is, the Cholesterol Panel, the Anemia Test, the Prostate Screen, the Thyroid Test, and the Hemoglobin A1c.

45

- Defendants falsely misstated to Plaintiffs Lab123's profit margins and sales.

- Defendants falsely stated to Plaintiffs the financial revenues for Lab123 and the Biosafe Entities.

- In June 2006, Defendants falsely stated to Plaintiff the 2006 year-to-date revenue figures for Biosafe.

- Defendants falsely represented to Plaintiff that Lab123 is governed independently of the Biosafe Entities.

137.    Defendants' knowledge when they made the above-mentioned representations that the representations were false is corroborated by the fact that, upon information and belief, before Biosafe Labs and Lab123 entered into the Licensing Agreement, the Biosafe Entities had entered into separate agreements with four other entities or persons – Johnson & Johnson, Rapid Response, Ultimate Health, and Henry Warner's son Chris Warner -- granting these persons the rights or the exclusive rights to market and sell some or all of Cholesterol Panel, the Anemia Test, the Prostate Screen, the Thyroid Test, and the Hemoglobin A1c.  In other words, Defendants' scienter is corroborated by the fact that, upon information and belief, the Biosafe Entities sold or licensed (or, with respect to Defendant Henry Warner's son, gratuitously gave away) the exclusive rights to market and sell five Biosafe customer health diagnostic tests both to Lab123 and to multiple other entities.

138.    Plaintiff reasonably relied on Defendants' misrepresentations to Plaintiff's detriment in that, as a result of the false representations Defendants made and the lies Defendants told people at Barron Partners, Plaintiff executed transactions in Lab 123's

securities at prices which were artificially inflated. But for Defendants' misrepresentations, Plaintiff either would not have invested in Lab 123 or would have purchased securities of Lab123 at drastically lower prices.

139.    Given that Plaintiff shows (i) a misrepresentation, (ii) scienter, (iii) reasonable reliance, and (iv) detriment, Plaintiff possesses a cause of action against Defendants for fraud.

140.    By reason of the foregoing fraudulent conduct by Defendants, Plaintiff has been damaged in an amount to be determined at trial.

141.    Defendant Henry Warner personally participated in, and had actual knowledge of, Lab123's and the Biosafe Entities' fraud.

142.    Defendant Henry Warner's personal participation in, and actual knowledge of, Lab123's and the Biosafe Entities' fraud is corroborated by the facts that:

    a.    Upon information and belief, defendant Henry Warner had arranged for his son, Chris Warner, to market and sell Biosafe Entities products, including the Anemia Test, at a discount through websites linked to the Biosafe Entities' website. The Anemia Test is among the Biosafe customer health diagnostic tests which the Licensing Agreement granted to Lab123 exclusive rights to market and sell.

    b.    When Plaintiff's Managing Partner, Andrew B. Worden, discovered, and protested to Defendants, the fact that Defendants did not give to Lab123 all or any of the proceeds from Kellogg's order, from the Biosafe Entities, of 300,000 Cholesterol Panels, Defendant Henry Warner argued, in a reply e-mail to Mr. Worden, that "Clearly, Kellogg is not covered by the license agreement between BIOSAFE and Lab123."

47

c.       Defendant Warner sent an e-mail to Plaintiff explicitly representing that $1,000,000 from Plaintiff's potential investment would be used by Lab123 to purchase licenses for the sale of products from Biosafe.

d.       Defendant Warner represented to Plaintiff that Kellogg Corporation was imminently going to buy 500,000 products from Biosafe.

e.       By e-mail to Plaintiff, Defendant Warner represented that Lab123 operates totally independently of the Biosafe Entities.

f.       Defendant Warner terminated the Licensing Agreement between the Biosafe Entities and Lab123 because Defendant Warner had simply changed his mind, which is clearly not a basis for termination of the Licensing Agreement.

143.    Defendant Robert Trumpy personally participated in, and had actual knowledge of, Lab123's and the Biosafe Entities' fraud.

