# EXHIBIT L

## Catherine Rivera

| | |
|---|---|
| **From:** | Henry Warner [hwarner@ebiosafe.com] |
| **Sent:** | Monday, August 07, 2006 7:42 AM |
| **To:** | Andrew B. Worden; Matt Samuel |
| **Cc:** | Darren L. Ofsink; Jay Weil; Robert Trumpy; David Fleisner; Leonardo G. Zangani |
| **Subject:** | Lab123 |

Andrew and Matt:

Can we set a conference call for today – perhaps 10:00AM Chicago time (11:00 NY time)? I am concerned that we have made very little progress in the last weeks, have spent some $7,000 on legal and understand that there is now a question on valuation. Perhaps a call can resolve any remaining issues and move this project forward.

One quick word on valuation: My understanding is the Barron protects itself against downside valuation movement with its paragraph 6.16. You should also be aware that Kellogg is preparing to announce that Lab123 has been selected as its marketing partner for the Smart Start™ brand for 2007. We have been advised that the initial Purchase Order will be for 500,000 Cholesterol Panels to be delivered in Q4, 2006. So, pending arrival of this order, we also have valuation concerns but no mechanism for our protection. Please note: The Kellogg marketing plan is confidential until they announce.

Look forward to talking.

*Hank*

Henry A. Warner
Chief Executive Officer
BIOSAFE Medical Technologies, Inc.
847-234-8111

-----------CONFIDENTIALITY NOTICE-----------
This e-mail message may contain confidential and privileged information. If you
have received this message by mistake, please notify us immediately by replying
to this message or telephoning us at (847) 234-8111.

9/19/2007

PL 00037

**Catherine Rivera**

| | |
|---|---|
| **From:** | Henry Warner [hwarner@ebiosafe.com] |
| **Sent:** | Monday, August 07, 2006 9:22 AM |
| **To:** | Andrew B. Worden |
| **Cc:** | Matt Samuel; Robert Trumpy |
| **Subject:** | RE: Lab123 |

11:30 your time works fine. We will be prepared to resolve any disconnect.

Will you initiate the call or should we?

Thanks,

*Hank*

Henry A. Warner
Chief Executive Officer
BIOSAFE Medical Technologies, Inc.
847-234-8111

---

**From:** Andrew B. Worden [mailto:abw@barronpartners.com]
**Sent:** Monday, August 07, 2006 7:45 AM
**To:** Henry Warner
**Cc:** 'Matt Samuel'
**Subject:** RE: Lab123

I have an 11 already

11.30am EST works for us

There seems to be a significant disconnect on run rate EBITDA between what was in the LOI and what our due diligence is finding. Hopefully we can figure it out, as we really want to go ahead.

Andrew Barron Worden
Managing Partner
Barron Partners LP
730 Fifth Avenue, 25th Floor
New York NY 10019
tel 212-359-0201
Fax 212-359-0222
cell 917-854-0036
abw@barronpartners.com

Please review our web site at: www.barronpartners.com

The information contained in this communication may be confidential, is intended only for the use of the recipient named above, and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please resend this communication to the sender and delete the original message and any copy of it from your computer system. Thank you.

---

**From:** Henry Warner [mailto:hwarner@ebiosafe.com]
**Sent:** Monday, August 07, 2006 7:42 AM
**To:** Andrew B. Worden; Matt Samuel
**Cc:** Darren L. Ofsink; Jay Well; Robert Trumpy; David Fleisner; Leonardo G. Zangani
**Subject:** Lab123

9/19/2007

Andrew and Matt:

Can we set a conference call for today – perhaps 10:00AM Chicago time (11:00 NY time)?  I am concerned that we have made very little progress in the last weeks, have spent some $7,000 on legal and understand that there is now a question on valuation.  Perhaps a call can resolve any remaining issues and move this project forward.

One quick word on valuation:  My understanding is the Barron protects itself against downside valuation movement with its paragraph 6.16.  You should also be aware that Kellogg is preparing to announce that Lab123 has been selected as its marketing partner for the Smart Start™ brand for 2007.  We have been advised that the initial Purchase Order will be for 500,000 Cholesterol Panels to be delivered in Q4, 2006.  So, pending arrival of this order, we also have valuation concerns but no mechanism for our protection.  Please note:  The Kellogg marketing plan is confidential until they announce.

Look forward to talking.

*Hank*

Henry A. Warner
Chief Executive Officer
BIOSAFE Medical Technologies, Inc.
847-234-8111

-----------CONFIDENTIALITY NOTICE-----------
This e-mail message may contain confidential and privileged information. If you
have received this message by mistake, please notify us immediately by replying
to this message or telephoning us at (847) 234-8111.
-----------CONFIDENTIALITY NOTICE-----------
This e-mail message may contain confidential and privileged information. If you
have received this message by mistake, please notify us immediately by replying
to this message or telephoning us at (847) 234-8111.

9/19/2007

PL 00039

## Catherine Rivera

| | |
|---|---|
| **From:** | Henry Warner [hwarner@ebiosafe.com] |
| **Sent:** | Monday, July 31, 2006 7:41 AM |
| **To:** | Matt Samuel |
| **Cc:** | dofsink@golawintl.com; jweil@golawintl.com; Robert Trumpy; David Fleisner; Jeremy Warner; DBUKZIN@MKLLP.COM |
| **Subject:** | RE: country south (aka national diabetes product retailer) |

Thanks, Matt:

Also, anything you can do to finalize the Lab123 paperwork would be appreciated. My weekend emails are from attorneys that want to complete the SB2 paperwork, the accountants that want to complete the audit and from my brand managers from cholesterol and glucose who want to know if they should write their orders with Kellogg Smart Start cereal (500,000 cholesterol tests) and GNC stores (initial order) with Lab123. Thanks for the help.

Safe travels.

*Hank*

Henry A. Warner
Chief Executive Officer
BIOSAFE Medical Technologies, inc.
847-234-8111

**From:** Matt Samuel [mailto:mcs@barronpartners.com]
**Sent:** Friday, July 28, 2006 6:01 PM
**To:** Henry Warner
**Subject:** RE: country south (aka national diabetes product retailer)

Hank,

I will get you in touch next week when I get back form California.

Matthew C T Samuel
Junior Analyst
Barron Partners LP
730 Fifth Avenue, 25th Floor
New York, NY 10019
tel: 212-359-0205
fax: 212-359-0222
mcs@barronpartners.com
www.barronpartners.com

**From:** Henry Warner [mailto:hwarner@ebiosafe.com]
**Sent:** Friday, July 28, 2006 1:17 PM
**To:** Matt Samuel
**Subject:** RE: country south (aka national diabetes product retailer)

Matt:

9/19/2007

This looks interesting to us. How do we proceed?

*Hank*

Henry A. Warner
Chief Executive Officer
BIOSAFE Medical Technologies, inc.
847-234-8111

**From:** Matt Samuel [mailto:mcs@barronpartners.com]
**Sent:** Thursday, July 20, 2006 1:56 PM
**To:** Henry Warner
**Subject:** FW: country south (aka national diabetes product retailer)

Henry,

This deal just came across the desk, just for future reference, would you guys ever be interested in an acquisition such as this? Let me know so we can keep out eye out for future opportunities for Lab123.

Please treat this attachment as confidential.

Regards,

Matthew C T Samuel
Junior Analyst
Barron Partners LP
730 Fifth Avenue, 25th Floor
New York, NY 10019
tel: 212-359-0205
fax: 212-359-0222
mcs@barronpartners.com
www.barronpartners.com

---

**From:** hammer [mailto:hammer@ncptrs.com]
**Sent:** Tuesday, June 27, 2006 9:46 AM
**To:** Mark Jensen; abw@barronpartners.com
**Cc:** mcs@barronpartners.com
**Subject:** country south (aka national diabetes product retailer)

as requested, the om.

Paul C. Hammer
Managing Partner
Navigator Capital Group
hammer@ncptrs.com
o: 703-740-3635

This communication is confidential. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication or any of its contents is strictly prohibited. If you have received this in error, please re-send this communication to the sender, and delete the original and any copies from your computer system. Thank you.
-----Original Message-----

9/19/2007

**From:** Mark Jensen [mailto:mcj@barronpartners.com]
**Sent:** Sunday, June 25, 2006 6:22 PM
**To:** hammer@ncptrs.com; abw@barronpartners.com
**Cc:** mcs@barronpartners.com
**Subject:** RE: national diabetes product retailer

Can you get me more info

---

**From:** hammer [mailto:hammer@ncptrs.com]
**Sent:** Wednesday, June 21, 2006 7:12 PM
**To:** Mark Jensen; abw@barronpartners.com
**Cc:** mcs@barronpartners.com
**Subject:** national diabetes product retailer

rev/ebitda of 3.4/.942

This is a NATIONAL, direct-to-consumer diabetes product retailer. The company's owners currently spend less than 20 hours per week managing the business – the business is on "auto-pilot" allowing for tremendous growth potential with new and motivated ownership.

