# EXHIBIT U

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | No. 07-4412 |
| | ) | Chapter 11 |
| Biosafe Medical Technologies, Inc. | ) | |
| | ) | Involuntary Petition |
| Debtor. | ) | |
| | ) | Hon. Susan Pierson Sonderby |
| | ) | Courtroom 642 |

## NOTICE OF MOTION

To:  U. S. Trustee's Office
     Attn: Richard Friedman
     227 W. Monroe St., Suite 3350
     Chicago, Illinois 60606

BioSafe Medical Technologies, Inc.
100 Field Drive, Suite 240
Lake Forest, IL 60045
Fax: 847-234-8112
(service via fax and U.S. Mail)

     PLEASE BE ADVISED that on Tuesday, March 27, 2007, at 10:00 a.m. we shall appear before the Honorable Susan Pierson Sonderby in the room usually occupied by her in courtroom 642 of the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, and then and there present the *Petitioning Creditors' Motion to Appoint Trustee.*, a copy of which is attached hereto and hereby served upon you.

Paul M. Bauch (ARDC 6196619)
Kenneth A. Michaels Jr. (ARDC 6185885)
Carol Y. Sales (ARDC 6287277)
BAUCH & MICHAELS, LLC
53 W Jackson Blvd, Suite 1115
Chicago, IL 60604
Office: 312-588-5000
Fax: 312-427-5709
Email: kmichaels@bauch-michaels.com

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| In re: | ) No. 07-4412 |
| | ) Chapter 11 |
| **Biosafe Medical Technologies, Inc.** | ) |
| | ) Involuntary Petition |
| Debtor. | ) |
| | ) Hon. Susan Pierson Sonderby |
| | ) Courtroom 642 |

### PETITIONING CREDITORS' MOTION TO APPOINT TRUSTEE

Petitioning creditors David C. Fleisner, William S. Lear, Focus Enterprises, Inc., Ned Bedrio, Steven J. Reitman, Frederick J. Fitzsimmons, Peter M. Mott, Michael T. Welch, A. Alexander Arnold, and Timothy O'Brien (collectively "Petitioning Creditors"), move pursuant to § 1104(a)(1) and (2) of Title 11, United States Code §§ 101 *et seq.*, ("Bankruptcy Code") to appoint a trustee, and in support thereof state as follows.

**I.   Background.**

1.   On March 13, 2007, Petitioning Creditors filed an Involuntary Petition for relief against the Debtor under Chapter 11 of the Bankruptcy Code.

2.   No order for relief has yet been entered in this case.

3.   BioSafe Medical Technologies, Inc., f/k/a Illinois Medical Technologies, Inc. ("BioSafe" or "Debtor") is an Illinois corporation with its principal place of business located at 100 Field Drive, Suite 240, Lake Forest, Illinois.

4.   BioSafe subcontracts the manufacture of medical blood testing kits and provides laboratory processing services, which do not require a phlebotomist to draw blood. Rather, by using a virtually painless small lancet a person may prick his/her finger and drop a small sample of blood onto a card or other proprietary BioSafe device which is then sent to BioSafe's laboratory for the testing of certain specific diagnostics such as a lipid profile, hemoglobin A(1)c, or allergies. The

Debtor's clients include, directly or through subsidiaries, Fortune 500 companies such as Genentech, Johnson & Johnson, Kellogg and Albertson's.

5. BioSafe is the sole or majority-principal shareholder or member of the following Illinois corporations or limited liability companies: BioSafe Acceptance Corporation f/k/a BioSafe Genetics and Forensics, Inc.; BioSafe Diagnostics Corporation; BioSafe Laboratories, Inc.; BioSafe Medical Products, Inc.; BioSafe Products, Inc., f/k/a BioSafe Diagnostic Products, Inc., f/k/a BioSafe Proscreen, Inc.; BioSafe Allergy Services, Inc., f/k/a Bioquest, Inc.; BioSafe Rapid Test Technologies, Inc.; The Ultimate Health Club, Inc.; BioSafe Rapid Testing I, LLC; and, BioSafe TSH, LLC. Furthermore, BioSafe owns the majority shares of Lab123, Inc., a Delaware corporation ("Lab123").

