to forfeiture if Mr. Sosnowik's employment is terminated. 300,000 of such shares shall become vested and not subject to forfeiture on each of the first through fourth anniversaries of the date of Mr. Sosnowik's employment agreement (September 1, 2006) if Mr. Sosnowik is then employed by the Company.

If termination of the employment agreement is by the Company for "Cause", as result of Mr. Sosnowik's Total Disability, death or retirement or if Mr. Sosnowik terminates the agreement for other than Good Reason, the only compensation of any kind or nature that Mr. Sosnowik shall be entitled to receive under the agreement following such termination shall be such compensation earned by him prior to the date of termination and which is then unpaid.

If termination of the agreement is by the Company for any reason other than Cause or by Mr. Sosnowik for Good Reason, then and only in such event, commencing with the last day of the month following the month in which termination of his employment with the Company occurs and on the last day of each month thereafter for eleven consecutive calendar months, Mr. Sosnowik will be entitled to receive one-twelfth of his base salary on the date of termination.

"Cause" shall mean the occurrence of any one or more of the following with respect to Mr. Sosnowik:

- his conviction of a felony (through trial or plea);
- his conviction of any crime (be it a felony or otherwise) involving misuse or misappropriation of money or other property or involving a breach of trust;

- any act of dishonesty that either is intended to or results in his substantial and improper personal enrichment at the expense of the Company or adversely affects the business or financial condition of the Company;
- the willful commission of acts of misconduct that result in injury to the Company or its assets or business;
- his breach of any covenant or agreement under the agreement and his failure to cure such breach (if such breach can be cured) within thirty (30) days after written notice thereof has been given to him by the Company;
- any failure, neglect or refusal by him to perform any material obligation under the agreement;
- his violation of any statutory or common law duty of loyalty to the Company;
- his habitual intoxication; or
- his drug addiction.

Good Reason" shall mean, without Mr. Sosnowik's written consent:

- the assignment to him of duties inconsistent with those of President of the Company, or a reduction in such duties;

- the breach by the Company of any provision of the agreement where such breach has not been cured within thirty (30) days from the Company's receipt of written notice from Mr. Sosnowik to cure such breach; or

- the Board of Directors requiring Mr. Sosnowik to perform, ignore, supervise or otherwise participate in illegal, unethical or materially misleading acts.

If, at any time while the agreement is in force, the Company is sold or otherwise experiences a Change in Control, then either the Company or Mr. Sosnowik may terminate Mr. Sosnowik's employment without breaching any provision hereof and without having to compensate Mr. Sosnowik, except that Mr. Sosnowik shall immediately vest in all shares issued to him and the Company shall compensate him as if the agreement was terminated by him for Good Reason. The term "Change of Control" means the effect of any transaction in which holders of the Company's voting power immediately prior to such transaction do not continue after such transaction to hold securities of the Company having the voting power necessary to elect a majority of the members of the board of directors of the Company.

**Directors' Compensation**

Each independent director shall receive an annual directors' fee of $5,000. In addition, each such person shall be reimbursed for all out of pocket expenses in connection the person's service as a director of the Company.

### SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table sets forth, as of December 8, 2006, certain information regarding the ownership of Lab123's common stock by (i) each person known by Lab123 to be the beneficial owner of more than 5% of the outstanding shares of common stock, (ii) each of Lab123's directors, (iii) each executive officer and (iv) all of Lab123's executive officers and directors as a group. Beneficial ownership, for purposes of this table, includes preferred stock convertible into common stock and warrants to purchase common stock that are either currently exercisable or convertible or will be exercisable or convertible within 60 days of December 8, 2006.

The percentage ownership data is based on 7,675,000 shares of our common stock outstanding as of December 8, 2006. Under the rules of the SEC, beneficial ownership includes shares over which the indicated beneficial owner exercises voting and/or investment power. Shares of common stock subject to warrants or underlying convertible preferred stock that are currently exercisable or convertible, or will become exercisable or convertible, within 60 days of December 8, 2006 are deemed outstanding for the purpose of computing the percentage ownership of the person holding the warrant or convertible preferred stock, but are not deemed outstanding for the purpose of computing the percentage ownership of any other person. Except as otherwise noted, we believe that the beneficial owners of the shares of common stock listed below have sole voting and investment power with respect to all shares beneficially owned.

| Name of Beneficial Owner | Shares Beneficially Owned | |
|---|---|---|
| | Number | Percent of Class |
| Barron Partners LP c/o Barron Capital Advisors, LLC 730 Fifth Avenue, 25th Floor New York, NY 10019 | 7,548,000(1) | 49% |
| Biosafe Laboratories, Inc. 8600 West Catalpa Chicago, Illinois 60656 | 6,050,000 | 78.8% |
| Michael Sosnowik 233 Narragansett Avenue Lawrence, New York 11559 | 300,000(2) | 3.9% |
| Henry Warner c/o Biosafe Medical Technologies, Inc. 100 Field Drive, Suite 240 Lake Forest, Illinois 60045 | 0(3) | 0% |
| All current directors and current executive officers as a group (2 persons) | 300,000(2)(3) | 3.9% |

(1)   Contractual restrictions in the Barron preferred stock purchase agreement and warrants prohibit Barron from exercising any warrants or converting any preferred stock if such conversion or exercise would cause it to exceed 4.9% beneficial ownership of Lab123. Barron Partners holds 3,774,000 shares of Series A Convertible Preferred Stock (currently convertible into Lab123 common stock on a share for share basis) plus warrants to purchase up to an aggregate of 3,774,000 shares of common stock of Lab123, in each case not giving effect to the contractual restrictions.

(2)   Under his employment agreement with the Company, dated as of August 30, 2006, on such date Mr. Sosnowik was issued 1,500,000 shares of the Company's common stock, of which 300,000 shares were fully vested on issuance and 300,000 shares shall become vested on the each of the first through fourth anniversaries of August 30, 2006 provided that Mr. Sosnowik is then employed by the Company under the agreement. Therefore, the 1,200,000 shares of common stock of the Company which were issued to Mr. Sosnowik on August 30, 2006, but which are not yet vested on the date of this prospectus are not reported in the table as beneficially owned by Mr. Sosnowik.

(3)   Mr. Warner is the Chief Executive Officer and Chairman of the Board of Biosafe, which directly owns 6,050,000 shares of common stock of Lab123. Mr. Warner is the managing member of a limited liability company which owns approximately 54% of the outstanding common stock of Biosafe.

