UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
BARRON PARTNERS, LP,                 :
                                     :
              Plaintiff,             :
                                     :        07 Civ. 11135 (JSR)
         -v-                         :
                                     :        OPINION & ORDER
LAB123, INC. et al.,                 :
                                     :
              Defendants.            :
------------------------------------ x

JED S. RAKOFF, U.S.D.J.

     Plaintiff Barron Partners, LP ("Barron") brings suit against

corporate defendants Lab123, Inc. ("Lab123"), Biosafe Laboratories,

Inc. and Biosafe Medical Technologies, Inc. (collectively, "Biosafe")

and individual defendants Henry A. Warner, Kent B. Connally, Robert

Trumpy, and Jeremy J. Warner,[1] alleging, in essence, that defendants

fraudulently induced Barron to invest in a new public entity, Lab123,

by means of various misrepresentations and that the investment proved

worthless.  On this basis, the Amended Complaint ("Am. Compl.")

asserts eleven causes of action: (1) securities fraud in violation of

Section 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), 15

U.S.C. § 78j(b); (2) "control person" liability (against the

individual defendants only) in violation of Section 20(a) of the 1934

Act, 15 U.S.C. § 78t(a); (3) fraud; (4) negligent misrepresentation;

---

[1] The suit originally named three other individual
defendants, Fred Fitzsimmons, David Fleisner, and Kurt Katz.  On
April 7, 2008, defendants Fitzsimmons and Fleisner moved for a
Settlement Bar Order.  That motion is hereby granted and the
Settlement Bar Order will be signed and docketed separately.
Defendant Kurt Katz was dismissed from this action on May 7,
2008, on consent.  See Stipulated Order of Partial Dismissal
dated May 7, 2008.

(5) breach of contract against Lab123; (6) breach of contract against Biosafe and Lab123; (7) unjust enrichment; (8) conversion; (9) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act; (10) violation of the Illinois Securities Law of 1953; and (11) fraud in the inducement.  Defendants move under Federal Rule of Civil Procedure 12(b)(6) to dismiss all counts for failure to state a claim, and move under Rule 12(b)(2) to dismiss individual defendants Jeremy Warner and Kent Connally for want of personal jurisdiction.

The allegations relevant to the motion brought under Rule 12(b)(6) are as follows.[2]  In early 2006, Barron, a private investment fund, began investigating a potential investment in Biosafe.  See Am. Compl. ¶¶ 52-53.  On June 2, 2006, plaintiff sent Biosafe a letter of intent ("LOI") in which it proposed to pay $2 million for 3.774 million shares of stock in an as-yet-unformed public company (eventually, Lab123).  See Declaration of Henry Warner dated Apr. 30, 2008 ("Warner Decl."), Ex. 11 (the LOI).  The LOI stated that Barron would have an exclusive due diligence period until

_____

[2]  As noted at oral argument, see transcript 6/4/08, defendants' moving papers contained much factual information that patently exceeded what a court is permitted to consider on a motion brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).  Therefore, the Court has considered for purposes of the motion under Rule 12(b)(6) only the allegations of the Amended Complaint and those limited documents incorporated by reference in the Amended Complaint or plainly relied upon by plaintiff in bringing suit.  See id.  For purposes of the motion to dismiss for lack of jurisdiction under Rule 12(b)(2), certain additional submissions are also properly considered.  See infra.

July 30, 3006, during which time it would "be given reasonable access
to the Company's facilities, management personnel, customers and its
financial and legal records." Id.

In August, 2006, as part of the due diligence process,
defendants completed plaintiff's Questionnaire. Am. Compl. ¶ 54.
According to the Amended Complaint, defendants' responses to the
Questionnaire contained numerous misrepresentations. Id. ¶¶ 54-67.
Among other things, defendants' responses represented that Lab123 had
the exclusive rights to market and sell in retail, internet, and
disease management channels select Biosafe customer health diagnostic
tests, including five tests covered by a licensing agreement between
Biosafe and Lab123 that became effective as of September 7, 2006.
Id. ¶ 55-56. According to the Amended Complaint, this representation
was false and misleading because (1) Biosafe had already granted the
same exclusive rights to market and sell at least some of the five
tests to other companies, including Johnson & Johnson and Biosafe
subsidiaries Rapid Response and The Ultimate Health Club, Inc.
("Ultimate Health"); (2) Henry Warner, who controlled Biosafe, had
already arranged for one of his sons, Chris Warner, to sell one of
the tests through various websites; and (3) certain of the defendants
sold one of the tests to Kellogg Company without remitting the
proceeds to Lab123. Id. ¶ 57.