144.    Defendant Robert Trumpy's personal participation in, and actual knowledge of, Lab123's and the Biosafe Entities' fraud is corroborated by the facts that:

a.       Defendant Trumpy sent Plaintiff a Letter of Intent which incorporated the fraudulent financials that had been presented to Plaintiff and detailed several of the false "assumptions" which underlined the transaction between the parties.

b.       Defendant Trumpy sent an e-mail to Plaintiff providing revised, but still false, projections of income for the new entity, Lab123, for use in a conference call.

c.       Defendant Trumpy sent Plaintiff the Sales by Customer Summary, which document provided Plaintiff with false, fraudulent and artificially inflated revenue for the periods January 1, 2006 through June 7, 2006.

d.    In response to a request from Plaintiff for "proof of revenue," on July 27, 2006, Defendant Trumpy sent an e-mail to Plaintiff attaching a false and misleading spreadsheet that details the specific invoices that purportedly supported the product revenue generated from the sales of the Biosafe products from January 1, 2006, through June 7, 2006.

e.    Defendant Trumpy sent another e-mail to Plaintiff revising the pro forma financial projections for a third time. These projections, however, were based on the artificially inflated revenues of the product sales for the year 2005, and thus were false and misleading.

f.    Again, Defendant Trumpy re-sent these same fraudulent financials to Plaintiff.

145.    Defendant Jeremy Warner personally participated in, and had actual knowledge of, Lab123's and the Biosafe Entities' fraud.

146.    Defendant Kent Connally personally participated in, and had actual knowledge of, Lab123's and the Biosafe Entities' fraud.

a.    Defendant Kent Connally's personal participation in, and actual knowledge of, Lab123's and the Biosafe Entities' fraud is corroborated by the fact that when Plaintiff's Managing Partner, Andrew B. Worden, discovered, and protested to Defendants, the fact that Defendants did not give to Lab123 all or any of the proceeds from Kellogg's order, from the Biosafe Entities, of 300,000 Cholesterol Panels, Defendant Connally, by e-mail to Mr. Worden, snidely retorted that "the fact that you can become so 'incensed' over business disagreements . . . is disturbing to me" and that "I

49

cannot, and will not, become embroiled in your temper tantrums," and demanded that Mr. Worden remove Connally from Worden's e-mail distribution list.

147.    By reason of the foregoing fraudulent conduct by Defendants, Plaintiff has been damaged in an amount to be determined at trial, but in excess of $2,000,000.

## COUNT IV

## AGAINST ALL DEFENDANTS FOR NEGLIGENT MISREPRESENTATION

148.    Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

149.    In order to induce Plaintiff to invest in Lab123's securities at an artificially inflated price, Defendants made the above-mentioned material representations of presently existing or past facts, with knowledge that the representations were required for Plaintiff to decide whether to invest in Lab123's securities and, if so, at what price to invest in Lab123's securities. By way of example and without limitation, these material representations include the following:

- Defendants falsely represented to Plaintiff that Lab123 has exclusive rights to market and sell the five Biosafe customer health diagnostic tests covered by the Licensing Agreement between Biosafe Labs and Lab123, that is, the Cholesterol Panel, the Anemia Test, the Prostate Screen, the Thyroid Test, and the Hemoglobin A1c.

- Defendants falsely misstated to Plaintiffs Lab123's profit margins and sales.

- Defendants falsely stated to Plaintiffs the financial revenues for Lab123 and the Biosafe Entities.

- In June 2006, Defendants falsely stated to Plaintiff the 2006 year-to-date revenue figures for Biosafe.

- Defendants falsely represented to Plaintiff that Lab123 is governed independently of the Biosafe Entities.

150.    Defendants made the above-mentioned material representations knowing that the representations were made for the benefit of Plaintiff, that Plaintiff would rely on these representations, and that Plaintiff might be damaged if these representations were inaccurate.

151.    Defendants owed a duty to Plaintiff to take reasonable care that the above-mentioned material representations were accurate.

152.    Defendants made the above-mentioned material representations without reasonable basis, and failed to take reasonable care that these representations were accurate.

153.    In fact, the Defendants' above-mentioned material representations were false and misleading.

154.    Plaintiff justifiably relied on Defendants' above-mentioned false statements to its detriment, and has suffered damages a proximate result of such reliance.