### HIGHLIGHTS:
- $3.4 MM annual revenues
- Extraordinary Growth Potential with little effort
- 5,400 patients/ customers and growing on National basis
- Company offers excellent consultative services
- 10 full time employees
- 90 % of transactions Medicare paid
- Obtains patients through national cable advertising
- Company acquisition cost/ customer continues to drop
- Owner leases space to Company

small, but possible add on to chinamed, or another of your port co's.

Paul C. Hammer
Managing Partner
Navigator Capital Group
hammer@ncptrs.com
o: 703-740-3635

This communication is confidential. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication or any of its contents is strictly prohibited. If you have received this in error, please re-send this communication to the sender, and delete the original and any copies from your computer system. Thank you.

-----Original Message-----
**From:** hammer [mailto:hammer@ncptrs.com]
**Sent:** Wednesday, June 21, 2006 6:02 PM
**To:** mcj@barronpartners.com; abw@barronpartners.com
**Cc:** mcs@barronpartners.com
**Subject:** telecom field service provider

rev/ebitda of 10.7/1.1

9/19/2007

A tele-communications equipment installation and service business serving the tele-communications / cellular industry. Company provides regional service in the southeast to national accounts. Skilled force of technicians engaged in the installation and service of tele-communications equipment. Company has a proven and experienced management team. Staff has been serving the tele-communications market for nearly a decade. Market area includes Georgia and surrounding states. The company's "concept to completion" capabilities distinguish this business from its competitors. Blue ribbon group of customers providing repeat business

mgmt wants to stay

could be a good op to merge with one of the tower co's that i showed you


Paul C. Hammer
Managing Partner
Navigator Capital Group
hammer@ncptrs.com
o: 703-740-3635

This communication is confidential. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication or any of its contents is strictly prohibited. If you have received this in error, please re-send this communication to the sender, and delete the original and any copies from your computer system. Thank you.

-----------CONFIDENTIALITY NOTICE-----------
This e-mail message may contain confidential and privileged information. If you have received this message by mistake, please notify us immediately by replying to this message or telephoning us at (847) 234-8111.
-----------CONFIDENTIALITY NOTICE-----------
This e-mail message may contain confidential and privileged information. If you have received this message by mistake, please notify us immediately by replying to this message or telephoning us at (847) 234-8111.

# EXHIBIT M

**Catherine Rivera**

| | |
|---|---|
| **From:** | Henry Warner [hwarner@eblosafe.com] |
| **Sent:** | Thursday, August 10, 2006 8:37 AM |
| **To:** | Matt Samuel; Robert Trumpy; Andrew B. Worden |
| **Cc:** | Jay Well; Darren L. Ofsink; DBUKZIN@MKLLP.COM; Leonardo G. Zangani; David Fleisner |

**Subject: RE: Late Concerns**

Matt:

Our intension has always been to hire a totally independent operating staff for Lab123, people experienced in retail sales and appropriate to the mission statement of the company. To that end, we had attempted to negotiate a fair and attractive agreement for Mary Rodino, but at the 11th hour (Monday), she required that we remove language that would permit termination of her agreement based on performance. We expect our executives to be held accountable for their company's performance and therefore, discontinued our efforts with Mary on Monday. Our commitment to hire an experienced, independent senior executive has never wavered. We have other candidates that we believe would do an excellent job and if you would like to participate in the interview process, we can arrange for you to meet with candidates.

The only BIOSAFE employee intending to transfer to Lab123 is John Kramer who presently handles sales to the retail channels including Walgreen's, Osco, Albertsons, etc. We do not know if this assignment should be permanent but would certainly continue for the first year to smooth transition. We may make John (who has been with BIOSAFE for approximately 8 years) the interim president of Lab123 for the first period until a permanent president is selected. It may be more efficient for you to meet with John during your visit to us than to participate in the selection process of the permanent president but that choice is yours.

Regarding Lab123's independence from BIOSAFE, we, like Barron, would prefer not to even hold a Board seat. We would prefer that our ownership be in the form of a convertible (we do not require preference as found in your preferred convertible). We believe, as you do, that Lab123 must operate totally independent of BIOSAFE. While Lab123 will have access to all the suppliers BIOSAFE uses to build its kits, it probably make more economic sense, at least in the beginning, to piggy-back off BIOSAFE volume production. There is also no requirement that Lab123 issue its products under the BIOSAFE brand. Lab123 is free to re-brand the products, acquire non-competing products from others without restriction. This should be no different that Hertz buying the cars it rents from GM rather than building the cars itself, although it always has the option to do so. Just as GM is a significant vendor to Hertz, BIOSAFE will or can be significant vendor to Lab123.

Regarding the future staffing of Lab123, we intend to leave that to the President and his board. The financial projections give an indication of anticipated positions.

Regarding options on future products, options are always available at a price.

Finally, since we airing late stage concerns, paragraph 6.1.6.2 causes me significant concern. If seems that paragraph 6.1.6.1 confirms and validates the run rate of $1.9M (a small reach over the $1.85 in the LOI). On the other hand, paragraph 6.1.6.2 requires a guarantee not of a historical rate but rather of a 3.1% monthly, compounded growth rate for an additional 12 months based on the historical $1.9M base amount. Further, the doubling of the price adjustments in 6.1.2.1 and 6.1.2.2 punishes the firm twice for the single error of failing to enjoy a $1.85M run rate on date certain. – September, 2006.

Matt, in our experience, contract negotiations typically occur when due diligence is complete. Pleas forgive our surprise when you were unable to execute the agreement on Tuesday and required time to complete your site visit and further due diligence. Now that we understand, our staff stands ready to assist you in anyway possible as you complete your efforts. Further, our lawyers, accountants and others stand ready to begin the preparation of the SB2 and Audit as soon as an agreement is signed.

Please let me know if I can be of further service.

9/18/2007

PL 00035

*Hank*

Henry A. Warner
Chief Executive Officer
BIOSAFE Medical Technologies, Inc.
847-234-8111

---

**From:** Matt Samuel [mailto:mcs@barronpartners.com]
**Sent:** Wednesday, August 09, 2006 6:33 PM
**To:** Robert Trumpy; Henry Warner
**Subject:** Late Concerns

Hank and Rob,

In our internal discussions we have come up against a few potential issues for Lab123, which can be hopefully ironed out quickly.

1. We need to know that Lab123 will be fully independent of Biosafe. There can not be a perception in the market that Lab123 is beholden to Biosafe in terms of product development. That being said, we would like to see at least a plan or preliminary agreement to receive products from another supplier. This would not hurt Biosafe in any way while increasing the value of Lab123.
2. Can Lab123 get a right of first refusal to sell all new Biosafe diagnostic products?
3. We need to meet a CEO. We do not need an employment agreement in place to meet with the potential CEO, but if there is no management, what would we be investing in?
4. Who will the remainder of Lab123 employees be? Who are the executives? Will they be related to Biosafe in anyway? Completely new hires? How long to staff the company?

Thank you for your time and patience.

Regards,

Matthew C T Samuel
Junior Analyst
Barron Partners LP
730 Fifth Avenue, 25th Floor
New York, NY 10019
tel: 212-359-0205
fax: 212-359-0222
mcs@barronpartners.com
www.barronpartners.com

The information contained in this communication may be confidential, is intended only for the use of the recipient named above, and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please re-send this communication to the sender and delete the original message and any copy of it from your computer system. Thank you.

-----------CONFIDENTIALITY NOTICE-----------
This e-mail message may contain confidential and privileged information. If you
have received this message by mistake, please notify us immediately by replying
to this message or telephoning us at (847) 234-8111.