6. BioSafe has in excess of 200 shareholders.

7. On information and belief, BioSafe presently has assets valued at less than $1,000,000 and liabilities in excess of $8,000,000. BioSafe's creditors include secured bank lenders, unsecured subordinated lenders, unsecured promissory note holders, trade vendors, and compensation and salary claimants. For the past two years BioSafe has managed to operate while financially insolvent by using cash advances from new clients to make minimal past due payments to vendors which had provided services to previous clients.

8. Henry Warner ("Warner") is the CEO and Chairman of BioSafe's Board of Directors. Warner is also the managing member of Renraw, L.L.C. ("Renraw"), the majority shareholder of BioSafe. Most, if not all, of Warner's stock has been acquired through his takeover of a predecessor company more than twelve years ago. Warner contributed little, if any, cash to acquire his ownership of BioSafe.

2

### A. Warner rejects three offers to purchase Biosafe and fails to disclose fully these offers to Biosafe's board of directors.

9. In the past two months, BioSafe's Board of Directors have become aware that they had been left in the dark that on at least three occasions in the past two years, Warner, as BioSafe's CEO and Chairperson, received offers to purchase BioSafe that would have fully or substantially satisfied all or most of the debts and obligations of the corporation. At that time the corporation, as stated above, was essentially insolvent. Warner failed to disclose these offers to the Board of Directors, all of whom are also creditors.. In fact, Warner not only failed to disclose these offers to the Board, but effectively nullified the offers from being seriously considered because Warner was not satisfied with the stock price and remuneration he personally or through entities he controlled would have received or because the offers, if accepted, would remove Warner as CEO of the Debtor. His demands for personal compensation such as high priced consulting contracts or long-term personal health insurance drove down the prospective offering price for shareholders and in their totality eventually drove the potential buyers away. During the past two years, when asked by the Board of Directors at board meetings about his efforts to find new investors to recapitalize the corporation, Warner repeatedly responded that he had not received any offers worth bringing to the Board. At no time did he inform the Board that he had received the offers described below. Had he done so there is a strong possibility that the Board would have recommended acceptance, creditors would have been paid and shareholders would have had a distribution albeit less, presumably than the majority shareholder would obviously have preferred.

10. In Fall 2005, Warner, as CEO and Chairman of BioSafe, received an offer from AIG-Altarus to purchase BioSafe at approximately $0.50 per share (*i.e.*, approximately $15,000,000) and additional consideration. Warner failed to disclose this offer to the Biosafe's Board of Directors.

3

PL 02063

11. In Spring 2006, AIG-Altarus made another offer to purchase BioSafe at a price of $0.40 per share and additional consideration. This offer also included a requirement that Warner resign as CEO of BioSafe. Warner again failed to disclose this offer to BioSafe's Board of Directors.

12. In Fall 2006, First Analysis made an offer to purchase BioSafe at a price of $0.30 per share ($0.10 cash and the remainder in stock, *i.e.*, approximately $8,500,000) and additional consideration. Warner again failed to disclose this offer to Biosafe's Board of Directors.

13. With respect to all of these offers, the prospective purchaser would have assumed and/or paid all of the outstanding liabilities of BioSafe. In each and every instance with regard to these offers, Warner as CEO and Chairman of an insolvent company rejected and failed to inform the Debtor's Board of Directors of the purchase offers that were in the best interests of BioSafe's creditors, because he did not perceive that he would be acquiring enough personally. As a result of Warner's failure to disclose these offers and incompetence in managing the considerable intellectual assets of the firm, the equity of the Company has dissipated and the listed creditors herein are at grave risk of recapturing the totality of their legitimate claims.

**B. *Warner has sons who do not perform work on the BioSafe payroll.***

14. Warner has also ensured that his family is compensated by BioSafe, at the expense of creditors.

15. Warner put one of his sons, Jeremy Warner, on the payroll for sales commissions in excess of what comparable employees earn from the Debtor. On information and belief, Jeremy Warner and Warner also worked together to divert a corporate opportunity from the Debtor to another entity they controlled and earned substantial amounts from this opportunity, all without disclosure to the Board of Directors Another son, Chris Warner, is an associate producer of television shows in California. Nevertheless, Warner has arranged, without consent of the Board of

4

PL 02064

Directors, for Chris Warner to sell BioSafe products at a discount through websites linked to the BioSafe website. Since these products were available through BioSafe's own website, providing them at a discount through his son's website constitutes a diversion of corporate revenues by Warner to his own family.