## DESCRIPTION OF SECURITIES

The Company currently has 21,000,000 authorized shares of common stock, $.001 par value, of which 7,675,000 shares are issued and outstanding and 3,774,000 shares are reserved for issuance upon the exercise of outstanding stock warrants and 3,774,000 shares are reserved for issuance upon conversion of outstanding shares of convertible preferred stock. In addition, the Company has 5,000,000 authorized shares of preferred stock, of which 3,774,000 shares of Series A Stock are issued and outstanding which shares are without dividend rights, but are convertible into an aggregate of 3,774,000 shares of common stock upon their exercise.  The conversion rate into common stock of the shares of Series A Stock is subject to adjustment upon the occurrence of certain specified events, including the issuance of additional shares of common stock or a subdivision or combining of shares of common stock. In addition, if the Company's EBITDA for the three months ending December 31, 2006 and the fiscal year ending December 31, 2007 as reported in the audited financial statements of the Company for such periods, are less than certain targeted amounts, the conversion rate shall be adjusted based upon a formula. The Series A Stock have no voting rights. However, so long as any shares of Series A Stock are outstanding, the Company shall not, without the affirmative approval of the holders of the shares of the Series A Stock then outstanding, (a) alter or change adversely the powers, preferences or rights given to the Series A Stock or alter or amend the Certificate of Designation of the Series A Stock, (b) authorize or create any class of stock ranking as to dividends

or distribution of assets upon a liquidation of the Company senior to or otherwise pari passu with the Series A Stock, or any of preferred stock possessing greater voting rights or the right to convert at a more favorable price than the Series A Stock, (c) amend its certificate or articles of incorporation or other charter documents in breach of any of the provisions of the Series A Stock, (d) increase the authorized number of shares of Series A Stock, or (e) enter into any agreement with respect to the foregoing.

The conversion right as contained in the Certificate of Designations of the Series A Stock provides that a holder may not convert an amount of Series A Stock to the extent that the number of shares held by the holder, when added to the number of shares of common stock beneficially owned by such holder or issuable if the holder exercised one or more of its warrants immediately prior to conversion, would exceed 4.9% of the Company's issued and outstanding common stock after giving effect to such conversion.

Upon any liquidation, dissolution or winding-up of the Company, whether voluntary or involuntary, the holder of shares of Series A Preferred Stock are entitled to receive out of the assets of the Company, for each share of Series A Preferred Stock, an amount equal to $0.53 per share before any distribution or payment shall be made to the holders of any junior securities. Certain change in control transactions may also, at the election of the holder of the Series A Stock, be treated as a liquidation.

Each share of outstanding common stock is entitled to one vote. Shares of common stock have no preemptive rights.

The rights, preferences, privileges and limitations of the remaining preferred stock have not been established, and no series of preferred stock has been established. The rights, preferences, privileges and limitations of the preferred stock, in one or more series, may be established by the Board without the approval of the holders of the common stock.

Authorized but unissued common stock may be issued for such consideration as the Board determines to be adequate. Issuance of common stock could have a dilutive effect on current stockholders. Stockholders may or may not be given the opportunity to vote on the issuance of common stock, depending upon the nature of any such transactions, applicable law, the rules and policies of the national securities exchange on which the common stock is then trading, if any, and the judgment of the Board. Having a substantial number of authorized and unreserved shares of common stock and preferred stock could have the effect of making it more difficult for a third party to acquire a majority of the Company's outstanding voting stock. Management could use the additional shares to resist a takeover effort even if the terms of the takeover offer are favored by a majority of the independent stockholders. This could delay, defer, or prevent a change of control.

## CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

There have not been any transactions, or series of similar transactions, since the inception of the Company, or any currently proposed transaction, or series of similar transactions, to which the Company or any of its subsidiaries was or is to be a party, in which the amount involved exceeds $60,000 and in which any director or executive officer of the Company, nominee for election as a director, any five percent security holder or any member of the immediate family of any of the foregoing persons had, or will have, a direct or indirect material interest, except that on September 7, 2006 we entered into a license and distributor agreement with Biosafe for our five Diagnostic Products.

To acquire the license, we paid to Biosafe a one time fee of $1,000,000 in cash and issued to Biosafe 6,050,000 shares of our common stock, valued at $3,300,000. Henry Warner, one of our directors and our Chairman of the Board, is also the Chief Executive Officer and Chairman of the Board of Biosafe.

## MARKET FOR COMMON EQUITY AND RELATED STOCKHOLDER MATTERS

There is no market for our common stock.

As of December 8, 2006, we had 3 record holders of our common stock.

We have not paid dividends on our common stock, and the terms of Certificate of Designations relating to the creation of the Series A Stock prohibit us from paying dividends. We plan to retain future earnings, if any, for use in our business. We do not anticipate paying dividends on our common stock in the foreseeable future.

As of December 8, 2006, there were reserved for issuance a total of 7,548,000 shares, of which 3,774,000 were issuable upon conversion of the Series A Stock and 3,774,000 shares were reserved for issuance upon exercise of the warrants. No shares are available for sale pursuant to Rule 144 as of the date of this prospectus.

See "Selling Stockholders" for information relating to the issuance of stock since our organization.

**Equity Compensation Plan Information**

As of the date of this prospectus, the Company does not have any equity compensation plans.

**Transfer Agent**

The Company currently acts as its own transfer agent, but plans to engage a transfer agent when, and if, a trading market for its common stock develops.

**Penny Stock Regulations**

The SEC has adopted regulations which generally define "penny stock" to be an equity security that has a market price of less than $5.00 per share. The Company's common stock, when and if a trading market develops, may fall within the definition of penny stock and subject to rules that impose additional sales practice requirements on broker-dealers who sell such securities to persons other than established customers and accredited investors (generally those with assets in excess of $1,000,000, or annual incomes exceeding $200,000 or $300,000, together with their spouse).

For transactions covered by these rules, the broker-dealer must make a special suitability determination for the purchase of such securities and have received the purchaser's prior written consent to the transaction. Additionally, for any transaction, other than exempt transactions, involving a penny stock, the rules require the delivery, prior to the transaction, of a risk disclosure document mandated by the SEC relating to the penny stock market. The broker-dealer also must disclose the commissions payable to both the broker-dealer and the registered representative, current quotations for the securities and, if the broker-dealer is the sole market-maker, the broker-dealer must disclose this fact and the broker-dealer's presumed control over the market. Finally, monthly statements must be sent disclosing recent price information for the penny stock held in the account and information on the limited market in penny stocks. Consequently, the "penny stock" rules may restrict the ability of broker-dealers to sell the Company's common stock and may affect the ability of investors to sell our common stock in the secondary market.

**LEGAL PROCEEDINGS**

Lab 123 is not a party to any litigation or legal proceeding.