Defendants' responses to the Questionnaire also made reference
to certain financial statements defendants had previously forwarded
to plaintiff. Am. Compl. ¶¶ 64-65. According to the Amended

3

Complaint, these financial statements also contained numerous misrepresentations. For example, a financial statement sent to plaintiff by defendant Henry Warner materially overstated Biosafe's 2005 revenue for the five relevant health diagnostic tests, the projected 2006 returns for these five tests, and the anticipated returns for the tests for 2007-2009. Id. ¶¶ 64, 68. Additionally, a statement sent to plaintiff by defendant Trumpy, Biosafe's CFO, stated that the five tests at issue had actual revenue of more than $1 million during the period January to June 2006, when in reality they had revenue of approximately $100,000. Id. ¶ 73.

Further still, the defendants' responses to the Questionnaire stated that "the key advantage that the Lab123's retail and internet sales have over other sales channel [sic] is that the sales are very profitable with a gross margin that could approach 70-80%." Am. Compl. ¶ 61. According to the Amended Complaint, this representation grossly overstated the gross margin and potential profitability. Id.

The Amended Complaint further alleges that, quite aside from the aforementioned misrepresentations made, directly or by reference, in defendants' responses to the Questionnaire, defendants made numerous other false and fraudulent misrepresentations in the period before plaintiff invested in Lab123. A few examples suffice:

First, in emails to plaintiff dated July 31, 2006 and August 7, 2006, respectively, Henry Warner falsely represented that Kellogg had placed an order with Biosafe for 500,000 cholesterol tests to be delivered in the fourth quarter of 2006. However, Kellogg had placed no order at the time, and when Kellogg finally did place the order in

4

November 2006, Biosafe did not remit any of the sale proceeds to Lab123.  Am. Compl. ¶¶ 82-83.

Second, in an August 2006 email from Henry Warner, defendants falsely misrepresented that Biosafe and Lab123 were completely separate and would operate independently of one another.  Instead, according to the Amended Complaint, Henry Warner always intended that at least three of the five Lab123 Board Members would be controlled by him.  Id. ¶ 86, 88, 105.

Third, a "Director & Officer Form," submitted to plaintiff in August 2006 by the individual defendants stated that Biosafe and Banc Street Acquisitions were the only two entities of which Henry Warner had been a director (as well as majority shareholder, founder, etc.).  Id. ¶¶ 98, 100.  However, this was false because Warner had been a director of, among other companies, Ultimate Health and Rapid Response.  Id. ¶ 99.  Plaintiff states that but for defendants' failure to disclose this fact, it would have investigated Ultimate Health and would have discovered that Biosafe had already granted to Ultimate Health some of the "exclusive" rights granted to Lab123. Id. ¶ 101.

After the completion of the due diligence process, Barron and Lab123 entered into a convertible preferred Stock Purchase Agreement ("SPA") whereby Barron agreed to purchase 3,774,000 shares of common stock of Lab123 for $2 million.  Am. Compl. ¶ 102, Declaration of David S. Rich, Esq. dated May 23, 2008 ("Rich Decl."), Ex. B (the SPA).  The SPA provided that Barron was able to bear the financial risks associated with the investment and that it had been given "full

access to such records of the Company and [its] subsidiaries and to
the officers of the Company . . . as it has deemed necessary or
appropriate to conduct its due diligence investigation." Rich Decl.,
Ex. B § 5.4. It also provided that Barron was capable of evaluating
the risks and merits of an investment by virtue of its experience as
an investor and its "knowledge, experience, and sophistication in
financial and business matters" and that Barron was capable of
bearing the entire loss of its investment in the company. Id. The
SPA also provided that Barron understood that the investment
"involve[d] a high degree of risk," id. § 5.8, and further provided
that Barron was an accredited investor as that term is defined in
Rule 501 of Regulation D of the Securities Act of 1933, had
experience in making investments of the kind described in the
Agreement, was able to protect its own interests, and was able to
afford a loss of its entire investment. Id. § 5.5.

   The SPA also provided that Barron had been furnished with all
materials relating to the business of the Company, had been afforded
the opportunity to ask questions of the Company "and ha[d] received
complete and satisfactory answers to any such inquiries." Id. § 5.7.
Additionally, the SPA contained a standard merger clause, which
stated: "This Agreement (together with the Schedule, Exhibits,
Warrants and documents referred to herein) constitute [sic] the
entire agreement of the parties and supersede [sic] all prior
agreements and undertakings, both written and oral, between the
parties, or any of them, with respect to the subject matter hereof."
Id. § 11.4.

Given the breadth of the forgoing disclaimers, it is not
surprising that the SPA included several warranties, of which the
broadest read that "no . . . document furnished or to be furnished to
the Investor pursuant to this Agreement contains or will contain any
untrue statement of a material fact, or omits or will omit to state a
material fact necessary to make the statements contained herein or
therein not misleading." Id. § 4.15. The Amended Complaint, as
noted, alleges that numerous of the documents previously furnished to
plaintiff contained false material statements. Additionally, with
respect to documents "to be furnished," the Amended Complaint alleges
that after the SPA was executed, defendants continued to supply
fraudulent financial statements to Barron. Am. Compl. ¶¶ 102-03.
Among other things, Lab123 filed with the SEC a revised form SB-2 on
November 22, 2006 that, plaintiff alleges, included the false
statement that "[r]evenue is recognized upon shipment of products.
Sales discounts and allowances are recorded at the time product sales
are recognized and are offset against sales revenue." Id. ¶ 106.
The Amended Complaint alleges that this statement was false because
Lab123 actually used a pay-on-scan system, whereby revenue was only
recognized when a store actually sold the relevant product to a
retail customer. Id. ¶ 106.