155.    For Plaintiff's losses proximately caused by Defendants' negligent misrepresentation of such material facts, Defendants are liable to Plaintiff in an mount to be determined at trial, but in excess of $2,000,000.

## COUNT V

### AGAINST LAB123 FOR BREACH OF THE PURCHASE AGREEMENT

156.    Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

157.    Lab123 and Plaintiff formed a valid and binding contract, that is, the Preferred Stock Purchase Agreement.

158.    Plaintiff duly performed all of the conditions of the Preferred Stock Purchase Agreement on its part.

159.    Pursuant to the Preferred Stock Purchase Agreement, Lab123 agreed that the Financial Statements and other documents which Lab123 was to provide to Plaintiff would contain no false or misleading statements of material fact.

160.    Specifically, sections 4.6 and 4.15 of the Preferred Stock Purchase Agreement state, in pertinent part:

> 4.6    **Audited    Report    and    Financial Statements.**  The Company will provide to the Investor the audited financial statements of the Company as of August 31, 2006 (collectively, the "**Financial Statements**") prior to the release of funds by the escrow agent pursuant to the Escrow Agreement.  The balance sheet contained in such Financial Statements (including the related notes and schedules thereto) fairly presented the financial position of the Company, as of its date, and the statement of income and changes in stockholders' equity cash flows or equivalent statements in such Financial Statements (including any related notes schedules thereto) fairly presents, changes in stockholders' equity and changes in cash flows, as the case may be, of the Company, for the periods to which they relate, in each case in accordance with United States generally accepted accounting principles ("**U.S. GAAP**")
>
> . . . .

4.15 **Full Disclosure.** No representation or warranty made by the Company in this Agreement and no certificate or document furnished or to be furnished to the Investor pursuant to this Agreement contains or will contain any untrue statement of a material fact, or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading.

161.    The Financial Statements and other documents which Lab123 provided to Plaintiff, however, did contain false and misleading statements of material fact.

162.    The conduct of Lab123 in providing, to Plaintiff, Financial Statements and other documents containing false and misleading statements of material fact constitutes a breach of contract.

163.    Pursuant to the Preferred Stock Purchase Agreement, Lab123 agreed that that the Board of Directors of Lab123 would be comprised of a majority of independent directors:

164.    Specifically, section 4.16 of the Preferred Stock Purchase Agreement, entitled "Independent Board," states:

Not later than 30 days after the Closing, the Board of Directors of the Company shall consist of five directors, three of whom shall be independent as such term is defined in Rule 4200(a)(15) promulgated by the National Association of Securities Dealers, (the "NASD"). Not later than 30 days after the Closing Date of this Agreement, the Board of Directors Shall Have an Audit and Compensation Committee[] of the Board of Directors of the Company comprised of independent directors.

165.    At all relevant times, NASD Rule 4200(a)(15) stated in pertinent part that:

'Independent director' means a person other than an officer or employee of the company or its subsidiaries or any other individual having a relationship, which, in the opinion of the company's board of directors, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director.

53

166.    However, Lab 123's Board of Directors at all pertinent times has not had, and does not have, a majority of independent directors

167.    Lab123 breached the Purchase Agreement because there was not and is not a majority of independent directors on Lab123's Board.

168.    The conduct of Lab123 in failing to place on its Board of Directors a majority of independent directors constitutes a breach of contract.

169.    By reason of the foregoing breaches of contract by Lab123, Plaintiff has been damaged in an amount to be determined at trial.

170.    Lab123 is therefore indebted to Plaintiff in an amount to be determined at trial, but not less than $2,000,000.

171.    Further, pursuant to the Purchase Agreement, Lab123 is indebted to Plaintiff, a prevailing party, in the amount of Plaintiff's attorneys' fees.