9/18/2007

# EXHIBIT N

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X

BARRON PARTNERS, LP,

                                                      Docket No: 07-CV-11135 (JSR)

                   Plaintiff

         - against -

LAB123, INC., HENRY A. WARNER, FRED
FITZSIMMONS, KENT B. CONNALLY, KURT
KATZ, ROBERT TRUMPY, JEREMY A. WARNER,
DAVID FLEISNER, BIOSAFE LABORATORIES,
INC, and BIOSAFE MEDICAL TECHNOLOGIES,
INC.,

                  Defendants
---------------------------------------------------------------------X

## AFFIDAVIT OF FREDERICK FITZSIMMONS

STATE OF ILLINOIS    )
                      )   ss.:
COUNTY OF COOK   )

      FREDERICK FITZSIMMONS, being duly sworn, deposes and says:

    1.     I am a named Defendant in this action, and am fully familiar with the facts and

circumstances contained herein.

    2.     I am a resident of the State of Illinois.

    3.     I was a member of the Board of Directors ("Board") of Lab123, Inc. ("Lab123"),

and a member of its audit and compensation committees from approximately September 29,

2006 through March 17, 2007. I was also a member of the Board of Directors of Biosafe

Medical Technologies, Inc. ("BMT") from approximately 2002 to March 17, 2007.

    4.     On or about September 29, 2006, Henry A. Warner ("Warner"), the Chairman of

the Board and Chief Executive Officer of BMT and Lab123 convened the first Board meeting of

Lab123 via teleconference, during which Kent Connally, Kurt Katz and I were appointed as independent members of the Board. During the Board meeting which Warner chaired, he stated that the licensing agreement between Lab123 and Barron Partners, LP ("Barron") had to be executed immediately. To the best of my recollection, there were no facts presented concerning the Barron transaction or on what basis the agreement had been negotiated, beyond Warner indicating that it was a $2,000,000 licensing agreement that had been finalized.

5.    The next Board meeting was supposed to be scheduled in December 2006. On or about December 29, 2006, Warner sent me an e-mail stating that the second Board meeting was going to convene on January 11, 2007.

6.    On or about January 11, 2007, an in-person Board meeting was held. At the Board meeting, Michael Sosnowik ("Sosnowik") was introduced as the Chief Executive Officer of Lab123. Sosnowik submitted pro-forma financials, including projected net income, for Lab123 for year-ended 2006, 2007 and beyond. Warner and Robert Trumpy ("Trumpy"), the Chief Financial Officer of BMT, submitted the same pro forma financials for Lab123, but without any net income figures. I and the other Board members reviewed the pro forma financials provided by Sosnowik, Warner and Trumpy and had several concerns, in particular the amount of the so-called CVS settlement that appeared on the Warner/Trumpy pro forma financials, and the fact that the net income projections provided by Sosnowik for the year 2007 and beyond seemed too small for Lab123 to succeed. Warner stated that the numbers Sosnowik had presented were totally unacceptable. Indeed, Warner berated Sosnowik for producing these figures to the Board. In response, Sosnowik defended his projections and provided the Board with a sales and marking effort results report describing his sales efforts to date.

2

7.    Notwithstanding this contentious discussion between Warner and Sosnowik, as a member of the audit committee for Lab123, I also questioned why in January 2007 the Board was receiving pro-forma financials for the year ended 2006 when Lab123 had been in business for 90 days. I therefore demanded that Warner and Trumpy provide detailed 2006 and to-date January 2007 basic financials, like balance sheets, and profit and loss statements, as that time period was complete so said production should easily be accomplished. Warner stated that he would calculate the figures and produce them to the Board.

8.    Further, during the January 11, 2007 Board meeting and my review of the detail provided on the Warner /Trumpy pro-forma financials for the year ended 2006, I inquired about the CVS Caremark ("CVS") line item revenue entry in the amount of a $400,000 settlement from BioSafe. Warner had previously represented to me and the BioSafe Board that CVS contractually owed $2 million to BioSafe, so I inquired why the CVS amount was so low for 2006 in the Lab 123 pro formas presented by Warner/Trumpy. In response, Warner and Trumpy stated that "we" had negotiated a $400,000 settlement with CVS because it was determined that the $2,000,000 was not collectible. I further questioned, in light of Warner's statement about the uncollectibility of the $2,000,000, whether the $400,000 was collectible. Warner assured me that it was collectible.

9.    Subsequent to the January 11, 2007 Lab 123 Board meeting, I continued to request from Warner the detailed financials for 2006 and to-date 2007.

10.    On or about January 31, 2007, Warner informed me by teleconference that Sosnowik had been terminated because his performance was unsatisfactory. Warner also informed me that Mary Rodino ("Rodino") had been recruited to replace Sosnowik as CEO of Lab 123 pending Board approval. A teleconference Board meeting was scheduled for on or

3

about February 1, 2007 to formally present for Board approval the terms of the termination agreement with Mr. Sosnowik, the announced hiring of Ms. Rodino as his replacement, Ms. Rodino's appointment as Director/CEO effective March 1, 2007 and approval of Ms. Rodino's employment contract. Minutes of that Board meeting were drafted and distributed by Jay Weil, Esq. During that teleconference, I again requested the financials for the year-end 2006 and the first month of 2007 for Lab123, and was given the same response by Warner that Lab123 was calculating its numbers and that I need not worry. I was very concerned about the 2007 financial projections for Lab123 due to Warner's failure to provide me with the financials that I requested, the termination of Sosnowik and the hiring of Rudino, who I believed did not have sufficient retail experience.

11.    On February 22, 2007, I sent an e-mail to Connally and Katz indicating the need for an audit committee teleconference meeting. I attached to the e-mail a memo listing issues and concerns I had, which included the following:

      a.    The audit committee needed a Chairman with expertise in accounting and finance matters;

      b.    The financial data provided to the Board by Trumpy did not contain net income projections;

      c.    The net income projections provided by Sosnowik appeared to be too small for Lab123 to succeed;

      d.    The top-line revenue projections did not seem reliable, especially with respect to the $400,000 figure for CVS;

      e.    The replacement of Sosnowik with Rodino who did not have retail experience;

4

PL 02153

f.  The Board had still not been provided with the basic financial information for
2006 and January 2007; and

g.  The first quarter revenue for Lab123 would likely be significantly lower than
the projections, and the ramifications relating to the Barron's preferred stock
and warrant considerations.

12.    Subsequent to my sending the February 22, 2007 memorandum, Connally, Katz
and I had an audit committee teleconference to discuss the issues raised in the memorandum.
There was a consensus among Connally, Katz and me that it was unacceptable to go further
without reviewing the year-end 2006 and the first two months of 2007 financials for Lab123, and
therefore, we, as audit committee members, needed to draft a memorandum to Warner
concerning our issues and concerns relating to Lab123.

13.    As a consequence of the audit committee teleconference meeting, I, on behalf of
the independent Board members, sent a memo to Warner and Trumpy on February 28, 2007, that
summarized the issues and concerns raised during the teleconference meeting regarding the
financial condition of Lab123, which included the following:

a.  Demanding immediate receipt of the basic financials -- balance sheet, income
statement, cash flow statement -- for Lab123 for the year-ended 2006 and first
two months of 2007;

b.  Net income projections were not provided by Trumpy and Warner;

c.  Sosnowik's net income projections were poor;

d.  The CVS $400,000 figure was seriously questioned;

e.  Rodino did not have retail experience;

f.  The 2007 revenue projections did not seem achievable;

5

PL 02154

g. Failure to meet the projections will trigger preferred stock and warrants to Barron;

h. The Board and audit committee had been left in the dark about Lab123's true financial condition;

i. Lab123's financial condition may be unstable;

j. The accounting function for Lab 123 should be outsourced and, until then Trumpy must become more proactive;

k. Until the audit committee is assured that the company's financial condition is stable, Lab123 financials must be reported on a monthly basis, not quarterly;

l. Potential conflict of interest of Warner serving as Chairman of the Board of both Lab123 and BMT;

m. Requested a full day Board meeting in person on April 12, 2007; and

n. Requested a teleconference meeting as soon as possible with the entire Board prior to April 12, 2007.

14. I continued to demand the financial figures from Warner. The 2006 unaudited financials were finally provided by Trumpy shortly in advance of a teleconference Board meeting scheduled on March 12, 2007, but the January and February 2007 financials were not provided. The financials for the year-ended 2006 provided by Trumpy to the Board were drastically worse than the pro-forma financials provided by Warner and Trumpy at the January 11, 2007 Board meeting. Moreover, the financials raised more questions than they answered, such as why the $400,000 CVS settlement no longer appeared on the balance sheet.