16.  In addition Warner is causing promotional materials to be inserted in medical kits under the Kellogg contract which promote purchasing other BioSafe products from his son's website, thus further diverting these corporate opportunities from BioSafe. On information and belief, Warner has also arranged a contract for BioSafe to purchase this website from his son for approximately $50,000 sometime in the next year.

### C.  BioSafe's President resigns in dispute over Warner paying himself from investors' funds as an unauthorized "commission" in preference to other lenders and creditors.

17.  Until February 2, 2007, David Fleisner ("Fleisner"), one of the Petitioning Creditors, was President of BioSafe. When Fleisner discovered that Warner had directed BioSafe to pay Warner $116,000 in corporate funds to repay a $100,000 loan Warner had made to BioSafe a few months earlier and objected to this repayment when substantial unpaid and defaulted loans were outstanding to other officers, directors and shareholders, Fleisner resigned as President of BioSafe.

### D.  Board of Directors convenes a special meeting to review Warner's actions.

18.  As permitted under Fleisner's contract, he petitioned and two Board members, Lear and Reitman, agreed to hold a Special Board Meeting on February 15, 2007 to examine the facts surrounding the matter which Warner chose not to attend. The other four Directors attended. (Fleisner, the sixth, had resigned on February 2, 2007 when he also resigned as President.) At that meeting (attended by Fleisner and his counsel), the Directors learned about several actions Warner had taken in the past years that had not been disclosed to the Board.

5

PL 02065

19. Specifically, at the February 15, 2007 Directors meeting, the Directors learned about actions taken by Warner to favor payments to himself and his family members while expense reimbursements and compensation had gone unpaid for long periods of time. The Board also considered that Warner had caused BioSafe to maintain vanity offices near his home in Lake Forest at a cost of approximately $360,000 per year. These offices are approximately 60% vacant while rent for a Milwaukee office had not been paid in 6 months, and most of the 25 employees were working out of a laboratory elsewhere. The Directors present at the meeting voted unanimously to adopt the following resolutions:

a. To nullify Warner's inappropriate letter terminating Fleisner and to accept Fleisner's resignation;

b. To demand that Warner immediately refund to BioSafe $70,000 that he took in a self-described "commission" that had not been authorized by the Board from a financing he arranged about nine months earlier;

c. To express a lack of confidence that Warner would utilize existing advances of customer funds for the benefit of BiosSafe's shareholders and creditors and to cause all bank resolutions to be amended to require the CFO's co-signature on any check for more than $500;

d. To require that all existent firm capital and customer advances be used to produce goods and services for which the advances were intended, and to not use such funds for payment of past-due salaries, bonuses and debts without Board authorization; to prohibit the payment of legal expenses on behalf of any BioSafe employee or director without prior authorization of the Board; to compel the company to immediately disclose to the Board all pending lawsuits against BioSafe or Warner (relating to the company); to prohibit payment of more than $5,000 for any legal

PL 02066

expenses except for specific business purposes over the next six months, unless authorized by the Board; to require disclosure to the Board any actions in violation of creditor covenants or breaches of contract by the company, and to cease and desist such actions;

e. To compel Warner to cease all favored treatment to himself, his family and related entities; to compel Warner to disclose such favored treatment, including payments, to the Board; to authorize that any excessive payments to Warner, his family or his entities, as determined by future investigation, be reimbursed to BioSafe;

f. To affirm that the Board believes that Warner has failed to provide material information to the Directors or provided disinformation to the Directors; to direct Warner to cease using company assets for his own and his family's personal benefit; and to compel Warner to disclose to the Board by March 15, 2007, the contents of a certain letter dated April 6, 2006, by Director Frederick J. Fitzsimmons ("Fitzsimmons"), one of the Petitioning Creditors, and to present this letter to the Board for discussion;

g. To direct the company to pay a certain American Express credit card account that had been personally guaranteed by Director Patty O'Brien ("O'Brien"), whose husband is a trade vendor and Petitioning Creditor, and to cease using the credit card; to grant O'Brien the option to return her salary to the level it was at on December 31, 2006, before Warner reduced it; to pay immediately the past-due rent for the Milwaukee office; and reimburse Director William Lear ("Lear"), one of the Petitioning Creditors, approximately $14,000 that he paid personally several years ago for corporate expenses on an American Express card that he had personally guaranteed. (Directors O'Brien and Lear abstained from those portions of this

7

motion that concerned paying or reimbursing corporate expenses relating to them personally) and,

h. To appoint a compensation committee of the Board to review and approve all officer salary levels and changes.