**EXPERTS**

The financial statements of Lab123, Inc. at August 31, 2006 and for the period from August 25, 2006 (inception) to August 31, 2006 included in this prospectus to the extent and for the periods indicated in its report, have been audited by Marcum & Kliegman, LLP, independent registered public accountants, and are included herein in reliance upon the authority of such firm as an expert in accounting and auditing in giving such report.

**LEGAL MATTERS**

The validity of the shares of common stock offered through this prospectus will be passed on by Guzov Ofsink, LLC, New York, New York.

## INDEX TO FINANCIAL STATEMENTS

Lab123, Inc.

**Financial Statements**

As of August 31, 2006 and from August 25, 2006 (Inception) to August 31 , 2006

Report of Independent Registered Public Accounting Firm ........................... F-1

Balance Sheet ........................... F-2

Statements of Operations and Comprehensive Loss ........................... F-3

Statement of Changes in Stockholders' Equity (Deficiency) ........................... F-4

Statement of Cash Flows ........................... F-5

Notes to Financial Statements ........................... F-6

Report of Independent Registered Public Accounting Firm

To the Board of Directors
LAB123, INC.

We have audited the accompanying balance sheet of LAB123, INC. (A Development Stage Company) (the *"Company"*) as of August 31, 2006 and the related statement of operations, changes in stockholder's deficiency and cash flows for the period from August 25, 2006 (Date of Inception) to August 31, 2006. These financial statements are the responsibility of the Company 's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company 's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of LAB123, INC. (A Development Stage Company) as of August 31, 2006, and the results of its operations and its cash flows for the period from August 25, 2006 (Date of Inception) to August 31, 2006 in conformity with accounting principles generally accepted in the United States of America.

The accompanying financial statements have been prepared assuming the Company will continue as a going concern. As discussed in Note 2 to the financial statements, the Company has incurred a loss since inception and has a working capital deficiency as of August 31, 2006. These conditions raise substantial doubt about its ability to continue as a going concern. Management's plans regarding those matters are also described in Note 2. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

/s/ Marcum & Kliegman LLP

New York, New York
September 21, 2006

F-1

PL 00509

Lab123, Inc.
(A Development Stage Company)
Balance Sheet
August 31, 2006

| TOTAL ASSETS | $ - |
|---|---|

| | |
|---|---|
| Accrued expenses | 5,628 |
| Due to Biosafe | 18,619 |
|     Total Current Liabilities | 24,247 |
| | |
| TOTAL LIABILITIES | 24,247 |
| | |
| Stockholder's Deficiency | |
|   Series A Convertible Preferred Stock - .001 par value; 6,000,000 authorized; none issued and outstanding | - |
|   Common Stock - .001 par value; 15,000,000 authorized; 1,500,000 issued and outstanding | 1,500 |
|   Additional paid in capital | 106,500 |
|   Deficiency accumulated during the development stage | (132,247) |
|     Total Stockholder's Deficiency | (24,247) |
| | |
| TOTAL LIABILITIES AND STOCKHOLDER'S DEFICIENCY | $ - |

*The accompanying notes are an integral part of these financial statements.*

F-2

PL 00510

Lab123, Inc.
(A Development Stage Company)
For the period from August 25, 2006 (Date of Inception)
to August 31, 2006
Statement of Operations

OPERATING EXPENSES:

| | |
|---|---:|
| Compensation | $ 108,000 |
| Formation and legal expenses | 24,247 |
| Total Operating Expenses | 132,247 |
| NET LOSS | $ (132,247) |
| Basic and diluted loss per common share | $ (0.31) |
| Weighted average common shares, basic and diluted | 428,571 |

*The accompanying notes are an integral part of these financial statements.*

F-3

PL 00511

Lab123, Inc.
(A Development Stage Company)
Statement of Changes in Stockholder's Deficiency
For the period from August 25, 2006 (Date of Inception)
to August 31, 2006

| | Common Stock | | Additional Paid - in Capital | Deficiency Accumulated During the Development Stage | Total Stockholder's Deficiency |
| | Shares | Amount | | | |
|---|---|---|---|---|---|
| Issuance of shares under employment agreement (August 30, 2006, $0.36) | 1,500,000 | $ 1,500 | $ 106,500 | | $ 108,000 |
| Net loss | | | | (132,247) | (132,247) |
| Balance at August 31, 2006 | 1,500,000 | $ 1,500 | $ 106,500 | $ (132,247) ) | $ (24,247) |

*The accompanying notes are an integral part of these financial statements.*

F-4

PL 00512

Lab123, Inc.
(A Development Stage Company)
Statement of Cash Flows
For the period from August 25, 2006 (Date of Inception)
to August 31, 2006

| | |
|---|---|
| Cash Flows From Operating Activities | |
| Net Loss | $ (132,247) |
| Adjustments to reconcile net loss to net cash used in operating activities: | |
| Non-cash stock based compensation | 108,000 |
| Changes in operating liabilities: | |
| Due to Biosite | 18,619 |
| Accrued expenses | 5,628 |
| | |
| Net cash used in operating activities | - |
| | |
| Change in Cash | - |
| | |
| Cash - Beginning of the Period | - |
| | |
| Cash - End of the Period | $ - |

*The accompanying notes are an integral part of these financial statements.*

F-5

PL 00513

Lab123, Inc.
(A Development Stage Company)
NOTES TO FINANCIAL STATEMENTS

**NOTE 1 - Organization, Business and Operations**

Lab123, Inc. (a development stage company) ("Lab123" or the "Company") is currently a development stage company under the provisions of Statement of Financial Accounting Standards ("SFAS") No. 7, Development Stage Enterprises and was incorporated in Delaware on August 25, 2006. Lab123 is a marketing, distributing and manufacturing company whose objective is to license, broker or acquire retail medical diagnostic products and services to sell into retail drug stores and chains the United States and internet drug retailers. As of August 31, 2006, the Company has not commenced operations and will continue to report as development stage company until significant revenues are generated.

All activity through August 31, 2006 relates to the Company's formation and the progress towards the completion of the private placement described below. The Company has selected December 31 as its fiscal year-end.

On September 6, 2006 the Company entered into a convertible preferred stock purchase agreement with Barron Partners to issue 3,774,000 shares of Series A Convertible Preferred Stock ("Series A Preferred") and a warrant (see note 6) to purchase 3,774,000 shares of common stock for $2,000,000. As described more fully in Note 3, these proceeds will be used primarily to fund the Company's working capital needs, pay the expenses associated with the formation of Company and partially fund the license the Company has obtained of certain retail medical diagnostic products (see Note 6) to sell into the retail drug stores and chains the United States and internet drug retailers.