Against this background, the Court turns first to defendant's
motion to dismiss all claims for failure to state a claim. See Fed.
R. Civ. P. 12(b)(6). As to the counts that sound in fraud or
misrepresentation, to wit, Count 1 for violation of Section 10b of
the 1934 Act, Count 2 for violation of Section 20(a) of the 1934 Act,

Count 3 for common law fraud, Count 4 for negligent

misrepresentation, Count 10 for violation of the Illinois Securities

Law of 1953, and Count 11 for fraud in the inducement, defendants

seek dismissal principally on the ground that, as a matter of law,

plaintiff cannot establish reasonable reliance on the alleged false

statements.  Specifically, defendants emphasize the holding in

Emergent Capital Inv. Management, LLC v. Stonepath Group, Inc., 343

F.3d 189 (2d Cir. 2003), that:

> where ... a party has been put on notice of the existence of
> material facts which have not been documented and he
> nevertheless proceeds with a transaction without securing the
> available documentation or inserting appropriate language in the
> agreement for his protection, he may truly be said to have
> willingly assumed the business risk that the facts may not be as
> represented. Succinctly put, a party will not be heard to
> complain that he has been defrauded when it is his own evident
> lack of due care which is responsible for his predicament.

Id. at 195.

   In Emergent, plaintiff alleged that during the negotiations that

led up to its investment in the defendant corporation, the individual

defendants repeatedly misrepresented, both in writing and orally, the

size of the corporation's largest asset.  Id. at 192-93.  However,

the stock purchase agreement signed by the parties included specific

warranties and representations concerning the corporation's capital

structure, indebtedness, involvement in litigation, and ownership of

real property, and included a standard merger clause stating that the

agreement "contain[ed] the entire understanding and agreement among

the parties . . . and supersede[d] any prior understandings or

agreements between or among any of them."  Id. at 192.  The Second

Circuit held that given the size of the transaction and the fact that

8

plaintiff was a sophisticated investor and had secured extensive contractual representations concerning NETV's financial condition and operations, plaintiff should have protected itself by insisting that the representation regarding the size of NETV's largest asset be included in the stock purchase agreement.  Because it did not do so, it was precluded, as a matter of law, from showing reasonable reliance.  Id. at 196.  Accord, e.g., ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 105 (2d Cir. 2007); Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1541-1543 (2d Cir. 1997); Wurtsbaugh v. Banc of America Securities LLC, 2006 WL 1683416, *7 (S.D.N.Y. 2006).

Similarly, defendants here argue, the SPA in this case contains a standard merger clause and states that Barron was a sophisticated investor able to bear the financial risks associated with the investment, was given full access to the records of the company, had been furnished with all materials relating to the business of the company, and had been afforded the opportunity to ask questions. Rich Decl., Exhibit B §§ 5.4, 5.7, 5.8, 11.4.  Yet, at the same time, the SPA contains no specific warranties regarding the exclusive licensing arrangement or regarding any of the other specific items as to which misrepresentations are alleged in the Amended Complaint. Consequently, argue defendants, since plaintiff was in a position to protect itself against the misrepresentations on which it now claims it relied, but failed to do so, such reliance was, under Emergent, unreasonable as a matter of law.

But there is an important difference between this case and Emergent, for here plaintiff did obtain, as part of the SPA, a general warranty that "no . . . document furnished or to be furnished to the Investor pursuant to this Agreement contains or will contain any untrue statement of a material fact, or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading." Rich Decl., Ex. B § 4.15. Although defendants would interpret this warranty as being limited to those documents expressly listed elsewhere in the SPA, in particular, in sections 1.3.20, 3.2, and 3.3, section 1.3.20 refers only to "Transaction Documents," a phrase not used in § 4.15, and sections 3.2 and 3.3 only deal with documents to be furnished by Lab123 or by Barron but say nothing about documents already furnished pursuant to the agreement.

Because, therefore, Barron did secure a representation in the SPA warranting the truth of the documents previously furnished by Biosafe and Lab123 during the due diligence process, it is not precluded from showing that it reasonably relied on those documents and on the allegedly false representations made therein. Therefore, defendants' argument that the SPA itself precludes reasonable reliance as a matter of law must be rejected.[3]

---

[3] Second Circuit case law also establishes that:

[r]easonable reliance entails a duty to investigate the legitimacy of an investment opportunity where plaintiff was placed on guard or practically faced with the facts. Only [w]hen matters are held to be peculiarly within defendant's knowledge[ ] [is it] said that plaintiff may rely without prosecuting an investigation, as he ha[d] no independent

Defendants also argue that Counts 1, 3 and 4 must be dismissed for failure to plead loss causation. Loss causation is a causal link between the alleged misconduct and the economic loss that plaintiff ultimately suffered -- i.e., "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 186 (2d Cir. 2001) (internal quotation marks omitted). To adequately plead loss causation, "a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 173 (2d Cir. 2005) (internal quotation marks omitted).