## COUNT VI

### AGAINST BIOSAFE LABS AND LAB 123 <br> FOR BREACH OF THE LICENSING AGREEMENT

172.    Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

173.    Biosafe Laboratories, Inc. and Lab123 formed a valid and binding contract, that is, the Licensing Agreement.

174.    The Licensing Agreement was intended for Plaintiff's benefit.

175.    That the Licensing Agreement was intended for Plaintiff's benefit is corroborated by the following facts:

a.    Plaintiff's and Lab123's entry into the Purchase Agreement immediately followed Biosafe Labs' and Lab123's entry into the Licensing Agreement.

b.    Specifically, Biosafe Labs and Lab 123 entered into the Licensing Agreement on September 1, 2006, and Plaintiff and Lab123 entered into the Purchase Agreement on September 6, 2006.

c.    In determining whether to invest in Lab123's securities, Plaintiff was concerned about the then-proposed Licensing Agreement between Biosafe Labs and Lab123. On June 20, 2006, Defendant Henry Warner attempted to allay Plaintiff's fears by providing Plaintiff with the then-proposed Licensing Agreement, which set forth that Lab123 had exclusive rights to market and sell five Biosafe customer health diagnostic tests, that is, the Cholesterol Panel, the Anemia Test, the Prostate Screen, the Thyroid Test, and the Hemoglobin A1c.

d.    The Licensing Agreement between Biosafe Labs and Lab123 was the basic foundation for Plaintiff's investment in Lab123. In particular, because the Biosafe Entities, for years, had been selling, and recognizing revenues for sales of, the Cholesterol Panel, the Anemia Test, the Prostate Screen, the Thyroid Test, and the Hemoglobin A1c, Lab123 would enjoy an established client base, and Plaintiff would be able readily to predict, and would face little risk concerning, the future revenues of Lab123.

176.    The Licensing Agreement's benefit to Plaintiff is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties, Biosafe Labs and Lab123, of a duty to compensate Plaintiff if the benefit is lost.

55

177.    No one other than Plaintiff can recover if either of the promisors, Biosafe Labs and Lab123, breaches the Licensing Agreement.

178.    The language of the Licensing Agreement otherwise clearly evidences an intent to permit enforcement by Plaintiff.

179.    Plaintiff possesses a cause of action against Biosafe Labs and Lab123 for breach of the Licensing Agreement as a third-party beneficiary.

180.    By reason of the foregoing breaches of contract by Biosafe Labs and Lab123, Plaintiff has been damaged in an amount to be determined at trial.

181.    Biosafe Labs and Lab123 is therefore indebted to Plaintiff in an amount to be determined at trial, but in excess of $2,000,000.

## COUNT VII

### AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

182.    Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

183.    Defendants received money, property or services belonging to or provided by Plaintiff.

184.    Specifically, Defendants received $2,000,000 that Plaintiff invested in Lab123. Defendant Henry Warner representing in a June 20, 2006 e-mail to Plaintiff, and Defendants represented in August 14, 2006 responses to Plaintiff's due diligence Questionnaire, that, of Plaintiff's then-contemplated $2,000,000 investment, Lab123 would utilize $1,000,000 to license, for a period of 25 years, exclusive rights to market and sell five Biosafe customer health diagnostic tests.

185.    Of Plaintiff's $2,000,000 investment in Lab123, Lab123 did, in fact, pay $1,000,000 to Biosafe Labs as partial payment for exclusive rights, for a period of 25 years, to market and sell five Biosafe customer health diagnostic tests.

186.    The defendants benefited from the receipt of $2,000,000 which Plaintiff paid to Lab123 for securities, including the $1,000,000 which Lab123, in turn, paid to Biosafe Labs.

187.    However, in April 2007 – a mere seven months after Biosafe Labs and Lab23 entered into the 25-year Licensing Agreement -- Defendant Henry Warner unlawfully terminated the Licensing Agreement between Biosafe Labs and Lab123.

188.    Defendant Henry Warner's unlawful termination of the Licensing Agreement rendered virtually worthless the $2,000,000 of Lab123's securities purchased by Plaintiff, because the unlawful termination of the Licensing Agreement has deprived Lab123 of its sole source of revenue -- that is, Lab123's exclusive rights under the Licensing Agreement to market and sell five Biosafe customer health diagnostic tests.

189.    Under principles of equity and good conscience, the Defendants should not be permitted to retain Plaintiff's $2,000,000 investment.

190.    Plaintiff enjoyed a beneficial interest in the licenses leased from Biosafe Labs to Lab123.

191.    Plaintiff enjoyed a beneficial interest in the one million dollars of financing that was intended to be used by Lab123 to lease certain licenses from the Biosafe Entities.