15. During the teleconference Board meeting held on March 12, 2007, these financials were discussed and I continued to demand the January and February 2007 financials.

6

PL 02155

In response, Warner told me that he could not provide the audit committee with those financials unless the company's SEC lawyer OK'd it, and he was out of the country. Warner also admitted that the auditors had disallowed the $400,000 CVS revenue. It was now becoming clear that Lab123's realized revenues were in all likelihood going to be significantly lower than the original projections provided to the Board at the January 11, 2007 Lab123 Board meeting.

16.    On March 16, 2007, I submitted a memorandum to Warner, Rodino, Trumpy, Connally and Katz, praising Rodino's enthusiasm, but emphasizing the following unsatisfactory conditions:

      a.  Refusal by Warner to allow the March 12, 2007 teleconference meeting to be conducted as an official Lab 123 board meeting;

      b.  Refusal by Warner to move the regularly scheduled April 12, 2007 Board meeting to an earlier date to address the many critically important issues facing Lab 123;

      c.  Refusal by Warner to allow the audit committee access to the January and February 2007 financials;

      d.  Admission by Warner and Trumpy that the $400,000 CVS revenue recorded in the fourth quarter of 2006 was rejected by Lab 123's auditors;

      e.  Admission by Warner that the deduction of the $400,000 from the fourth quarter 2006 revenue would trigger the preferred stock and warrant clauses of the Barron licensing agreement;

      f.  Proposal by Warner to solve the Barron problem by replacing the lost CVS revenue with Kellogg revenue, even though Kellogg revenue was BMT

7

PL 02156

revenue -- and perhaps should have been Ultimate Health Club revenue -- and

the BMT board had not approved such a revenue trade; and

    g.  Admission by Warner that his proposed revenue trade would not cure the

Barron problem for 2007 revenue shortfalls.

17.    On March 19, 2007, instead of responding to the Board's specific concerns, Warner terminated me (effective as of March 17, 2007) as a Board member of Lab123 by email sent at 7:04am.

18.    I am informed that on March 19, 2007, Warner sent an email at 7:44am to Barron and Rodino advising them that I may be planning to leave the Board of Lab123. If Warner made that statement, it was a misrepresentation because he had already terminated me two days earlier.

19.    On March 22, 2007, I sent an email (attaching a memo dated March 21, 2007) to Warner and others saying that effective March 21st I was resigning from the Board of Lab123. In that memo, I reiterated many of the concerns addressed above.

20.    Prior to my termination from the Lab123 Board, I was confronted with another issue concerning Warner's conduct while serving as board member of BMT. On or about February 7, 2007, Warner advised me that he had terminated the employment of David Fleisner, President and member of the Board of Directors of BMT ("BMT Board"), for cause. By petition from Fleisner, the BMT Board convened a February 15, 2007 special teleconference meeting to review Warner's actions. Warner chose not to participate in the teleconference meeting, and later claimed not to have received notice of the meeting. At the meeting, the BMT Board overturned Warner's decision to terminate Fleisner's employment for cause. (Fleisner resigned as President and Director of BMT on or about February 12, 2007.) Additionally, at that February 15, 2007 meeting, the BMT Board voted unanimously to adopt several resolutions regarding

8

PL 02157

Warner's conduct as to BMT. Warner ignored these directives and called a special meeting of the BMT Board on March 17, 2007 to nullify the votes of the February 15, 2007 BMT Board meeting.    On or about March 17, 2007, Warner through an entity he controls, Renraw LLC -- removed all the BMT directors at the same time, including me, and upon information and belief, appointed a new BMT Board.

Dated: _Wilmette_, Illinois
        March _8_, 2008

_Frederick Fitzsimmons_
Frederick Fitzsimmons

Sworn to before me this
_8_ day of March, 2008

_Ekaterina V. Konstantinova_.
NOTARY

"OFFICIAL SEAL"
Yekaterina V. Konstantinova
Notary Public, State of Illinois
Cook County
My Commission Expires March 6, 2010

9

# EXHIBIT O

Matt:

## Catherine Rivera

| | |
|---|---|
| **From:** | Henry Warner [hwarner@ebiosafe.com] |
| **Sent:** | Monday, March 19, 2007 7:44 AM |
| **To:** | Matt Samuel |
| **Cc:** | Mary Rodino |
| **Subject:** | Lab123 Update |

Matt:

I am in the Caribbean on Spring Break with my family but wanted to give you timely notice of the following:

During a board meeting for BIOSAFE Labs on Saturday, March 17, it came to the board's attention that Fred Fitzsimmons may be planning to leave the board of Lab123. His leaving would leave the board without a majority of outside directors as required in the covenants of the Barron Stock Purchase Agreement (SPA) and, thus, trigger a potential dilutive event. To protect the firm against this possibility, the shareholders elected to remove Fred from the board and elect Mike Carney to his vacancy. Mike is the President of Stille, a Swedish manufacturer and distributor of surgical instruments and operating room tables. Mike's experience should prove most valuable to Lab123, and the adding of Mike to the board maintains the ratio of 2 inside directors to 3 outside directors.

During the negotiation of the SPA, we requested a 30 day cure provision be added to the covenant that the board must always be made up of a majority of outside directors. The concern referenced just this type of situation. I believe all would be better served if the shareholders did feel a necessity to act quickly. We once again suggest that a cure provision would allow the shareholders to act with less haste and concern. Please consider an amendment to the SPA providing for a period to cure this deficiency should it occur.

Finally, Mary has suggested adding perhaps 2 new directors to the board adding experience in retail drug sales and advertising. These outside directors could add great strength and experience to Lab123 and its board of directors. I support this suggestion and suggest Mary talk to you about this further.

I will be back in the office March 26, and we can talk further at that time.

*Hank Warner*

Henry A. Warner
Chief Executive Officer
BIOSAFE Medical Technologies, Inc.
847-234-8111

9/18/2007

# EXHIBIT P

CONFIDENTIAL

## Form DOB: Director/Officer Background

**INTRODUCTION:** Barron Partners conducts background and reference checks on all key officers and directors of its investment candidates. All information you submit is contained behind secured networks and is only accessible by a limited number of employees who have specific access rights to such systems. The computer that stores these records is kept on site in a secure environment, behind locked doors. In the even that Barron terminates the transaction being contemplated, your file is destroyed. None of your personal information is shared with any third parties.

**INSTRUCTIONS:** This form should be opened and completed in MS-Word. Upon completion please email the file to SECURE@BARRONPARTNERS.COM. If you choose to password protect the file please fax the password to (917) 591-7787. You must fax the signature page to (917) 591-7787. We can not conduct the background or reference checks until we receive the signature page.

<u>HANDWRITTEN, FAXED OR SCANNED COPIES WILL NOT BE ACCEPTED.</u>

<u>LEAVE NO ITEMS BLANK. ALL INFORMATION IS REQUIRED. YOU MUST ANSWER "YES" or "NO" or indicate "NONE" wherever required.</u>

<u>NOTICE:</u> FAILURE TO PROVIDE MATERIAL BACKGROUND INFORMATION AS REQUIRED BY THIS FORM OR THE WILLFUL OR FRAUDULENT SUBMITTAL OF A FALSE STATEMENT IN RESPONSE TO ANY SECTION MAY RESULT IN THE TERMINATION OF ANY TRANSACTIONS BEING CONTEMPLATED IN ASSOCIATION WITH THE DUE DILIGENCE EFFORTS BEING CONDUCTED HEREIN.

**SECTION 1 - Identification Information**

First Name: HENRY
Middle Name (s):
Last Name: WARNER
Previous Name (Complete Name):
Primary Telephone #: 847-2348111
Alternate Telephone #:
Email Address: hwarner@eblosafe.com
Social Security Number: 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
Are you a U.S. citizen? YES
Visa or Work Permit Status: (Fax copy to (917) 591-7787 or scan and email to SECURE@BARRONPARTNERS.COM)
Driver's License (State Issued and Number): IL W65638150158
Previous Driver's License (if held current license less than five years):
Date of Birth: 6/3/1950
Place of Birth (City and State, or City and Country):DAVENPORT ,IA
Marital Status: Single, Married, or Divorced? MARRIED
Spouse's Complete Name:
Spouse's Date of Birth:
How long married?
If divorced, when?
How many children?