E. *Warner retaliates against the Board and when they refuse to capitulate to his demands, he discharges the Board and votes a new Board.*

20. Warner ignored these directives and retaliated against BioSafe's Directors by spending corporate funds to retain the law firm of Vedder, Price to attack the majority-dissident Directors. When Vedder was notified of conflicts, Warner persisted and, again using corporate funds, retained the law office of Kevin Flynn which then sent a lengthy letter to Warner, which in turn was then forwarded to each of the Directors. This letter threatened each of them with a lawsuit and personal liability for their votes on February 15, 2007 and demanded that they convene to annul their votes.

21. Warner called a special meeting of the Board for March 7, 2007 to nullify the votes of the February 15, 2007 Board meeting. This meeting failed to obtain a quorum.

22. On or about March 12, 2007, Warner produced and sent to all shareholders a "notice of action" by Renraw which owns approximately 52% of the Debtor's shares, to act without a shareholders meeting to remove all the Directors from Biosafe's Board, and to appoint a new Board. This notice incorrectly represented that another shareholder, Neirobo LLC, controlled by one of the Petitioning Creditors, had joined in this action.

23. On or about March 17, 2007, Warner, through his entity Renraw, purportedly removed all Directors and appointed a new Board. The legitimacy of Warner's actions is disputed.

PL 02068

### F. *Warner has diverted Biosafe contracts and customers to Lab123 which is not a wholly owned subsidiary of Biosafe.*

24. Warner has previously admitted to one of the Directors, who is also a Director of Lab123, that Warner has diverted or moved BioSafe contracts and customers to Lab123 in order to create a more favorable financial appearance for Lab123's investors and potential investors, all at the expense and loss of BioSafe.

### II. It is in the best interests of creditors that this Court immediately appoint a trustee to operate and manage the business of BioSafe and its subsidiaries.

25. Section 1104(a) of the Bankruptcy Code provides for the appointment of a Trustee any time after commencement of the case either because of gross mismanagement or because doing so is in the interests of the creditors.

§ 1104. Appointment of trustee or examiner.
  (a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee —
    (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor;
    (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
    (3) if grounds exist to convert or dismiss the case under section 1112, but the court determines that the appointment of a trustee or an examiner is in the best interests of creditors and the estate.

Bankruptcy Code § 1104(a). In this case, a trustee should be appointed for either of the reasons set forth in subsections (a)(1) or (a)(2).

26. The facts demonstrate unequivocally that Warner has been operating BioSafe in a manner disregarding the interests of creditors and advancing his personal interests.

9

PL 02069

27.   BioSafe has been insolvent for longer than the past two years. As a Director of BioSafe, Warner has had at all times during the period of BioSafe's insolvency a fiduciary duty to operate BioSafe in the best interests of its creditors.

> Directors who conceive of their corporations as legal and economic entities will recognize that "in managing the business affairs of a solvent corporation in the vicinity of insolvency, circumstances may arise when the right (both efficient and the fair) course to follow for the corporation may diverge from the choice that the stockholders (or the creditors, or the employees, or any single group interested in the corporation) would make if given the opportunity to act."