**NOTE 2 - GOING CONCERN**

These financial statements have been prepared in accordance with generally accepted accounting principles applicable to a going concern, which implies the Company will continue to meets its obligations and continue its operations for the next fiscal year. Realization values may be substantially different from carrying values as shown and these financial statements do not include any adjustments to the recoverability and classification of recorded asset amounts and classification of liabilities that might be necessary should the Company be unable to continue as a going concern. The Company has not generated revenues since inception, has accumulated losses of $132,247 since inception and does not have sufficient working capital to sustain its operations for the next fiscal year. These factors raise substantial doubt regarding the Company's ability to continue as a going concern. The continuation of the Company as a going concern is dependent upon the continued financial support from its shareholders, the ability of the Company to obtain additional necessary equity financing to continue operations, the successful acquisition of a business or assets, and the attainment of profitable operations. Management has plans in place to address this concern and expects that the Company will be able to obtain additional funds by equity financing and/or related party advances; however, there is no assurance that additional funding will be available to the extent required to address this concern.

F-6

PL 00514

Lab123, Inc.
(A Development Stage Company)
NOTES TO FINANCIAL STATEMENTS

**NOTE 3 - Summary of Significant Accounting Policies**

*Revenue Recognition*

Revenue is recognized upon shipment of products, Sales discounts and allowances are recorded at the time product sales are recognized and are offset against sales revenue. Consignment sales or "pay-on-scan" sales are recorded as revenue when the sale at the retail store level has occurred. If a sale occurs that has a right-of-return, a reserve for returns will be created using Company and industry experience as to rates of return. Service revenue is recognized in the period in which the service was performed.

*Income Taxes*

The Company is in the development stage and incurred net operating losses, therefore no provisions for income taxes have been established. As of August 31, 2006, the Company's net operating loss carry-forward totaled approximately $132,000.

The Company recorded a deferred tax asset for the tax effect of the net operating loss carry forwards aggregating approximately $49,500. A full valuation allowance has been provided that reduced the tax benefits accrued by the Company for these operating losses to zero as it cannot be determined when, or if, the tax benefits derived from these losses will materialize.

*Development Stage Company*

The Company has not generated any revenues to date; accordingly, the Company is considered a development stage enterprise as defined in Financial Accounting Standards Board No. 7, "Accounting and Reporting for Development Stage Companies." The Company is subject to a number of risks similar to those of other companies in an early stage of development.

*Loss Per Share*

Basic loss per share was computed using the weighted average number of outstanding common shares. Diluted loss per share includes the effect of dilutive common stock equivalents from the assumed exercise of options, warrants and convertible preferred stock. Common stock equivalents were excluded in the computation of diluted loss per share since their inclusion would be anti-dilutive. As of August 31, 2006, the Company did not have common stock equivalents.

*Stock Based Compensation*

The Company adopted SFAS No. 123R "Share Based Payment". This statement is a revision of SFAS Statement No. 123, and supersedes APB Opinion No. 25, and its related implementation guidance. SFAS 123R addresses all forms of share based payment ("SBP") awards including shares issued under employee stock purchase plans, stock options, restricted stock and stock appreciation rights. Under SFAS 123R, SBP awards will result in a charge to operations that will be measured at fair value on the awards grant date, based on the estimated number of awards expected to vest over the service period.

On August 30, 2006, the Company issued 1,500,000 shares of common stock to the Chief Executive Officer; the Company has recorded a charge to operations of $108,000 for the 300,000 shares that vested immediately on the date of issuance. The remaining 1,200,000 shares have been valued at $432,000 and will be amortized over the life of the employment agreement (see Note 4). As of August 31, 2006 the Company has not granted options or warrants to purchase shares of its common stock.

Compensation cost for awards that vest will not be reversed if the awards expire without being exercised.

F-7

PL 00515

Lab123, Inc.
(A Development Stage Company)
NOTES TO FINANCIAL STATEMENTS

*Fair Value of Financial Instruments*

The Company evaluates its financial instruments such as convertible preferred stock, options, warrants or other contracts to determine if those contracts or embedded components of those contracts qualify as derivatives to be separately accounted for under Statement of Financial Accounting Standards 133 "Accounting for Derivative Instruments and Hedging Activities" and related interpretations including EITF 00-19 "Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's Own Stock". The result of this accounting treatment is that the fair value of the embedded derivative is marked-to-market each balance sheet date and recorded as a liability. In the event that the fair value is recorded as a liability, the change in fair value is recorded in the consolidated statement of operations as other income or expense. Upon conversion or exercise of a derivative instrument, the instrument is marked to fair value at the conversion date and then that fair value is reclassified to equity.

In circumstances where the embedded conversion option in a convertible instrument is required to be bifurcated and there are also other embedded derivative instruments in the convertible instrument that are required to be bifurcated, the bifurcated derivative instruments are accounted for as a single, compound derivative instrument.

The classification of derivative instruments, including whether such instruments should be recorded as liabilities or as equity, is re-assessed at the end of each reporting period. Equity instruments that are initially classified as equity that become subject to reclassification under SFAS 133 are reclassified to liability at the fair value of the instrument on the reclassification date. Derivative instrument liabilities are classified in the balance sheet as current or non-current based on whether or not net-cash settlement of the derivative instrument is expected within 12 months of the balance sheet date.

At August 31, 2006 the Company has not entered into financial instruments, as discussed above. Please see Note 6 "Subsequent Events" for discussion of financial instruments entered into subsequent to August 31, 2006.

*Use of Estimates*

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of expenses during the reporting period. Actual results could differ from those estimates.

*Product Warranty*

The Company will offer warranties for certain of its products and/or customers. The Company will accrue its estimated exposure to warranty claims based upon historical warranty claim costs as a percentage of sales. Management will review these estimates on a regular basis and adjust the warranty provisions as actual experience differs from historical estimates. For the period August 25, 2006 (Date of Inception) through August 31, 2006 the Company has not incurred any warranty claims expense as the Company has not yet commenced operations.

PL 00516

Lab123, Inc.
(A Development Stage Company)
NOTES TO FINANCIAL STATEMENTS

*Recent Accounting Pronouncements*

In February 2006, the Financial Accounting Standards Board issued SFAS No. 155, "Accounting for Certain Hybrid Financial Instruments," which amends SFAS No. 133, Accounting for Derivative Instruments and Hedging Activities" ("SFAS No. 155"), and SFAS No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities" . SFAS No. 155 simplifies the accounting for certain derivatives embedded in other financial instruments by allowing them to be accounted for as a whole if the holder elects to account for the whole instrument on a fair value basis. SFAS No. 155 also clarifies and amends certain other provisions of SFAS No. 133 and SFAS No. 140. SFAS No. 155 is effective for all financial instruments acquired, issued or subject to a remeasurement event occurring in fiscal years beginning after September 15, 2006. Earlier adoption is permitted, provided we have not yet issued financial statements, including for interim periods, for that fiscal year. The Company does not expect that the adoption of SFAS 155 will have a material impact on its financial position and results of operations.