Here, however, plaintiff has adequately pleaded loss causation by alleging that Lab123's entire business model was based on the exclusive licensing agreement discussed above and that when the licensing turned out to be a sham, plaintiff's investment was left worthless. See Am. Compl. ¶¶ 1-3. See also Glidepath Holding B.V.

---

means of ascertaining the truth . . . Put another way, if the plaintiff has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations.

Crigger v. Fahnestock and Co., Inc., 443 F.3d 230, 234-35 (2d Cir. 2006) (internal citations and quotation marks omitted; all but first alteration in original). However, whether plaintiff was placed on guard in a way that was sufficient to trigger a duty to investigate is generally a question of fact that is not to be decided on a motion to dismiss. Id. at 236. In this case, the Amended Complaint does not allege sufficient information to establish as a matter of law that plaintiff was placed on notice that defendants' statements were fraudulent.

v. Spherion Corp., 2007 WL 2176072, *16-17 (S.D.N.Y. July 26, 2007)
(loss causation adequately pleaded where plaintiffs alleged that the
subject of the misrepresentation, the potential market for the
product and the suitability of the business plan that defendants had
developed for that market, was the reason that the business failed).
Therefore, the motion to dismiss Counts 1, 3 and 4 for failure to
plead loss causation is denied.

Next, defendants argue that, even if the Court refuses to
dismiss Count 1 for violation of Section 10b of the 1934 Act, it
should dismiss Count 2 as to defendants Kent Connally and Jeremy
Warner for failure to state as to them a prima facie claim of control
person liability.  Since, however, as discussed infra, the Court has
decided to dismiss all claims against Connally and Jeremy Warner for
lack of personal jurisdiction, this argument is moot.

Count 5 of the Amended Complaint alleges breach of contract.
Specifically, plaintiff alleges that Lab123 breached sections 4.6,
4.15, and 4.16 of the SPA.  See Rich Decl., Ex. B.  Defendants argue
that this count must be dismissed because plaintiff has failed to
adequately plead a breach of any of these provisions of the SPA.  As
to sections 4.6 and 4.16, the Court agrees.

Specifically, section 4.6 states: "The Company will provide to
the Investor the audited financial statements of the Company as of
August 31, 2006 . . . (collectively, the "Financial Statements") . .
. [T]he balance sheet contained in such Financial Statements . . .
fairly presented the financial position of the Company." Id.  Yet
the Amended Complaint does not allege that the audited financial

12

statements of Lab123 as of August 31, 2006 were falsified.  Plaintiff therefore has not pleaded a breach of this provision.

The same is true for section 4.16, which states: "Not later than 30 days after the Closing, the Board of Directors of [Lab123] shall consist of five directors, three of whom shall be independent as such term is defined in Rule 4200(a)(15) promulgated by the National Association of Securities Dealers, Inc. (the 'NASD')."  According to NASD Rule 4200(a)(15), a director is independent if he is not "an officer or employee of the company or its subsidiaries" or if he does not have any "relationship which, in the opinion of the company's board of directors, would interfere with the exercise of independent judgment."  Am. Compl. ¶ 165.  Here, the Amended Complaint alleges in general terms that one of the three purportedly independent directors, defendant Connally, was not independent, but it does not allege that Connally was an officer or employee of Lab123 or its subsidiaries or that he had a relationship which, "in the opinion of the [Lab123] board of directors, [] interfere[d] with the exercise of independent judgment."  Therefore, plaintiff has not adequately pleaded a breach of this provision.

However, as already discussed, above in the discussion on reasonable reliance, plaintiff has adequately pleaded a breach of the warranty in section 4.15 of the SPA, which states "no . . . document furnished or to be furnished to the Investor pursuant to this Agreement contains or will contain any untrue statement of a material fact, or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading." Rich

Decl., Ex. B.[4]  Accordingly, while certain of the breaches alleged in Count 5 cannot support the claim, defendants' motion to dismiss Count 5 in its entirety must be denied.

Next, defendants argue that Count 6, which alleges breach of the licensing agreement between Biosafe and Lab123, must be dismissed because, under applicable Illinois law, Barron is not a third-party beneficiary to that licensing agreement.  Defendants are correct. Barron is not even mentioned in the Biosafe-Lab123 licensing agreement.  Moreover, the agreement expressly provides that:

> Nothing contained in this Agreement, expressed or implied, is intended, and shall be construed, to confer upon or create in any Person (other than the Parties hereto, their successors and permitted assigns, the Biosafe Indemnified Parties and the Company Indemnified Parties) any rights or remedies under or by reason of this Agreement, including any rights of any kind or nature to enforce this Agreement.