192.    By accepting the funds, funded by Plaintiff and by canceling the lease of the licenses to Lab123, Biosafe and the other Defendants wrongfully deprived Plaintiff of its legal right to receive the benefits of the transferred licenses.

193.    Under the circumstances described herein, Defendants cannot in equity and good conscience be permitted to retain such benefit at Plaintiff's expense.

194.    Defendants have been unjustly enriched at the expense of Plaintiff.

195.    Defendants are therefore indebted to Plaintiff in an amount to be determined at trial, but in excess of $2,000,000.

## COUNT VIII

## AGAINST ALL DEFENDANTS FOR CONVERSION

196.    Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

197.    Defendants have unlawfully converted to their own use at least $2,000,000 belonging to Plaintiff.

198.    Specifically, Defendants have unlawfully converted to their own use the $2,000,000 which Plaintiff invested in Lab123's securities.

199.    Defendants have wrongfully and willfully failed and refused to deliver to Plaintiff the $2,000,000, despite demand being made by Plaintiff.

200.    In possessing and retaining Plaintiff's $2,000,000, Defendants acted with intent to interfere with those funds to the exclusion of the rights the true owner, Plaintiff.

201.    Plaintiff has the right to possession of the $2,000,000.

202. For Plaintiff's damages caused by the Defendants' conversion of Plaintiff's property as complained of herein, Defendants are liable to Plaintiff for an amount to be determined at trial, but in excess of $2,000,000.

## COUNT IX

## AGAINST ALL DEFENDANTS FOR VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

203. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

204. This Count is brought against all Defendants under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 I.L.C.S. §§ 505/1 – 505/12.

205. At all times relevant to this Complaint, there was in full force and effect in the State of Illinois a statute commonly known as the "Consumer Fraud and Deceptive Business Practices Act," section 2 of which, 815 I.L.C.S. § 505/2, states in pertinent part:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. . . .

206. Further, section 10(a) of the Consumer Fraud and Deceptive Business Practices Act, 815 I.L.C.S. § 505/10(a), states in pertinent part:

> Any person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in

59

its discretion may award actual economic damages or
any other relief which the court deems proper . . .

207.    Plaintiff is a "consumer" within the meaning of section 1(e) of the
Consumer Fraud and Deceptive Business Practices Act, 815 I.L.C.S. § 505/1(e).

208.    The sale of the preferred stock to Plaintiff as alleged herein above
constitutes the sale of "merchandise" within the meaning of sections 1(b) of the
Consumer Fraud and Deceptive Business Practices Act, 815 I.L.C.S. § 505/1(b).

209.    The conduct of Defendants as alleged hereinabove constitutes unfair
and deceptive acts and practices, including but not limited to the use and employment of
deception, fraud, false pretense, false promise, misrepresentation and the con-
cealment, suppression and omission of a material fact by Defendants in their con-
duct of trade or commerce with the intent that Plaintiff, a consumer, rely upon the
concealment, suppression and omission of such material fact and the use and
employment of practices alleged hereinabove, thus constituting a violation of the
Consumer Fraud and Deceptive Business Practices Act.

210.    The conduct of the Biosafe Entities, Lab123, and the Individual
Defendants as alleged herein, constitutes violations of the Illinois Consumer Fraud
and Deceptive Business Practices Act, 815 I.L.C.S. §§ 505/1 – 505/12.

211.    As a result of the aforesaid violations of the Consumer Fraud and
Deceptive Business Practices Act, 815 I.L.C.S. §§ 505/1 – 505/12, Plaintiff has suffered
actual economic damages in an amount to be determined at trial, but in excess of
$2,000,000.

## COUNT X

## AGAINST ALL DEFENDANTS FOR VIOLATION
## OF THE ILLINOIS SECURITIES LAW OF 1953

212.   Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

213.   By the foregoing actions, Defendants, in violation of section 12(F) of the Illinois Securities Act, 815 I.L.C.S. § 5/12(F), engaged in a transaction in connection with the sale of securities which worked or tended to work a fraud or deceit upon Plaintiff.