**SECTION 2 - Residential Addresses and Other Addresses**

Beginning with your current residential address, list in reverse chronological order each residential address (U.S. and international), showing the name to who the property is title and indicating the dates you resided at each address. Leave no cells blank, if you do not remember, write "DNR". Provide as much information as possible.

|  | Address (#, street, city, state, zip code): | Titled to (full name): | Fr. (MM/YY): | To (MM/YY): |
|---|---|---|---|---|
| 1 | 323 WARWICK ROAD  LAKE FOREST, IL 60045 | HENRY WARNER | 1982 | PRESENT |
| 2 |  |  |  |  |
| 3 |  |  |  |  |
| 4 |  |  |  |  |
| 5 |  |  |  |  |
| 6 |  |  |  |  |
| 7 |  |  |  |  |
| 8 |  |  |  |  |
| 9 |  |  |  |  |
| 10 |  |  |  |  |

CONFIDENTIAL

PL 01666

CONFIDENTIAL

In a separate list, show in reverse chronological order any other addresses (vacation homes, investment properties, or second or shared homes) indicating the dates you owned or had an interest in these properties. Leave no cells blank, if you do not remember, write "DNR".

| | Address (#, street, city, state, zip code): | Titled to (full name): | Fr. (MM/YY): | To (MM/YY): |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |
| 3 | | | | |

List any other states or countries where you have resided or worked on a full-time basis for over six weeks:

| | Additional States and Countries | Duration of Stay |
|---|---|---|
| 1 | | |
| 2 | | |
| 3 | | |

## SECTION 3 – Mailing Addresses

Beginning with your current mailing address, list in reverse chronological order each mailing address that differs from your residential address history provided in Section 2. Indicate the dates you received mail at each address. Leave no cells blank, if you do not remember, write "DNR".

| | Mailing Address (#, street (or box #), city, state, zip code): | Fr. (MM/YY): | To (MM/YY): |
|---|---|---|---|
| 1 | SAME | | |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |

## SECTION 4 – Employment, Business and Investment History with References

Beginning with your current employer, business, or investment entity, show in reverse chronological order all your past employer/entities, including all entities which you are/were a director, a primary or majority shareholder or founder of, ventures or projects which you advised, directed, or had any other non-employee relationship. Leave no items blank.

1. from _1996_ (MM/YY) to PRESENT__ (MM/YY)
2. Business Name: BIOSAFE MEDICAL TECHNOLOGY
3. Corporate Name (if different):
4. Other names under which does business:
5. State of Incorporation: IL
6. Is the Company still in business?  YES If not, please explain.
7. Headquarters Address: 100 FIELD DRIVE LAKE FOREST, IL 60045
8. Website Address: ebiosafe.com
9. Address where you worked: SAME
10. Main Phone: 847-234-8111
11. Other Phone:
12. Your title and all positions held: CEO AND MAJORITY OWNER
13. Your ownership %:  57%
14. Your salary plus bonus: 250000
15. Describe your responsibilities, ownership and the reason you left the firm. NA
16. Provide two references from this employer/entity including name, title, current position and place of employment, phone number and alternate phone number.  In what capacity did these people work?  What was their relation to you? NA

Continued next page...

CONFIDENTIAL

PL 01667

CONFIDENTIAL

1. from 1982__ (MM/YY) to PRESENT__ (MM/YY)
2. Business Name: BANC STREET ACQUITIONS
3. Corporate Name (if different):
4. Other names under which does business:
5. State of Incorporation: IL
6. Is the Company still in business? YES If not, please explain.
7. Headquarters Address: 1323 WARWICK ROAD  LAKE FOREST, IL 60045
8. Website Address:
9. Address where you worked: SAME
10. Main Phone: 847-234-8111
11. Other Phone:
12. Your title and all positions held: CEO AND OWNER
13. Your ownership %: 100
14. Your salary plus bonus: VARIABLE
15. Describe your responsibilities, ownership and the reason you left the firm. BECAME INVESTOR IN BIOSAFE
16. Provide two references from this employer/entity including name, title, current position and place of employment, phone number and alternate phone number.  In what capacity did these people work?  What was their relation to you? NA

1. from __ (MM/YY) to __ (MM/YY)
2. Business Name:
3. Corporate Name (if different):
4. Other names under which does business:
5. State of Incorporation:
6. Is the Company still in business? If not, please explain.
7. Headquarters Address:
8. Website Address:
9. Address where you worked:
10. Main Phone:
11. Other Phone:
12. Your title and all positions held:
13. Your ownership %:
14. Your salary plus bonus:
15. Describe your responsibilities, ownership and the reason you left the firm.
16. Provide two references from this employer/entity including name, title, current position and place of employment, phone number and alternate phone number.  In what capacity did these people work?  What was their relation to you?

1. from __ (MM/YY) to __ (MM/YY)
2. Business Name:
3. Corporate Name (if different):
4. Other names under which does business:
5. State of Incorporation:
6. Is the Company still in business? If not, please explain.
7. Headquarters Address:
8. Website Address:
9. Address where you worked:
10. Main Phone:
11. Other Phone:
12. Your title and all positions held:
13. Your ownership %:
14. Your salary plus bonus:
15. Describe your responsibilities, ownership and the reason you left the firm.
16. Provide two references from this employer/entity including name, title, current position and place of employment, phone number and alternate phone number.  In what capacity did these people work?  What was their relation to you?

CONFIDENTIAL

PL 01668

CONFIDENTIAL

1. from __ (MM/YY) to __ (MM/YY)
2. Business Name:
3. Corporate Name (if different):
4. Other names under which does business:
5. State of Incorporation:
6. Is the Company still in business? If not, please explain.
7. Headquarters Address:
8. Website Address:
9. Address where you worked:
10. Main Phone:
11. Other Phone:
12. Your title and all positions held:
13. Your ownership %:
14. Your salary plus bonus:
15. Describe your responsibilities, ownership and the reason you left the firm.
16. Provide two references from this employer/entity including name, title, current position and place of employment, phone number and alternate phone number. In what capacity did these people work? What was their relation to you?

---

1. from __ (MM/YY) to __ (MM/YY)
2. Business Name:
3. Corporate Name (if different):
4. Other names under which does business:
5. State of Incorporation:
6. Is the Company still in business? If not, please explain.
7. Headquarters Address:
8. Website Address:
9. Address where you worked:
10. Main Phone:
11. Other Phone:
12. Your title and all positions held:
13. Your ownership %:
14. Your salary plus bonus:
15. Describe your responsibilities, ownership and the reason you left the firm.
16. Provide two references from this employer/entity including name, title, current position and place of employment, phone number and alternate phone number. In what capacity did these people work? What was their relation to you?

---

1. from __ (MM/YY) to __ (MM/YY)
2. Business Name:
3. Corporate Name (if different):
4. Other names under which does business:
5. State of Incorporation:
6. Is the Company still in business? If not, please explain.
7. Headquarters Address:
8. Website Address:
9. Address where you worked:
10. Main Phone:
11. Other Phone:
12. Your title and all positions held:
13. Your ownership %:
14. Your salary plus bonus:
15. Describe your responsibilities, ownership and the reason you left the firm.
16. Provide two references from this employer/entity including name, title, current position and place of employment, phone number and alternate phone number. In what capacity did these people work? What was their relation to you?

PL 01669

CONFIDENTIAL

### Section 5 - Additional Reference History

Please provide additional references so that you have a total of at least ten (10) references including those given in Section 4. Please verify all contact numbers.

| #; | Additional Reference: | Relation/Capacity: | Current Phone: | Other Phone: |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | | | | |
| 6 | | | | |

### Section 6 - Licenses, Affiliations and Certifications

In reverse chronological order, list any and all licenses (including securities licenses), affiliations, or professional certifications as well as any trade, civic and nonprofit organizations with which you have had any association, past or present. Indicate the period of your activity and your title, role, or service capacity. Also list any special certifications you have received. Please provide a phone number if at all possible. Also provide a copy of the affiliation or certification if possible by fax to (917) 591-7787.

| License/Cert./Title | Name of Org./Board/Exchange | Complete Address: | Phone: | Dates: |
|---|---|---|---|---|
| NA | | | | |
| | | | | |
| | | | | |

### Section 7 - Education

List the complete name of each institution and school you attended from doctorate and graduate level, to undergraduate and other college level institutions. Indicate the period you attended and the degree awarded if any. In addition, provide the address of each institution and, if possible, a telephone number. If your degree was earned outside of the U.S. please provide a copy of the diploma or transcript to document your degree by fax to (917) 591-7787. If a degree was not awarded, indicate "Not Awarded".