*Ben Franklin Retail Stores, Inc. v. Kendig,* 2000 U.S. Dist. Lexis 276, * 12, nos. 97 C 7934 and 97 C 6043 (ND. Ill. 2000) quoting *Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Co.,* 1991 Del Ch. Lexis 215, * 108 n. 55, no. 12150 (Del Ch. 1991); See, Jonathan C. Lipson, *Director's Duties to Creditors: Power Imbalance and the Financially Distressed Corporation,* 50 UCLA L. REV. 1189, 1203 ("[B]ecause directors owe fiduciary duties to the residual claimants of the firm, creditors will naturally become such claimants when the firm is insolvent. Thus, because unsecured creditors precede shareholders in order of priority (broadly understood), they become the beneficiaries of a duty.") Notwithstanding his fiduciary duty, at all times in the past two years Warner has breached his fiduciary duty and has operated Biosafe for his own gain, at the expense and loss of creditors and more than two hundred investor-shareholders.

28.   Alternatively, aside from Warner's gross mismanagement of the Debtor, the Court may appoint a trustee because doing so is in the best interest of the creditors and equity security holders.

> The traditional factors used to determine whether appointment of a chapter 11 trustee is in the best interest of the creditors include (a) the trustworthiness of the debtor; (b) the debtor's past and present performance and prospects for rehabilitation; (c) whether the business community and creditors of the estate have confidence in the debtor and (d) whether the benefits outweigh the costs.

10

PL 02070

*In re Sanders*, 2000 Bankr. Lexis 263, *14-15, no. 99-9876 (Bankr. N.D. Ill. 2000). In the instant case, the trustworthiness of the Debtor under the control of Warner is at best suspect; the Debtor's present conduct in contract fulfillment and prospects for rehabilitation under Warner's command is null because of his direct interference with and unilateral rejection of recapitalization offers; the business community and creditors have little or no confidence in Warner's management of the Debtor (i) as evidenced by his actions in attempting to replace the entire board of directors (other than himself) when the Directors voted a lack of confidence in him and voted to prevent him from taking corporate opportunities or acting without Board supervision and (ii) as evidenced by the number of Petitioning Creditors representing in excess of $2,888,000 or almost one-third of Debtor's debt. In totality, the benefits of appointing a trustee to administer the Debtor's estate far outweigh the costs.

29. Petitioning Creditors have discussed with William Brandt the possibility of being employed as Trustee of BioSafe, and he has indicated a willingness to accept such employment on terms to be presented and approved by this Court.

*WHEREFORE*, Petitioning Creditors ask that this Court enter an Order appointing William Brandt as trustee of the estate and for such other relief as this Court may determine to be appropriate.

Petitioning Creditors of Biosafe

By: /s/ Kenneth A. Michaels Jr.
One of Their Attorneys

PL 02071

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| In re: | ) No. 07-4412 |
| | ) Chapter 11 |
| Biosafe Medical Technologies, Inc. | ) |
| | ) Involuntary Petition |
| Debtor. | ) |
| | ) Hon. Susan Pierson Sonderby |
| | ) Courtroom 642 |

### CERTIFICATE OF SERVICE

To:  U. S. Trustee's Office
Attn: Richard Friedman
227 W. Monroe St., Suite 3350
Chicago, Illinois 60606

BioSafe Medical Technologies, Inc.
100 Field Drive, Suite 240
Lake Forest, IL 60045
Fax: 847-234-8112
(service via fax and U.S. Mail)

The undersigned attorney, certifies that on March 22, 2007, he caused **Petitioning Creditors' Motion to Appoint Trustee** to be served upon the persons identified above or on the attached service list by ❏ electronically delivering a copy through the Court's CM/ECF filing system, unless otherwise indicated immediately above, in which circumstances service was made as so indicated by: ❏ personally delivering a copy to the recipient at his or her respective address before 4:00 P.M.; or, ❏ mailing a copy to the recipient at his or her respective address by depositing the same in United States Post Office Box with proper first class postage affixed thereto; or, ❏ personally delivering a copy to the recipient at his or her respective facsimile transmittal number, this transmittal being sent from a facsimile machine at 312-427-5709, and a copy of the facsimile transmittal record being attached hereto.

/s/ Kenneth A. Michaels Jr.

Paul M. Bauch (ARDC 6196619)
Kenneth A. Michaels Jr. (ARDC 6185885)
Carol Y. Sales (ARDC 6287277)
BAUCH & MICHAELS, LLC
53 W Jackson Blvd, Suite 1115
Chicago, IL 60604
Office: 312-588-5000
Fax: 312-427-5709
Email: kmichaels@bauch-michaels.com

12

PL 02072