In July 2006, the Financial Accounting Standards Board (the "FASB") issued FASB Interpretation No. 48, "Accounting for Uncertainty in Income Taxes - an interpretation of FASB Statement No. 109" ("FIN48"), which clarifies the accounting for uncertainty in tax positions. This interpretation requires that the Company recognize in its financial statements, the impact of a tax position, if that position is more likely than not of being sustained on audit, based on the technical merits of the position. The provisions of FIN 48 are effective as of the beginning of the Company's 2007 fiscal year, with the cumulative effect of the change in accounting principle recorded as an adjustment to opening retained earnings. The Company is currently evaluating the impact of adopting FIN 48 on its financial statements.

In September 2006, the staff of the Securities and Exchange Commission issued Staff Accounting Bulletin No. 108 ("SAB 108") which provides interpretive guidance on how the effects of the carryover or reversal of prior year misstatements should be considered in quantifying a current year misstatement. SAB 108 becomes effective in fiscal 2007. Adoption of SAB 108 is not expected to have a material impact on the Company's consolidated financial position, results of operations or cash flows.

F-9

Lab123, Inc.
(A Development Stage Company)
NOTES TO FINANCIAL STATEMENTS

**NOTE 4 - Related Party Transactions**

*Employment Agreement*

On August 30, 2006 the Company entered into a five year employment agreement with Mike Sosnowik, the Company's CEO, that calls an for annual salary of $200,000 and an incentive bonus of $200,000 if certain target earnings before interest, taxes, depreciation and amortization ("EBITDA") (2007-$2,983,000; 2008- $5,525,000; 2009-$7,385,000) are achieved plus 8% on any earning above target. In addition, Mr. Sosnowik was issued 1,500,000 shares of common stock at par value. Of the total grant, 1,200,000 shares are subject a restriction that requires the return of such shares to the Company, at no cost. This restriction lapses at the rate 300,000 shares for each year the agreement remains in effect. The Company recorded a charge of $108,000 for the 300,000 shares that vested on the date of issuance. The remaining 1,200,000 shares valued at $432,000 will be amortized over the life of the agreement.

*Due to Biosafe*

For the period ended August 31, 2006 Biosafe Laboratories, Inc. ("Biosafe") paid legal costs of $ 6,247 on behalf of the Company and incurred costs for certain formation services provided to the Company. As of August 31, 2006, $ 18,619 is due to Biosafe. The balance does not have repayment terms or a stated interest rate. Biosafe is the licensor of the Company's license agreement (see Note 6b).

**NOTE 5 - Commitments**

The Company presently occupies office space provided by the CEO at no charge to the Company, except for office related out-of-pocket expenses.

**NOTE 6 - Subsequent Events**

*a) Private Placement*

On September 6, 2006, the Company sold to Barron Partners, L.P. ("Barron") 3,774,000 shares of Series A Preferred at $0.53 per share, for a total of $2,000,000. One share of Series A Preferred is initially convertible into one share of Common Stock at any time, except that at no time may Barron own any more than 4.9% of the Company's issued and outstanding common stock. In addition, Barron received warrants to purchase 3,774,000 shares of common stock ("warrant"). The warrants entitle the holder to purchase from the Company an equal number of common stock at an exercise price per share of $0.80 for 1,887,000 shares and $1.10 for the remaining 1,887,000 shares. The warrants are exercisable immediately and shall expire five years from the purchase date. Barron Partners will be reimbursed $85,000 to cover its due diligence and transaction costs. The warrants carry a cashless exercise provision.

Pursuant to the terms of the agreement, from September 6, 2006, the purchase date, until the expiration of 48 months after the Closing Date or until Barron owns less than 5% of their Series A Preferred, whichever occurs first, if the Company closes on the sale of a note or notes, shares of common stock, or shares of any class of Preferred Stock at a price per share of common stock, or with a conversion right to acquire common stock at a price per share of common stock, that is less than the conversion value the Company shall make a post-purchase adjustment in the conversion value so that the conversion value is reduced to price per share of common stock or conversion price of the securities sold.

Conversion price adjustment based on 2006 and 2007 earnings per share:

In the event the Company earns between $0.0306 and $0.0187 (40% Decline) per share (where such earnings in this computation shall always be defined as earnings on a pre tax fully diluted basis for the year ended December 31, 2006 from continuing operations before any non-recurring items), the then current conversion value at the time the 2006 Audited Financials are filed with the SEC shall be decreased proportionally by 0% if the earnings are $0.0306 per share or greater and by 40% if the earnings are $0.0187 per share or less.

In the event the Company earns between $0.19 and $0.1446 (25% Decline) per share (where such earnings in the computation shall always be defined as earnings on a pre tax fully diluted basis for the year ended December 31, 2007 from continuing operations before any non-recurring items),

F-10

PL 00518

Lab123, Inc.
(A Development Stage Company)
NOTES TO FINANCIAL STATEMENTS

the then current conversion value at the time the 2007 Audited Financials are filed with the SEC shall be decreased proportionally by 0% if the earnings are $0.19 per share or greater and by 25% if the earnings are $0.1446 per share or less.

The stock purchase agreement also contains certain covenants including:

- For five years after Closing the Company shall not to enter into any new borrowings of more than twice as much as the sum of the EBITDA from recurring operations over the past four quarters without Barron's consent.

- A majority of the Board of Directors must qualified independent members.

- In any future stock issuance, Barron has the right to purchase issued shares sufficient to prevent dilution.

The Series A Preferred will be accounted for in accordance with Emerging Issues Task Force ("EITF") No. 98-5 "Accounting for Convertible Securities with Beneficial Conversion Features or Contingently Adjustable Conversion Ratios" ("EITF 98-5"), EITF No. 00-27 "Application of Issue No. 98-5 to Certain Convertible Instruments". Upon issuance of the Series A Preferred the Company recognized an effective beneficial conversion feature of approximately $524,000 based upon the relative fair values of the underlying securities issued. This beneficial conversion feature will be recorded as a deemed preferred stock dividend.