Rich Decl., Ex. C § 12.3.  Furthermore, under Illinois law a third-party beneficiary can sue to enforce a contract to which he is not a party only if the contracting parties intended the third party to benefit from the contract,  Am. United Logistics, Inc. v. Catellus Dev. Corp., 319 F.3d 921, 930 (7th Cir. 2003), and "any intent to benefit a third party must be discernible in the language and circumstances of the contract,"  Rawoof v. Texor Petroleum Co., Inc., 521 F.3d 750, 758-759 (7th Cir. 2008).  Moreover, under Illinois law there is a strong presumption against inferring liability to third-

---

[4]  Defendants have not raised in the instant motion the issue of whether, under applicable state law, the claim for breach of section 4.16 precludes a common law fraud claim based on the same facts, and so the Court need not consider the issue here.

party beneficiaries.  <u>Quinn v. McGraw-Hill Cos., Inc.</u>, 168 F.3d 331, 334 (7th Cir. 1999).

The cases applying Illinois law on which plaintiff relies for its third-party beneficiary claim all involved third parties who were expressly referenced on the face of the contract.  <u>See, e.g.,</u> <u>Tradewinds</u>, 2004 WL 2533728 at *3; <u>American Nat. Bank and Trust Co.</u> <u>of Chicago ex rel. Emerald Investments LP v. AXA Client Solutions</u>, 2001 WL 743399, *8 (N.D. Ill. 2001); <u>Paukovitz v. Imperial Homes,</u> <u>Inc.</u>, 271 Ill. App. 3d 1037, 1039 (Ill. App. 3 Dist. 1995); <u>Factory</u> <u>Mut. Ins. Co. v. CICA-TEC Terminal Equipment Corp.</u>, 2006 WL 3825028, *3-4 (N.D. Ill. 2006).  Here, by contrast, not only is Barron not mentioned on the face of the Biosafe-Lab123 licensing agreement, but also the express language of the agreement precludes third party reliance.  Accordingly, Count 6 is dismissed.

As to Count 7, which alleges unjust enrichment, defendants argue that such a claim for equitable relief must be dismissed because a written contract covers the subject matter at issue.  Under New York law, "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter" where the existence of the written contract is undisputed and its scope "clearly covers the dispute between the parties." <u>Clark-Fitzpatrick, Inc. v Long Is. R.R. Co.</u>, 70 N.Y.2d 382, 388-89 (1987).  However, "[a]n unjust enrichment claim is not precluded where the existence of the contract is in dispute or where the contract does not cover the subject matter at issue."  <u>Rabin v. Mony</u>

15

<u>Life Ins. Co.</u>, 2007 WL 737474, *5 (S.D.N.Y. 2007)(denying motion to dismiss unjust enrichment claim).   <u>See also E*Trade Financial Corp.</u> <u>v. Deutsche Bank AG</u>, 420 F. Supp. 2d 273, 291 (S.D.N.Y. 2006) (stating that "[q]uasi-contract claims are permitted if they arise from services not covered by a contract," and refusing to dismiss a claim for unjust enrichment under New York law premised on events not governed by the relevant Stock Purchase Agreement).

Here, if plaintiff were to prevail on its claim for fraudulent inducement (Count 11), the SPA would be void and the claim for unjust enrichment would be viable.   Short of that, the SPA arguably does not cover the granting of the "exclusive license" to Lab123 for sale and marketing of the five Biosafe tests in question and in such instance an unjust enrichment claim might also be viable.   Finally, since the Court has already held that Barron has no standing to enforce the licensing agreement between Biosafe and Lab123, and therefore there is no contract that even arguably governs the relationship between Barron and Biosafe or between Barron and the individual defendants named in the Amended Complaint, an unjust enrichment claim might also cover that situation.   Therefore, defendants' motion to dismiss Count 7 for unjust enrichment is denied.

The same is true for Count 8, conversion.   "Claims for conversion . . . will be deemed redundant when damages are merely being sought for breach of contract . . . To state a viable conversion claim here, plaintiff must allege acts that are unlawful or wrongful as distinguished from acts that are a mere violation of contractual rights."   <u>Rolls-Royce Motor Cars, Inc. v. Schudroff</u>, 929

F. Supp. 117, 124 (S.D.N.Y. 1996) (internal quotation marks omitted). In this case, plaintiff has alleged many acts that are unlawful and wrongful and that are arguably not governed by the SPA with Lab123. Therefore, the motion to dismiss this claim is denied.  See Fantozzi v. Axsys Technologies, Inc., 2007 WL 2454109, *3-4 (S.D.N.Y. Aug. 20, 2007) (refusing to dismiss conversion claim where complaint assumed that the contract at issue did not cover the alleged facts underlying the conversion claim).