214.   By the foregoing actions, Defendants in violation of section 12(G) of the Illinois Securities Act, 815 I.L.C.S. §  5/12(G), obtained money from Plaintiffs through the sale of securities by means of untrue statements of material facts.

215.   By the foregoing actions, Defendants, in violation of section 12(H) of the Illinois Securities Act, 815 I.L.C.S. §  5/12(H), circulated statements to Plaintiff pertaining to securities knowing or having reasonable grounds to know that the statements contained material representations that were false or untrue.

216.   By the foregoing actions, Defendants, in violation of section 12(I) of the Illinois Securities Act, 815 I.L.C.S. 5/12(I), employed a scheme or artifice to defraud Plaintiff in connection with the sale or purchase of securities.

217.   As a result of the aforesaid violations of the Illinois Securities Act, 815 I.L.C.S. 5/12 *et seq.*, Plaintiff has suffered actual economic damages in an amount to be determined at trial, but in excess of $2,000,000.

## COUNT XI

### AGAINST ALL DEFENDANTS FOR FRAUD IN THE INDUCEMENT

218.    Plaintiff repeats and realleges the forgoing paragraphs as if fully set forth herein.

219.    Defendants' acts described above constitute fraudulent inducement between Plaintiff and Defendants because Defendants made knowing misrepresentations of material fact to Plaintiff as described herein in intent to deceive Plaintiff and to induce Plaintiff to act on it, which caused injury.

220.    By reason of the foregoing, Plaintiff has been injured in an amount to be determined at trial, but in excess of $2,000,000.


**WHEREFORE**, Plaintiff Barron Partners, LP, respectfully requests:

    A.    Judgment against the Defendants;

    B.    Compensatory damages in favor of Plaintiff against all Defendants, jointly and severally, in an amount in excess of $2,000,000, as well as punitive damages and interest, where applicable, and reasonable attorney's fees, expenses and costs; and

    C.    All other relief to which it may be properly entitled.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims properly triable by a jury.

Dated: New York, New York
      March 12, 2008

                           **LAX & NEVILLE, LLP**

                           Barry R. Lax, Esq. (BL 1302)
                           1412 Broadway, Suite 1407
                           New York, NY 10018
                           Tel: (212) 696-1999
                           *Attorneys for Plaintiff Barron Partners, LP*

LAX & NEVILLE, LLP
BARRY R. LAX (BL 1302)
1412 Broadway, Suite 1407
New York, NY 10018
Tel: (212) 696-1999
Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x

BARRON PARTNERS, LP,                          :       Index No.
                                              :       07 CV 11135 (JSR)
                                Plaintiff,    :
                                              :
     -against-                                :
                                              :       **CERTIFICATE OF**
LAB123, INC., HENRY A. WARNER, FRED           :       **SERVICE**
FITZSIMMONS, KENT B. CONNALLY, KURT           :
KATZ, ROBERT TRUMPY, JEREMY J. WARNER,        :
DAVID FLEISNER, BIOSAFE LABORATORIES,         :
INC., and BIOSAFE MEDICAL TECHNOLOGIES, INC., :
                                              :       **ECF CASE**
                                              :
                                Defendants.   :
-------------------------------------------------------------------x

I, the undersigned, certify:

1.      I am a legal assistant in the offices of Lax & Neville, LLP at 1412 Broadway,

Suite 1407, New York, NY 10018.

2.      On March 19, 2008, I served a true copy of the annexed First Amended

Complaint, as follows:

By depositing the papers, enclosed in a first class postpaid wrapper, in a post office or

official depository under the exclusive care and custody of the United States Postal Service

within the state, addressed to the following address(es), which is/are designated by the

addressee(s) for the purpose or, if none is designated, which is/are the last known address(es) of

the addressee(s):

KAUFMAN DOLOWICH & VOLUCK LLP
*Attorneys for Defendants Lab123, Inc.,*
*Biosafe Laboratories, Inc., Biosafe Medical*
*Technologies, Inc., Henry A. Warner, Jeremy*
*J. Warner, Robert Trumpy, and Kent B.*
*Connally*
Attn:   Michael V. DeSantis, Esq.
135 Crossways Park Drive
Suite 201
Woodbury, NY 11797

Angela Rosa