| Degree Awarded | Name of School | Address: | Phone: | Student ID # | Dates: |
|---|---|---|---|---|---|
| MS | UNIV OF IL | | | | 1974 |
| | | | | | |
| | | | | | |

### Section 8 - Litigation, Censure, Sanctions

Provide complete detail of any litigation, civil or criminal; past, present, or pending; settled or unsettled; resolved or unresolved in any jurisdiction indicating the status of such cases, any censure or sanctions you have received or license revocation from any professional group or licensing authority. Indicate all relevant details including names of all parties, attorneys for both sides, time of action, court, case number, jurisdiction, and reason for such action. Please make sure to include any personal or business legal proceedings or bankruptcy proceedings in which you have been or may have been named. IF NONE, YOU MUST WRITE "NONE". NO PRESENT LITIGATION

### Section 9 - Employment, Business, and Investment Criminal History

To your knowledge has any business organization, its officers, directors or general partners of which you are/were an officer, director or general partner or in which you have or had a controlling interest (for these purposes, defined as owning a larger percentage than any other shareholder) been the subject of a criminal investigation or prosecution in any jurisdiction (whether or not convicted of a crime) during the period of and five years following your employment, investment or affiliation? If so, indicate all relevant details including whether you were personally convicted, names of all legal representatives, time of action, court, case number, jurisdiction, and reason for such action. IF NONE, YOU MUST WRITE "NONE". NONE

### Section 10 - Personal Criminal History

Have you ever been charged or convicted of any crime in any jurisdiction other than in response to Section 9? If so, indicate all relevant details including names of all legal representatives, time of action, court, case number, jurisdiction, and reason for such action. IF NONE, YOU MUST WRITE "NONE". NONE

CONFIDENTIAL

CONFIDENTIAL

### Section 11 - Indictments and Outstanding Warrants

To your knowledge are you or any other executive, director or general partner of your current employer/entity the subject of any indictment, warrant, arrest, questioning, hearing or judgment including civil arrest warrants in any jurisdiction? If so, indicate all relevant details including court, judge, attorney, agency, offense, jurisdiction, time of action, reason for such action and any other relevant details. IF NONE, YOU MUST WRITE "NONE". NONE

### Section 12 - Employment, Business, and Investment Bankruptcy Record

To your knowledge has any business organization of which you are/were an officer, director or general partner or in which you have or had a controlling interest (for these purposes, defined as owning a larger percentage than any other shareholder) filed a petition of bankruptcy or been adjudged a bankrupt or made an assignment for the benefit of creditors in any jurisdiction during the period of and five years following your employment, investment or affiliation? If so, please explain and provide all relevant details including names of all legal representatives, time of action, court, case number, jurisdiction, and reason for such action. IF NONE, YOU MUST WRITE "NONE". NONE

### Section 13 - Employment, Business, and Investment Investigation History

Has any business organization of which you are/were an officer, director or general partner or in which you have or had a controlling interest (for these purposes, defined as owning a larger percentage than any other shareholder) been subject to any investigation by, or been a party to any litigation with, any international, federal, state or local agency in any jurisdiction during the period of and five years following your employment, investment or affiliation? If so, indicate all relevant details including names of all legal representatives, time of action, court, case number, jurisdiction, and reason for such action. IF NONE, YOU MUST WRITE "NONE". NONE

### Section 14 - Employer and Business Unsatisfied Judgments and Liens Including Tax Liens

Is any business organization of which you are/were an officer, director or general partner or in which you have or had a controlling interest (for these purposes, defined as owning a larger percentage than any other shareholder) now in default on any obligation to, or subject to any unsatisfied judgment or lien obtained by any party, public or private, federal, state or local taxing authority in any jurisdiction during the period of and five years following your employment, investment or affiliation? If so, explain, listing all unsatisfied judgments or liens. IF NONE, YOU MUST WRITE "NONE". NONE

### Section 15 - Personal Unsatisfied Judgments and Liens Including Tax Liens

Are you, your personal property, personal corporation, trust or foundation now in default on any obligation to, or subject to any unsatisfied judgment or lien obtained by any party, public or private, federal, state or local taxing authority in any jurisdiction? If so, explain, listing all unsatisfied judgments or liens. IF NONE, YOU MUST WRITE "NONE". NONE

PLEASE TAKE TIME TO REVIEW YOUR ANSWERS MAKING SURE YOU COMPLETED EACH SECTION AND CHECKING TO MAKE SURE YOUR REFERENCE CONTACT INFORMATION IS STILL VALID.

PLEASE EMAIL THIS COMPLETED FORM TO SECURE@BARRONPARTNERS.COM

Continued next page...

CONFIDENTIAL

CONFIDENTIAL

**Section 16 - Certification and Authorization to Conduct Background Check**

I, _____, state that I have read and understand all the items contained in the foregoing pages of this questionnaire; that I supplied full and complete answers to each item therein to the best of my knowledge, information and belief; that I will notify Barron Partners LP in writing of any change in circumstances occurring after the submission of this questionnaire and before the execution of any contract with Barron Partners LP; and that all information supplied by me is true to the best of my knowledge, information and belief. I understand that Barron Partners LP will rely on the information supplied in this questionnaire as additional inducement when considering entering into a contract with the submitting individual or business entity.  Furthermore, I understand and authorize Barron Partners LP and Eos Funds Limited to conduct a background investigation including but not limited to a criminal background check in any jurisdiction, civil case history, residence, employment and degree verification, as well as to seek and contact any references, including but not limited to references provided therein.

_____

Name of submitting business

by

_____

Print Name, Title

_____

Signature

_____

Date

# PLEASE COMPLETE AND FAX A SIGNED COPY OF THIS PAGE TO

# (917) 591-7787

CONFIDENTIAL

PL 01672

# EXHIBIT Q

**Catherine Rivera**

| | |
|---|---|
| **From:** | Robert Trumpy [rtrumpy@eblosafe.com] |
| **Sent:** | Thursday, September 21, 2006 1:59 PM |
| **To:** | Matt Samuel |
| **Subject:** | Book3.xls |
| **Attachments:** | Book3.xls |

here you go. Rob
-----------CONFIDENTIALITY NOTICE-----------
This e-mail message may contain confidential and privileged information. If you
have received this message by mistake, please notify us immediately by replying
to this message or telephoning us at (847) 234-8111.

9/11/2007

PL 00022

Period 8/1-8/31/06

| | |
|---|---:|
| AbDiagnostics, Inc. | 3,238.53 |
| Albertson's -0000 | 161.56 |
| Albertson's -0130 | 34.84 |
| Albertson's -0162 | 57.81 |
| Albertson's -0176 | 11.54 |
| Albertson's -0177 | 11.54 |
| Albertson's -0213 | 11.65 |
| Albertson's -0225 | 11.54 |
| Albertson's -0238 | 11.54 |
| Albertson's -0240 | 57.92 |
| Albertson's -0301 | 11.65 |
| Albertson's -0304 | 23.30 |
| Albertson's -0309 | 11.54 |
| Albertson's -0363 | 23.08 |
| Albertson's -0364 | 11.54 |
| Albertson's -119 | 11.65 |
| Albertson's -138 | 11.54 |
| Albertson's -168 | 34.62 |
| Albertson's -174 | 46.27 |
| Albertson's -2047 | 104.08 |
| Albertson's -206 | 11.54 |
| Albertson's -2248 | 11.54 |
| Albertson's -3252 | 11.54 |
| Albertson's -327 | 34.62 |
| Albertson's -3405 | 23.08 |
| Albertson's -3479 | 11.54 |
| Albertson's -3775 | 23.30 |
| Albertson's -4384 | 23.19 |
| Albertson's -5177 | 220.69 |
| Albertson's La Habra Distribution | 3,454.74 |
| Albertson's Lunt | 2,028.00 |
| Albertson's Sundries Center | 2,088.00 |
| Albertson's, Inc. | 19,498.42 |
| Amazon.com | 1,764.07 |
| American Diabetes Wholesale | 751.36 |
| Anderson Taylor | 0.00 |
| | |
| B-Scientific | 580.90 |
| Cardio Quick Health Resources | 585.78 |
| | |
| | |
| CorSolutions | 6,052.20 |
| Craig Medical | 682.32 |
| CVS/pharmacy | 39,035.35 |
| | |
| eGeneral Medical, Inc. | 418.33 |
| Focused Health Solutions | 2,349.80 |