The warrants and conversion option will be accounted for under EITF No. 00-19 "Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's Own Stock" ("EITF 00-19"). The warrants and conversion option were not deemed to be a derivative liability in accordance with SFAS No. 133 (par 11a) as the contracts were indexed to the Company's own stock and qualified as equity in the balance sheet.

*b) License of Product Marketing Rights*

On September 7, 2006 the Company entered into a twenty-five year license agreement with Biosafe that gives the Company the exclusive right to market five medical diagnostic tests to retail drug stores and mass merchandisers within the U.S. and internet-based drug retailers for a purchase price of $1,000,000 in cash and 6,050,000 shares of the Company's common stock. The license agreement also includes certain restrictions and rights including the following:

- The licensor is to receive royalty payments of 8% of collected revenues related to the licensed products.
- The continued market exclusivity is dependent upon the Company aggregate unit sales of licensed products of at least 250,000 in 2007 and 300,000 in each subsequent year of the license. Should the unit sales ever drop below the threshold(s), the Company can maintain the exclusivity by paying an amount equal to the minimum royalty on the number of units below the thresholds to maintain exclusivity.
- The Company may continue throughout the entire term of the license agreement to have the licensor produce and process the tests at cost plus 20% or elect to in-source (or out-source to another third-party) the production and processing.

*c) Registration Rights*

On September 6, 2006 The Company has entered into a registration rights agreement with Barron whereby the Company is required to file a registration statement with the SEC, to register the resale of the shares of common stock that the Company will issue upon conversion of the convertible preferred stock and exercise of warrants issued to Barron.

The Company shall use its best efforts to cause the registration statement to be declared effective within 120 days of the closing date.

Under the liquidated damages provision, if the Company fails to meet the effectiveness deadline for the registration statement, the Company shall issue to Barron 2,491 additional shares of the Series A Preferred to Barron as liquidated damages for each day that the registration is not effective after the deadline until September 6, 2008. The obligations of the Company under the registration rights agreement terminate if and when Barron no longer holds more than 5% of its shares of registrable securities.

The Company has also granted to each of the other potential selling stockholders noted below, "piggyback" registration rights to include shares of common stock they own in the registration statement.

The shareholders granted registration rights and the total number of shares beneficially owned by each of them are: Barron (7,548,000), Biosafe (6,050,000), the CEO of the Company (600,000) and an principals of an advisory firm (125,000).

*d) Advisory Firm*

On September 6, the Company issued 125,000 shares of common stock to principals of an advisory firm for advisory services, valued at $66,250 in connection with the private placement described in note 6a.

F4J 1

PL 00520

## PART II — INFORMATION NOT REQUIRED IN PROSPECTUS

### Item 24. Indemnification of Directors and Officers

Pursuant to Article V, Section 1 of our By-Laws, we may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Company) by reason of the fact that he or she is or was a director, officer, employee or agent of the Company, or is or was serving at the request of the Company as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if he or she acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceedings, had no reasonable cause to believe his or her conduct was unlawful.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to Directors, Officers and controlling persons pursuant to the foregoing provisions, or otherwise, we have been advised that in the opinion of the SEC, such indemnification is against public policy as expressed in the Securities Act and is, therefore unenforceable.
Section

### Item 25. Other Expenses of Issuance and Distribution

| | |
|---|---|
| SEC Registration Fee | $ |
| Accounting Fees and Expenses | $ 20,000 |
| Legal Fees and Expenses | $ 10,000 |
| Printing and Engraving Costs | $ 5,000 |
| | |
| Total | $ 57,910 |

All amounts other than the SEC registration fee are estimates. We will pay all of the expenses of the offering, except that the selling stockholders will pay all brokerage or other commissions or other costs of sale.

### Item 26. Recent Sales of Unregistered Securities

On August 30, 2006, we issued 1,500,000 shares of common stock to Michael Sosnowik, our Chief Executive Officer, under an employment agreement with Mr. Sosnowik. 1,200,000 of such shares are restricted shares which vest over a 4 year period commencing August 30, 2007.

Pursuant to a Distributor and License Agreement entered into on September 7, 2006 we issued 6,050,000 shares of common stock to Biosafe, as partial consideration of a grant to us of an exclusive license to sell the Diagnostic Products in the Market.

On September 6, 2006, we issued to Barron for a total purchase price of $2 million, 3,774,000 shares of our Series A Stock, five year warrants to purchase an aggregate of 1,887,000 shares of our common stock at an exercise price of $.80 per share and five year warrants to purchase an aggregate of 1,887,000 shares of our common stock at an exercise price of $1.10 per share. The Series A Stock is convertible into 3,774,000 shares of common stock. The warrants and preferred stock are all currently exercisable and convertible in full.

On September 6, 2006 we issued to Leonardo and Kathleen Zangani an aggregate of 125,000 shares of our common stock, valued at $66,250, for advisory services in connection with the formation of our company and the private placement of our securities to Barron on September 6, 2006.

In connection with these transactions, the Company relied upon the exemptions from registration provided by Section 4(2) of the Securities Act and Rule 506 of Regulation D thereunder as each of the purchasers was an "accredited investor" as defined in Rule 501(a) of Regulation D. There were no placement agents or underwriters in any of the foregoing transactions

II-1

PL 00521

**Item 27. Exhibits .**

| Exhibit Number | Description of Exhibit |
| --- | --- |

3.1   Certificate of Incorporation of the Company*

3.2   Certificate of Designations of Preferences, Rights and Limitations of Series A Convertible Preferred Stock of the Company.*

3.3   By-laws of the Company*

3.4   Certificate of Amendment to Certificate of Incorporation of the Company**

4.1   Common Stock Purchase Warrant A to purchase 1,887,000 shares of Common Stock Issued to Barron*

4.2   Common Stock Purchase Warrant B to purchase 1,887,000 shares of Common Stock Issued to Barron*

5.1   Opinion of Guzov Ofsink, LLC*

10.1   Employment Agreement dated August 30, 2006 between Michael Sosnowik and the Company.*

10.2   Distributor and License Agreement dated as of September 7, 2006 between Biosafe and the Company.*

10.3   Preferred Stock Purchase Agreement between the Company and Barron dated September 6, 2006.*

10.4   Registration Rights Agreement between the Company and Barron dated September 6, 2006.*

21.1   Subsidiaries of the Registrant - none

23.1   Consent of Guzov Ofsink, LLC (contained in Exhibit 5.1)*

23.2   Consent of Marcum & Kliegman LLP**

\*     Previously filed.
\*\*    Filed herewith.