    Turning finally to Count 9, which alleges a claim for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, to support such a claim a plaintiff must plead: (1) a deceptive act or practice on the part of defendant; (2) that defendant intended for plaintiff to rely on the deception; and (3) that the deception occurred in a course of trade or commerce.  Lynch Ford, Inc. v. Ford Motor Co., Inc., 957 F. Supp. 142, 147 (N.D. Ill. 1997) (internal citations omitted).  Defendants argue that this claim must be dismissed because, first, Barron is not a "consumer" within the meaning of the Illinois Act.  The Act defines "consumer" as "any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household."  815 Ill. Comp. Stat. 505/1(e).  "Merchandise" is defined as "any objects, wares, goods, commodities, intangibles, real estate situated outside the State of Illinois, or services."  815 Ill. Comp. Stat. 505/1(b).  In this case, Barron is not a "consumer" because it did not purchase any "merchandise" from Lab123.  Stock and securities are considered

17

"merchandise" only when sold as a business's "product." American Roller Co., LLC v. Foster-Adams Leasing, LLP, 472 F. Supp. 2d 1019, 1022 n.3 (N.D. Ill. 2007). Here, according to the Amended Complaint, the product of Lab123 is medical tests, not the company's securities. Therefore, by purchasing stock in Lab123, plaintiff did not become a consumer within the meaning of the Illinois Act. See id. (holding that plaintiff was not a consumer where defendants' stock was not defendants' product, but only an asset sold to plaintiff as an incident of the sale of defendants' business).

It is true that there is an alternative basis for liability, viz., "[i]f a business is not a consumer under the Consumer Fraud Act, then it must allege conduct that involves trade practices directed to the market generally or otherwise implicates consumer protection concerns." New Freedom Mortgage Corp. v. C & R Mortgage Corp., 2004 WL 783206, *9 (N.D. Ill. Jan 14, 2004) (dismissing claim where non-consumer failed to allege a consumer nexus). See also Pace American, Inc. v. Elixir Industries, 2007 WL 495302, *4 (N.D. Ill. Feb. 13, 2007); Bank One Milwaukee v. Sanchez, 336 Ill. App. 3d 319, 322 (Ill. App. 2 Dist. 2003). But here, plaintiff has not alleged that defendants' conduct caused any public injury or injury to consumers at large. Therefore, Count 9 is dismissed.[5]

Turning next to the motion to dismiss two of the defendants, Jeremy Warner and Kent Connally, for lack of personal jurisdiction, "[w]here a court has chosen not to conduct a full-blown evidentiary

---

[5] The Court therefore need not consider defendants' alternative arguments as to why this claim must be dismissed.

hearing on the motion, the plaintiff need make only a prima facie showing of jurisdiction through its own affidavits and supporting materials." Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 784 (2d Cir. 1999) (internal citations, quotation marks and alterations omitted). In this regard, all allegations and affidavits must be construed in the light most favorable to the plaintiff. See PDK Labs, Inc. v. Friedlander, 103 F.3d 1105, 1108 (2d Cir. 1997).

Plaintiff's allegations are as follows. First, defendant Jeremy J. Warner, an individual domiciled in the State of Illinois, was at all relevant times the Director of Business Development at Biosafe. Am. Compl. ¶ 48. In December 2006 and January 2007, he exchanged emails with Barron analyst Matthew Samuel regarding the content of Lab123's website. Rich Decl., Ex. V. In February and March of 2007 he also exchanged emails with Samuel to schedule a meeting regarding Lab123's business plan. Id., Ex. W.[6]

Defendant Kent Connally became a member of the Board of Directors of Lab123, as well as the company's audit and compensation committees, on September 29, 2006. Am. Compl. ¶¶ 49, 105. Based on two exhibits, plaintiff now alleges that Connally attended a January 11, 2007 meeting of Lab123's Board in New York. Warner Decl., Ex. 35

---

[6] The Amended Complaint also contains the conclusory allegations that "Jeremy Warner assisted in the preparation of the false financial statements, and repeated the contents therein to Plaintiff. Further, Jeremy Warner directly made written and oral misrepresentations and/or omissions to Plaintiff regarding the financial condition, position, outlook and earnings of [Biosafe] and Lab123." Am. Compl. ¶ 48. Wholly conclusory allegations of this kind are irrelevant to any Rule 12(b) motion.

at 2; Rich Decl., Ex. N. ¶ 6.[7]  On March 28, 2007, according to the
Amended Complaint, Connally sent an email to Barron's Managing
Partner Andrew Worden, demanding to be removed from Worden's email
distribution list.  Am. Compl. ¶ 57.