PL 00023

| | |
|---|---:|
| Harris Health Trends | 5,722.78 |
| Health and Wellness Professionals | 976.81 |
| Health Watch Central | 473.63 |
| Healthgoods, LLC | 1,800.86 |
| HMSC | 9,373.46 |
| Hock's Pharmacy | 491.59 |
| Key to Better Health | 3,760.00 |
| Kulick, David | 58.10 |
| Matria Healthcare | 10,056.32 |
| New Line Medical | 4,268.51 |
| Onsite Wellness | 630.00 |
| Walgreen's | 87,045.90 |
| Rivergate Pharmacy | 550.73 |
| Safe Home Products | 278.72 |
| Skalsky, Barbara | 26.51 |
| Stat Technologies | 214.81 |
| XCL Nutrition | 0.00 |
| Internet Orders | 8,325.95 |
| TOTAL | 217,612.73 |
| Albertson's backend billing estimate | 10,000.00 |
| Total | 227,612.73 |

PL 00024

# EXHIBIT R



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549

DIVISION OF
CORPORATION FINANCE

Mail Stop 6010                                          October 20, 2006

Michael Sosnowik
President
Lab123, Inc.
233 Narrangansett Avenue
Lawrence, NY 11559

Re:    Lab123, Inc.
       File 333-137545
       Form SB-2 filed September 22, 2006

Dear Mr. Sosnowik:

We have reviewed your filing and have the following comments. Where indicated, we think you should revise your document in response to these comments. If you disagree, we will consider your explanation as to why our comment is inapplicable or a revision is unnecessary. Please be as detailed as necessary in your explanation. In some of our comments, we may ask you to provide us with supplemental information so we may better understand your disclosure. After reviewing this information, we may or may not raise additional comments.

Please understand that the purpose of our review process is to assist you in your compliance with the applicable disclosure requirements and to enhance the overall disclosure in your filing. We look forward to working with you in these respects. We welcome any questions you may have about our comments or on any other aspect of our review. Feel free to call us at the telephone numbers listed at the end of this letter.

**General**

1. Please note that where we provide examples to illustrate what we mean by our comments, they are examples and not exhaustive lists. If our comments are applicable to portions of the filing that we have not cited as examples, make the appropriate changes in accordance with our comments.

2. In your response letter, please state our comment and then explain each change that has been made in response to a comment. In addition, you should also reference each page number in which disclosure has been revised in response to a comment so that we can easily place your revised disclosure in its proper context.

PL 01010

3. Please file as promptly as possible all exhibits to the registration statement. We note, for example, that you have not filed the warrant relating to the issuance of shares and we have included a number of comments relating to the warrant below. Please note that we may have comments on these materials once they are filed.

4. Please provide us proofs of all graphic, visual or photographic information you will provide in the printed prospectus prior to its use, for example in a preliminary prospectus. Please note we may have comments regarding this material.

5. Please note that when you file a pre-effective amendment containing pricing-related information, we may have additional comments. As you are likely aware, you must file this amendment prior to circulating the prospectus.

6. Please note that when you file a pre-effective amendment that includes your price range, it must be bone fide. We interpret this to mean that your range may not exceed $2 if you price below $20 and 10% if you price above $20.

7. We note your statement that the selling stockholders will sell their shares at a price ranging from $1.15 to $1.90. However, since there is no market for the securities, the shares must be sold at a fixed, pre-determined price. Please revise your disclosure to include a fixed price and make all conforming changes, including but not limited to the plan of distribution, fee table, etc., as necessary.

8. In light of your recent formation, the fact that Biosafe owns almost all your voting stock, your limited number of selling stockholders, the selling stockholders relationship with the company, and the fact that substantially all outstanding shares are being registered for resale, please provide us with an analysis explaining why this offering should be considered a secondary offering rather than a primary offering.

9. Does Barron have any plans to convert its Series A stock or to exercise warrants? If so, you should describe such plans in the Summary and in the Selling Stockholder page.

10. Please consider whether it is appropriate to register for resale shares issued to Mr. Sosnowick that are restricted until August 2007. As Mr. Sosnowick cannot sell the shares until they are vested, why are they being registered for resale at this time?

Prospectus Summary, page 3

11. Please revise your summary to include a brief discussion of your products and background information about the company, such as when the company was incorporated, how the license with Biosafe came about and any other key points relating to the company or the offering.

12. Please revise to disclose when the warrants issued to Barron Partners become exercisable and when the Series A Stock becomes convertible. Also, disclose the exercise price of the warrants. Your summary currently states that you issued "warrants to purchase an

PL 01011

aggregate of $3,774,000 shares of common stock." Please clarify whether you intended to disclose that the warrants were to purchase 3,774,000 shares or whether the exercise price is for $3,774,000.

Risk Factors, page 5
General

13. Please consider whether you should include risk factors relating to the fact that Biosafe owns a very high percentage of your outstanding common stock and effectively controls the company. As a result, Biosafe can prevent a change in control transaction that might be beneficial to shareholders or could take other action which does not benefit unaffiliated stockholders.

14. Please include a risk factor disclosing the reduction in conversion price and exercise price of the Barron series A stock and warrants if you issue stock at a purchase price below the Barron conversion price or warrants or convertible securities at an exercise or conversion price less than the conversion price of the Series A stock.

15. Please revise to include a risk factor disclosing the reduction in the Barron Series A stock conversion price and warrant exercise prices if EBIDTA for the three months ended December 31, 2006 and December 31, 2007 are below certain thresholds.

We have only recently been organized and have very little operating history, page 5

16. Rather than state that the Company is subject to all the risks encountered by a new company, please revise to describe what these risks are. Please also consider whether any of these risks are sufficiently significant to warrant disclosure in a separate stand alone risk factor discussion.

Rapid screening and diagnostic at-home testing devices...., page 5

17. Please explain what you mean when you say you are not licensed to sell products in the professional market.

18. Provide the basis for your belief that the market for your products and other rapid testing products is very large.

We have been the subject of a going concern opinion..., page 5

19. Please revise to explain that a going concern opinion often results in difficulty raising funds and/or in terms that are less favorable to the company.

We may continue to incur losses and are likely to require additional financing, page 5

20. We note your statement that you may be required to limit or completely curtail your research and development activities. This statement implies that you are conducting

research and development activities. Please either revise your "Business" section to describe these activities, or revise this statement to clarify that you do not conduct these activities and you may not be able to conduct them in the future without sufficient financing.

Competition in the human medical diagnostic industry...page 6

21. Please name your competitors in this section and describe the specific advantages held by each relative to the company.

Our products and activities are subject to regulation by various governments and government agencies, page 6

22. We note your statement that distribution outside the U.S. is subject to extensive foreign government regulation. Do you have current plans to distribute your products outside the U.S.? If you do, please revise the "Business" section to describe these plans and any steps you have taken to obtain approval from foreign governments.

Our success depends, in part, on our ability of our partners, to obtain patents and license patent rights.... page 6

23. You describe the risk as being related to litigation costs. Please consider whether there are risks associated with the intellectual property you license being invalidated or an infringement upon the intellectual property of another entity.

We depend on our suppliers for our products' components, page 7

24. It appears that you purchase all of your products from Biosafe. Therefore, it is not clear why you refer to "second vendors for all critical raw materials" and "main supplier for a given material." Please revise or advise.

25. If you purchase all your products from Biosafe, please revise your risk factor heading accordingly. Also, file the supply agreement with Biosafe as an exhibit. If you do not have a formal supply agreement with Biosafe, please specifically state that you do not have such an agreement.

Due to the specialized nature of our business, our success will be highly dependent upon our ability to attract and retain qualified scientific and executive personnel, page 7

26. If Mr. Sosnowik has any plans to leave the company, you should disclose this fact.

The testing, manufacturing and marketing of medical diagnostic devices entails an inherent risk of productivity claims, page 7

27. Please revise to disclose the limitation of your insurance.

PL 01013

Case 1:07-cv-11135-JSR    Document 31-12    Filed 05/23/2008    Page 41 of 45

10/20/2008 04:08 FAX                                                    @005/008

<u>There has, to date, been no active public market for our Common stock..., page 8</u>

28. Many of the bullet points warrant separate risk factor disclosure. Please revise to describe each material risk in a stand alone discussion following a heading that identifies the risk and potential consequences.

29. Additionally, if you currently do not have an analyst following and you retain a risk addressing the possibility that your revenue or income may be below analysts' expectations, you should clarify that you do not currently have an analyst following and might never develop an analyst following.