**Item 28. Undertakings**

The undersigned registrant hereby undertakes:

1.     To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement:

    (a)   To include any prospectus required by Section 10(a)(3) of the Securities Act of 1933;

    (b)   To reflect in the prospectus any facts or events arising after the effective date of this registration statement, or most recent post effective amendment, which, individually or in the aggregate, represent a fundamental change in the information set forth in this registration statement; and

    (c)   To include any material information with respect to the plan of distribution not previously disclosed in this registration statement or any material change to such information in the registration statement.

2.     That, for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered herein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

3.     To remove from registration by means of a post-effective amendment any of the securities being registered hereby which remain unsold at the termination of the offering.

PL 00522

Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to our directors, officers and controlling persons pursuant to the provisions above, or otherwise, we have been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act of 1933, and is, therefore, unenforceable.

II-2

Ii

PL 00523

## SIGNATURES

In accordance with the requirements of the Securities Act of 1933, the registrant certifies that it has reasonable grounds to believe that it meets all of the requirements of filing on Form SB-2 and authorized this Amendment No. 2 to the registration statement to be signed on its behalf by the undersigned, in the City of New York, State of New York on December 11, 2006.

**LAB123, INC.**

By    /s/ Michael Sosnowik
Michael Sosnowik,
Chief Executive Officer

In accordance with the requirements of the Securities Act of 1933, this Amendment No. 1 to the registration statement was signed by the following persons in the capacities and on the dates stated:

| Signature | Title | Date |
|---|---|---|
| /s/ Michael Sosnowik<br>Michael Sosnowik | Chief Executive Officer (Principal Executive Officer) and Chief Financial Officer (Chief Financial Officer and Chief Accounting Officer) and Director | December 11, 2006 |
| /s/ Henry Warner<br>Henry Warner | Director and Chairman of the Board | December 11, 2006 |
| /s/ Fred Fitzsimmons<br>Fred Fitzsimmons | Director | December 11, 2006 |
| /s/ Kent Connally<br>Kent Connally | Director | December 11, 2006 |
| /s/ Kurt Katz<br>Kurt Katz | Director | December 11, 2006 |

PL 00524

Exhibit 23.2

## Independent Registered Public Accounting Firm's Consent

We consent to the inclusion in this Registration Statement of Lab123, Inc. (A Development Stage Company) on Form SB-2 Amendment No. 2 [File No. 333-137545] of our report dated September 21, 2006, which includes an explanatory paragraph as to the Company's ability to continue as a going concern, with respect to our audits of the financial statements of Lab123, Inc. (A Development Stage Company) as of August 31, 2006 and for the period from August 25, 2006 (Date of Inception) through August 31, 2006, which report appears in the Prospectus, which is part of this Registration Statement. We also consent to the reference to our Firm under the heading "Experts" in such Prospectus.

/s/ Marcum & Kliegman LLP

Marcum & Kliegman LLP
New York, New York
December 11, 2006

December 11, 2006

BY EDGAR

Suzanne Hayes, Esq.
Division of Corporation Finance
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20002

      Re: Lab123, Inc.
          Registration Statement on Form SB-2, Amendment No. 1
          File No. 333-137545
          Filed: November 22, 2006

Dear Ms. Hayes:

      Reference is made to your comment letter, dated December 1, 2006 to our client, Lab123, Inc. (the "Company"), relating to the subject Amendment No. to the Registration Statement (the "Comment Letter"). Set forth below are the comments contained in the Comment Letter followed by our response thereto:

General

    1.  We note your response to comment 8. Your response states that you have reduced the number of shares being registered for resale by Barron Partners, the Investor, Biosafe Laboratories, Inc. and Michael Sosnowik. Please tell us whether you have plans to register the shares that were removed from this registration statement at a later date.

    The Company has no plans to file another registration statement covering the shares removed from the subject registration statement for at least 9 months after the effective date of the subject registration statement.

    2.      Your response to comment 8 also states that the Investor has already held the risk of ownership for more than eight months. Given that the private placement

PL 00526

occurred in September 2006, it is not clear why you believe the Investor held the risk of ownership for eight months. In fact, the company was incorporated in August 2006 and has not been in existence for eight months. Please explain.

The statement made in the previous response letter with respect to Comment 8 in the SEC Comment Letter dated October 20, 2006 was made in error. The sentence should have read: "Rather it has purchased the shares for its own account and has already held the risk of ownership for approximately three months."

Prospectus Summary

3.    Please revise the first sentence in your summary to delete the statement that you are engaged in the manufacture of clinical diagnostic products. Additional, disclose in the summary that you do not have any experience marketing diagnostic products, have a history of losses and have not generated any revenues.

The first sentence of the Summary has been revised to delete the statement regarding manufacturing. An additional paragraph has been added to "The Company" subsection of the Summary to make the disclosure that the Company does not have any experience marketing diagnostic products, have a history of losses and have not generated any revenues.

4.    We note that Biosafe has been developing and marketing new clinical diagnostic products for more than 10 years. Have they been marketing any of the products that you have licensed from them? If so, please disclose how long these products have been commercially available. If the products have not been commercially available before now, please disclose this information.

The third paragraph of "The Company" subsection of the Summary has been revised to provide disclosure regarding the commercial availability of the products before they were licensed to the Company.

Risk Factors, page 5
We may incur losses and are likely to require additional financing, page 5

5.    We note your response to comment 20. The risk factor discussion now states that you may not be able to conduct research and development activities in the future without additional financing. However, it is not clear from the discussion of your business and strategy that you intend to conduct research and development activities. If you intend to conduct research and development activities, please revise the "Business" section to describe these plans. If you do not plan to conduct these activities, revise this risk factor to discuss how your operations or your operating plan will change if funding is not available.

PL 00527

The Company does not currently plan to conduct research and development activities. We believe that that the risk factor does discuss how the Company's operations would be affected if funding is not available. We have deleted the last sentence of the risk factor to avoid any implication that other planned operations of the Company would be affected by a lack of additional funding.

Our success depends, in part, on our ability to obtain patents and license patent rights. page 8

6.         We note your response to comment 23. Please revise the risk factor discussion to   discuss the possibility that if another party is successful in bringing a case of patent infringement against you, it   may result in you being unable to sell some of your products.

An additional sentence has been added to the end of the risk factor to such effect.

Because we may be subject to the "penny stock" rules, you may have difficulty in selling our common stock, page 20

7.         We note your response to comment 30. As it appears your stock is a penny stock, please revise to state that your stock will be subject to the penny stock rules as opposed to stating  that it "may be" subject to the penny stock rules. Alternatively, tell us why you believe it may not be considered a penny stock.

The heading and the first sentence of the risk factor have been so revised.

Plan of Distribution, page 14

8.         We note your response to comment 38. Please restore the language stating that the selling shareholders may be deemed to be underwriters.