Further, the Amended Complaint alleges "[u]pon information and
belief" that both Connally and Jeremy Warner completed and/or
reviewed the fraudulent responses to plaintiff's due diligence
Questionnaire and to its Director & Officer Form, Am. Compl. ¶¶ 54,
97, and that defendant Connally also signed fraudulent SB-2 Forms
filed with the SEC, Rich Decl., Exs. S, Y.  Plaintiff further alleges
that Jeremy Warner was paid sales commissions in excess of what other
comparable Biosafe employees earned and that, "on information and
belief," he diverted a corporate opportunity from Biosafe to another
corporate entity he and his father (defendant Henry A. Warner)
controlled.  Rich. Decl., Ex. U at 4-5.

None of this is sufficient to establish a prima facie showing
of jurisdiction pursuant to N.Y. CPLR § 301 or CPLR § 302(a), the two
bases on which plaintiff relies.  Under CLPR § 301, a defendant is
subject to general jurisdiction in New York if he is, inter alia, a
New York domiciliary or is "doing business" in New York.  However,

---

[7] Neither of the exhibits, however, establishes that
Connally attended any Lab123 board meeting in New York.  Exhibit
N to the Declaration of the David S. Rich states only that an in-
person board meeting of Lab123 was held on or about January 11,
2007, and Exhibit 35 to the Declaration of Henry Warner, which
consists of notes from a Lab123 board meeting held telephonically
on September 29, 2006, states that "the Chairman scheduled the
next Board meeting for January 11, 2007 and suggested that the
meeting be held at the offices of counsel to the Company in New
York, New York."

"[a]n individual cannot be subject to jurisdiction under CPLR 301 unless he is doing business in New York as an individual rather than on behalf of a corporation."  Big Apple Pyrotechnics v. Sparktacular, Inc., 2007 WL 747807, at *4 (S.D.N.Y. Mar. 9, 2007) (internal quotation marks omitted).  Here, the Amended Complaint does not allege that either Jeremy Warner or Connally personally and individually did business in New York.  Instead, all of the alleged contacts with New York arose out of Warner's and Connally's work as corporate officers of Lab123 and Biosafe.  Accordingly, there is no basis for personal jurisdiction pursuant to § 301.

As for § 302(a), it permits a court to exercise personal jurisdiction over any non-domiciliary, who, either in person or through an agent,

> 1. transacts any business within the state . . .; or
> 2. commits a tortious act within the state . . .; or
> 3. commits a tortious act without the state causing injury to person or property within the state, . . . , if he
>> (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
>> (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or
> 4. owns, uses or possesses any real property situated within the state.

Plaintiff asserts a number of bases for jurisdiction under § 302(a).

First, plaintiff argues that jurisdiction over Connally and Jeremy Warner is proper because Lab123 and Biosafe acted as their agents while transacting business in New York.  However, to establish that a corporation acted as its principal's agent, a plaintiff must

21

show that the corporation "engaged in purposeful activities in this State . . . for the benefit of and with the knowledge and consent of the [principals] and that [the principals] exercised some control over [the corporation] in the matter." Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 467 (1988) (internal quotation marks omitted). Put another way, the question is whether the out-of-state corporate officers were "primary actors in the transaction in New York that gave rise to the litigation." Karabu Corp. v. Gitner, 16 F. Supp. 2d 319, 323 (S.D.N.Y. 1998) (internal quotation marks omitted). This means that a plaintiff must show that defendants exercised "some control" over the corporate actions allegedly taken in New York. Id. Specifically, in order to make a "prima facie showing of control, a plaintiff's allegations must sufficiently detail the defendant's conduct so as to persuade a court that the defendant was a primary actor in the specific matter in question; control cannot be shown based merely upon a defendant's title or position within the corporation, or upon conclusory allegations that the defendant controls the corporation." Id. at 324 (internal quotation marks omitted). Where the plaintiff has made only broadly worded or vague allegations about a defendant's participation in the action allegedly taken in New York, courts have routinely granted motions to dismiss for lack of personal jurisdiction. See, e.g., Pilates, Inc. V. Current Concepts, 1996 WL 599654 (S.D.N.Y. Oct. 18, 1996); Sterling Interiors Group, Inc. v. Haworth, Inc., 1996 WL 426379 (S.D.N.Y. July 30, 1996).

Here, although the Amended Complaint alleges, in a purely
conclusory fashion, that "Lab123 and the Biosafe Entities acted for
the benefit of and with the knowledge and consent of the Individual
Defendants and the Individual Defendants exercised some control over
Lab123 and the Biosafe Entities in the matter," Am. Compl. ¶ 15,
there is no specific allegation that Connally or Jeremy Warner were
the primary actors in any of Lab123 or Biosafe's activities in New
York.  That Jeremy Warner was the Director of Business Development at
Biosafe, and that Connally was a member of the Board of Directors of
Lab123, as well as a member of the company's audit and compensation
committees, is not sufficient to establish a prima facie case of
jurisdiction based on agency.