30. Please discuss the penny stock regulations and the consequences of your securities being subject to the penny stock regulations as a separate risk.

<u>Failure to achieve and maintain effective internal controls.... page 9</u>

31. Please revise the statement that you "may be" required to document and test our internal control procedures to state that you will be required.

<u>Because the purchaser of our Series A...p.9</u>

32. Please explain how a right of first refusal could prevent the company from selling stock.

<u>Because the holder of our warrants.... p. 9</u>

33. Please revise to disclose the risk a cashless exercise poses for investors, including a risk of dilution as well as any other potential risks.

<u>The issuance and sale of the registered common stock could result in a change of control, page 10</u>

34. Given the limitation that Barron cannot exercise warrants or convert preferred shares to the extent that Barron or its affiliates would own more than 4.9% of the outstanding stock, please explain how the shares offered by Barron would constitute 49.6% of the outstanding common stock and could result in a change in control.

<u>Determination of offering price, page 10</u>

35. As noted in our comment above, the offering must include a fixed offering price. In addition, we note that Item 505 of Regulation S-B requires that you describe the factors that determine this fixed price. You have not included this information in this section. In this regard, we note that Barron paid $2M for 3.774M shares ($0.53 per share) and now seeks to sell its shares for at least $1.15. As noted in our comment above, it also appears that the warrants will be exercised for $0.80 and $1.10 per share. Your discussion in this section should disclose these premiums and explain the factors which explain the premium that is being received in this short time-frame.

Selling Stockholders, p. 10

36. Please disclose the individual with voting and dispositive power over the shares held by Biosafe.

September 2006 Private Placement to Barron Partners, L.P., page 12

37. Please revise the discussion to quantify the liquidated damages you will be required to pay if you are unable to compose an audit and compensation committee consisting of independent directors. Is there a deadline for composing these committees? Have you considered whether your ability to recruit independent directors is a risk that should be discussed in the risk factor section?

Plan of distribution, page 13

38. You state that Biosafe and Barron may be deemed underwriters. The use of "may be" in this situation is not appropriate as both are underwriters. Please revise the disclosure accordingly.

Business, page16

39. As it appears you are not involved in the manufacturing of clinical diagnostic products, please revise the first sentence accordingly.

Our diagnostic products business, p. 16

40. Please provide support for the following statements:

- Individuals who need testing often avoid it because of the hassle and fear or apprehension of having blood drawn;
- Your products are readily accepted alternatives to traditional testing;
- Your products are widely accepted; and
- Your testing method has attracted thousands of new consumers who were previously reluctant.

Additionally, revise your document to clarify who considers your product to be a readily accepted alternative. For example, is it the users, health care providers, etc.?

41. Similarly, you have included a table showing the benefits of your product on four different criteria and a second table showing size of patient groups. Please revise provide a third party citation for the assertions in both tables or delete them from the registration statement. In addition, you should state where the information originates, as opposed to simply citing Dr. Michelson or stating "estimated with heart disease." Finally, provide us with copies of all supporting materials. These documents should be marked to indicate information supporting your statements.

PL 01015

42. On page 21, you state that in some testing instances, the value of a test would be increased with more immediate, while you wait, results. Please revise to identify the tests that would be more valuable with immediate results.

## Markets for our products, page 22

43. On page 22, you cite the following example for your claim that your technology is a broad platform from which additional tests can be quickly derived: "expected time from proof of concept to FDA clearance for extension products is down to just six to ten months and at a probable cost of approximately $1,000,000." This statement implies FDA clearance which is inappropriate. You may state that additional tests are "often" or "sometimes" quickly derived and state the timing and cost of recent extension product clearances but you cannot imply that clearances are expected to be obtained in six to ten months with an expected cost of $1,000,000.

## Our License Agreement with Biosafe, page 23

44. Please quantify the minimum annual unit sales requirement.

## Patents, Trade Secrets and Trademarks, page 23

45. Please revise to disclose when the licensed patents expire.

## Directors, Executive officers..., p. 25

46. You must include a five year biography for both Mr. Sosnowik. You have not described Mr. Sosnowik's activities between 2004 and August, 2006. Please revise accordingly.

## Certain relationships and related party transactions, p. 29

47. Please revise your document to include all information required by Item 404 of Regulation SB here in this section, rather than cross referencing to other parts of the document. Additionally, it appears your reference to the agreement between Lab123 should be a reference to Biosafe and Lab123. Please revise accordingly.

## Part II
## Item 26. Recent Sales of Unregistered Securities

48. Please file the August 30, 2006 agreement that is referenced in your employment agreement with Mr. Sosnowik as an exhibit to the registration statement. The agreement relates to the shares of restricted stock that were issued to Mr. Sosnowik.

49. Please include a description of the agreement that conforms to the requirements of Item 701 of Regulation SB. The cross-reference you have included is not appropriate for the registration statement.

PL 01016

Financial Statements
Statement of Operations, page F-3

50. You state the CEO is providing office space at no charge to the Company (except for office related out-of-pocket expenses). In subsequent financial statements please include provisions to recognize the fair value of the office space as contributed services provided to the Company or advise us why this is not appropriate. See Staff Accounting Bulletin Topic 1:B.1: for guidance.

Note 3 – Summary of Significant Accounting Policies, page F-7

51. Please disclose your revenue recognition policy.

Note 6 – Subsequent Events, page F-10

52. Please tell us and disclose how you plan to account for the Series A Convertible Preferred Stock and the associated warrants. Additionally, please disclose the impact this issuance will have on the financial statements. In your response, please ensure that you identify each of the embedded derivatives and management's assessment of the accounting treatment of each embedded derivative under SFAS 133 and EITF 00-19, including, but not limited to, the registration rights agreement and the variable conversion price. Lastly, please tell us how the registration rights agreement and the cashless exercise provision will effect the accounting treatment of the warrants.

As appropriate, please amend your filing in response to these comments. You may wish to provide us with marked copies of the amendment to expedite our review. Please furnish a cover letter with your amendment that keys your responses to our comments and provides any requested supplemental information. Detailed cover letters greatly facilitate our review. Please file your cover letter on EDGAR under the form type label CORRESP. Please understand that we may have additional comments after reviewing your amendment and responses to our comments.

We urge all persons who are responsible for the accuracy and adequacy of the disclosure in the filings reviewed by the staff to be certain that they have provided all information investors require for an informed decision. Since the company and its management are in possession of all facts relating to a company's disclosure, they are responsible for the accuracy and adequacy of the disclosures they have made.

Notwithstanding our comments, in the event the company requests acceleration of the effective date of the pending registration statement, it should furnish a letter, at the time of such request, acknowledging that

- should the Commission or the staff, acting pursuant to delegated authority, declare the filing effective, it does not foreclose the Commission from taking any action with respect to the filing;
- the action of the Commission or the staff, acting pursuant to delegated authority, in declaring the filing effective, does not relieve the company from its full responsibility for the

PL 01017

10/20/2006 04:07 FAX                                                    ⊠009/009

adequacy and accuracy of the disclosure in the filing; and
  · the company may not assert this action as defense in any proceeding initiated by the
    Commission or any person under the federal securities laws of the United States.

    In addition, please be advised that the Division of Enforcement has access to all information
you provide to the staff of the Division of Corporation Finance in connection with our review of
your filing or in response to our comments on your filing.

    We will consider a written request for acceleration of the effective date of the registration
statement as a confirmation of the fact that those requesting acceleration are aware of their
respective responsibilities under the Securities Act of 1933 and the Securities Exchange Act of
1934 as they relate to the proposed public offering of the securities specified in the above
registration statement. We will act on the request and, pursuant to delegated authority, grant
acceleration of the effective date.

    We direct your attention to Rules 460 and 461 regarding requesting acceleration of a
registration statement. Please allow adequate time after the filing of any amendment for further
review before submitting a request for acceleration. Please provide this request at least two
business days in advance of the requested effective date.

    You may contact Christine Allen (202) 551-3652 if you have questions regarding comments
on the financial statements and related matters. Please contact Zafar Hasan at (202) 551-3653 or me
at (202) 551-3715 with any other questions.

                                              Sincerely,

                                          for Jeffrey Riedler
                                             Assistant Director

cc:    Darren Ofsink
       Guzov Ofsink
       600 Madison Avenue
       New York, NY 10022
       F: 212-688-7273

PL 01018