The language contained in the initial version of the risk factor has been restored.

Description of Business, page 17

Technology Platforms, page 19

9. Please explain the following statement on page 21 "While not *as* 'scientific' as other platforms, the test instruction 'placemat' is a critical component of all of our tests." In what way is your platform not as "scientific" as other platforms? Explain the term "placemat."

PL 00528

The language of the risk factor has been revised to eliminate references to the terms "scientific" and "placemat."

10. Please quantify the discussion of the low level of improperly collected samples and disclose who conducted the study and testing.

The risk factor has been revised to include the average percentage of improperly collected samples for the Company's diagnostic products and that Biosafe Laboratories, Inc. was the firm that did the laboratory processing of the samples.

Markets for our products, page 22

11. Disclose how long your products have been for sale in retail chains and on the internet.

A paragraph has been inserted after the first paragraph of the subsection to make the disclosure.

12. You have stated that your diagnostic platforms are sufficiently unique that they are presently for sale in retail chains and on the Internet. It is unclear how being sufficiently unique relates to being available for sale in retail chains and on the internet. Please explain.

What is now the third paragraph of the subsection has been revised to eliminate the statement about the uniqueness of the product as it relates to the product being available for sale in retail chains an on the internet as there is no causal connection.

Financial Statements, pages F-2 thru F-5

13. Please update your financial statements to reflect the interim period ended September 30, 2006 as required by Rule 3-10(g) of Regulation S-B.

After consultation with the staff, the Company does not believe that an update of its financial statements to reflect the interim period ended September 30, 2006 is required.

Notes to Financial Statements, F-6

Note 3 – Summary of Significant Accounting Policies, na<sup>k</sup>e3-7

Revenue Recognition, page F-7

14. We acknowledge your response to our prior comment two. Please tell us and disclose if you have a product return policy and what consideration was given to

PL 00529

that policy in determining that recognizing revenue upon the shipment of products is appropriate when a right of return exist.

Note 3 has been revised to discuss the Company's policy accounting regarding situations in which a right of return on a product exists.

15. You state that your operations will be "to license, broker or acquire retail medical diagnostic precuts and services. Please disclose your revenue recognition policy for the services you intend to provide.

Note 3 has been revised to include the Company's revenue recognition policy with regard to service revenue.

Note 6 – Subsequent Events, page F-10

16. We acknowledge your response to our prior comment three. Your analysis does not sufficiently address the provision of SFAS 133 and EITF 00-19. Based on the disclosed information, including Exhibits 10.3 and 10.4, it appears that several provisions of the agreements may be required to be accounted for as liabilities in accordance with EITF 00-19. These include but are not limited to the requirement to provide registered shares, maintain an effect registration statement covering the underlying shares, and the payment of liquidating damages if the previous provisions are not achieved. As such, we reissue our previous comment. Please provide management's detailed analysis of the transaction supporting your current accounting for the transaction. Please specifically address why management has determined that a liability does not exist regarding the before mentioned provisions. Cite all applicable paragraphs of SFAS 133 and all+ 00-19 and other accounting literature management considered. Additionally, disclose the impact this issuance will have on the financial statements. In your response, ensure that management's assessment addresses the registration rights agreement, the variable conversion price, and other provisions as applicable. Lastly, please tell us how the registration rights agreement and the cashless exercise provision will effect the accounting treatment of the warrants.

The Series A Convertible Preferred Stock ("Series A Preferred") will be accounted for in accordance with Emerging Issues Task Force ("EITF") No. 98-5 "Accounting for Convertible Securities with Beneficial Conversion Features or Contingently Adjustable Conversion Ratios" ("EITF 98-5"), EITF No. 00-27 "Application of Issue No. 98-5 to Certain Convertible Instruments" and EITF No. 00-19 "Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's Own Stock" ("EITF 00-19").

The Series A Preferred will qualify as permanent equity and not accounted for as a liability was determined as follows
- The Series A Preferred does not have redemption rights;
- The Series A Preferred is convertible into a determinable number of shares;

- The Series A Preferred can be converted into unregistered shares;
- The Company has sufficient authorized and unissued common shares available.

Although the Series A Preferred provides for conversion price reset provisions, such reset is a contingency of a future event and has a maximum determinable amount of common shares the Series A Preferred can be convertible into for which the Company has sufficient authorized and unissued shares. In addition under guidance provided by 98-5 the task force reached a consensus that the contingent beneficial conversion feature of the reset provision should be measured at the commitment date but not recognized in earnings until the contingency is resolved.

Upon issuance of the Series A Preferred the Company will recognize an effective beneficial conversion feature of approximately $524,000 based upon the relative fair values of the underlying securities issued. This beneficial conversion feature will be recorded as a deemed preferred stock dividend.

Under the terms of the registration rights agreement the Company is required to cause the registration statement to be declared effective in 120 days from the closing date and to maintain the effectiveness of the registration statement. Should the Company not meet these requirements the Company shall issue to Barron 2,491 additional shares of the Series A Preferred to Barron as liquidating damages for each day through two years. The Company determined the Company has sufficient authorized and unissued shares for the maximum amount issuable and the agreement does not require cash settlement of the liquidated damages.

The warrants and conversion option were accounted for under EITF No. 00-19 and Statement of Financial Accounting Standard ("SFAS") No. 133 "Accounting for Derivative Instruments and Hedging Activities" ("SFAS No 133"),

The Company determined that the warrants and conversion option were not deemed to be derivative liability as follows

- The warrants are exercisable into a determinable number of shares,
- The exercise of the warrants can be settled in unregistered shares
- The Company has sufficient authorized and unissued common shares available to settle.

The warrants and conversion option were not deemed to be a derivative liability in accordance with SFAS No. 133 (par 11) as the contracts were indexed to the Company's own stock and qualify as equity in the balance sheet. In addition, under no circumstances were cash settlements required under the conversion option and warrants.

Although the warrants provide for an exercise price reset provision, the reset is a contingency of a future event. The cashless exercise provision does not have an accounting impact due to the warrants have a maximum determinable amount of common shares the warrants can be exercised into, for which the Company has sufficient authorized and unissued shares to settle in.

## Item 26. Recent Sales of Unregistered Securities

17. Please describe the services and quantify the value of the services performed by Leonardo and Kathleen Zangani in exchange for the shares issued on September 6, 2006.

The next to last paragraph of Item 26 has been revised to describe the services and quantify the value of the services performed by Leonardo and Kathleen Zangani in exchange for the shares issued on September 6, 2006.

Very truly yours,

/s/ Darren Ofsink

Darren Ofsink