Next, plaintiff argues that Jeremy Warner and Connally
"transact[] . . . business within the state" pursuant to § 302(a)(1).
In order to make out a prima facie case of jurisdiction pursuant to
302(a)(1), a plaintiff must plead facts showing that defendants
"purposefully avail[ed] [themselves] of the privilege of conducting
activities within [New York]," CutCo Industries v. Naughton, 806 F.2d
361, 365 (2d Cir. 1986) (internal citations and quotations marks
omitted; some alterations omitted), by transacting business in New
York, where the "cause of action arises out of the subject matter of
the transacted business."  Beatie & Osborn LLP v. Patriot Scientific
Corp., 431 F. Supp. 2d 367, 387 (S.D.N.Y. 2006).  Here, even if
Connally did attend a Lab123 board meeting in New York and did send
an email to Worden demanding to be taken off Worden's email
distribution list, this is not sufficient to show that Connally

conducted business in New York, and plaintiff's cause of action does
not appear to arise out of either of these alleged New York
activities.  As to Jeremy Warner, his limited email contact with
Barron analyst Matthew Samuel is not sufficient to establish that he
conducted business in New York, and, again, there is no substantial
relationship alleged between plaintiff's cause of action and Warner's
email activities.  See Cutco, 806 F.2d at 365; Nat'l Tele. Directory
Consultants, Inc. v. Bellsouth Advert. & Pub. Corp., 25 F.Supp.2d
192, 197 (S.D.N.Y. 1998).

    Finally, plaintiff alleges that Connally and Jeremy Warner
committed torts outside of New York that caused injury within New
York while (i) "regularly do[ing] or solicit[ing] business, or
engag[ing] in any other persistent course of conduct, or deriv[ing]
substantial revenue from goods used or consumed or services rendered"
in New York; or (ii) "expect[ing] . . . the act to have consequences
in the state and deriv[ing] substantial revenue from interstate or
international commerce."  However, plaintiff has failed to establish
a prima facie case of jurisdiction under 302(a)(3).  To begin with,
it is not even clear what torts Connally or Jeremy Warner allegedly
committed.  The Amended Complaint contains the conclusory allegation
that "Jeremy Warner assisted in the preparation of the false
financial statements, and repeated the contents therein to Plaintiff.
Further, Jeremy Warner directly made written and oral
misrepresentations and/or omissions to Plaintiff regarding the
financial condition, position, outlook and earnings of [Biosafe] and
Lab123."  Am. Compl. ¶ 48.  However, it provides no details or

specific factual allegations whatsoever.  On the contrary, with regard to Warner's specific contacts with Barron, plaintiff alleges only that Jeremy Warner was involved in various email exchanges with Barron analyst Matthew Samuel.  It does not allege that these email exchanges contained fraudulent information or were otherwise tortious.[8]  Moreover, plaintiff's allegations "[u]pon information and belief" that each of the Individual Defendants completed and/or reviewed the fraudulent responses to Barron's Due Diligence Questionnaire and Director & Officer Form, Am. Compl. ¶¶ 54, 97, are insufficient to establish a prima facie showing that Connally or Jeremy Warner committed fraud or any other tort.  The same is true of the fact that Connally signed the purportedly fraudulent SB-2 Forms filed with the SEC, Rich Decl., Exs. S, Y.  Nor, at least with regard to the fraudulent Forms SB-2, has plaintiff alleged that these forms caused any injury in New York.

Furthermore, § 302(a)(3)(i) requires that defendants engage in "ongoing activity within New York State" that is regular, persistent or substantial, Ingraham v. Carroll, 90 N.Y.2d 592, 597 (1997)(emphasis in original).  See Hearst Corp. v. Goldberger, 1997 WL 97097, at *14 (S.D.N.Y. Feb. 26, 1997).  For the reasons set forth above, despite plaintiff's conclusory allegation that "[u]nder N.Y. C.P.L.R. 302(a)(3)(i), Connally and Warner 'regularly do or solicit

---

[8] The most specific reference to any tortious conduct on the part of Jeremy Warner is plaintiff's allegation, "on information and belief," that he diverted a corporate opportunity from Biosafe to another corporate entity that he and his father controlled.  However, plaintiff has not alleged that this tort caused them any injury in New York.

business, or engage in another persistent course of conduct, or derive substantial revenue from goods used or services rendered, in the New York State," plaintiff has not made a prima facie showing that either Jeremy Warner or Connally engaged in any ongoing activity in New York.  Plaintiff Barron Partners, LP's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Complaint, at 14 (alterations omitted).  Therefore, the motion to dismiss defendants Connally and Jeremy Warner for lack of personal jurisdiction is granted.

In sum, for the foregoing reasons, defendants' motion to dismiss defendants Connally and Jeremy Warner for lack of personal jurisdiction is granted, as is the motion to dismiss Counts 6 and 9 for failure to state a claim.  In all other respects, defendants' motion to dismiss is denied.  Counsel for the parties are hereby instructed to jointly call Chambers on Tuesday, July 29, 2008, at 5 p.m., to schedule further proceedings in this case.

SO ORDERED.

_____
JED S. RAKOFF, U.S.D.J.

Dated:    New York, New York
          July 25, 2008